## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **HARMEL S. RAYAT, and RENOVACARE, INC.** <br><br> **Defendants.** | **No. 1:21-cv-4777** <br><br> **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Harmel S. Rayat ("Rayat") and RenovaCare, Inc. ("RenovaCare" or "company"), alleges as follows:

## <u>SUMMARY OF ALLEGATIONS</u>

1.      From at least July 2017 until January 2018, RenovaCare and Rayat, the company's controlling shareholder, defrauded investors by soliciting StreetAuthority, LLC ("StreetAuthority"), an online financial publishing company, to run a promotion designed to increase RenovaCare's stock price and trading volume, and then concealed their involvement in the promotion from investors.  Rayat worked closely with StreetAuthority on the promotion.  He provided false information to StreetAuthority regarding the efficacy of RenovaCare's experimental burn-wound healing medical device called the "SkinGun," edited StreetAuthority's promotional materials, advised StreetAuthority on how to distribute the promotion to enhance its

effectiveness, and arranged to pay StreetAuthority for the promotion using RenovaCare's funds that were routed through third parties.

2.      By January 2018, OTC Markets Group Inc. – the entity that supervised the market where RenovaCare's stock was quoted – learned of StreetAuthority's RenovaCare promotion and sent RenovaCare a letter demanding that the company make public disclosures concerning its involvement in the promotion.  On January 8, 2018, rather than acknowledging Rayat's and the company's involvement in the StreetAuthority promotion, Rayat and RenovaCare made and publicly disseminated a press release that contained material misrepresentations and omissions that denied *any* involvement in StreetAuthority's promotion.

3.      By engaging in the conduct described in this Complaint, Rayat and RenovaCare violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and RenovaCare violated Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rules 15d-11 and 12b-20 thereunder, 17 C.F.R §§ 240.15d-1 & 240.12b-20.  Rayat also aided and abetted RenovaCare's deceptive acts and false statements pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).  Unless restrained and enjoined, Defendants will engage in further violations of these provisions.

4.      The Commission respectfully requests, among other things, that the Court enjoin Defendants from committing further violations of the Federal securities laws as alleged in this Complaint, order Defendants to pay civil monetary penalties, bar Rayat from participating in any offering of a penny stock and serving as an officer or director of a public company, and order other appropriate and necessary equitable relief.

2

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§78u(d)-(e) & 78aa(a).

6.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(c)(3).  During the time period alleged in this Complaint, RenovaCare was headquartered and transacted business in this District, and its shares traded on the OTCQB Tier, the interdealer quotation system operated by OTC Markets Group, Inc. ("OTC Markets"), which was headquartered in this District.  In addition, certain of the transactions, acts, practices, and courses of conduct constituting the violations alleged in this Complaint occurred within this District.  Among other things, Rayat participated in telephone calls and email exchanges with RenovaCare representatives located in this District concerning the drafting and issuing of the false press release, and RenovaCare sent the deceptive payments to its third-party investor relations consultants for the StreetAuthority promotion through an account with a bank located in this District.  Rayat also conducts substantial business in the United States and owns several commercial properties in Arizona for investment purposes.

7.     Rayat is a Canadian citizen who engaged in fraudulent conduct in the United States and in Canada that had a foreseeable and substantial effect upon United States investors and the OTC market.  In connection with the violations alleged in this case, Rayat traveled to the United States on at least two occasions as an agent for RenovaCare to discuss StreetAuthority's promotion of RenovaCare.  He had frequent contact with StreetAuthority and RenovaCare employees and consultants in the United States, including in this District, over the phone, email, and other interstate means in furtherance of StreetAuthority's promotion of RenovaCare and to draft and issue the company's false press release that is the subject of this Complaint.  When

reviewing, approving, and transmitting the false press release to RenovaCare's CEO for dissemination to the public, Rayat frequently communicated over the telephone and email with at least one RenovaCare representative who was located in this District. Rayat also knew that the false press release was prepared in response to an inquiry from OTC Markets, which was based in this District, and would be disseminated to investors throughout the United States, including in this District.

8.     Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails, including the use of email, telephone, and the internet in connection with illegal acts alleged in this Complaint, certain of which occurred within this District.

## **DEFENDANTS**

9.     **Harmel S. Rayat**, ("Rayat") age 59, is a Canadian citizen and resident of Vancouver, British Columbia. Through his wholly owned holding company Kalen Capital Corporation ("Kalen"), Rayat has been the majority and controlling shareholder of RenovaCare, Inc. since at least 1999. As of January 1, 2021, Rayat owned 71,101,453 million shares of common stock, or 81.3 percent of the company's outstanding shares of common stock. Rayat has also served as RenovaCare's Chairman of the Board of Directors.

