# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> HARMEL S. RAYAT, RENOVACARE, INC., JATINDER BHOGAL, JEETENDERJIT SINGH SIDHU, and SHARON FLEMING, <br><br> Defendants, <br><br> and <br><br> TREADSTONE FINANCIAL GROUP LTD., TREADSTONE FINANCIAL GROUP LLC, BLACKBRIAR ASSET MANAGEMENT LTD., and 1420527 ALBERTA LTD., <br><br> Relief Defendants. | No. 1:21-cv-04777-LJL <br><br> JURY TRIAL DEMANDED |

**[PROPOSED] AMENDED COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission"), for its Amended

Complaint against Defendants Harmel S. Rayat ("Rayat"), RenovaCare, Inc. ("RenovaCare" or

the "Company"), Jatinder Bhogal ("Bhogal"), Jeetenderjit Singh Sidhu ("Sidhu"), and Sharon

Fleming ("Fleming") (collectively, "Defendants"), and Relief Defendants Treadstone Financial

Group Ltd. ("Treadstone Ltd."), Treadstone Financial Group LLC ("Treadstone LLC"),

Blackbriar Asset Management Ltd. ("Blackbriar Ltd."), and 1420527 Alberta Ltd. ("Alberta

Ltd.") (collectively, "Relief Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case concerns a longstanding and wide-reaching fraudulent scheme to increase the share price and trading volume of the common stock of RenovaCare, a purported medical device company with no commercially available product and no revenue.  From at least 2007 to 2018 (the "Relevant Period"), Rayat, a recidivist securities law violator and majority and controlling shareholder of RenovaCare, orchestrated the scheme along with three long-time friends and business associates – Bhogal, Sidhu, and Fleming.

2.      Defendants' fraudulent scheme, which was essentially a "pump and dump" designed to artificially increase the share price and trading volume of RenovaCare stock to permit Defendants to sell shares at an inflated price, involved a number of steps, including:  (i) accumulating millions of shares of RenovaCare stock and distributing them among the Defendants; (ii) coordinating the registration of restricted shares for resale, and depositing them as "free trading" shares in brokerage accounts in the United States and Canada; (iii) promoting RenovaCare stock to investors through a paid third-party promotional campaign while intending to sell and selling – a practice known as "scalping;" (iv) disseminating materially false statements in a Company press release and a Form 8-K filed with the Commission, both of which denied any involvement in the promotional campaign orchestrated and funded by Defendants; (v) orchestrating RenovaCare press releases to coincide with the third-party promotion; and (vi) manipulative trading across multiple accounts to support the share price and trading volume of RenovaCare stock while selling over one million of shares to monetize the scheme.

3.      In organizing and executing this fraudulent scheme, Rayat and his associates were playing a "long game."  Beginning no later than 2007, Rayat transferred shares of RenovaCare

and other penny stocks to Sidhu, Bhogal, and others.  Rayat retained a financial interest in the shares he transferred – either in the form of debt obligations or preferred shares in the entities that received the shares.  This allowed Rayat to profit from the sale of shares by others during the promotional activity.

4.     Each of the individual Defendants played a role in the scheme, and they acted through and used RenovaCare as a vehicle for the fraud.  For example, Bhogal – Rayat's friend and long-time business associate, and a large shareholder of RenovaCare stock who also served as a consultant to the Company – played a central part in creating and maintaining RenovaCare's "investor relations" operation, including developing a company website, managing a series of third-party investor relations consultants, and managing the timing and content of RenovaCare's public press releases.

5.     By at least 2015, RenovaCare's investor relations program was in place, and Defendants engaged a series of third-party promoters to tout the Company and its common stock in focused promotional campaigns intended to increase its stock price and trading volume to permit them to profit.

6.     In July 2017, Rayat hired one such promoter, StreetAuthority, LLC ("StreetAuthority"), to conduct a promotional campaign focused on RenovaCare stock and the Company's experimental medical device called the "SkinGun."  Each year, StreetAuthority built a promotional campaign called the "Predictions Campaign" around an annual "Predictions Report" for the next calendar year.  After Rayat approached StreetAuthority and offered to fund the campaign, RenovaCare and another company owned by Rayat became StreetAuthority's lead "predictions."

7.     Rayat knowingly provided materially false information to StreetAuthority for use

in its promotional campaign aimed at "pumping" the share price and trading volume of RenovaCare stock.  This included false "before and after" pictures of a burn patient that was treated with a SkinGun prototype.

8.      From at least July 2017 through February 2018, Rayat organized, financed and directed StreetAuthority's efforts, which included a steady stream of "research" reports, emails, and advertisements that encouraged investors to buy RenovaCare stock.  During this promotional blitz – funded by RenovaCare – the Company issued press releases to bolster the StreetAuthority promotional campaign.  Bhogal was responsible for and worked on several press releases issued by the Company, all while knowing that StreetAuthority was promoting RenovaCare.

9.      Rayat, Bhogal, Sidhu, and Fleming intended to sell and all but Rayat sold RenovaCare stock while the StreetAuthority promotional campaign was ongoing – the textbook definition of scalping.  During this time, Bhogal, Sidhu, and Fleming's RenovaCare stock trading tracked key events in the StreetAuthority promotional campaign as well as each other's trading activity.

10.     While the Predictions Campaign was active, Bhogal sold millions-of-dollars of RenovaCare shares through Alberta Ltd., a company in which Rayat held a substantial financial interest.  Later in the scheme, Bhogal also placed at least two orders to buy RenovaCare stock that were intended to manipulate the market.

11.     Sidhu – Rayat's long-time business associate, and a former member of RenovaCare's board of directors – and the registration and deposit of Defendants RenovaCare shares during the Relevant Period.  He also sold millions-of-dollars of RenovaCare shares during the fraudulent scheme, using multiple brokerage accounts, and engaged in manipulative trading to further artificially inflate the market for RenovaCare stock.

12.     Fleming – a third party investor relations consultant to RenovaCare and an active participant in the StreetAuthority promotional campaign – sold over 50,000 RenovaCare shares during the fraudulent scheme, and engaged in manipulative trading to further artificially inflate the market for RenovaCare stock.

13.     While the scheme was ongoing, Defendants also took steps to conceal their role in the Predictions Campaign.  On January 8, 2018 – in response to an inquiry from OTC Markets Group, Inc. ("OTC Markets"), the entity that supervised the exchange on which RenovaCare stock was listed – Rayat, Bhogal, and RenovaCare made and publicly disseminated a materially false press release that denied *any* involvement in the StreetAuthority promotional campaign.

14.     As a result of the fraudulent conduct alleged below, Bhogal, Sidhu, and Fleming sold millions of shares of RenovaCare stock at artificially inflated prices and made over $7 million in ill-gotten gains, either directly or through the Relief Defendants, which were entities they owned and controlled and in which Rayat had substantial financial interests.

**VIOLATIONS AND RELIEF SOUGHT**

15.     By engaging in the conduct described in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; RenovaCare violated Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rules 15d-11 and 12b-20 thereunder, 17 C.F.R §§  240.15d-1 & 240.12b-20; Bhogal, Sidhu, and Fleming violated Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2); Rayat and Bhogal aided and abetted RenovaCare's violation of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e); Bhogal aided and abetted Rayat's and RenovaCare's violations of Section 17(a)

of the Securities Act, in violation of Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b); and, by acting through or by means of third parties, including StreetAuthority, RenovaCare's third-party investor relations consultants, and each other, Rayat, Bhogal, Sidhu, and Fleming violated Section 20(b) of the Exchange Act.15 U.S.C. § 78t(b).  Unless restrained and enjoined, Defendants will engage in further violations of these provisions.

16.     The Commission respectfully requests that the Court enter a judgment: (i) enjoining Defendants from committing further violations of the Federal securities laws as alleged in this Complaint; (ii) ordering Rayat, Bhogal, Sidhu, Fleming, and the Relief Defendants to disgorge their ill-gotten gains with prejudgment interest; (iii) ordering Defendants to pay civil monetary penalties; (iv) permanently barring Rayat, Bhogal, Sidhu, and Fleming from participating in any offering of a penny stock and serving as an officer or director of a public company; and (v) ordering other appropriate and necessary equitable relief.

### JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§78u(d)-(e) & 78aa(a) and Sections 20(b)-(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b)-(d) & 77v(a).  Among other things, the Defendants conducted business and engaged in the unlawful acts described herein, directly or indirectly, throughout the United States, using the means, instruments, or instrumentalities of interstate commerce and/or the mails, including the use of email, the internet, and telephone.

18.     Until August 3, 2016, RenovaCare had securities registered with the Commission pursuant to Exchange Act Section 12(g), at which time it filed a Form 15 to terminate the registration.  Thereafter, RenovaCare continued to regularly file forms with the Commission, including Forms 8-K.  During the Relevant Period, the company's stock was a penny stock

because it did not meet any of the exceptions to the definition of a "penny stock" pursuant to Exchange Act Section 3(a)(51), 15 U.S.C. § 78c(a)(51), and Exchange Act Rule 3a51-1, 17 C.F.R. § 240.3a51-1.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(c)(3) and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).  During part of the Relevant Period, RenovaCare was headquartered and transacted business in this District.  Throughout the events described here, RenovaCare's common stock (ticker symbol "RCAR") traded on the OTCQB Tier, an interdealer quotation system operated by OTC Markets Group, Inc. ("OTC Markets"), which is headquartered in this District.

20.     In addition, certain of the transactions, acts, practices, and courses of conduct constituting the violations alleged in this Complaint occurred within or touched upon this District.  The Defendants and Relief Defendants engaged in fraudulent conduct that had a foreseeable and substantial effect upon investors and markets in this District and throughout the United States.

21.     The StreetAuthority promotional campaign, which included material misrepresentations and omissions, was directed at investors, including those in this District.  At Rayat's direction, RenovaCare deceptively routed payments to StreetAuthority through a series of third-party investor relations consultants, using an account with a bank located in this District.

22.     Defendants had frequent contact with RenovaCare employees, outside counsel, and third-party consultants in the United States, including in this District, via telephone, email, and other means of interstate communications.  At least Rayat, Bhogal, and Fleming also had contact with StreetAuthority representatives in the United States using similar means.

23.     Bhogal and Sidhu organized, owned and controlled Canadian and U.S.-based

entities through which they owned and controlled and/or traded RenovaCare common stock.

Rayat repeatedly tried to open accounts with U.S.-based brokerage firms, and Bhogal, Sidhu,

Fleming, and the Relief Defendants traded RenovaCare shares in accounts with U.S.-based

broker-dealers, through U.S. exchanges, and/or wired the proceeds of those sales through

accounts held in the U.S. and Canada in furtherance of the unlawful conduct alleged herein.

## DEFENDANTS

24.     **RenovaCare** is a Nevada corporation that was headquartered at 430 Park Avenue,

New York, New York, during the Relevant Period.  It is now headquartered in Roseland, New

Jersey.  The Company has been through several name changes and changes in purported business

focus.  Most recently, on January 7, 2014, the Company changed its name to RenovaCare and

purportedly changed its business focus to medical devices.  It was and is a development stage

company with no revenue, but claims to be developing a medical device called the "SkinGun"

that uses a "CellMist" system to treat burns.