10.     **RenovaCare, Inc.** ("RenovaCare" or "company") is a Nevada corporation that is currently headquartered in Roseland, New Jersey. During the time period at issue in this Complaint, RenovaCare was headquartered at 430 Park Avenue, New York, New York. RenovaCare is a development stage company with no revenues, but claims to be developing a "SkinGun" medical device and "CellMist" system for the treatment of skin burns through the rapid regeneration of skin cells.

4

11.    RenovaCare had securities registered with the Commission pursuant to Exchange Act Section 12(g) until August 3, 2016, when it filed a Form 15 to terminate the registration. RenovaCare is currently quoted on the OTC Pink Open Market Tier, operated by OTC Markets under the ticker symbol "RCAR."  During the time period relevant to this Complaint, the company's stock constituted a penny stock because it did not meet any of the exceptions from the definition of a "penny stock" pursuant to Exchange Act Section 3(a)(51), 15 U.S.C. § 78c(a)(51), and Exchange Act Rule 3a51-1, 17 C.F.R. § 240.3a51-1.

12.    RenovaCare was originally incorporated in Utah on July 14, 1983, as "Far West Gold, Inc."  On May 20, 1999, the company changed its name to "WhatsOnline.Com, Inc.," and Rayat became, and ever since has been, the company's majority and controlling shareholder. The company later made several other name changes, until January 7, 2014, when it changed its name to RenovaCare.

## OTHER RELEVANT ENTITIES

13.    **StreetAuthority, LLC**, ("StreetAuthority"), was an online financial publishing and research company based in Austin, Texas, that sold subscriptions to its investment research bulletins and newsletters during the time period at issue in this Complaint.  It was owned and operated by a long-time friend of Rayat ("StreetAuthority Owner").

14.    **Company A** is a company whose stock is quoted on the OTC Markets that purports to be developing and marketing windows for residential and commercial buildings that generate electricity from solar energy.  During the time period at issue in this case, Rayat was a controlling shareholder of Company A.

**FACTS**

I.    **Rayat And RenovaCare Solicited StreetAuthority To Run A Promotional Campaign To Increase The Price And Trading Volume Of RenovaCare's Stock And Then Concealed Their Involvement In It**

15.    By July 2017, Rayat owned approximately 65 percent of RenovaCare's stock (approximately 52 million shares), and was the company's controlling shareholder.  At that time, Rayat, on behalf of RenovaCare, solicited StreetAuthority, an online financial publisher of investment newsletters with a dedicated subscriber base, to run a promotional campaign for RenovaCare and Company A, another company in which Rayat was the controlling shareholder. Rayat was interested in the promotion because he wanted to increase RenovaCare's stock price and trading volume, which would benefit him and his close associates who owned the company's stock.

16.    From the outset, Rayat worked closely with StreetAuthority on the campaign. Among other things, Rayat, on behalf of RenovaCare, reviewed StreetAuthority's promotional materials, and provided StreetAuthority with information on the company, including false information regarding the efficacy of the "SkinGun," the company's experimental medical device for treating burn wounds.

17.    Rayat also arranged for RenovaCare to pay StreetAuthority $50,000 per month for the promotion, and arranged for the payment to be made through third parties for the fraudulent purpose of concealing Rayat's and the company's involvement.

A.    **Rayat Solicited StreetAuthority To Promote RenovaCare's Stock**

18.    Rayat was a long-time friend of the StreetAuthority Owner.  While he was RenovaCare's controlling shareholder, on or about July 26, 2017, Rayat solicited the StreetAuthority Owner to start a promotional campaign for RenovaCare and Company A.  That

day, Rayat spoke to the StreetAuthority Owner on the phone, and later emailed marketing materials related to RenovaCare's SkinGun to the StreetAuthority Owner.

19.     On July 28, 2017, the StreetAuthority Owner suggested to Rayat that StreetAuthority feature RenovaCare and Company A in its annual "Predictions Report."  The StreetAuthority Owner noted that this could "create awareness of both companies" and persuade StreetAuthority subscribers to invest in RenovaCare and Company A.  The StreetAuthority Owner further stated that StreetAuthority was interested in "partnering up" with Rayat to advertise on various online media platforms.  In response, Rayat agreed it was a "great idea," and then arranged to discuss the proposal in more detail.

20.     Between July 28 and August 31, 2017, Rayat discussed the details of the promotion with StreetAuthority representatives on several occasions, including an in-person meeting at StreetAuthority's headquarters in Austin, Texas, in late August, 2017.

21.     On September 4, 2017, shortly after Rayat's trip to Austin, the StreetAuthority Owner emailed Rayat to discuss several different marketing strategies in which StreetAuthority could promote RenovaCare and Company A, and asked if Rayat was "interested in exploring and participating in this marketing program."