25.     **Rayat**, age 59, is a Canadian citizen and resident of Vancouver.  He has been the

majority and controlling shareholder of RenovaCare, Inc., or its predecessors since at least 1999,

and has at times served as its Chairman.  As of January 1, 2021, Rayat owned 71,101,453 million

shares of common stock (approximately 81.3 percent of the company's outstanding float), either

individually or through his wholly owned holding companies, Kalen Capital Corporation ("Kalen

Corp.") and Kalen Capital Holdings LLC ("Kalen LLC").

26.     **Bhogal**, age 42, is a Canadian citizen and resident of Vancouver.  During the

Relevant Period, Bhogal, individually or through companies he owned and controlled – including

Relief Defendant Alberta Ltd. – owned and controlled millions of shares of RenovaCare

common stock.  He received this stock in transactions financed or arranged by Rayat, in

exchange for debt or equity obligations to Rayat. Bhogal served as a "strategic advisor" to RenovaCare through his wholly owned consulting firm Vector Asset Management, Inc. from August 1, 2013, through June 26, 2018, when he was appointed RenovaCare's Chief Operating Officer. During the Predictions Campaign, Bhogal transacted in RenovaCare shares in furtherance of the scheme.

27.     **Sidhu**, age 49, is a Canadian citizen and resident of Vancouver. During the Relevant Period, Sidhu, individually or through companies he owned and controlled – including Relief Defendants Blackbriar Ltd., Treadstone Ltd., and Treadstone LLC – owned and controlled millions of shares of RenovaCare common stock. He received this stock either directly from Rayat, or in transactions financed by Rayat, in exchange for debt or equity obligations. Sidhu served on the Board of Directors of RenovaCare's predecessor entity from September 2008 through 2010. During the Predictions Campaign, Sidhu transacted in RenovaCare shares in furtherance of the scheme.

28.     **Fleming (a/k/a Sharon Hebgin)**, age 60, is a California resident and served as a third-party investor relations consultant to RenovaCare through her wholly owned consulting firm Inspiren LLC ("Inspiren"). During the Predictions Campaign, Fleming transacted in RenovaCare shares in furtherance of the scheme.

## **RELIEF DEFENDANTS**

29.     **Treadstone Financial Group Ltd.**, f/k/a 1422688 Alberta Ltd. ("Treadstone Ltd.") is a Canadian entity nominally owned and controlled by Sidhu's brother, but actually owned and controlled by Sidhu, through which he owned shares of RenovaCare common stock. During the fraudulent scheme, Sidhu sold certain of these RenovaCare shares and then wired the proceeds from an account in the United States to an account in Canada, generating ill-gotten

gains as to which Treadstone Ltd. has no legitimate claim.

30.     **Treadstone Financial Group LLC** ("Treadstone LLC"), a subsidiary of

Treadstone Ltd., is a Delaware corporation nominally controlled by Sidhu's brother, but in fact

owned and controlled by Sidhu, through which he owned shares of RenovaCare common stock.

During the fraudulent scheme, Sidhu transferred certain RenovaCare shares from Treadstone

Ltd. to an account in the United States in Treadstone LLC's name, sold the shares, and then

wired the proceeds to Treadstone Ltd.'s account in Canada, generating ill-gotten gains as to

which Treadstone LLC has no legitimate claim.

31.     **Blackbriar Asset Management Ltd.**, f/k/a Fargo West Investments Ltd.,

("Blackbriar Ltd.") is a Canadian entity owned and controlled by Sidhu, through which he owned

shares of RenovaCare common stock.  During the fraudulent scheme, Sidhu sold certain of these

RenovaCare shares through U.S.-based exchanges, generating ill-gotten gains as to which

Blackbriar Ltd. has no legitimate claim.

32.     **1420527 Alberta Ltd**. ("Alberta Ltd.") is a Canadian entity owned and controlled

by Bhogal, through which he owned shares of RenovaCare common stock.  During the

fraudulent scheme, Bhogal sold certain of these RenovaCare shares in an account in Alberta

Ltd.'s name through U.S.-based exchanges, and then wired the proceeds through U.S.-based

financial institutions to its account in Canada, generating ill-gotten gains as to which Alberta Ltd.

has no legitimate claim.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

33.     **StreetAuthority** was an online financial publishing company based in Austin,

Texas, that sold subscriptions to investment research bulletins and newsletters.  During the

Relevant Period, it was owned and operated by a long-time friend of Rayat (the "StreetAuthority

Owner").

34.     **Company A** is a company that purports to be developing windows that generate electricity from solar energy.  During the Relevant Period, Rayat was a controlling shareholder of Company A, and Bhogal and Sidhu were also substantial shareholders.  Bhogal served as a consultant to Company A from February 1, 2014, through his company Vector Asset Management LLC, and became a Director on August 1, 2017.  Sidhu was an employee of Company A before 2010.  Fleming was an investor relations consultant to Company A during the Predictions Campaign.  Company A was featured in the Predictions Campaign with RenovaCare based on Rayat's agreement, and similarly paid StreetAuthority through the same third-party investor relations consultants, including Fleming.

35.     **Investor Relations Consultant 1** ("IRC 1"), a long-time business associate of Rayat, Fleming, and Bhogal, was a third-party provider of investor relations services to Rayat and RenovaCare beginning no later than 2014.  He was replaced by Fleming to work on the Predictions Campaign around the time it began.

36.     **Investor Relations Consultant 2** ("IRC 2"), a long-time friend and business associate of both Rayat and Bhogal, was a third-party provider of investor relations services to Rayat and RenovaCare beginning no later than December 2017, when he was selected by Rayat and Bhogal to replace Fleming on the Predictions Campaign.

37.     **1420527 Alberta LLC** ("Alberta LLC"), a subsidiary of Alberta Ltd., was a Delaware corporation owned and controlled by Bhogal.  During the fraudulent scheme, Bhogal transferred RenovaCare shares between Alberta Ltd. and Alberta LLC and sold shares in an account owned by Alberta Ltd.

38.     **Boston Financial Group Ltd.** ("Boston Financial") is a Canadian entity owned

and controlled by Bhogal and his wife that received restricted shares of RenovaCare common stock from Rayat in exchange for preferred shares in Boston Financial.

39.     **Vector Asset Management Ltd.** ("Vector") is a Canadian company owned and controlled by Bhogal, through which Bhogal worked as a consultant to RenovaCare from August 1, 2013, until June 2018.

40.     **Wolverhampton Holdings LLC** ("Wolverhampton") is a Delaware company owned and controlled by Bhogal that purchased shares of RenovaCare common stock in June 2013 from a friend of Rayat with the proceeds of a loan from Rayat.

41.     **Blackbriar Asset Management LLC** ("Blackbriar LLC") a Delaware corporation owned and controlled by Sidhu, was used to open accounts in the United States and receive RenovaCare shares from Blackbriar Ltd.

42.     **Collingwood Holdings, LLC** ("Collingwood") is a Delaware company owned and controlled by Sidhu that purchased shares of RenovaCare common stock in June 2013 from a friend of Rayat with the proceeds of a loan from Rayat.  During the fraudulent scheme, Sidhu transferred certain of Collingwood's RenovaCare shares into one or more accounts in his own name and sold shares.

43.     **Kalen Capital Corporation** ("Kalen Corp.") is a Canadian company owned and controlled by Rayat and headquartered in Vancouver, British Columbia, through which he owns and controls a substantial portion of his holdings of RenovaCare and other penny stocks, as well as financial interests with Sidhu, Bhogal, and Fleming and entities they owned and controlled. Certain of the acts or transactions described here were undertaken by Rayat on behalf of Kalen Corp., including one or more attempts to open brokerage accounts to sell RenovaCare shares.

44.     **Kalen Capital Holdings LLC** ("Kalen LLC"), a subsidiary of Kalen Corp., is a

12

U.S.-based company owned and controlled by Rayat.  Certain of the acts or transactions described here were undertaken by Rayat on behalf of Kalen LLC, including one or more attempts to open brokerage accounts to sell RenovaCare shares.

## FACTS

I.    **Step One Of The Scheme (Setting the Table):  Defendants Accumulated RenovaCare Stock To Sell During The Scheme**

45.    Rayat has been the majority and controlling shareholder of RenovaCare, Inc. since at least 1999.  By no later than 2007, Rayat began distributing RenovaCare shares to his friends and business associates to ensure that he profited from promoting the Company even if he was unable to sell RenovaCare shares himself.

A.    **Between 2007 And 2013, Rayat Sold Millions of RenovaCare Shares To Sidhu And Bhogal, But Retained A Financial Interest**

46.    Between 2007 and 2013, Rayat sold millions of RenovaCare shares to entities owned and controlled by Sidhu and Bhogal, or financed their purchase of shares from other business associates.  These transactions allowed Bhogal and Sidhu to acquire millions of shares of RenovaCare stock for little or no money, and in exchange, Rayat received debt or equity interests that permitted him to maintain a financial interest in any later sale of these shares:

| Date | Entity | Beneficial Owner | RCAR Shares Purchased | Rayat Role | Rayat Financial Interest |
|------|--------|------------------|------------------------|------------|---------------------------|
| Dec. 31, 2007 | Blackbriar Ltd. (Relief Defendant) | Jeet Sidhu | 1,250,000 | Sold Shares | Preferred Shares of Blackbriar Ltd. redeemable for $1,062,500 |

13

| Dec. 31, 2007 | Boston Financial Group Ltd. | Jatinder Bhogal | 2,500,000 | Sold Shares | Preferred Shares of Boston Financial Group redeemable for $2,215,000 |
|---|---|---|---|---|---|
| Sept. 8, 2008 | Alberta Ltd. (Relief Defendant) | Jatinder Bhogal | 3,000,000[1] | Sold Shares | Preferred Shares of Alberta Ltd. redeemable for $8,351,000 |
| Sept. 8, 2008 | Treadstone Ltd. (Relief Defendant) | Jeet Sidhu | 1,250,000[2] | Sold Shares | Preferred Shares of Treadstone Ltd. redeemable for $3,741,500 |
| June 1, 2013 | Wolverhampton Holdings LLC | Jatinder Bhogal | 822,000 | Financed Purchase from third party | $425,000 loan at 4.7% annual interest |
| June 1, 2013 | Collingwood Holdings LLC | Jeet Sidhu | 1,962,000 | Financed purchase from third party | $1,200,000 loan at 4.7% annual interest |

47.     Defendants also obtained shares in private transactions with the Company.  In 2008, for example, Fleming acquired 300,000 RenovaCare shares in a private placement.  By October 2017, she still owned 153,630 shares of RenovaCare.

48.     Rayat also loaned substantial sums to Bhogal and Fleming.  In March 2013, for example, Rayat loaned $548,000 to Vector, the company through which Bhogal managed RenovaCare's investor relations operation.  In 2013, Rayat loaned Fleming $500,000 to allow

---

[1] Alberta Ltd. also received 2.8 million shares of Company A and shares in three other companies in this transaction.

[2] Treadstone Ltd. also received 1.25 million restricted shares of Company A and shares of three other companies in this transaction.

her to purchase an interest in a stock promotion company.

**B.     In Anticipation Of The Predictions Campaign, Rayat And Sidhu Orchestrated Additional Below-Market Sales Of RenovaCare Stock**

49.     In advance of the Predictions Campaign, Defendants engaged in several transactions that provided them with additional stock at below-market prices.  On June 28, 2017, for example, Rayat exercised warrants that granted Kalen over 114,000 RenovaCare shares at below-market prices.  In July 2017, Rayat purchased 410,000 RenovaCare shares, and he solicited several friends to purchase another 50,250 shares.  Sidhu assisted Rayat and RenovaCare in completing this private sale of RenovaCare shares, including by coordinating documentation of the transactions.