22.     Later that day, Rayat responded that "nothing would make me happier than working with [the StreetAuthority Owner and other StreetAuthority representatives] in spreading the word to investors and dramatically improving [RenovaCare's and Company A's] awareness in the investment community, which I wholeheartedly believe will help the companies raise additional capital and get senior listings, which in turn will allow institutional investors to jump in."  Rayat further noted that he was "very interested in exploring how [they could] work together," and suggested they speak the next day.

23.    The discussions between Rayat and StreetAuthority about the creation of a RenovaCare and Company A promotion continued into October 2017.

**B.    Rayat Concealed His And The Company's Involvement In The Promotion By Arranging For RenovaCare's Payments To StreetAuthority To Be Paid Through Third Parties**

24.    Before StreetAuthority launched its promotion of RenovaCare and Company A, the StreetAuthority Owner and Rayat orally agreed that StreetAuthority would receive a $100,000 per month for the promotion that would be split between the two companies. StreetAuthority agreed to use that money to pay for advertising and other distribution costs relating to the publication and dissemination of its promotion of RenovaCare and Company A.

25.    Rather than have RenovaCare and Company A pay StreetAuthority directly, Rayat arranged for the companies to pay StreetAuthority through a third-party investor relations company that Rayat had hired in the past for other promotional campaigns ("Investor Relations Company A").  Rayat arranged for RenovaCare to pay Investor Relations Company A $2,500 per month, and the only service Investor Relations Company A provided in exchange for this money was to prepare invoices and route payments between RenovaCare and StreetAuthority.  Rayat provided the same arrangement as to Company A.

26.    Rayat devised this deceptive payment scheme on behalf of RenovaCare to conceal from the investing public that RenovaCare was, in fact, paying StreetAuthority for the promotion.  Rayat knew, or was reckless in not knowing, that StreetAuthority would have to disclose in its promotional materials any payments RenovaCare made to StreetAuthority pursuant to Section 17(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(b). In 2000, Rayat had settled a case with the Commission in which he was charged with violating

Section 17(b) of the Securities Act. *SEC v. EquityAlert.Com, Inc. and Harmel S. Rayat*, No. cv-00-146 (D. Ariz. Aug. 24, 2000).

27.    For example, the disclosures in StreetAuthority's RenovaCare and Company A promotional materials pursuant to Securities Act Section 17(b) stated that StreetAuthority did "not receive any direct cash payments in connection with the production of paid advertisements" for Company A and RenovaCare. Rayat, however, arranged for the investor relations company, not RenovaCare, to make the direct payments to StreetAuthority. Rayat's payment arrangement – that concealed the company's and its controlling shareholder's involvement in and potential financial incentives to StreetAuthority in promoting the stock – had the effect of reducing investor skepticism regarding the truthfulness of the campaign by making it appear to investors that StreetAuthority was offering an objective and fair assessment of RenovaCare's stock.

28.    Throughout StreetAuthority's campaign, RenovaCare and Company A funneled money through Investor Relations Company A to Street Authority, until another investor relations company that Rayat selected ("Investor Relations Company B"), replaced Investor Relations Company A on or around January 4, 2018.

29.    RenovaCare's CEO approved all of the payments from RenovaCare to Investor Relations Company A and Investor Relations Company B, while he knew, or was reckless in not knowing, that they were ultimately going to StreetAuthority for the promotion. On November 9, 2017, for example, RenovaCare's CEO approved the company to pay $46,000 to Investor Relations Company A based on invoices Investor Relations Company A sent RenovaCare's CEO charging the company $43,500 for the StreetAuthority promotion and $2,500 for Investor Relations Company A's monthly retainer.

30.     In all, by January 4, 2018, RenovaCare paid approximately $90,000 to StreetAuthority through these two investor relations companies.

**C.     Rayat Worked Closely With StreetAuthority To Create And Disseminate A Promotion Of RenovaCare**

31.     By at least September 2017, StreetAuthority began drafting materials for its RenovaCare and Company A promotion, and it publicly released the promotion on or about October 24, 2017.  StreetAuthority disseminated the promotional materials in emails to its subscriber base, as well as on the internet more broadly in banners advertisements on internet search engines, social media sites, and other internet platforms.  A key piece of the promotion were certain periodic reports such as an annual "Predictions Report" for the next calendar year, of which the success of RenovaCare's and Company A's products were StreetAuthority's lead "predictions."

32.     Rayat actively worked with StreetAuthority to create StreetAuthority's promotional materials, including the Predictions Report.  He regularly provided information to StreetAuthority to use for its promotion, and he reviewed and commented on draft promotional materials prior to their release.