50.     In October 2017, shortly before the Predictions Campaign began, Rayat directed RenovaCare to engage in another private sale of shares to Rayat's friends and associates at below-market prices.  After another friend decided not to invest, Sidhu stepped in and purchased those shares, despite already owning millions of RenovaCare shares at a significantly lower cost basis.  Sidhu's participation allowed RenovaCare to publicly announce that the offering was fully subscribed, and he substantially assisted Rayat and RenovaCare in executing the transaction. Among other things, Sidhu worked with Rayat to solicit one of Rayat's friends to invest over $2 million ("Friend A"), and assisted her in completing the transaction.  Sidhu later assisted Friend A in registering her shares for resale while the Predictions Campaign was ongoing.  Later, Friend A purchased and sold RenovaCare stock on the open market during the promotional campaign.

51.     The proceeds of the July and October 2017 financings – funding exclusively provided by Rayat and his friends and associates – were the primary source of funds RenovaCare used to pay StreetAuthority for the promotional campaign.

C.     **Sidhu Worked With The Other Defendants To Open Brokerage Accounts With Free-Trading RenovaCare Shares**

52.     Beginning no later than 2013, Bhogal, Rayat, Fleming, and Sidhu closely coordinated their brokerage accounts.  Bhogal and Sidhu had accounts with the same U.S. broker-dealer ("Broker-Dealer A") that held shares of RenovaCare and other penny stocks that they both obtained through transactions involving Rayat, and Fleming also opened an account with Broker-Dealer A pursuant to Rayat's recommendation.  Sidhu, who had online access to Bhogal's and Rayat's accounts, regularly managed their brokerage accounts.

53.     Sidhu would frequently review Bhogal's and Rayat's accounts, including their RenovaCare holdings, when he logged into his own accounts.  For example, on January 23, 2017, Sidhu logged in and viewed all three accounts.

54.     In early 2017, Broker-Dealer A closed a number of Sidhu's and Bhogal's accounts.  Sidhu coordinated the transfer of shares between entities to prepare the shares for sale at another brokerage.  On February 10, 2017, he sent instructions to RenovaCare's transfer agent to move the shares between the various entities he and Bhogal controlled as follows:  (i) Collingwood shares to Sidhu; (ii) Alberta LLC's shares to Alberta Ltd.; (iii) Wolverhampton shares to Boston Financial; and (iv) Blackbriar Ltd. received shares from Blackbriar LLC.

55.     By April 2017, Sidhu and Bhogal were working together to deposit RenovaCare shares with another U.S. broker-dealer ("Broker-Dealer B").  Sidhu deposited shares from Collingwood into a new account in his name with Broker-Dealer B.  With Sidhu's assistance, Bhogal opened an account in Alberta Ltd.'s name and deposited shares.

56.     As of April 2017, the RenovaCare shares in both Sidhu's and Bhogal's Broker-Dealer B accounts were restricted from sale pursuant to the Federal securities laws.

57.     By May 2017, in coordination with RenovaCare's outside counsel and a member

of the Company's board of directors ("RenovaCare's Director"), Bhogal and Sidhu asked RenovaCare to register their shares so that they could be sold.

58.     On June 6, 2017, RenovaCare amended a Form S-1 Registration Statement already pending with the Commission to add Sidhu's and Bhogal's shares to the list of shares that the company sought to register for resale.  The prior version of the S-1 had sought to register approximately 2 million RenovaCare shares owned by Rayat and other friends and associates.

59.     As of June 2017, Bhogal owned 5.5 million RenovaCare shares, Sidhu owned over 3.3 million RenovaCare shares, and Fleming owned over 100,000 RenovaCare shares.

60.     On July 5, 2017, the Commission declared RenovaCare's June 6, 2017 S-1 effective, which removed any restrictions on the ability of Rayat, Bhogal, Sidhu, and other friends and associates of Rayat to sell their shares.

61.     Shortly thereafter, Sidhu contacted Broker-Dealer B to remove the restricted legend from his and Bhogal's RenovaCare shares.  On July 17, 2017, Sidhu informed Bhogal that both accounts were cleared to sell their RenovaCare stock.  They would wait to sell, however, until shortly after the Predictions Campaign commenced.

**D.     With Sidhu's Help, Rayat Sought to Open Accounts With Five Different Brokers To Sell RenovaCare and Company A Shares**

62.     In anticipation of the Predictions Campaign, Rayat repeatedly tried to open brokerage accounts that would allow him to sell his RenovaCare shares.  Although his efforts were ultimately unsuccessful, they demonstrate Rayat's intention to sell RenovaCare stock during the planned promotional campaign.  While these efforts were ongoing, he repeatedly asked Sidhu to track his holdings and assist him in preparing information needed to open the accounts.

63.     Rayat also coordinated accounts openings with Bhogal and Sidhu.  On June 6,

2017, Rayat received account opening forms from a foreign financial institution. After Rayat forwarded the email to Sidhu, Sidhu replied, "Which entity am I filling this out for?" Rayat responded, "[Kalen Capital] for me . . . and whatever company [Bhogal] has his shares in."

64.     In addition, between August 2017 and November 2017, Rayat had on-going discussions with at least four different brokerage firms concerning opening accounts. For example, on or around September 1, 2017, while he was in Austin, Texas, visiting StreetAuthority to discuss the Predictions Campaign, he discussed opening an account with one of these firms. He had previously informed this firm he intended to sell 500,000 RenovaCare shares.

65.     Similarly, on October 19, 2017 – days before the Predictions Campaign began – Rayat told another brokerage firm that he intended to sell 2.5 million to 5 million RenovaCare shares over the next two years.

66.     By November 2017, however, all four brokerages had either declined to open an account or closed the account before Rayat could sell his stock. Thus, Rayat was unable to sell his RenovaCare stock during the Predictions Campaign.

67.     Nonetheless, Rayat's beneficial interest in entities owned by Bhogal and Sidhu, including several that sold RenovaCare shares during the StreetAuthority promotional campaign, allowed Rayat to profit from the scheme.

II.     **Step Two (Scalping):  Rayat Solicited StreetAuthority To Promote RenovaCare While Defendants Intended To Sell And Sold**

68.     The second part of Defendants' scheme was to aggressively promote RenovaCare while intending to sell and selling RenovaCare shares, a fraudulent practice referred to as "scalping." By 2015, Rayat and Bhogal had developed a robust "investor relations" operation within RenovaCare that included a company website and a steady stream of press releases

touting the company's prospects, despite the Company's lack of revenue or any commercially available product.  Rayat and Bhogal also hired and worked with a series of third party investor relations consultants, including Fleming, IRC 1, and IRC 2, through whom they orchestrated, funded, and directed paid promotional campaigns through third-party promoters such as StreetAuthority.

### A.   Bhogal, Rayat, And Sidhu Developed An Aggressive Investor Relations Program That Provided The Basis For The Predictions Campaign

69.     As of 2013, RenovaCare was known as Janus Resources Inc. and purported to be in the business of oil-and-gas production.  By the middle of 2013, Bhogal and Rayat decided to radically alter RenovaCare's business plan by purchasing the technology related to the SkinGun.

70.     Bhogal received a "finder's fee" for this transaction, after which he shifted his attention to building and managing RenovaCare's investor relations and press relations operations, working as a RenovaCare consultant through Vector, his consulting company.  He had regular contact with Rayat, IRC 1, Fleming, and RenovaCare's CEO, attended RenovaCare Board meetings, worked closely with IRC 1 and others to develop RenovaCare's website, and directed the timing and content of RenovaCare's press releases.

71.     Fleming was actively involved in promoting RenovaCare beginning no later than 2014, working initially through an investor relations company called Gold Key Media, and later through her own company, Inspiren, the publisher of "The Cheap Investor," an investor-focused newsletter she purchased in a transaction that Rayat financed.  On May 11, 2015, for example, Fleming copied Rayat and IRC 1 on an email in which she referred to RenovaCare as "the new sponsor" of The Cheap Investor in response to a question regarding approval of an "RCAR promo piece" in the newsletter.

72.     The Cheap Investor disseminated paid promotions of RenovaCare from at least

October 2015 to July 2016.  During that period, Sidhu, Bhogal, and Fleming collectively sold over 600,000 RenovaCare shares.

73.     By October 2015, Rayat had worked with Sidhu, Bhogal, Fleming, and others to develop RenovaCare's "investor relations" strategy that would temporarily increase the price and trading volume of RenovaCare shares as they sold shares.

74.     For example, on or around October 9, 2015, Sidhu discussed the process with RenovaCare's CEO, and later forwarded wire instructions to him to be used to pay IRC 1 for his investor relations services.

75.     As RenovaCare's CEO explained in an October 9, 2015 email after he discussed with Rayat:

> [J]ust talked to Harmel.  We will enter an agreement as of Sep 1 with [IRC 1] for the entire branding, website, etc. activities.  He will be on a retainer of $10,000 per month . . .
>
> In addition we will enter an agreement for investor relation activities[.] [T]hese payments we will wire after we have the agreement. This will be done by third party companies (e.g. thecheapinvestor.com) but will run also through [IRC 1's] company.  That will be $60,000 monthly for about 4 months.

76.     The RenovaCare CEO's mention of "thecheapinvestor.com" refers to Fleming's investor-focused newsletter, and his explanation illustrates Defendants' business model – funding a short-term promotional campaign through a third-party "investor relations consultant" (at the time, IRC 1) who worked with a third-party stock promoter (at the time, Fleming – an approach that mirrored Defendants' scheme two years later involving StreetAuthority.

77.     Bhogal was directly involved in directing the timing and content of RenovaCare press releases, ensuring that they coincided with third-party promotional activity.  Bhogal served as RenovaCare's primary interface with IRC 1, and he organized weekly conference calls via Skype with RenovaCare's CEO and IRC 1 to discuss RenovaCare's investor relations program,

including building content for RenovaCare's website and to map out RenovaCare's press releases over the ensuing months.

78.     In December 2016, for example, Bhogal had numerous contacts with IRC 1, RenovaCare's CEO, and other consultants to plan the content and timing of RenovaCare's press releases and other investor relations activities for the following year.

79.     Defendants' investor relations strategy set the groundwork for Rayat to enlist a new third-party stock promoter in 2017 – StreetAuthority.

**B.     In July 2017, Rayat Approached StreetAuthority To Promote RenovaCare**

80.     On or about July 26, 2017, Rayat contacted the StreetAuthority Owner, who was a longtime friend.  StreetAuthority was an online financial publisher of investment newsletters with a dedicated subscriber base.  That day, Rayat asked if StreetAuthority would be willing to promote RenovaCare and Company A.  Following the call, Rayat emailed the StreetAuthority Owner marketing materials related to RenovaCare and Company A.

81.     On July 28, 2017, the StreetAuthority Owner suggested to Rayat that StreetAuthority feature RenovaCare and Company A in its annual "Predictions Report."  The StreetAuthority Owner noted that this could "create awareness of both companies" and attract investors, and he stated that StreetAuthority was interested in "partnering up" with Rayat to advertise on various online media platforms.  Rayat agreed it was a "great idea."  The StreetAuthority Owner proposed that RenovaCare and Company A each pay StreetAuthority $50,000 per month to fund the planned promotional campaign, and Rayat agreed.