33.     StreetAuthority's promotional materials highly touted RenovaCare.  For example, the promotional materials claimed that the SkinGun was a "revolutionary wound-healing device," and encouraged readers to buy RenovaCare stock and hold it for "10, 20x, even 40x gains."

34.     In describing the basis for its recommendation, StreetAuthority's promotional materials described a case study of one patient who had severe burns on his arm ("Patient A") that the SkinGun purportedly healed *in three days*.  The promotional materials further showed the following purported "before" and "after" SkinGun-treatment pictures of Patient A:



35.     However, the SkinGun did not heal Patient A's wounds in three days; after treatment, Patient A's skin remained discolored for over a year.  Furthermore, the "before" photo was *not* Patient A's arm, and the "after" picture was taken approximately five years after Patient A's injury, not three days.

36.     Rayat provided materials containing these false pictures and claims about Patient A's SkinGun treatment to StreetAuthority.  On July 26, 2017, Rayat emailed RenovaCare marketing materials to StreetAuthority that contained Patient A's false before-and-after pictures, and on September 21, 2017, Rayat emailed StreetAuthority additional marketing materials that contained the false claim that the SkinGun healed Patient A's arm in three days.

37.     When sending these materials to StreetAuthority, Rayat knew, or was reckless in not knowing, that the materials contained false information and would be disseminated to investors.  RenovaCare employees had discussed the actual results of Patient A's treatment with Rayat, and sent Rayat an accurate summary of his treatment, as early as July 23, 2014.  The summary Rayat received that day explained that Patient A's arm took months to heal, and it contained accurate pictures illustrating the treatment, and not the pictures of Patient A that Rayat later sent to StreetAuthority.

38.     StreetAuthority's promotional materials also claimed that the SkinGun "could soon be approved by the FDA [Food and Drug Administration]. . . . RenovaCare has submitted a 510(k) filing to the FDA, which permits the marketing of a medical device.  Now it's just a

11

matter of waiting on the FDA … so this device can be rolled out at every burn unit in the country."

39.    However, RenovaCare did not have a pending 510(k) filing with the FDA at the time; in fact, it had only applied to the FDA for approval to use in clinical studies, not in general clinic or hospital settings, and RenovaCare had withdrawn that application more than a year earlier.

40.    Prior to their release to the investing public, Rayat reviewed draft promotional materials that contained both of these false claims, but did nothing to correct them.  On October 3, 2017, the StreetAuthority Owner emailed Rayat a draft Predictions Report that contained the false statements and pictures concerning Patient A's SkinGun treatment and the SkinGun's status with the FDA.  After reviewing the draft, Rayat called the StreetAuthority Owner to suggest at least one change concerning the possibility of the FDA's approval of the SkinGun, but he did not suggest that StreetAuthority correct the false statements in the draft.  StreetAuthority subsequently made Rayat's suggested change to its promotional materials.

41.    In addition, internal StreetAuthority documents reflect three versions of draft StreetAuthority promotions of RenovaCare and Company A dated October 10, 2017, that are entitled "Harmel changes," including one draft that contained an internal comment from a StreetAuthority representative indicating that he was deleting certain language in the draft because the deleted language contained something that "Har[m]el doesn't want us to talk about."

42.    When reviewing the draft promotional materials concerning RenovaCare, Rayat knew, or was reckless in not knowing, that the statements about the FDA approval were false. Shortly before that time, in an email between Rayat and an acquaintance on April 14, 2017,

Rayat discussed RenovaCare's regulatory strategy, and Rayat explained that RenovaCare did not have a pending 510(k) application.

43.    From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials on the internet and to its subscriber base.

44.    Throughout this time, Rayat continued to be involved in the drafting of StreetAuthority's promotional materials, and he was closely involved in its distribution and dissemination.  For example:

a.   At an in-person meeting at StreetAuthority's headquarters in Austin, Texas, on or around November 27, 2017, Rayat and several StreetAuthority representatives reviewed StreetAuthority's distribution and dissemination of the promotional materials.  The StreetAuthority representatives discussed the various advertisements they were running with Rayat, and Rayat gave directions to StreetAuthority on how it could more effectively run the campaign.  Rayat also provided additional edits to StreetAuthority's promotional materials.  After the meeting, StreetAuthority implemented at least some of Rayat's directions.

b.   On or around December 3, 2017, Rayat sent StreetAuthority new advertisements that he wanted StreetAuthority to disseminate, and StreetAuthority representatives incorporated those advertisements into the promotional campaign.

c.   On or around December 15, 2017, Rayat approved a change in StreetAuthority's format for how StreetAuthority advertised its promotion on one online platform.