82.     On August 1, 2017, in an email to StreetAuthority employees after Rayat's call with StreetAuthority representatives, a colleague at StreetAuthority wrote the StreetAuthority Owner:

> I want to pursue a marketing partnership with Harmel/[IRC 1] for
> this promotion. We will disseminate this promotion to all our lists,
> but for it to have the kind of impact we all want, we're going to
> need to rent outside lists and promote it on
> Google/YahooFinance/etc.

83.     In reply, the StreetAuthority Owner agreed, and noted that "Harmel initially called me about advertising and promoting his companies."

84.     Between July 28 and August 31, 2017, Rayat discussed the details of the promotional campaign with StreetAuthority representatives on several occasions, including an in-person meeting at StreetAuthority's headquarters in Austin, Texas, in late August 2017.

85.     Each year, StreetAuthority built a promotional campaign around an annual "Predictions Report" for the next calendar year.  After Rayat approached StreetAuthority and offered to fund the promotional campaign, RenovaCare and Company A became StreetAuthority's lead "predictions."

86.     On September 4, 2017, shortly after Rayat's trip to Austin, the StreetAuthority Owner emailed Rayat to confirm that "StreetAuthority will be featuring both [RenovaCare and Company A] in its annual 'Predictions' report and promotions for Game-Changing Stocks," one of StreetAuthority's investor-focused newsletters.  He also asked if Rayat was "interested in exploring and participating in this marketing program"—referred to within Street Authority as the "Predictions Campaign"—which could include "developing native ads that can run within Google, Yahoo Gemini, Taboola, Dianomi, Outbrain and other Content Display Networks." These advertising platforms later became the subject of focused discussions with Rayat.

87.     Later that day, Rayat responded:

> [N]othing would make me happier than working with
> [StreetAuthority] in spreading the word to investors and
> dramatically improving [RenovaCare's and Company A's]
> awareness in the investment community [].

So, and as it relates to 1) being featured in the annual 'Predictions' report, 2) participating in marketing programs, 3) developing research reports and 4) being featured in Game-Changing Stocks and StreetAuthority Daily, please know that I am very interested in exploring how we can work together.

88.    After expressing his interest in participating in all of the key elements of what would regularly refer to as the Predictions Campaign, Rayat suggested they speak the next day.

**C.    Rayat Worked Closely With StreetAuthority To Create, Distribute, and Disseminate The Predictions Campaign**

89.    Between July and October 2017, Rayat worked closely with StreetAuthority representatives to create promotional materials to be used in the Predictions Campaign. Rayat provided StreetAuthority with extensive information on RenovaCare and the purported efficacy of the "SkinGun," the Company's experimental medical device.

90.    RenovaCare's website and press releases, all of which were developed under Bhogal's supervision, were the primary source of promotional content for the StreetAuthority promotion.

91.    By at least September 2017, StreetAuthority began drafting materials for its paid promotion of RenovaCare. All or most of the information used in promotional materials during the campaign was provided to StreetAuthority by Rayat in emails, attachments, or links to RenovaCare's website or third-party websites. Virtually all of this information came from RenovaCare's investor relations program, which was managed by Rayat and Bhogal through IRC 1, who later worked with StreetAuthority.

92.    StreetAuthority publicly launched the Predictions Campaign on or about October 24, 2017. Rayat reviewed and commented on draft promotional materials, including the Predictions Report that was the heart of the campaign, prior to their release.

93.    After the Predictions Campaign launched in late October 2017, Rayat reviewed

draft advertisements, received reports from StreetAuthority regarding the campaign's performance, and weighed in on advertising content and "placements." He also stopped and started the advertising "spend" for the campaign based on external events, including the OTC Markets inquiry described in detail below.

94.     From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials on the internet and to its subscriber base. Throughout the campaign, Rayat continued to be closely involved in the drafting, distribution, and dissemination of StreetAuthority's promotional materials.

95.     For example, on or around November 28, 2017, Rayat traveled to StreetAuthority headquarters in Austin, Texas, to meet with the StreetAuthority Owner and his staff, including the copy writer for the Predictions Campaign. The next day, having had a chance to reflect on their discussion and "examine the results of the last 30 plus days" that they provided, Rayat gave StreetAuthority a series of explicit instructions:

1.  Focus on Gemini [an online advertising platform];

2.  Have separate single company ads and landers, so that one single company is the focus of the report ... I think this will definitely have more impact;

3.  A few days later, a special report goes out on the other company so that we get another chance at the investor,

96.     Rayat then suggested that if the copywriter "can get the copy tweaked right away, we can start this new strategy sooner than later."

97.     Rayat explicitly linked his "suggestions" to future payments to StreetAuthority, stating that "we have to show meaningful results to the CEOs [of RenovaCare and Company A], who need to make another transfer shortly," referring to the next $50,000 monthly payments to StreetAuthority from RenovaCare and Company A.

98.     On or around December 4, 2017, a StreetAuthority employee sent Rayat a text message attaching a draft version of the "separate single company ads and landers" he had requested that related to the Predictions Campaign.

99.     On or around December 5, 2017, Rayat had another telephone conference call with StreetAuthority representatives.  After that call, the StreetAuthority employee informed Rayat that "we're ready to launch on ad networks whenever we're given the green light."  The next day, Harmel Rayat responded and approved the decision to restart the advertising campaign:  "I say we start up the machinery :)."

100.     On numerous other occasions, including on or around December 20, 2017, Rayat asked StreetAuthority employees to report on the performance of the Predictions Campaign, and weighed in on how they should proceed.

**D.     Defendants Concealed Their Involvement In The Predictions Campaign StreetAuthority Promotion By Paying StreetAuthority Through Third Party Service Providers, Including Fleming**

101.     Before StreetAuthority launched its promotion, Rayat arranged to have both RenovaCare and Company A pay StreetAuthority $50,000 per month through a series of third-party service providers that he and Bhogal selected – initially IRC 1, followed by Fleming, and followed finally by IRC 2.  Each of these third party service providers worked on the StreetAuthority promotion at the direction of Rayat and Bhogal.  Although IRC 1 was replaced before the StreetAuthority promotion began, Fleming and IRC 2 each invoiced RenovaCare and Company A for StreetAuthority's work promoting the companies.

102.     Initially, Rayat arranged for RenovaCare to pay IRC 1 a $2,500 per month retainer to prepare invoices and route payments between RenovaCare and StreetAuthority, but Rayat remained StreetAuthority's primary source of information regarding RenovaCare.

103.     Shortly before the Predictions Campaign launched on October 24, 2017, Rayat

replaced IRC 1 with Fleming, under the same payment terms and with the same limited duties.

Rayat arranged for RenovaCare to pay Fleming a $2,500 per month retainer to prepare invoices

and route payments between RenovaCare and StreetAuthority.  This arrangement – which

Fleming characterized as a "personal favor" to Rayat – served to conceal RenovaCare's and

Rayat's involvement in and funding of the StreetAuthority promotion.

104.     On October 18, 2017, pursuant to Rayat's instructions, Fleming had an

introductory phone call with several representatives of StreetAuthority, after which they

provided wire instructions for her to funnel payments from RenovaCare and Company A.

**E.     Defendants Failed to Disclose Their Involvement In The Predictions
          Campaign And Intent To Sell**

105.     Defendants knew, or were reckless in not knowing, that it was unlawful to

promote RenovaCare stock while they intended to sell RenovaCare stock without disclosing this

fact to investors.  For example, as a recidivist securities law violator, Rayat was well aware of

the rules surrounding stock promotion.  In 2000, Rayat settled a case with the Commission in

which he was charged with violating Section 17(b) of the Securities Act for failing to disclose

compensation received relating to a stock promotion.  *See SEC v. EquityAlert.Com, Inc. and

Harmel S. Rayat*, No. cv-00-146 (D. Ariz. Aug. 24, 2000).  Nonetheless, Defendants schemed to

defraud investors by orchestrating and financing a promotion through StreetAuthority without

disclosing their intent to sell, and later, their orchestrated sales of RenovaCare stock.

106.     Defendants could have accurately disclosed their involvement in the Predictions

Campaign, and their intent to sell.  In an email on October 3, 2017, the StreetAuthority Owner

asked Rayat to provide "disclaimer" language for StreetAuthority to use in the Predictions

Campaign.  Rayat contacted RenovaCare's Director, who provided draft disclaimer language that

had been used in earlier third-party promotions of RenovaCare by The Cheap Investor, Fleming's newsletter.  Rayat provided this disclaimer to the StreetAuthority Owner, who worked with a lawyer referred by RenovaCare's outside counsel to review it.

107.     In its final form, the disclaimer disclosed that StreetAuthority was compensated, and disclosed the ownership of RenovaCare shares by certain individuals involved in the Predictions Campaign, but it did not clearly explain that Rayat and RenovaCare were funding the Predictions Campaign, or that they were directly involved in creating and distributing promotional materials related to the campaign.  The language of the disclaimer that appeared in the promotional materials was very similar to the draft that Rayat gave the StreetAuthority Owner, but substituted Fleming and Inspiren for IRC 1 and substituted StreetAuthority for The Cheap Investor.

108.     Rather than clearly disclosing that Rayat and RenovaCare were funding the Predictions Campaign, the disclaimer stated that StreetAuthority did "not receive any direct cash payments in connection with the production of paid advertisements" for RenovaCare, which gave investors the impression that it was an objective recommendation of RenovaCare, when, in fact, it was orchestrated and funded by Rayat and RenovaCare.

109.     Furthermore, this disclaimer failed to disclose a number of material facts relating to the Defendants' involvement in the promotion and intent to sell during it, including that: (1) RenovaCare was featured in the Predictions Report based on a verbal agreement between Rayat and StreetAuthority that RenovaCare would fund the Predictions Campaign; (2) Rayat, Bhogal, and Sidhu directly and indirectly owned and controlled millions of RenovaCare shares; (3) Rayat, Bhogal, Fleming, and Sidhu intended to sell their RenovaCare shares during the promotion; (4) Bhogal and Sidhu were actively selling RenovaCare shares as of November 8,

2018, while the promotion was on-going; (5) Fleming began actively selling RenovaCare shares as of January 3, 2018, when she transitioned her work with StreetAuthority on RenovaCare's behalf to IRC 2; and (6) Rayat held financial interests in entities through which Bhogal and Sidhu sold stock.

110.    Some of StreetAuthority's promotional materials, including the Predictions Report, contained this disclaimer while others, including periodic promotional emails and advertisements related to the campaign, included more limited language or no disclaimer at all.

111.    Defendants controlled the content of the disclaimer, which never disclosed Defendants' involvement in the campaign or Defendants' intent to sell RenovaCare shares while the company was being promoted.  Rayat and Fleming had the authority to direct StreetAuthority to amend its disclaimer, given their direct involvement in the Predictions Campaign and the fact they were funding the campaign through RenovaCare.

112.    StreetAuthority acknowledged Defendants' influence.  For example, on January 3, 2018, the StreetAuthority Owner sent an internal email concerning issues relating to its spending on the campaign, and stated, "It is very important that we spend the budget equally -- $50,000/month for each RCAR and $50,000/month for [Company A].  I think this is important to ensure that RCAR does not withdraw from the marketing program."  Similarly, StreetAuthority's publisher testified that Rayat had influence over the Predictions Campaign because he "controlled the purse strings at the end of the day."