### D. StreetAuthority's Promotion Of RenovaCare Was Successful

45.     The promotional campaign that Rayat solicited, concealed the payments for, and worked closely with StreetAuthority to create and distribute was a success.  During the course of the promotional campaign, internet users clicked on tens of thousands of RenovaCare ads created by StreetAuthority.  For instance, one of the several online platforms StreetAuthority used to promote RenovaCare alone generated over 20,000 clicks from internet users.

46.     RenovaCare stock saw an uptick in volume and price that correlated with StreetAuthority's promotional campaign.  On October 23, 2017, RenovaCare's stock price closed at $3.10 per share, and by January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase.

## II. In Response To A Regulatory Inquiry, RenovaCare And Rayat Made And Issued A Materially False Press Release Denying Their Involvement In StreetAuthority's Promotional Campaign

### A. On January 3, 2018, OTC Markets Demanded RenovaCare Make Disclosures Concerning StreetAuthority's Promotion

47.     On or around January 2, 2018, OTC Markets, which supervised the OTCQB Tier in which RenovaCare's stock was quoted, learned of StreetAuthority's promotion.

48.     OTC Markets has a strict disclosure policy regarding company promotions, as the motivation to provide false information through such campaigns could severely impact the integrity of the OTC Markets.  As a result, companies that violate the disclosure policies can be removed from OTCQB Tier and relegated to the more risky OTC Pink Open Market Tier, which could have a material impact on the stock's trading and negatively affect its price.

49.     Consistent with this policy, on January 3, 2018, OTC Markets sent RenovaCare a letter requiring the company make public disclosures relating to StreetAuthority's promotional campaign.

50.     OTC Markets' January 3, 2018 letter demanded that RenovaCare issue a press release concerning its involvement in the StreetAuthority promotion, including:

    a.  "the date on which the Company became aware of the promotional activities;"

    b.  "[a] written summary of the Company's understanding of the promotional activities," and "[i]f the company was involved in the dissemination or payment of promotional material, … direct language describing the company's involvement and a description of any engagements and/or agreements relating to the promotional material;"

    c.  "whether the company has editorial control over the content in the promotional materials;" and

    d.  "[w]hether, after inquiry of management, the directors and control persons, its officers, directors, any controlling shareholders (defined as shareholders owning 10% or more of the company's securities), or any third party service providers have, directly or indirectly, been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials related to the Company and its securities."

**B.     Rayat And RenovaCare Made And Issued A Materially Press Release Falsely Denying Any Involvement In StreetAuthority's Promotional Campaign**

51.     Rayat was instrumental in drafting and disseminating RenovaCare's press release in response to OTC Market's demand.  Rayat was in the best position to provide the substantive detail in response to OTC Market's inquiry because, on behalf of RenovaCare, he had solicited StreetAuthority to run the campaign, concealed RenovaCare's payments to them, and worked closely with them to create and disseminate the promotion.

15

52.     On January 3, 2018, Rayat had several conference calls with RenovaCare's CEO, RenovaCare's director and outside counsel ("RenovaCare's Director"), and a third-party consultant to discuss the company's strategy in responding to OTC Markets.

53.     By at least January 4, 2018, Rayat began working on a draft of the press release to respond to the issues raised by OTC Markets.

54.     On January 4, 2018, Rayat again had several conference calls with RenovaCare's Director, RenovaCare's CEO, and a third-party consultant to discuss the draft press release.

55.     On January 5, 2018, RenovaCare's Director emailed Rayat, RenovaCare's CEO, and a third-party consultant to request a follow-up conference call in the next few days "to discuss/review and edit the revised draft" of the press release. Shortly thereafter, Rayat replied to suggest they talk on January 7, 2018, and noted that he would send his comments on the draft press release later by the following day. That day, Rayat also had several calls with RenovaCare's Director to discuss the draft.

56.     On January 7, 2018, Rayat, RenovaCare's CEO, and RenovaCare's Director again discussed RenovaCare's draft press release, and a draft press release dated shortly after the call contained only minor differences from the draft the company would ultimately issue.

57.     On January 8, 2018, at 12:57 p.m., Rayat emailed RenovaCare's CEO a final version of the draft press release, and instructed the company to add its boilerplate "about us" and "disclaimer" language to the draft.

58.     A few minutes later, at 1:14 p.m., RenovaCare's CEO forwarded the draft press release to Investor Relations Company B, noting that it was the final draft of the press release. As Rayat had instructed, RenovaCare's CEO requested that the consultant add the "about us" and "disclaimer" language, then issue the press release at 3:45 p.m.

59.     Rayat possessed the knowledge required to answer OTC Market's inquiry regarding the StreetAuthority campaign and had ultimate control of the content and dissemination of the press release to the public.  Rayat's continuous involvement in the press release's drafting, culminating in his January 8, 2018 email to RenovaCare's CEO, followed by the CEO's response, demonstrates Rayat's authority and control over the content of the statement and his intent to disseminate it to the public.