113.    By late December 2017, Rayat and Bhogal directed RenovaCare's transition from Fleming to IRC 2, and Bhogal instructed IRC 2 regarding how to manage the StreetAuthority promotion on RenovaCare's behalf.  On December 20, 2017, for example, Bhogal was copied on an email from IRC 2 to RenovaCare's CEO forwarding a "Market Services Agreement" and an

initial invoice to RenovaCare "[f]urther to my conversations with Jay." Thereafter, Bhogal was in regular communication with IRC 2 as the Predictions Campaign continued into January and February 2018.

114.    Among other things, Fleming provided IRC 2 with the disclaimer she used while working with StreetAuthority, and then Rayat and Bhogal provided IRC 2 with guidance on updating the disclaimer for the StreetAuthority promotional campaign, and directed him to update and share it with StreetAuthority to be used in the promotional campaign. The updated disclaimer was almost identical, except it replaced references to Fleming with IRC 2, and clarified that "out of pocket expenses" paid by RenovaCare included funding for the Promotions Campaign.

115.    After talking to Bhogal and Rayat, on December 29, 2017, IRC 2 sent the StreetAuthority Owner "the attached disclaimer for updating your records pertaining to" RenovaCare and Company A, which StreetAuthority then followed the instructions and updated their promotional materials.

116.    These communications, among others, demonstrate that Defendants controlled the content of the disclaimer, which never clearly disclosed Defendants' involvement in the campaign or Defendants' intent to sell RenovaCare shares during the promotion.

**F.    StreetAuthority's Promotional Materials Included Materially False Statements**

117.    The Predictions Campaign touted RenovaCare, notwithstanding the fact that the Company had no revenue and no commercially available product. For example, the promotional materials claimed that the SkinGun was a "revolutionary wound-healing device," and encouraged readers to buy RenovaCare stock and hold it for "10, 20x, even 40x gains."

118.    StreetAuthority's promotional materials also highlighted a case study of one

29

patient ("Patient A"), claiming that the SkinGun healed his burns "without scarring—in just three days" and showing purported "before" and "after" pictures:



119.    These pictures and statements were false:  (1) the SkinGun did not heal Patient A's wounds in three days.  Instead, his skin remained discolored for at least a year after treatment; (2) the "before" photo was not Patient A's arm, instead depictign a patient with more severe burns; and (3) the "after" picture was taken several years after his injury, not three days later.

120.    Rayat was the source of these false claims and pictures.  On July 26, 2017, he sent an email to StreetAuthority that contained the false "before" and "after" pictures, and on September 21, 2017, he emailed StreetAuthority additional marketing materials that contained the false claim that the SkinGun treatment had healed Patient A's arm in three days.

121.    Rayat knew, or was reckless in not knowing, the truth.  On or about July 23, 2014, RenovaCare employees had discussed the actual results of Patient A's treatment with Rayat, and sent him an accurate summary of Patient A's treatment.  The summary explained that Patient A's arm took months to heal, and included accurate pictures illustrating Patient A's course of treatment.  The summary did not include the misleading pictures Rayat later sent to StreetAuthority.

122.    StreetAuthority's promotional materials also claimed that the SkinGun "could soon be approved by the FDA . . . . RenovaCare has submitted a 510(k) filing to the FDA, which

permits the marketing of a medical device.  Now it's just a matter of waiting on the FDA … so this device can be rolled out at every burn unit in the country."  In fact, RenovaCare had applied to the FDA only for approval to use the SkinGun in clinical studies, not to make the SkinGun available to treat patients in clinic or hospital settings, and had withdrawn the 510(k) application more than a year earlier.

123.    Rayat knew, or was reckless in not knowing, the truth.  On April 14, 2017, Rayat discussed RenovaCare's regulatory strategy in an email with an acquaintance, and acknowledged that RenovaCare did not have a pending 510(k) application.

124.    Rayat knew, or was reckless in not knowing, that the StreetAuthority promotions containing these false statements and fake "before" and "after" pictures would be disseminated to investors, because he reviewed StreetAuthority's draft promotional materials prior to their release to the investing public, but he did nothing to correct them.

125.    On October 3, 2017, for example, the StreetAuthority Owner emailed Rayat a draft Predictions Campaign promotion for StreetAuthority's Game-Changing Stocks newsletter that contained the false statements regarding FDA approval, the fake "before" and "after" pictures and the false claim that Patient A's "arm healed without scarring—in just three days." recovery.  After reviewing the draft, Rayat called the StreetAuthority Owner to suggest at least one change, but he did not suggest that they correct the false statements or replace the pictures.

126.    In an internal email dated October 10, 2017, the lead copy writer for the Predictions campaign circulated a document entitled "HIO report with 2 picks—Editorial Review, Harmel Changes" and wrote:

Here is the report back, with Harmel's changes input

…

fyi, the doc that [the StreetAuthority Owner] reviewed with Harmel was one of the promos where nothing was identified, not this hybrid report where Harmel's stocks are identified.

…

He should probably review this at some point.

127.    Three versions of the draft promotion circulated internally at StreetAuthority on October 10, 2017, all with filenames including "Harmel Changes," one of which included a comment that the copy writer had deleted language that "Har[m]el doesn't want us to talk about."

### G.    Shortly After The Predictions Campaign Was Launched, Defendants Began Selling RenovaCare Shares

128.    The StreetAuthority promotion of RenovaCare went public on October 24, 2017. At the time, RenovaCare stock was trading around $3 per share, and its daily trading volume was about 10,000 shares per day.  By early November, the Predictions Campaign began to have its intended effect.  On November 7, 2017, RenovaCare stock price rose to nearly $4 per share (up about 30% from October 24), and trading volume was over 60,000 shares (up about 600 percent).

129.    In early November 2017, while Fleming and Rayat worked with StreetAuthority and RenovaCare on the promotional campaign, Sidhu and Bhogal began selling RenovaCare shares in a highly coordinated manner.  Their trades tracked the Predictions Campaign, and evidences their knowing participation in the scheme.

130.    On November 8, 2017, Bhogal and Sidhu began selling RenovaCare shares. Between November 8 and December 7, 2017, they sold more than 100,000 shares at historically high prices.

131.    In early December 2017, Rayat directed StreetAuthority to pause advertising related to the Predictions Campaign while he considered how to maximize the effectiveness of

the campaign.  On December 8, 2017, Bhogal and Sidhu stopped trading.

132.    On or about December 11, 2018, Rayat directed StreetAuthority to resume advertising the Predictions Campaign.  Bhogal and Sidhu again waited for the campaign to impact the market before both resumed selling RenovaCare stock.  Between December 18, 2017, and January 3, 2018, Sidhu sold over 30,000 shares, and Bhogal sold over 131,000 shares.

133.    On January 3, 2018, a day after Rayat and Bhogal replaced her with IRC 2 and she stopped handling RenovaCare's payments to StreetAuthority for the Predictions Campaign, Fleming sold 7,000 shares of RenovaCare stock.  She did so despite having been directly involved in the campaign, and with knowledge that the paid promotion she had helped organize was ongoing.

134.    During the Predictions Campaign, Sidhu, Bhogal, and Fleming ultimately sold more than 1 million shares of RenovaCare stock through at least seven brokerage accounts.

135.    By November 8, 2017, Bhogal knew, or was reckless in not knowing, about the Predictions Campaign, including because:  (1) Bhogal's transactions in RenovaCare stock tracked the timing and progress of the StreetAuthority promotion; (2) on September 21, 2017, Rayat forwarded to Bhogal an email between Rayat and StreetAuthority concerning the campaign; (3) on October 6, 2017, Bhogal participated in a phone call with StreetAuthority representatives and Rayat; (4) on October 31, 2017, Bhogal attended a RenovaCare Board meeting, a presentation for which included an item stating that the company planned to spend $300,000 on investor relations through March 2018, an amount consistent with Rayat's agreement that RenovaCare would pay Street Authority $50,000 per month to fund the campaign; (5) on November 8, 2017, a friend sent Bhogal a StreetAuthority campaign email promoting RenovaCare and Company A; and (6) in September 2017, Bhogal received two emails

concerning Rayat's attempts to sell his shares.

136.    By November 8, 2017, Sidhu knew, or was reckless in not knowing, about the

Predictions Campaign, including because: (1) Sidhu's transactions in RenovaCare stock tracked

the timing and progress of the campaign; (2) he was in daily contact with Rayat while Rayat

worked on the campaign;  (3) in August 2017, Rayat asked Sidhu to send a package to a

StreetAuthority representative; (4) Sidhu planned two of Rayat's trips to visit StreetAuthority in

Austin; (5) on November 2, 2017, Rayat sent Sidhu an email stating, "Jeet, I need to be in Austin

for at least one night during the week of November 27 . . . . Let's discuss tomorrow;" (6) Sidhu

managed and tracked the RenovaCare shares held by Rayat and Bhogal, and assisted with the

company's private sales of stock to Rayat, Sidhu, and other of Rayat's friends in July and

October 2017.

**III.    Step Three (Misrepresentation, Omissions, and Related Fraudulent Conduct):  In Response To OTC Markets' Inquiry, RenovaCare And Rayat Issued A Materially False Press Release Denying Any Involvement In The Predictions Campaign**

**A.    On January 3, 2018, OTC Markets Required RenovaCare To Disclose The Company's Role In The StreetAuthority Promotion**

137.    On or around January 2, 2018, OTC Markets, which supervised the OTCQB Tier

in which RenovaCare stock was quoted, learned of StreetAuthority's ongoing promotion of

RenovaCare.  OTC Markets has a strict disclosure policy regarding company promotions, and

companies that violate the policy may be removed from the OTCQB Tier and relegated to the

less desirable OTC Pink Open Market Tier, which can negatively impact a stock's trading

volume and share price.

138.    Consistent with this policy, around noon on January 3, 2018, OTC Markets sent

RenovaCare a letter requiring the Company make public disclosures relating to the

StreetAuthority promotion.  Attached to the letter was a January 2, 2018, Predictions Campaign

34

promotion for Game-Changing Stocks, a StreetAuthority newsletter.  The promotional "copy" was based on information from RenovaCare's investor relations program that had been provided to StreetAuthority by Rayat, and the promotional language had been reviewed by Rayat prior to publication.  In fact, the promotion, which included the false statements about FDA approval and Patient A's course of treatment, as well as the fake "before and after" pictures, was an updated version of the promotion the StreetAuthority Owner emailed to Rayat for his review on October 3, 2017.

139.    OTC Markets' letter demanded that RenovaCare issue a press release concerning its involvement in the January 2, 2018 StreetAuthority promotion, including:

a.   "the date on which the Company became aware of the promotional activities;"

b.   "[a] written summary of the Company's understanding of the promotional activities," and "[i]f the company was involved in the dissemination or payment of promotional material, … direct language describing the company's involvement and a description of any engagements and/or agreements relating to the promotional material;"

c.   "whether the company has editorial control over the content in the promotional materials;" and

d.   "[w]hether, after inquiry of management, the directors and control persons, its officers, directors, any controlling shareholders (defined as shareholders owning 10% or more of the company's securities), or any third party service providers have, directly or indirectly, been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials related to the Company and its securities."

**B.     On January 3, 2018, Rayat Instructed StreetAuthority To Pause The Predictions Campaign, And Defendants Paused Their Selling**

140.    On January 3, 2018, a few hours after RenovaCare received OTC Markets' inquiry, Rayat instructed StreetAuthority to pause the Predictions Campaign while he, Bhogal, and RenovaCare considered how to respond to the inquiry.