60.     On January 8, 2018, at 3:45 p.m., RenovaCare publicly issued the press release drafted by Rayat and RenovaCare and responding to OTC Markets' inquiry via BusinessWire ("January 8 Press Release").  It was not signed by any individual.

61.     On January 12, 2018, RenovaCare publicly filed a Form 8-K with the Commission, signed by RenovaCare's CEO, that attached a copy of the January 8 Press Release.

62.     Rather than fairly and accurately disclose Rayat's and RenovaCare's continuous and on-going relationship with StreetAuthority from the outset of StreetAuthority's promotional campaign, the January 8 Press Release contained numerous material misrepresentations and omissions that concealed Rayat's and RenovaCare's involvement in it.

63.     First, the January 8 Press Release stated that RenovaCare conducted an inquiry of all relevant persons, including controlling shareholders such as Rayat, "regarding their involvement in the creation or distribution of promotional materials," and stated that "the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly[] **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities."  (emphasis in original).

64.     This statement was materially false.  Rayat was involved in the creation of StreetAuthority's promotional materials by providing information to StreetAuthority from the outset and reviewing and commenting on drafts before and during the promotion.  Rayat was also involved in the distribution of StreetAuthority's promotional materials by consulting with StreetAuthority on several occasions concerning its distribution strategy and suggesting and approving changes to the promotion that StreetAuthority implemented.

65.     In addition, Rayat, RenovaCare's CEO, and the company's third-party investor relations consultants were all involved in the distribution of StreetAuthority's promotional materials by arranging for and working together to pay StreetAuthority $50,000 per month to cover StreetAuthority's distribution costs for the promotion.

66.     Second, the January 8 Press Release claimed that RenovaCare was "not affiliated in any way with the authors of the annual predictions report or its publisher."  This was materially false.  RenovaCare was affiliated with StreetAuthority because the company was paying StreetAuthority $50,000 per month to run StreetAuthority's promotion, including its annual Predictions Report.  The company was also affiliated with StreetAuthority because Rayat had been working closely with StreetAuthority on the promotion as RenovaCare's agent.

67.     Third, the January 8 Press Release claimed that RenovaCare "had no editorial control over the content" of StreetAuthority's RenovaCare-related promotional materials.  This was materially false.  Rayat, acting as an agent for the company, reviewed and commented on StreetAuthority's promotional materials before and throughout StreetAuthority's promotional campaign, and on several occasions, StreetAuthority incorporated Rayat's changes before publicly releasing the promotional materials.

18

68.     Fourth, the January 8 Press Release stated that RenovaCare "was not involved in the creation, or directing the dissemination, of [StreetAuthority's Predictions] report." This statement was materially false. Rayat, on behalf of RenovaCare, was involved in the creation of the Predictions Report by providing information to StreetAuthority to include in the report and by reviewing and commenting on drafts before and during the promotion. Rayat, on behalf of RenovaCare, was also involved in directing the dissemination of the report by discussing StreetAuthority's plan for disseminating the promotional materials and suggesting and approving changes to its dissemination on several occasions. In addition, RenovaCare provided StreetAuthority the funding for the dissemination of StreetAuthority's promotional materials.

69.     Fifth, the January 8 Press Release contained material omissions, including specific information required by OTC Markets, that, if addressed, would have required Rayat and RenovaCare to admit to some awareness and involvement in StreetAuthority's campaign. OTC Markets required that RenovaCare disclose "the date on which it became aware of the promotional activities," and yet the company failed to disclose that Rayat, on behalf of the company, was aware of the campaign since at least July 2017, and that RenovaCare's CEO was aware of the campaign by at least November 2017 when he authorized RenovaCare to pay Investor Relations Company A for expenses relating to the promotion.

70.     The misrepresentations and omissions in the January 8 Press Release were material. The potential for small companies with illiquid and low-priced shares to fund false promotional campaigns to increase company's stock price and trading volume to benefit corporate insiders and controlling shareholders, as was done here, is precisely why RenovaCare's false January 8 Press Release is material. OTC Markets' disclosure policy seeks to address this very issue. RenovaCare's compliance with OTC Markets' policies on company promotions, if

19

violated, could result in the Company's removal from the OTCQB Tier and be relegated to the lesser traded OTC Pink Open Market Tier, which could have a substantial impact on the stock's trading and negatively affect its price.

71.    In fact, on February 26, 2018, OTC Markets downgraded RenovaCare's stock to the OTC Pink Open Market Tier and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's company profile due to the on-going promotional activity.  The company's stock price simultaneously dropped approximately 30 percent, from $9 per share to $6.28 per share.