141.    As of January 3, 2018, Sidhu and Bhogal were actively selling RenovaCare

shares, and Fleming had just begun selling RenovaCare shares after her duties were transitioned to IRC 2.  After RenovaCare received the inquiry from OTC Markets, Bhogal, Fleming and Sidhu stopped trading, and did not sell any more shares for nearly a week.

### C. On January 8, 2018 Rayat, Bhogal, And RenovaCare Made And Issued A Materially False Press Release Denying Any Involvement In The StreetAuthority Promotion

142.   On January 3, 2018, Rayat held several conference calls with RenovaCare's CEO, RenovaCare's Director, and Bhogal to discuss the response to OTC Markets.

143.   By January 4, 2018, Rayat had assembled a team and was working on a draft press release, with Bhogal's assistance.  Bhogal had numerous discussions with IRC 2 concerning RenovaCare's response, and provided information for IRC 2 to share with Rayat and RenovaCare in the drafting of the release.  Rayat again had several conference calls with the RenovaCare director, RenovaCare's CEO, and Bhogal to discuss the draft press release.  Bhogal also received several of the coordinating emails.

144.   On January 5, 2018, the RenovaCare director emailed Rayat, RenovaCare's CEO, and Bhogal to request a follow-up conference call "to discuss/review and edit the revised draft" of the press release.  Shortly thereafter, Rayat replied by email to suggest they talk on January 7, 2018, and noted that he would send his comments on the draft press release by the following day. That day, Rayat also had several calls with the RenovaCare director to discuss the draft.

145.   On January 7, 2018, Rayat, RenovaCare's CEO, and the RenovaCare director again discussed RenovaCare's draft press release.  A draft press release dated shortly after the call contained only minor differences from the draft the company would ultimately issue.

146.   On January 8, 2018, at 12:57 p.m., Rayat emailed RenovaCare's CEO a final version of the draft press release, and instructed him to add the Company's boilerplate "about us"

and "disclaimer" language to the draft.  A few minutes later, at 1:14 p.m., RenovaCare's CEO

forwarded the draft press release to IRC 2, noting that it was the final draft of the press release.

As Rayat had instructed, RenovaCare's CEO requested that the consultant add the "about us"

and "disclaimer" language and issue the press release at 3:45 p.m.

147.    On January 8, 2018, at 3:45 p.m., RenovaCare publicly issued the press release

drafted by Rayat and RenovaCare and responding to OTC Markets' inquiry via BusinessWire

("January 8 Press Release").  It was not signed by any individual.

148.    Rayat instructed RenovaCare to issue the January 8 Press Release at 3:45 p.m.,

because he wanted to limit the potential impact of the Press Release by releasing it shortly before

the market closed at 4 p.m.  Bhogal assisted Rayat and RenovaCare in disseminating the January

8 Press Release, and he helped IRC 2 to correct an issue with this timing.

149.    To further reduce the market impact of the January 8 Press Release, Rayat and

RenovaCare also issued RenovaCare's year-end "Shareholder Update" at 9 a.m. on January 9,

2018.

150.    On January 12, 2018, RenovaCare publicly filed a Form 8-K with the

Commission, signed by RenovaCare's CEO, that attached a copy of the January 8 Press Release.

151.    Based on his involvement in the Predictions Campaign on RenovaCare's behalf,

Rayat possessed the knowledge required to accurately answer OTC Market's inquiry regarding

the campaign, and as RenovaCare's controlling shareholder he had ultimate control over the

content and dissemination of the press release to the public.  Rayat's involvement in the drafting

process, including his January 8, 2018, email to RenovaCare's CEO, and the CEO's adherence to

his instructions, also demonstrates his authority and control over the content and public

dissemination of the statement.

**D.** **The January 8 Press Release Contained Materially False Statements And Omissions**

152.   The January 8 Press Release contained numerous material misrepresentations and omissions concerning Rayat's and RenovaCare's involvement in the Predictions Campaign.

153.   **First**, the January 8 Press Release stated that Rayat and RenovaCare had no involvement in the StreetAuthority promotion:

> "[T]he Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly[] **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities."  (emphasis in original).

154.   This statement was materially false.  Rayat was RenovaCare's controlling shareholder, and he was directly involved in the creation of StreetAuthority's promotional materials, including the Predictions Report.  Among other things, he: (i) provided detailed information about RenovaCare to StreetAuthority representatives, including the lead author of the Predictions Report; (ii) reviewed and commented on draft promotions and advertisements before and during the Predictions Campaign; and (iii) consulted with StreetAuthority throughout the campaign concerning advertising and distribution of the Predictions Report and other promotional materials related to RenovaCare.

155.   In addition, Rayat, RenovaCare's CEO, and the Company's third-party investor relations consultants, including Fleming, were all involved in the distribution of StreetAuthority's promotional material by funding the Predictions Campaign, and Rayat had numerous discussions with StreetAuthority regarding how campaign promotional materials should be distributed.

156.   **Second**, the January 8 Press Release claimed that RenovaCare was "not affiliated in any way with the authors of the annual predictions report or its publisher."  Again, this was

materially false.  RenovaCare was affiliated with StreetAuthority as a paying customer.

157.    **Third**, the January 8 Press Release claimed that RenovaCare "had no editorial control over the content" of the promotion, including the Predictions Report.  This was materially false.  Rayat, RenovaCare's controlling shareholder and agent, reviewed, commented on, and edited promotional materials, including the Predictions Report, before and during the Predictions Campaign.  And Rayat and RenovaCare had the "power of the checkbook" – if either was dissatisfied with the content of the Predictions Report or other promotional materials, or the timing or content of advertising related to the Predictions Campaign, they could have refused to fund the campaign at the outset or at any time during the campaign.

158.    **Fourth**, the January 8 Press Release stated that RenovaCare "was not involved in the creation, or directing the dissemination, of [StreetAuthority's Predictions] report."  This statement was materially false.  Rayat, on behalf of RenovaCare, was involved in the creation of the Predictions Report.  He provided detailed information to StreetAuthority to include in the report, and he reviewed and commented on draft promotions and advertisements before and during the Predictions Campaign.  Rayat was also involved in directing the dissemination of the report, including weighing in on the timing, content, and placement of advertisements related to the campaign, all of which were funded by RenovaCare.  For example, on January 3, 2018, a few hours after RenovaCare received OTC Markets' inquiry, Rayat instructed StreetAuthority to pause the Predictions Campaign.

159.    **Fifth**, the January 8 Press Release contained material omissions regarding Rayat and RenovaCare's awareness and involvement in the StreetAuthority promotion and the Predictions Report.  OTC Markets required that RenovaCare disclose "the date on which it became aware of the promotional activities."  RenovaCare and Rayat failed to disclose that

Rayat became aware of the campaign when he approached StreetAuthority in July 2017, and that the Company was aware of the Predictions Campaign no later than November 8, 2017, when the Company's CEO received an invoice from Fleming that included line items for "StreetAuthority – Media Spend" and "StreetAuthority - $50,000 Monthly Fee."

160.    These misrepresentations and omissions were material.  Small companies like RenovaCare with illiquid and low-priced shares are susceptible to schemes to fund misleading promotions to increase a company's stock price and trading volume to benefit corporate insiders and controlling shareholders, which is exactly what the Defendants did here.

161.    OTC Markets' disclosure policy is premised on the fact that investors would want to know the truth.  Failure to comply with the disclosure policy can result in a company's removal from the OTCQB Tier and a downgrade to the OTC Pink Open Market Tier, which could have a substantial impact on a stock's price and trading volume.

162.    As explained in more detail below, this is exactly what happened here.  On February 23, 2018, OTC Markets downgraded RenovaCare to its lower tier "pink sheets" trading tier after it became aware of further promotional activity, and RenovaCare's share price dropped almost immediately, from $9 per share to $6.28 per share.

163.    RenovaCare and Rayat knew, or were reckless in not knowing, that the January 8 Press Release was false when they made and issued it to the investing public.  Given his personal participation in the StreetAuthority promotion, Rayat knew, or was reckless in not knowing, that the January 8 Press Release contained material misstatements and omissions.  As RenovaCare's agent with respect to StreetAuthority, and as the Company's controlling shareholder, Rayat's knowledge is imputed to RenovaCare.  And the Company's CEO was aware that the company was funding the Predictions Campaign.

164.    Rayat caused RenovaCare to issue the misleading January 8, 2018 Press Release in order to further conceal Defendants' role in both the Predictions Campaign and the overall fraudulent scheme to manipulate and scalp RenovaCare stock.

**E.    Rayat And Bhogal Aided And Abetted The False Statements In The January 8 Press Release**

165.    Rayat and Bhogal also aided and abetted RenovaCare's materially false statements and omissions.  They knowingly or recklessly substantially assisted RenovaCare by participating in the drafting and dissemination of the fraudulent January 8 Press Release and related Form 8-K.  Rayat and Bhogal knew, or were reckless in not knowing, that the January 8 Press Release contained material misstatements and omissions.  For example, Rayat knew that he orchestrated and directed the StreetAuthority promotional campaign, and he knew that RenovaCare was funding the campaign through a series of third-party service providers.

166.    Bhogal knew, or was reckless in not knowing, Rayat's and RenovaCare's role in the Predictions Campaign no later than September 21, 2017, when Rayat forwarded him an email concerning the campaign.  Bhogal also participated in at least one telephone conference with StreetAuthority before the start of the campaign, and by no later than December 28, 2017, Bhogal was coordinating the transition from Fleming to IRC 2, and described the nature of the relationship between StreetAuthority and RenovaCare to IRC 2.

**IV.    Step Four (Manipulative Trading And Related Conduct): After Issuing the January 8 Press Release, Defendants Restarted The Predictions Campaign And Resumed Trading**

167.    After issuing the false January 8 Press Release, Defendants restarted the Predictions Campaign, resumed selling shares, and engaged in deceptive conduct to support RenovaCare's share price and trading volume.

A. **Defendants Restarted The StreetAuthority Promotion**

168.    While Rayat, RenovaCare's CEO, and Bhogal were working on a response to the OTC Markets inquiry, Rayat and Bhogal were working with IRC 2 prepare to restart the Predictions Campaign.  On January 5, 2018, they initiated a review of StreetAuthority's promotional materials to allow StreetAuthority to support the claim that the promotional "copy" was based on publicly available information.  During this process, IRC 2 and the Company identified several misstatements, and corrected some of them.  While the review was ongoing, and notwithstanding ongoing and extensive communications with StreetAuthority regarding the promotional campaign, RenovaCare issued the January 8 Press Release disavowing any affiliation with StreetAuthority or involvement in the campaign.

169.    On January 22, 2018, Defendants, IRC 2, and StreetAuthority completed the content review, and Rayat authorized StreetAuthority to resume the Predictions Campaign.

B. **Defendants Resumed Their Coordinated Trading**

170.    After issuing the false and misleading January 8 Press Release, Defendants also resumed trading RenovaCare stock.  On January 9, 2018, Fleming bought 370 shares, despite the fact that RenovaCare stock was trading near a historic high, and the fact that she owned more than 100,000 shares at a lower cost basis.  Her trading was intended to create an artificial impression of demand for the stock to assist in maintaining share price and trading volume and counteract any negative market reaction to the January 8 Press Release.

171.    Between January 9 and January 22, 2018, Bhogal and Sidhu sold some shares, but after January 22, 2018, Defendants' trading pattern took off, again in a coordinated fashion. Bhogal, Sidhu, and Fleming all started by selling small amounts until about a week after StreetAuthority resumed the Predictions Campaign, when they began taking turns selling large

quantities of shares.