72.    Consistent with OTC Markets' disclosure policy, a reasonable investor would have wanted to know, in making an investment in RenovaCare stock, that RenovaCare's controlling shareholder was assisting a promotional campaign encouraging investors to purchase RenovaCare stock and covering up the source of the funding for the promotional campaign.

73.    RenovaCare and Rayat knew, or were reckless in not knowing, that the January 8 Press Release was false when they made and issued it to the investing public.  Given his personal participation in the StreetAuthority promotion in the months leading up to the January 8 Press Release as alleged in this Complaint, Rayat knew, or was reckless in not knowing, that the January 8 Press Release contained material misstatements and omissions that he approved in the final draft and sent to RenovaCare's CEO with instructions prior to disseminating it to the investing public.

74.    As an agent and controlling shareholder of RenovaCare, and the individual acting on behalf of RenovaCare with respect to the promotion, Rayat's knowledge is imputed to RenovaCare.  Furthermore, by January 8, 2018, RenovaCare's CEO was aware that the company was involved with StreetAuthority's promotional campaign, as he had previously approved several payments to the investor relations companies that he knew, or was reckless in not

knowing, that related to the StreetAuthority promotion.  The company also relied upon Rayat's knowledge of the promotional campaign when preparing the January 8 Press Release, included his substantive comments on the press release, and followed his directions when disseminating it to the public.

75.    Rayat also aided and abetted RenovaCare's deceptive conduct and materially false statements and omissions.  Rayat acted as RenovaCare's agent with respect to the StreetAuthority campaign.  He knowingly or recklessly substantially assisted RenovaCare's deceptive acts and materially false statements by providing StreetAuthority with false information about the company to include in its promotion of RenovaCare, participating in the drafting and dissemination of StreetAuthority's promotional materials, arranging for and making payments between RenovaCare and StreetAuthority through a third party to hide the source of RenovaCare's payments to StreetAuthority, and by participating in the drafting and disseminating of RenovaCare's fraudulent January 8 Press Release and related Form 8-K as alleged in this Complaint.

## III.    Rayat And His Associates Sought To, And Did, Profit From StreetAuthority's Promotion of RenovaCare

76.    Rayat made several attempts to take advantage of the impact of StreetAuthority's RenovaCare promotion.  Before the StreetAuthority campaign began, Rayat engaged in several transactions to increase his RenovaCare stock holdings at below-market prices.  On June 28, 2017, Rayat exercised warrants that granted his holding company, Kalen, over 114,000 shares, and on July 21, 2017, Rayat purchased another 410,000 shares from RenovaCare through a private placement at a price of $2.44 per share when the stock was trading over $3.00 per share.

77.    At the same time Rayat was working with StreetAuthority on the RenovaCare promotion, Rayat attempted to sell at least 500,000 RenovaCare shares through at least two

brokerages. The first brokerage closed Rayat's account before any sales could be made, and the compliance department of the second brokerage denied his request to open an account. For these reasons, the sales were never made.

78.     A number of Rayat's close associates also sought to benefit, and did benefit, from the increased stock price during this period. For example, right before the StreetAuthority promotion began, on October 16, 2017, a friend of Rayat's ("Friend A") purchased 900,000 shares directly from the company at a below-market price of $2.50 per share through a private placement by the company.

79.     In addition, while StreetAuthority's promotion was active, on February 12, 2018, RenovaCare filed a Form S-1 Registration Statement with the Commission seeking to register over 4 million restricted shares for public sale, including 2.42 million that Rayat owned, and Friend A's 900,000 shares that she just purchased in October 2017 at a below-market price.

80.     Rayat's other close associates successfully sold shares during the StreetAuthority promotion. For example, Rayat's long-time friend and the office manager of Rayat's real estate firm sold millions of dollars in RenovaCare stock at historically high prices while StreetAuthority's promotion was active.

### FIRST CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder**
(Against Rayat and RenovaCare)

81.     Paragraphs 1-4, 15-74, and 76-80 of this Complaint are re-alleged and incorporated by reference herein.

82.     By engaging in the conduct alleged in this Complaint, specifically by drafting and disseminating the January 8 Press Release and related Form 8-K containing materially false and misleading statements and omissions, Defendants, directly or indirectly, singly or in concert, in

connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83.     By reason of the foregoing, Defendants Rayat and RenovaCare, each violated, and unless restrained and enjoined will again violate, Exchange Act Section 10(b), 15 U.S.C. §78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5(a) & (c) Thereunder
(Against Rayat and RenovaCare)

84.     Paragraphs 1 through 1-4, 15-74, and 76-80 of this Complaint are re-alleged and incorporated by reference herein.