172.    First, Bhogal ramped up his selling to over 50,000 shares per day on January 26. On January 30, 2018, Bhogal sold 133,900 shares through Alberta Ltd.'s account, which left him with only about 10,000 shares in that account.

173.    Second, on January 31, 2018, Sidhu ramped up his activity, selling over 150,000 shares that day and at least 50,000 shares per day for the rest of that week.  Fleming also continued to sell on most trading days in this time period, selling approximately 25,000 shares between January 29 and February 2, 2018.

174.    This coordinated pattern of trading continued until February 7, 2018, when another threat to Defendants' scheme emerged.

**C.      Rayat And Bhogal Caused RenovaCare To Issue Press Releases To Counteract Negative Press And Complement The Predictions Campaign**

175.    On February 7, 2018, RenovaCare received an inquiry from an online financial media company ("Media Company 1").  Media Company 1 asked RenovaCare to answer several questions that suggested Media Company 1's view that RenovaCare was involved in a pump-and-dump scheme.

176.    IRC 2 discussed Media Company 1's inquiry with Bhogal and Rayat, and they decided to take action to counteract anticipated negative market reaction to the planned article. Bhogal, Rayat, and others immediately prepared a draft RenovaCare press release attacking the credibility of Media Company 1 and the negative article they anticipated.

177.    The next morning, on February 8, 2018, Media Company 1 published an article on RenovaCare that, among other things, called it "the most dangerous stock covered to date." In response, Rayat and Bhogal directed RenovaCare to issue a press release on February 12, 2018.  Rather than responding to the facts in Media Company 1's article, this press release

attacked the credibility of its authors.

178.    Defendants further attempted to counteract this negative news by doubling

StreetAuthority's promotional budget for the Predictions Campaign.  On the morning of

February 8, 2018, IRC 2 emailed StreetAuthority, ordering the promoter to double the

advertising budget for the next two weeks "from its current spend of $12,500 to $25,000 per

week."  Soon thereafter, Rayat contacted another StreetAuthority representative and reiterated

the request, noting that "It's kinda important that it gets turned on sooner rather than later."

StreetAuthority quickly implemented these instructions.

179.    Rayat also consulted with StreetAuthority to strategize ways to respond to Media

Company 1's negative coverage.  In response, on February 12, 2018, the StreetAuthority Owner

emailed Rayat and other StreetAuthority representatives and stated,

> "What can we do?
>
> I recommend, if [RenovaCare] will issue any PR release, that you
> should not address this article at all.  The release should be about a
> positive story about Renova[C]are.  **If you have news on the FDA
> or your submission to the FDA address that** . . . .
>
> My sense is that I do not think this negative story has received a
> great deal of press/readership.  The stock is up .54% and trading
> volume is pretty decent at mid-day.
>
> Regarding additional marketing exposure, I spoke with [another
> StreetAuthority representative] to crank up the spend. . . .
>
> **I think it is important to keep a steady spend to keep [the] volume
> up and the stock price up.**" (emphasis added)

180.    Just as the StreetAuthority Owner suggested, RenovaCare issued a press release

on February 15, 2018, announcing a "successful FDA meeting," despite the fact that the meeting

had occurred *a year earlier*.  Rayat and Bhogal were involved in the drafting and dissemination

of this press release, which was intended to complement the promotional campaign and Defendants' manipulative trading.

181.    A week later, Defendants coordinated another RenovaCare press release with the Predictions Campaign.  On February 21, 2018, Rayat and Bhogal drafted and disseminated another RenovaCare press release announcing that RenovaCare "secures [a] patent victory."  In fact, this "victory" had occurred months earlier, in December 2017.  Shortly after this press release was issued, Rayat forwarded a link to StreetAuthority Owner and another representative, stating that the release was "fresh off the presses and still warm."  The StreetAuthority Owner replied, "Just read the story . . . Need to figure out how to leverage this news on other media."

182.    Furthermore, on February 23, 2022, working at Rayat's and/or Bhogal's direction, IRC 2 emailed StreetAuthority to provide internet links "for the most recent news related to [RenovaCare and Company A] to update your copy."  By "copy," IRC 2 meant StreetAuthority's promotional materials.

### D.    Defendants Supported The Scheme Through Manipulative Trading

183.    By February 8, 2018, Sidhu, Bhogal, and Fleming also took other steps to bolster RenovaCare's share price and trading volume.  First, they stopped selling shares, which could depress the share price.  Second, they soon began aggressively buying RenovaCare stock at historically high prices to artificially inflate the market.

184.    On February 9, 2018, Sidhu bought 15,000 RenovaCare shares.  Despite owning millions of shares at no cost basis, he bought additional shares at then-near historic high prices of more than $7 per share.  This purchase had no economic justification other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock.

185.    On February 12, 2018, Media Company 1 issued another negative article

45

suggesting that RenovaCare was involved in a pump-and-dump scheme.

186.    In response, that same day and continuing throughout that week, Sidhu purchased more RenovaCare stock.  In all, between February 9, 2018, and February 16, 2018, Sidhu purchased over 155,000 shares of RenovaCare stock at near historically high prices, often placing purchase orders at or above the highest market prices at the time, which increased the effect of his orders on the market.  Again, Sidhu had no economic justification for these purchases other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock for the purpose of inducing its purchase or sale by others.

187.    In coordination with Sidhu, between February 12 and 16, 2017, Fleming also placed several purchase orders and ultimately purchased 3,200 shares of RenovaCare stock, with no economic justification other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock for the purpose of inducing its purchase or sale by others.

188.    Bhogal also engaged in manipulative trading during this period.  On February 20 and 21, 2018, Bhogal placed several buy orders for RenovaCare stock to further support RenovaCare's share price and trading volume.  Although these orders were never executed, they created a false impression of demand for the stock at the order prices. At the time, RenovaCare stock reached a new all-time high of over $10.50 per share, and Bhogal held millions of shares of RenovaCare stock at a low or no cost basis.  These buy orders were intended to manipulate the market for the purpose of inducing its purchase or sale by others.

189.    From February 21 to 22, 2018, Fleming and Sidhu resumed selling shares as the Predictions Campaign continued.

190.    At the time, Sidhu, Bhogal, and Fleming knew, or were reckless in not knowing, that they were engaged in manipulative trading of RenovaCare stock, based on the highly coordinated nature of their trading with each other's trades and with the ongoing promotional activity, the nature and timing of their purchases, and the fact that they all owned substantial shares at a low or no cost basis at a time they were buying more stock at historically high prices.

### E.    On February 9, 2018, RenovaCare Filed A New S-1 Seeking To Register Millions Of Restricted Shares Owned By Defendants

191.    In the midst of the pump-and-dump scheme, Defendants also sought to "reload" on stock by registering additional restricted RenovaCare shares to be sold.  On February 9, 2018, RenovaCare issued a new Form S-1 that sought to register for resale over 4.4 million shares held by Rayat and his associates, including:  (i) 2.42 million shares held by Kalen Capital; (ii) 900,000 shares held by a friend of Rayat; (iii) 508,636 shares held by Bhogal through Alberta Ltd.; and (iv) 355,000 shares held by Sidhu.  The shares RenovaCare sought to register included shares purchased in the July and October 2017 offerings.  Sidhu assisted RenovaCare's filing of the February 9, 2018 S-1 by providing information on his, Rayat's, and Bhogal's share holdings.

### F.    In February 2018, the Scheme Collapsed

192.    On February 23, 2018, after becoming aware of further promotional activity related to RenovaCare, OTC Markets downgraded the Company's stock to the OTC Pink Open Market Tier, also known as the "pink sheets," and placed a "Caveat Emptor" ("buyer beware") warning and skull and crossbones symbol on RenovaCare's company profile.

193.    After OTC Markets acted in response to the ongoing promotional activity, RenovaCare's share price plummeted, and Defendants abandoned their scheme.  Shortly thereafter, Defendants directed StreetAuthority to halt the Predictions Campaign.

V.    **The Scheme's Final Result**:  **The Defendants Reaped Millions**

194.    The fraudulent scheme orchestrated by Defendants was ultimately successful, allowing Defendants to sell millions of shares of RenovaCare stock at artificially inflated prices and obtain millions of dollars of ill-gotten gains.

A.    **RenovaCare's Share Price And Trading Volume Increased Dramatically During The Predictions Campaign**

195.    As internet users clicked on tens of thousands of RenovaCare ads during the StreetAuthority promotional campaign, RenovaCare's share price and trading volume increased dramatically.  For example, a single online platform, one of several that StreetAuthority used to promote RenovaCare, generated over 20,000 clicks from internet users.  On October 23, 2017, shortly before the Predictions Campaign began, RenovaCare stock price closed at $3.10 per share.  By January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase, and on February 21, 2018, RenovaCare stock traded at an all-time high of over $10.50 per share.

B.    **Defendants Reaped Millions From Their Sales of RenovaCare Shares At Artificially Inflated Prices**

196.    Collectively, Defendants reaped millions from the scheme.  During the StreetAuthority promotional campaign, Sidhu, Bhogal, and Fleming ultimately sold more than one million shares of RenovaCare stock through at least six separate accounts and obtained more than $7 million in trading proceeds:

| Account Holder | Beneficial Owner | Brokerage Firm | How Acquired Shares | Shares Sold Between October 24, 2017 and February 28, 2018 | Sale Proceeds |
|---|---|---|---|---|---|
| Treadstone LLC (Relief Defendant) | Jeet Sidhu | Broker-Dealer A | Treadstone Ltd. Purchase from Rayat in exchange for preferred shares | 265,839 | $1,598,185 |

| Jeet Sidhu | Jeet Sidhu | Broker-Dealer B | Collingwood purchase in 2013 in exchange for loan from Rayat, and open market purchases in February 2018 | 332,360 | $2,867,023 |
|---|---|---|---|---|---|
| Alberta Ltd. (Relief Defendant) | Jatinder Bhogal | Broker-Dealer B | Alberta Ltd. Purchase from Rayat in exchange for preferred shares | 491,364 | $2,659,410 |
| Sharon Fleming | Sharon Fleming | Broker-Dealer C | July 2008 company private placement when Rayat was its CEO | 52,200 | $380,802 |
| **TOTAL** | | | | | **$7,505,420** |

197.    In addition to the above sales, between December 2017 and February 2018, Sidhu transferred another 500,000 of Blackbriar Ltd.'s RenovaCare shares to an account with a broker-dealer outside the United States, and sold at least some of those shares on a U.S.-based exchange during the Relevant Period.  Sidhu also transferred another 250,000 shares in his name that originated from Collingwood's purchase in 2013 to an account with a broker-dealer outside the United States, and sold at least some of those shares on a U.S.-based exchange during the Relevant Period.  Sidhu ultimately sold RenovaCare shares from five brokerage accounts while the Predictions Campaign was ongoing.

198.    While Defendants engaged in this selling, Rayat continued to maintain millions-of-dollars of financial interests with Bhogal and Sidhu individually and/or through entities they owned and controlled, including Alberta Ltd. and Blackbriar Ltd.