85.     By engaging in the conduct alleged in this Complaint, specifically by engaging in deceptive acts by participating in StreetAuthority's promotion of RenovaCare, providing StreetAuthority with false information for StreetAuthority's promotional campaign, participating in the drafting and dissemination of StreetAuthority's promotion, arranging for and making payments between RenovaCare and StreetAuthority through a third party to hide the source of RenovaCare's payments to StreetAuthority, and by participating in the drafting and dissemination of the materially false January 8 Press Release and related Form 8-K, Defendants, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, employed devices, schemes, or artifices to defraud, and

engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & (c).

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Exchange
Act Section 10(b) and Rule 10b-5(b) Thereunder**
(Against Rayat)

87.     Paragraphs 1-4 and 15-80 of this Complaint are re-alleged and incorporated by reference herein.

88.     By engaging in the conduct alleged in this Complaint, specifically by drafting and disseminating the false January 8 Press Release and related Form 8-K containing materially false statements and omissions, RenovaCare, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.     Rayat knew, or was reckless in not knowing, that RenovaCare was engaged in the unlawful conduct alleged in this Complaint, and he knowingly or recklessly substantially assisted and participated in the wrongdoing.  Rayat provided substantial assistance to RenovaCare by participating in the drafting and dissemination of RenovaCare's false January 8 Press Release and related Form 8-K.

90.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Rayat aided and abetted RenovaCare's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Exchange Act**
**Section 10(b) and Rule 10b-5(a) and (c) Thereunder**
(Against Rayat)

91.     Paragraphs 1-4 and 15-80 of this Complaint are re-alleged and incorporated by reference herein.

92.     By engaging in the conduct alleged in this Complaint, specifically by engaging in deceptive acts by participating in StreetAuthority's promotion of RenovaCare, providing StreetAuthority with false information for StreetAuthority's promotional campaign, participating in the drafting and dissemination of StreetAuthority's promotion, arranging for and making payments between RenovaCare and StreetAuthority through a third party to hide the source of RenovaCare's payments to StreetAuthority, and by drafting and disseminating the materially false January 8 Press Release and related Form 8-K, RenovaCare, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

93.     Rayat knew, or was reckless in not knowing, that RenovaCare was engaged in the unlawful conduct alleged in this Complaint, and he knowingly or recklessly substantially assisted and participated in the wrongdoing. Rayat provided substantial assistance to RenovaCare by participating in StreetAuthority's promotion of RenovaCare, providing StreetAuthority with false

information for StreetAuthority's promotional campaign, arranging for the payments between RenovaCare and StreetAuthority to hide the source of RenovaCare's payments to StreetAuthority, and by participating in the drafting and dissemination of RenovaCare's materially false January 8 Press Release and related Form 8-K.

94.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. 78t(e), Rayat aided and abetted RenovaCare's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) & (c).

### FIFTH CLAIM FOR RELIEF

**Violations of Exchange Act Section 15(d) and Rules 15d-11 and 12b-20 Thereunder**
(Against RenovaCare)

95.     Paragraphs 1-4, 15-44, and 47-74 of this Complaint re-alleged and incorporated by reference herein.

96.     Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rule 15d-11 thereunder, 17 C.F.R § 240.15d-1, require issuers of securities that have filed certain registration statements to file with the Commission annual, quarterly, and current reports.  Exchange Act Rule 12b-20, 17 C.F.R. § 240.12b-20, provides that in addition to the information expressly required in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

97.     RenovaCare was required to file annual and other financial reports with the Commission pursuant to Section 15(d) of the Exchange Act and Rule 15d-11 thereunder.

98.     RenovaCare filed the January 12, 2018 Form 8-K that contained materially false statements or failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

99.    By reason of the foregoing, RenovaCare violated Section 15(d) of the Exchange Act, and Rules 15d-11 and 12b-20 thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Permanently enjoin Defendants from violating the Federal securities laws alleged in this Complaint.

### II.

Order Defendants to pay civil money penalties pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

### III.

Permanently barring Rayat from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 21(d)(6), 15 U.S.C. § 78u(d)(6).

### IV.

Pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), permanently barring Rayat from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which are required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act

### V.

Grant such further relief as the Court may deem just and appropriate.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.

Dated: May 28, 2021     Respectfully submitted,

              s/ Matthew Scarlato
              Matthew Scarlato (*Pro Hac Vice* motion to be filed)
              SECURITIES AND EXCHANGE
              COMMISSION
              100 F Street, NE
              Washington, DC 20549-4473
              202-551-3749
              scarlatom@sec.gov

OF COUNSEL:

Brian Quinn
Darren Long
Daniel Weinstein
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549-4473