199.    In addition to acting directly in furtherance of the scheme alleged in this Complaint, Defendants acted through a variety of third parties—both individuals and entities—to execute the scheme.  Defendants organized a false promotion of RenovaCare through StreetAuthority, and arranged for RenovaCare to pay StreetAuthority through a series of third-

party service providers, for the fraudulent purpose of concealing their involvement in the StreetAuthority promotional campaign.  Defendants could not directly promote RenovaCare stock while intending to sell and selling RenovaCare stock—an inherently deceptive practice known as scalping—without violating the Federal securities laws.  Nor could Defendants directly make material misrepresentations about RenovaCare.  They therefore acted through third parties to avoid direct liability while monetizing their scheme.

200.    Rayat also acted through Bhogal, Sidhu, and Fleming to maintain a beneficial interest in the RenovaCare shares they sold during the promotional campaign, while Bhogal, Sidhu, and Fleming acted through Rayat to promote RenovaCare.  Collectively, Rayat, Bhogal, Sidhu, and Fleming acted through RenovaCare to monetize the scheme by distributing millions of shares of RenovaCare stock to themselves and entities they controlled, and to ensure that the shares were registered for resale in advance of the StreetAuthority promotional campaign.  The scheme involved several deceptive acts, misrepresentations, and omissions, including scalping, manipulative trading, and false statements, all of which violated the securities laws.  Defendants are liable for these acts, misrepresentations, and omissions, notwithstanding the fact that they did so to some extent through or by means of other individuals and entities.

## C.    The Relief Defendants Received Ill-Gotten Gains

201.    Relief Defendant Treadstone Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants.  Treadstone Ltd. has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Treadstone Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants.

202.    Relief Defendant Treadstone LLC received ill-gotten funds transferred to it or for its benefit by the Defendants.  Treadstone LLC has no legitimate claim to the ill-gotten funds it

directly or indirectly received, and accordingly, Treadstone LLC should be required to disgorge the amounts it directly or indirectly received from Defendants.

203.    Relief Defendant Blackbriar Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants.  Blackbriar Ltd.  has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Blackbriar Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants.

204.    Relief Defendant Alberta, Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants.  Alberta, Ltd. has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Alberta, Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and**
**Rule 10b-5 Thereunder**
(Against All Defendants)

205.    Paragraphs 1-14, 24-32, 45-164, and 167-200 of this Complaint are re-alleged and incorporated by reference herein.

206.    By engaging in the conduct alleged in this Complaint, specifically by engaging in deceptive acts by orchestrating, funding, and participating in the Predictions Campaign while intending to sell RenovaCare common stock, providing StreetAuthority with false information regarding RenovaCare and its products, participating in the drafting and dissemination of StreetAuthority promotions, which contained materially false and misleading statements and omissions, arranging for and making payments between RenovaCare and StreetAuthority through a third party to conceal the source of those payments, drafting and disseminating the January 8 Press Release and related Form 8-K, both of which contained materially false and misleading statements and omissions, and buying and selling RenovaCare common stock in a

manipulative manner, Defendants, directly or indirectly, in connection with the purchase or sale

of a security, by use of the means or instrumentalities of interstate commerce, of the mails, or of

the facilities of a national securities exchange, with *scienter*, employed devices, schemes, or

artifices to defraud, made one or more untrue statements of material fact or omitted to state one

or more material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading, and engaged in acts, practices, or

courses of business which operated or would operate as a fraud or deceit upon other persons.

207.    By reason of the foregoing, Defendants violated, and unless restrained and

enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 10(b) and**
**Rule 10b-5(b) Thereunder**
(Against Rayat and Bhogal)

208.    Paragraphs 1-14, 24-32, and 45-200 of this Complaint are re-alleged and

incorporated by reference herein.

209.    By engaging in the conduct alleged in this Complaint, specifically by drafting and

disseminating the false January 8 Press Release and related Form 8-K containing materially false

statements and omissions, RenovaCare, directly or indirectly, singly or in concert, in connection

with the purchase or sale of securities and by use of the means or instrumentalities of interstate

commerce, or the mails, or the facilities of a national securities exchange, knowingly or

recklessly made one or more untrue statements of a material fact or omitted to state one or more

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading.

210.    Rayat and Bhogal, knew, or were reckless in not knowing, that RenovaCare was

engaged in the unlawful conduct alleged in this Complaint, and they knowingly or recklessly substantially assisted and participated in the wrongdoing. Rayat and Bhogal provided substantial assistance to RenovaCare by participating in the drafting and dissemination of RenovaCare's false January 8 Press Release and related Form 8-K.

211.    By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Rayat and Bhogal aided and abetted RenovaCare's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

**THIRD CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
(Against All Defendants)

212.    Paragraphs 1-14, 24-32, 45-164, and 167-200 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

213.    By engaging in the conduct alleged in this Complaint, specifically by orchestrating, funding, and participating in the StreetAuthority promotion of RenovaCare while intending to sell RenovaCare common stock, providing StreetAuthority with false information regarding RenovaCare and its products, participating in the drafting and dissemination of StreetAuthority promotions, which contained materially false and misleading statements and omissions, arranging for and making payments between RenovaCare and StreetAuthority through a third party to conceal the source of those payments, drafting and disseminating the January 8 Press Release and related Form 8-K, both of which contained materially false and misleading statements and omissions, and buying and selling RenovaCare common stock in a manipulative manner, Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices,

schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or

property by means of one or more untrue statements of a material fact or omissions of a material

fact necessary to make the statements made, in light of the circumstances under which they were

made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more

transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon the purchaser.

214.    By reason of the foregoing, Defendants directly or indirectly, singly or in concert,

have violated, and unless enjoined will again violate, Securities Act Section 17(a), 15 U.S.C. §

77q(a).

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 17(a) of the Securities Act
(Against Bhogal)

215.    Paragraphs 1-14, 24-32, and 45-200 of this Complaint are re-alleged

and incorporated by reference as if fully set forth herein.

216.    By engaging in the conduct alleged in this Complaint, specifically by drafting and

disseminating the false January 8 Press Release and related Form 8-K containing materially false

statements and omissions, RenovaCare and Rayat, directly or indirectly, singly or in concert, in

the offer or sale of securities and by use of the means or instruments of transportation or

communication in interstate commerce or the mails, (1) knowingly or recklessly employed one

or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently

obtained money or property by means of one or more untrue statements of a material fact or

omissions of a material fact necessary to make the statements made, in light of the circumstances

under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently

engaged in one or more transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon the purchaser.

217.    Bhogal, knew, was reckless in not knowing, or should have known that RenovaCare and Rayat were engaged in the unlawful conduct alleged in this Complaint, and he knowingly or recklessly substantially assisted and participated in the wrongdoing.  Bhogal provided substantial assistance to RenovaCare and Rayat by participating in the drafting and dissemination of RenovaCare's false January 8 Press Release and related Form 8-K.

218.    By reason of the foregoing, pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), Bhogal aided and abetted Rayat's and RenovaCare's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## FIFTH CLAIM FOR RELIEF
### Violations of Section 20(b) of the Exchange Act
(Against Rayat, Bhogal, Sidhu, and Fleming)

219.    Paragraphs 1-14, 24-32, and 45-200 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

220.    Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b), precludes any person, directly or indirectly, from doing any act which would be unlawful under the Exchange Act for such person to do, through or by means of any other person.

221.    By engaging in the conduct alleged in this Complaint, specifically by knowingly or recklessly using StreetAuthority, a series of investor relations consultants, and each other to promote RenovaCare common stock while intending to sell and selling, arranging for payments to StreetAuthority to be made through a series of third-party investor relations consultants for the fraudulent purpose of concealing Rayat's and the company's involvement in the StreetAuthority promotional campaign, organizing a false promotion of RenovaCare through StreetAuthority, enabling Rayat to maintain a financial interest in the Defendants' RenovaCare share sales, and

concealing Rayat, Bhogal, Sidhu, and Fleming's beneficial ownership, intent to sell, and/or sales of RenovaCare common stock, Rayat, Bhogal, Sidhu, and Fleming, directly or indirectly, violated Section 20(b) of the Exchange Act.   These acts, done through and by means of the third-party promoters, investor relations consultants, and each other, violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

222.    By reason of the foregoing, Rayat, Bhogal, Sidhu, and Fleming directly or indirectly, singly or in concert, have violated, and unless restrained and enjoined will continue to violate Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).

## SIXTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act
(Against Bhogal, Sidhu, and Fleming)

223.    Paragraphs 1-14, 24-32, and 167-200 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

224.    By engaging in the conduct alleged in the Complaint, specifically by conducting the trading in RenovaCare shares alleged in this Complaint, Bhogal, Sidhu, and Fleming, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or any facility of any national securities exchange, or for any member of a national securities exchange, with specific intent, effected, alone or with persons, a series of transactions in RenovaCare securities that created the actual or apparent trading in such security, or raised or depressed the price of such security, for the purpose of inducing the purchase or sale of such security by others.

225.    By reason of the foregoing, Bhogal, Sidhu, and Fleming violated, and, unless restrained and enjoined, will again violate Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2).

## SEVENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(d) and
### Rules 15d-11 and 12b-20 Thereunder
(Against RenovaCare)

226.     Paragraphs 1-14, 24-32, and 45-164 of this Complaint are re-alleged and incorporated by reference herein.

227.     Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rule 15d-11 thereunder, 17 C.F.R § 240.15d-1, require issuers of securities that have filed certain registration statements to file with the Commission annual, quarterly, and current reports.  Exchange Act Rule 12b-20, 17 C.F.R. § 240.12b-20, provides that in addition to the information expressly required in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

228.     RenovaCare was required to file annual and other financial reports with the Commission pursuant to Section 15(d) of the Exchange Act and Rule 15d-11 thereunder.

229.     RenovaCare filed the January 12, 2018 Form 8-K that contained materially false statements or failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

230.     By reason of the foregoing, RenovaCare violated Section 15(d) of the Exchange Act, and Rules 15d-11 and 12b-20 thereunder.

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
(Against Treadstone Ltd., Treadstone LLC,
Blackbriar Ltd., and Alberta Ltd.)

231.     Paragraphs 1-14, 24-32, 45-164, and 167-204 of this Complaint are re-alleged and incorporated by reference herein.

232.     Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78(d)(5) states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

233.     As alleged in this Complaint, Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd. received funds or property that were the proceeds, or are traceable to the proceeds, of Defendants' securities law violations alleged in this Complaint.  Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd. had no legitimate claims to these proceeds, and gave no consideration in exchange for receipt of those funds.

234.     Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd. obtained the funds and property alleged above as part of and in furtherance of the Federal securities law violations alleged in this Complaint and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds and property.  They were unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Permanently enjoin Defendants from violating the Federal securities laws alleged in this Complaint.

### II.

Order Rayat, Bhogal, Sidhu, Fleming, and the Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

### III.

Order Defendants to pay civil money penalties pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

**IV.**

Permanently barring Rayat, Bhogal, Sidhu, and Fleming from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 21(d)(6), 15 U.S.C. § 78u(d)(6).

**V.**

Pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), permanently barring Rayat, Bhogal, Sidhu, and Fleming from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which are required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

**VI.**

Grant such further relief as the Court may deem just and appropriate.

**DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated: _____                          Respectfully submitted,

                                        s/ Matthew Scarlato
                                        Matthew Scarlato (admitted *Pro Hac Vice*)
                                        John J. Bowers (Bar No. JB8515)
                                        SECURITIES AND EXCHANGE
                                        COMMISSION
                                        100 F Street, NE
                                        Washington, DC 20549-4473
                                        scarlatom@sec.gov
                                        bowersj@sec.gov