UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/09/2023
```

-----------------------------------------------------------------------X
: 
SECURITIES AND EXCHANGE COMMISSION,          :
:
Plaintiff,          :
:
:                    21-cv-4777 (LJL)
-v-              :
:                  OPINION AND ORDER
HARMEL S. RAYAT, *et al.*,                      :
:
Defendants.          :
:
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants RenovaCare, Inc. ("RenovaCare") and Harmel S. Rayat ("Rayat") (together, "Moving Defendants") move the Court to issue a Letter of Request for International Judicial Assistance to the Supreme Court of British Columbia in Vancouver, in the Province of British Columbia, Canada ("Request"), requesting assistance to compel the oral deposition of a British Columbia resident, Mary Ellis, CPA, CA, and the production of documents from two Canadian entities, MNP LLP and Deloitte LLP ("Deloitte").[1]  Dkt. No. 178.  Plaintiff, the United States Securities and Exchange Commission ("SEC"), does not oppose the Request but argues that it should be expanded to include additional documents.  Dkt. No. 180.

For the following reasons, the Request is granted in part and denied in part.  The Court agrees with the SEC that the Moving Defendants' proposed limitations as to the scope of the production of tax returns and related evidence are inappropriate.  The Court accordingly so-orders the SEC's proposed letter of request, a signed copy of which is attached to this Opinion and Order.

---

[1] Co-Defendants Jatinder Bhogal, Jeetenderjit Singh Sidhu, and Sharon Fleming join the Moving Defendants' Request in full.  Dkt. No. 179 at 2.

# BACKGROUND

## I.      The Allegations

Familiarity with the prior proceedings in this case is assumed.

The amended complaint ("Complaint") charges Rayat and RenovaCare, of which Rayat was the controlling shareholder, as well as Jatinder Bhogal ("Bhogal"), Jeetenderjit Singh Sidhu ("Sidhu"), and Sharon Fleming ("Fleming") (collectively, "Defendants"), *inter alia*, with committing securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5(a), (b), and (c).  Dkt. No. 118.  In broad strokes, the Complaint alleges a "pump and dump" scheme that lasted from 2007 to 2018.  *Id.* ¶¶ 1–2.  During that time, Defendants engaged in a fraudulent scheme to inflate the share price and trading volume of RenovaCare and to sell its stock at inflated prices to unsuspecting retail investors.  *Id.*  Defendants allegedly accumulated millions of shares of RenovaCare stock, distributed it among the Defendants, and then promoted RenovaCare stock to investors through a paid third-party promotional campaign that they secretly funded.  *Id.* ¶ 2.  Defendants also disseminated materially false statements about the RenovaCare in a press release and a Form 8-K filed with the SEC and engaged in manipulative trading across multiple accounts to support the share price and trading volume of RenovaCare stock while selling over one-million shares to monetize the scheme.  *Id.*

Rayat is alleged to have been the ringleader of the scheme.  But Rayat did not personally sell any shares himself, in part because he was unsuccessful in opening a trading account.  *Id.* ¶ 62.  Rather, it is the SEC's theory that he played the "long game."  *Id.* ¶ 3.  Beginning no later than 2007, Rayat transferred shares of RenovaCare and other penny stocks to his co-Defendants Bhogal and Sidhu and others while retaining a financial interest in the shares that he transferred—either in the form of debt obligations or preferred shares in the entities that received

2

the transferred shares, thereby permitting him to secretly profit when others sold the shares during the promotional campaign.  *Id.*

Rayat disputes that he maintained an interest in the shares transferred to Bhogal and Sidhu.  He claims that the 2007 and 2008 stock transfers were intended to be a gift to them and their families "in a manner that reduced any corresponding tax burden."  Dkt. No. 180-3 at 7.  He testified during the SEC's investigation that he was concerned that a gift to Bhogal and Sidhu would have been a taxable event for him and so he "went to [his] lawyers and accountants, said how do I do this without—without a tax impact, and how do I plan, you know, for my kids?  How do I do this, so in the future there's limited or minimal taxes?  And that's when everything was structured out, and all the detail—I just followed their leads."  Dkt. No. 180-4 at 150:10–151:9.

## II.     The Letter of Request

The letter of request seeks the testimony of Mary Ellis ("Ellis"), a resident of British Columbia and an accountant at the Langley, British Columbia office of MNP LLP.  Dkt. No. 179-1 at 2–3.  Ellis previously served as an accountant at Deloitte until a subset of Deloitte was purchased by MNP LLP in or around March 2021.  *Id.* at 3.  Ellis has served as the personal accountant to Rayat and Sidhu for approximately fifteen years.  *Id.*  According to the Moving Defendants, Ellis provided accounting advice concerning, and was involved in structuring, the 2007-era transactions and certain subsequent related-transactions between and among Rayat, Sidhu, and Bhogal.  *Id.* at 3–4.  It is the Moving Defendants' expectation that Ellis will be able to provide testimony regarding the purpose of the transactions, including their structure, whether the transactions involved an exchange at fair market value, and whether it is possible for Rayat to profit from trading conducted by entities owned by Bhogal and Sidhu given certain Canadian tax provisions.  *Id.* at 4.  Moving Defendants expect that Deloitte, as Ellis's employer during some of

the transactions, and MNP LLP, as her current employer, may possess documents related to the transactions. *Id.*

Deloitte has declined to make Ellis available for testimony on a voluntary basis,[2] and has stated that formal process would be necessary for it to produce documents; MNP LLP has also stated that it would not provide documents on a voluntary basis. Dkt. No. 179-2 ¶ 4(g), (h), (j). Rayat is not in possession of the 2007 and 2008 transaction documents. Dkt. No. 180-3 at 7.

## III.    The Dispute Between the Parties

The parties agree that the Court should issue a letter of request but differ as to its scope.

Moving Defendants argue that the Request should be limited to tax return information relating to what Moving Defendants term the "Estate Planning Transactions"—the 2007-era transactions and certain subsequent related transactions between and among Rayat, Sidhu, and Bhogal, and certain entities they owned or controlled. Dkt. No. 181 at 2. To that end, Moving Defendants argue that the return information that should be subject to the Request are "tax returns, financial statements, and related documents for [Rayat, Bhogal, and Sidhu], or any entity they owned or controlled (including but not limited to the entities enumerated [elsewhere in the Request]), for the tax years 2007 to the present reflecting the transfer of funds or assets between or among those individuals and their respective entities." Dkt. No. 179-1 at 9-10. Moving Defendants also would limit the tax return information for various trusts related to the Defendants to that which reflects the transfer of funds or assets between or among Rayat, Bhogal, and Sidhu, or any entity they owned or controlled, and would limit the request for communications with Rayat, Bhogal, and Sidhu or persons acting on their behalf to

---

[2] Ellis told counsel for Defendants that the decision of whether she would provide evidence voluntarily would be made by counsel for Deloitte (and not by herself or counsel for MNP LLP). Dkt. No. 179-2 ¶ 4.

communications "concerning any transfer of funds or other asset, a financial interest, or a financial relationship, direct or indirect, between or among any of them or any entity they owned or controlled." *Id.* at 10–11. Moving Defendants would have Ellis testify about the "purpose and structure of the Estate Planning Transactions" but not on any other subjects. *Id.* at 7.

The SEC argues that the Request should have a broader scope. In particular, it asks that the Request include (i) tax returns, financial statements, and related documents for Rayat, Bhogal, and Sidhu or any entity they directly or indirectly owned or controlled for the tax years 2007 to the present, without any additional limitations; (ii) tax returns, financial statements, and related documents for certain trusts for the same tax years again without additional limitations; and (iii) communications with Rayat, Bhogal, and Sidhu, again without any limitation. Dkt. No. 180-1 at 10–11. It asks that Deloitte and MNP LLP also be required to produce documentation related to the creation or dissolution of the trusts associated with the Moving Defendants, *id.* at 13, and that Ellis provide testimony not only on "the purpose and structure of the Estate Planning Transactions" but also on "defendants' other financial relationships, and other of defendants' accounting and tax-related information." *Id.* at 8.

## DISCUSSION

"Rule 28(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1781(b)(2) authorize federal courts to issue letters rogatory that enable a U.S. litigant to obtain non-party discovery from a foreign entity." *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 776 (S.D.N.Y. 2012). Rule 28(b) provides that a deposition may be taken in a foreign country pursuant to a letter of request issued "on appropriate terms after an application and notice of it" and "without a showing that taking the deposition in another manner is impracticable or inconvenient." Fed. R. Civ. P. 28(b). Section 1781 of Title 28, which authorizes the United States Department of State to accept letters rogatory issued by foreign tribunals, allows for "the

transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner." 28 U.S.C. § 1781(b)(2). "In considering the issuance of letters rogatory, U.S. courts apply the discovery principles contained in Rule 26." *Lantheus Med. Imaging, Inc.*, 841 F. Supp. 2d at 776. "The decision of whether to issue letters rogatory is within the discretion of the court." *Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 120 (S.D.N.Y. 2019).

Both the SEC and Moving Defendants agree that the Request is properly issued to the Supreme Court of British Columbia in Vancouver, in the Province of British Columbia, Canada, to compel the attendance of Ellis for a sworn oral deposition and to compel the production of documents from Deloitte and MNP LLP. Dkt. Nos. 179-1, 180-1. Ellis served as the personal accountant for Rayat and Sidhu for approximately fifteen years and has worked at both Deloitte LLP and MNP LLP during that time. Dkt. No. 179 at 3; Dkt. No. 180-1 at 3. She was involved in structuring the 2007-era transactions and certain subsequent related transactions between and among Rayat, Sidhu, and Bhogal, through which Rayat allegedly sold millions of shares of RenovaCare, SolarWindow, and several other public U.S. companies to Bhogal and Sidhu for preferred stock in companies that the two owned and controlled. Dkt. No. 180 at 3. The disagreement is as to the scope of the Request. The SEC argues that the Request should include all tax return information for Rayat, Bhogal, and Sidhu for tax years 2007 forward as well as testimony regarding Defendants' other financial relationships and other of Defendants' accounting and tax-related information. *Id.* Moving Defendants argue that the Request and the return information produced pursuant to it should be limited to that concerning the Estate Planning Transactions. Dkt. No. 181.

The parties initially assumed, without arguing, that the applicable standard for the discovery of the tax return information at issue here is that set forth in *Mangahas v. Eight Oranges Inc.*, 2022 WL 14106010, at *2 (S.D.N.Y. Oct. 24, 2022), and followed by numerous courts in this Circuit and elsewhere.  Dkt. No. 179 at 9; Dkt. No. 180 at 2.  Under that test, "[a] party seeking to compel production of tax returns in civil cases must meet a two-part showing that: '(1) the returns must be relevant to the subject matter of the action, and (2) a compelling need must exist because the information is not readily obtainable from a less intrusive source.'" *Lopez v. Guzman*, 2018 WL 11411132, at *3 (E.D.N.Y. Nov. 27, 2018) (quoting *Sadofsky v. Fiesta Prods, LLC*, 252 F.R.D. 143, 149 (E.D.N.Y. 2008)); *see Mangahas*, 2022 WL 14106010, at *2; *Trudeau v. N.Y. State Consumer Prot. Bd.*, 237 F.R.D. 325, 331 (N.D.N.Y. 2006) ("Routine discovery of tax returns is not the rule but rather the exception.").

However, while this test is generally applied to requests for U.S. tax records, the tax returns at issue here will mostly, if not entirely, consist of Canadian tax returns of British Columbia residents.  Dkt. No. 183 at 1.  And, it is not self-evident that a U.S. court asked to compel the production of foreign tax returns should apply the same standards that it would apply to discovery requests for tax return information filed with the Internal Revenue Service ("IRS") or with the several States.

The two-part test is rooted in provisions of the Internal Revenue Code and concerns about the public fisc of the United States and the several States—and not solely on concerns about the sensitive information contained within tax returns.  "The public policy supporting the courts' sensitive treatment of tax returns is" founded, in part, "in provisions of the Internal Revenue Code declaring that federal tax returns are confidential communications between the taxpayer and the government."  6 Moore's Federal Practice § 26.45[1][b] (3d ed. 2021); *see also S.E.C. v.*

*Cymaticolor Corp.*, 106 F.R.D. 545 (S.D.N.Y. 1985) ("The decision to disclose the returns involves a balancing of the policy of liberal discovery against the policy of maintaining the confidentiality of tax returns.").  26 U.S.C. § 6103(a) explicitly states that "[r]eturns and return information shall be confidential."  *See Gates v. Wilkinson*, 2005 WL 758793, at *1 (N.D.N.Y. Apr. 5, 2005) (quoting Section 6103(a) and stating "[s]ince 1977, tax returns have been described by statute as 'confidential'").  In addition, when a party requests return information filed with the IRS or the taxing authority of one of the States or its subdivisions, the public fisc of the United States or the States is at issue.  Courts are protective of tax return information not just because of the "the private nature of the sensitive information contained therein" but also because of "the public interest in encouraging the filing by taxpayers of complete and accurate returns."  *Xiao Hong Zheng v. Perfect Team Corp.*, 739 F. App'x 658, 660 (2d Cir. 2018) (quoting *Smith v. Bader*, 83 F.R.D. 437, 438 (S.D.N.Y. 1979)).  The theory is that a taxpayer will be less forthcoming with the IRS if she thought or believed that the disclosures she makes in a confidential capacity with the taxing authority might be available for a litigation adversary to see under the permissive standards of Federal Rule of Civil Procedure 26.

In other words, the two-part test is not justified alone by concerns of privacy.  All kinds of document requests call for confidential and sensitive information.  If the only interest at stake was that of privacy, a two-part test would not be necessary.  Federal Rule of Civil Procedure 26 itself protects against overbroad requests or requests designed to "embarrass or harass."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353 n.17 (1978).  The court has authority to enter a confidentiality order if the information is particularly sensitive and its public disclosure could cause harm to the producing party.  *See* Fed. R. Civ. P. 26(c)(1).  The additional protection

U.S. tax return information is accorded is based on the notion that "the fear of public disclosure may hinder the full reporting of the taxpayer's income." *Bader*, 83 F.R.D. at 439.

The balance that the U.S. courts have struck, however, with respect to the production of returns filed with United States taxing authorities is not the only one that a sovereign could choose to strike. A country, or a court, concerned with protecting its fisc but also concerned with the fair and accurate determination of a matter in dispute could just as easily decide that return information should be made available to litigants without any special showing. In that event, it would not be consistent with the Federal Rules of Civil Procedure for a U.S. court to deny to a party litigating in this country the evidence it would be able to obtain through a request in the country whose public fisc is at stake. To put it in the terms at issue in this case, the United States has no interest in being more protective of information filed with the Canadian taxing authorities than the Canadian authorities themselves would have.[3]

The question is therefore how Canada itself treats its own tax return information and whether it affords heightened protection to return information similar to that afforded by U.S. courts. Generally, "[w]here the alleged obstacle to production is foreign law, the burden of

---

[3] Moving Defendants argue that "[c]ourts in the Second Circuit have applied the Two-Part Test to the discoverability of foreign tax returns." Dkt. No. 184 at 1. However, all of the cases but one that Defendant cite involved requests for both U.S. and foreign tax returns. *See Shanshan Shao v. Beta Pharma, Inc.*, 2017 WL 1752932, at *5 (D. Conn. May 4, 2017) (involving request for both U.S. and foreign tax returns); *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 323 (S.D.N.Y. 2011) (involving request for federal, state, and foreign tax returns); *Grand River Enter. Six Nations, Ltd. v. King*, 2009 WL 363379, at *5 (S.D.N.Y. Feb. 11, 2009), *aff'd sub nom. Grand River Enterprises Six Nations, Ltd. v. King*, 2009 WL 1360686 (S.D.N.Y. May 15, 2009) (involving request for both U.S. and Canadian tax returns); *Gates*, 2005 WL 758793, at *1 (involving request for federal, state, and foreign tax returns); *Brassco, Inc. v. Klipo*, 2004 WL 1385816, at *3 (S.D.N.Y. June 21, 2004) (involving request for both Polish and U.S. tax returns). And, in the remaining case, the court did not consider whether different principles should govern the disclosure of foreign tax returns versus U.S. tax returns and appeared to assume that the principles should be the same. *See Beaty v. Basic Res. Int'l, S.A.*, 1985 WL 1074, at *1 (S.D.N.Y. Apr. 29, 1985).

proving what that law is and demonstrating why it impedes production falls on the party resisting discovery." *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016); *see also United States v. Wey*, 252 F. Supp. 3d 237, 252 (S.D.N.Y. 2017) (Nathan, J.).  "In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993); *see also Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) ("In our view, however, to avoid speculative forays into legal territories unfamiliar to federal judges, parties must provide authoritative proof that a foreign tribunal would reject evidence because of a violation of an alleged foreign privilege." (cleaned up)).

In this case, Moving Defendants have not presented persuasive evidence that Canadian tax returns are entitled to the same heightened protection applied to domestic tax returns.  First, Moving Defendants argue that the same protection afforded to domestic tax returns should be afforded to Canadian tax returns because, foreign tax returns, like domestic tax returns, involve the invasion of a litigant's privacy interests.  Dkt. No. 184 at 2.  However, as discussed, U.S. tax returns are subject to heightened protections not just because of the "the private nature of the sensitive information contained therein" but also in order to promote the filing of open and honest tax returns.  *See Perfect Team Corp.*, 739 F. App'x at 660 (quoting *Bader*, 83 F.R.D. at 438).  Second, Moving Defendants argue that "the Canadian Income Tax Act, like the United States Internal Revenue Code, recognizes the importance of maintaining the confidentiality of tax return information."  Dkt. No. 184 at 2.  Moving Defendants cite to Section 241 of the Canadian Income Tax Act, which they state is "directly analogous" to 26 U.S.C. § 6103.  *Id.* This argument is unavailing because Section 241 of the Canadian Income Tax Act is *not* directly

analogous to 26 U.S.C. § 6103.  While Section 241 is similar to 26 U.S.C. § 6103 in that it

imposes certain restrictions on the sharing of personal taxpayer information by officials or

representatives of governmental entities, Section 241 nowhere states that tax return information

"shall be confidential."  And, it is that phrase in 26 U.S.C. § 6103(a) that U.S. courts have looked

to in finding that domestic tax returns are subject to heightened protection.  *See* 6 Moore's

Federal Practice § 26.45[1][b].  Finally, Moving Defendants claim that Canadian law recognizes

litigants' privacy interests in their tax returns and permits redactions of tax returns.  Dkt. No. 184

at 3.  But, the Canadian caselaw that Moving Defendants cite does not involve an application of

a test comparable to the two-part test; instead, it appears that Canadian courts allow the

production of tax returns based solely on a showing of relevance (although with redactions of

wholly irrelevant material).  *See* Dkt. Nos. 184-1, 184-2 (stating that "[p]ersonal income tax

returns are compellable" "to the extent that they are relevant to matters in issue").

      Regardless, the Court need not rest its decision alone on Moving Defendants' failure to

show that the return information would be protected under Canadian law, because—as an

independent matter—even if the two-part test applicable to U.S. returns applies, the SEC has met

it.  The SEC has established that the returns are relevant to the subject matter of the action and

that a compelling need exists because Moving Defendants have not identified a less intrusive

source from which the information would be readily obtainable.  In particular, Rayat has argued

both that the transactions between him and Bhogal and Sidhu were tax-motivated estate planning

transactions and that he received no consideration and enjoyed no benefits from Bhogal and

Sidhu as a result of the transactions.  Thus, Rayat has put the returns and his tax strategy at issue.

He has also put the full nature of the relationship between him and Bhogal and Sidhu and the

entities they controlled, directly and indirectly, at issue.  In order to test Rayat's defense and his

theory, the SEC is entitled to information about Rayat's taxes, including the tax strategies he employed over time, the avoided taxes to him from this purported strategy, and the relationship of that benefit to Rayat's total income and tax position.  The SEC also is entitled to information regarding the capital gains taxes paid on the stock sales, dividends received, and other income received by each of Rayat, Bogul, and Sidhu.

Moving Defendants' proposed limitation to return information "reflecting the transfer of funds or assets between or among those individuals and their respective entities" is plainly inadequate.  Dkt. No. 181 at 4.  This limitation would not allow the SEC to discern whether Rayat had employed similar strategies in the past, how these transfers fit into Rayat's overarching tax strategy for a particular year, the truthfulness of Rayat's claim that he lacked any continuing interest in the stock that was transferred, or whether Rayat obtained any other form of benefit directly or indirectly as a result of those transfers.  In addition, the SEC presents evidence that Sidhu, Bhogal, and Rayat have been business partners for decades, and have had numerous "intertwined business relationships."  Dkt. No. 180 at 8–9.  The tax return information is thus relevant not only to understanding the transactions directly at issue, but also to understanding the "true depth of Defendants' financial ties" during, prior to, and after the scheme.  *Id.* at 10. Moving Defendants do not identify any other source for such information.  *See S.E.C. v. Garber*, 990 F. Supp. 2d 462, 466 (S.D.N.Y. 2014) (holding that it is the burden of "the originator of tax returns . . . to suggest alternative sources for the information they contain"); *United States v. Bonanno Organized Crime Fam. of La Cosa Nostra*, 119 F.R.D. 625, 627 (E.D.N.Y. 1988) ("While the party seeking discovery of the tax returns bears the burden of establishing relevance, the party resisting disclosure should bear the burden of establishing alternative sources for the information.").  Nor where the defense is that the transactions were tax-motivated is it readily

apparent that such alternate sources would exist.  Thus, both prongs of the test have been satisfied.

Moving Defendants argue that their Request should be deemed sufficient because their proposal includes a lengthy list of individuals and entities "that the parties are aware of having any role in the Estate Planning Transactions."  Dkt. No. 181 at 3.  The Moving Defendants' proposed form of Request would call for Deloitte LLP and MNP LLP to produce return information reflecting the transfer of funds or assets between or among Rayat, Bhogal, and Sidhu "and their respective entities."  Dkt. No. 179-1 at 12.  But there is no basis to believe that Deloitte LLP and MNP LLP know all of the entities Rayat, Bhogal, and Sidhu own and control beyond those which are specifically listed.  And, as noted, the SEC has presented evidence that Rayat and Bhogal are long-time family friends, who started doing business together in the 1990s, and that Sidhu worked with Rayat for over two decades in numerous businesses.  Dkt. No. 180 at 7.  The relationships among them are complex and extensive and the very list provided by the Moving Defendants demonstrates that the parties do business through numerous different entities.  The SEC is not required to rely alone on the list of entities provided by Moving Defendants or developed during its pre-suit investigation[4]; it has offered sufficient information to demonstrate that the request for all information, regardless whether it involves one of the lengthy list of individuals and entities of which the parties are already aware, is not a fishing expedition.

---

[4] This is particularly true when actions taken during the course of the SEC's pre-suit investigation would have had the effect of frustrating the SEC's ability to uncover all relevant information during that investigation.  *See* Dkt. No. 108 at 15–17.  This Court previously rejected the argument that the SEC must "conclude its investigation as to all potential members of a scheme before suing any of them."  *Id.* at 19 ("Requiring the SEC to conclude its investigation as to all potential members of a scheme before suing any of them, on pain that it would later be significantly time-limited in its ability to amend to do so, would undercut the SEC's 'statutory mandate to protect the public interest through prompt and effective enforcement of the federal securities laws.'" (citation omitted)).

Rayat claims that the moment he transferred the stock he lost any continuing interest in it.  The SEC is entitled to examine the returns to determine whether they establish the truth of that proposition, both with respect to the entities which are currently known to the SEC and to those which are not yet known but which the return information may reveal.

Finally, it is worth noting that, in this case, where Defendants seek to use certain tax information to bolster their defenses, "the policy of promoting full disclosure [would] not [be] thwarted." *Bader*, 83 F.R.D. at 439.  The presumption of Defendants' application is that the returns—in their entirety—would actually support their defenses.  That is why Defendants are seeking the returns in the first place; because they claim it would support their defenses.  In that context, it would be unfair to allow Defendants to use portions of their returns to support their defenses while preventing the SEC from reviewing the broader context from which these portions arise to determine whether the inference that Defendants would have a jury draw is a fair inference.  As the Second Circuit has noted in the context of privileged communications, the court must "protect[] the party, the factfinder, and the judicial process from selectively disclosed and potentially misleading evidence." *In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987); *see BristolMyers Squibb Co. v. Rhone-Poulenc Rorer*, *Inc.*, 1997 WL 801454, at *1 (S.D.N.Y. Dec. 31, 1997) ("Based principally on notions of fairness, courts have imposed . . . a 'subject matter waiver' . . . when [a] privilege-holder has attempted to use the privilege as both 'a sword' and 'a shield' or when the party attacking the privilege would be prejudiced at trial." (citation omitted)). "[T]he traditional concern with the privacy of these returns" is also easily satisfied by "a confidentiality stipulation which prohibits the disclosure of any tax returns produced to anyone other than counsel." *Bader*, 83 F.R.D. at 439.  If it turns out that the additional information requested by the SEC but resisted by Defendants is truly irrelevant, Defendants will not have

been harmed.  On the other hand, should it be that the information that the Defendants resist disclosing is not irrelevant but would put the lie to the Defendants' claim, it would not only be the SEC but the truth-finding function itself that would be harmed.

## CONCLUSION

The Request is GRANTED IN PART and DENIED IN PART.  A signed copy of the SEC's request for international judicial assistance is attached to this Opinion and Order.

The Clerk of Court is respectfully directed to close Dkt. No. 178.


SO ORDERED.

Dated: February 9, 2023
     New York, New York
                                               LEWIS J. LIMAN
                                    United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| SECURITIES AND EXCHANGE COMMISSION, |
| *Plaintiff*, |
| - against - |
| HARMEL S. RAYAT, RENOVACARE, INC., JATINDER BHOGAL, JEETENDERJIT SIDHU, and SHARON FLEMING, |
| *Defendants*, |
| - and – |
| TREADSTONE FINANCIAL GROUP LTD., TREADSTONE FINANCIAL GROUP LLC, BLACKBRIAR ASSET MANAGEMENT LTD., and 1420527 ALBERTA LTD., |
| *Relief Defendants*. |

Case No. 1:21-cv-04777-LJL

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE

The United States District Court for the Southern District of New York presents its compliments to the Supreme Court of British Columbia in Vancouver, in the Province of British Columbia, Canada, and requests judicial assistance to compel the attendance of one witness, Mary Ellis, at a sworn oral deposition and to compel the production of documents from two corporate witnesses, Deloitte LLP and MNP LLP, to be used in a civil proceeding before this Court in the above-captioned matter. This Court requests the assistance described herein as necessary in the interests of justice.

### I.   Summary Of Action

The Securities and Exchange Commission ("Commission") brought this public enforcement action on May 28, 2021, in the United States District Court for the Southern District of New York against Defendants Harmel S. Rayat and RenovaCare Inc.

("RenovaCare"). *See* Complaint, attached hereto as Exhibit ("Ex.") A. RenovaCare is a publicly traded company in the United States, and Mr. Rayat is its controlling shareholder. *See id.* ¶¶ 9-10.

The Commission alleges that Mr. Rayat and RenovaCare violated the securities laws by misrepresenting in a press release their involvement in a public promotion of RenovaCare by a third-party online financial publishing company called StreetAuthority LLC ("StreetAuthority"). *Id.* ¶ 1. The Commission alleges that Mr. Rayat made these alleged misrepresentations so that he and his associates could profit from an artificially increased RenovaCare stock price. *Id.* ¶¶ 76-80. Mr. Rayat and RenovaCare denied these allegations in their Answer on August 31, 2021. Among other defenses, Mr. Rayat claims that he did not sell a single RenovaCare share while the StreetAuthority campaign was active, or at any point in the last decade.

On August 30, 2022, the SEC filed an amended complaint. *See* Amended Compl., attached hereto as Ex. B. The Amended Complaint alleges that Mr. Rayat profited from the StreetAuthority campaign indirectly through sales by entities owned by new defendants Jeetenderjit Sidhu and Jatinder Bhogal. *Id.* ¶ 3. Specifically, the Commission now alleges that Mr. Rayat and his "associates," played a "long game" under which Mr. Rayat transferred to entities controlled by Mr. Sidhu and Mr. Bhogal shares of a predecessor company to RenovaCare and several other companies in exchange for preferred shares in Mr. Sidhu and Mr. Bhogal's entities (the "Estate Planning Transactions"). *See* Am. Compl. ¶ 3. The Commission alleges that these preferred shares "allowed Rayat to profit from the sale of shares by others during the promotional activity." *Id.* There were numerous entities and individuals involved in the Estate Planning Transactions, the Defendants' sale of RenovaCare and other

stock involved in these transactions, and the fraudulent scheme alleged in the Amended

Complaint, including Kalen Capital Corporation, Kalen Capital Holdings LLC, 1420524

Alberta Ltd., 1420525 Alberta Ltd., 1420468 Alberta Ltd., 1422688 Alberta Ltd, Fargo West

Investments Ltd., Collingwood Holdings LLC, Blackbriar Asset Management Ltd., Blackbriar

Asset Management LLC, Treadstone Financial Group Ltd., Treadstone Financial Group LLC,

the DS Sidhu Trust, the PK Sidhu Trust, Gurmeet Sidhu, Jasvir S. Kheleh, Amarjit Kaur

Sidhu, Anchhattar Singh Sidhu, Manjit Kaur Sidhu, Priya Kaur Sidhu, Jasvir K. Sidhu, Dayan

Singh Sidhu, 1420527 Alberta Ltd., 1420527 Alberta LLC, Boston Financial Group, Ltd.,

Boston Financial Group LLC, Wolverhampton Holdings LLC, Vector Asset Management Inc.,

Heritage Family Trust, the Legacy Family Trust, Amritpal Tanda, Arian Soheili, Nirmal Singh

Bhogal, Gurdyal Kaur Bhogal, Kesar Dhaliwal, Indy Panchi, Mehar Bhogal, Mehtab Bhogal,

and Ranjit K. Bhogal. *See* Am. Compl. ¶¶ 25-32, 37-48, 196-98; Exs. 1-6

The individual identified in this request, Mary Ellis, is a resident of Surrey, British

Columbia, and works as an accountant at the Langley, British Colombia office of MNP LLP.

Previously, Ms. Ellis served as an accountant at Deloitte LLP, until a subset of Deloitte LLP was

purchased by MNP LLP in or around March 2021. Ms. Ellis's testimony is highly relevant to the

parties' claims and defenses. Ms. Ellis's current employer, MNP LLP, and former employer,

Deloitte LLP, have evidence in their possession, custody, or control that is highly relevant to the

parties' claims and defenses.

Ms. Ellis has served as the personal accountant to defendants Harmel Rayat and

Jeetenderjit Sidhu for over fifteen years. *See*, *e.g.*, Ex. 1, RCHR-SEC-000011915 (March 28,

2011 email from Ms. Ellis to Mr. Sidhu and Mr. Rayat). As an accountant at Deloitte LLP, Ms.

Ellis provided accounting advice and was involved in structuring the Estate Planning

Transactions that the SEC now alleges permitted Mr. Rayat to profit indirectly from the

3

StreetAuthority campaign. *See, e.g.*, Ex. 2, RCHR-SEC-000010517 (September 1, 2008 Memorandum from Harmel Rayat to Lloyd Aasen and Mary Ellis regarding "Trust Documents"); Ex. 3, RCHR-SEC-000010522 (Election on Disposition of Property by Harmel Rayat in tax year 2007 regarding Boston Financial Group); Ex. 4, RCHR-SEC-000010533 (Election on Disposition of Property by Harmel Rayat in tax year 2007 regarding Fargo West Investments Ltd.); Ex. 5, RCHR-SEC-000010549 (Election on Disposition of Property by Harmel Rayat in tax year 2007 regarding 1420527 Alberta Ltd.).

Ms. Ellis can provide testimony regarding the purpose of the Estate Planning Transactions, Defendants' other financial relationships, and other accounting and tax-related issues. *See, e.g.*, Ex. 6, RCHR-SEC-000002953 (February 21, 2011 Letter from Deloitte Associate Partner Randy Munro to Lloyd Asen (Mr. Rayat "intended for the future value of Boston [Financial Group] to accrue to the benefit of the [Bhogal] Legacy Family Trust. . . .please do not hesitate to contact Mary Ellis")). Ms. Ellis can provide testimony regarding the structure of the Estate Planning Transactions: including to test Rayat's contention that the transactions were an exchange of fair market value and that was not possible for Mr. Rayat to profit from trading conducted by entities owned by Mr. Bhogal and Mr. Sidhu given the Canadian Income Tax Act provision utilized in the Estate Planning Transactions. *See* Income Tax Act, RSC 1985, c 1 (5th Supp.), s 85. As Rayat's long-time accountant, she can also testify as to the nature of Rayat's other financial relationships with Bhogal, Sidhu, and Defendant Sharon Fleming.  Thus, Ms. Ellis's testimony would be relevant to the SEC's theory that Rayat sought to benefit from the alleged scheme through his financial interests in the other Defendants.  Am. Compl. ¶¶ 62-67; 195-97. Ms. Ellis's current employer MNP LLP possesses documents related to the Estate Planning Transactions, Defendants' other financial relationships, and Defendants' other accounting and tax-related issues. In addition, given that

4

certain of the Estate Planning Transactions occurred as earlier as 2007, Ms. Ellis's former employer Deloitte LLP possesses documents relevant to this matter. Defendants have made attempts to secure the voluntary production of relevant documents without success.

## II.   **Assistance Requested**

The assistance of the British Columbia Supreme Court in Vancouver, British Columbia, Canada, is requested because the evidence sought from Ms. Ellis, MNP LLP, and Deloitte LLP is relevant to discovery in this case, and also necessary for use at trial, and the evidence is not otherwise obtainable by this Court at the trial through this Court's compulsory process. Therefore, this Court respectfully requests that, in the interests of justice, you issue appropriate orders, subpoenas, or other compulsory process necessary to compel Ms. Ellis to attend a sworn oral deposition for three days under Canadian law, or13.5 hours total hours, to permit the numerous parties to conduct their examinations. This Court further requests that the proper judicial authorities of the Province of British Columbia cause the depositions to be transcribed by a qualified court reporter, the transcript of the deposition to be authenticated, and the authenticated records to be delivered to counsel for all parties in this litigation. This Court further requests, in the interests of justice, you issue appropriate orders, subpoenas, or other compulsory process necessary to compel the production of relevant documents from MNP LLP and Deloitte LLP.

The Court requests that the parties be permitted to have the testimony videotaped by a qualified videographer, and that the original transcript of the testimony and the videotapes be returned to the parties for retention and production for trial. This Court further requests that U.S. counsel for the Defendants conduct the examination of the witness, that U.S. counsel for Commission be permitted to cross-examine the witnesses after the Defendant's examination is complete, and that U.S. counsel for the Defendants have an opportunity to conduct further examination, if necessary. Mr. Rayat requests at least 3.5 hours to question Ms. Ellis and anticipates that the Commission and co-Defendants will seek to question Ms. Ellis for a comparable amount of additional time.

Pursuant to 28 U.S.C. § 1782, this Court stands ready to extend similar assistance to the Courts of Canada in like cases.

### III.   Witnesses and Documents Requested

#### A.   Instructions

1. This request calls for the production of documents in the possession, custody, or control of the witness.

#### B.   Definitions

1.   "Document" includes any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded

by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

2.  "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

3.  The following rules of construction apply to this attachment:

   a.  the functional words "any" and "all" shall be deemed to include the other functional word;

   b.  the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the attachment all responses that might otherwise be construed to be outside of its scope;

   c.  the use of the singular form of any word includes the plural and vice versa; and

   d.  the term "including" means including, but not limited to.

4.  "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

5.  "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants,

7

attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

6.   "RenovaCare," means Defendant RenovaCare, Inc., and all predecessors, successors, parents, subsidiaries, affiliates, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names or trade or business names used by any of the foregoing, and all entities in which Defendant RenovaCare Inc. has or has had a controlling interest, such as a corporation, general partnership, limited partnership, or trade or business name, including, but not limited to, Entheos Technologies Inc.

7.   "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, analyzing or reflecting.

### C.     Witnesses and Documents Requests

### 1.  **<u>Mary Ellis</u>**

MNP LLP
Suite 620 - 19933 88th Avenue
Langley, BC, V2Y 4K5

The Commission alleges that Mr. Rayat profited from trading in RenovaCare shares through his interest in entities controlled by defendants Jeetenderjit Sidhu and Jatinder Bhogal. Ms. Ellis has served as Mr. Rayat and Mr. Sidhu's accountant for over a decade. Ms. Ellis was also the architect of the Estate Planning Transactions that the Commission alleges are one means by which Mr. Rayat profited from Mr. Sidhu and Mr. Bhogal's securities trading. Ms. Ellis can provide testimony regarding the purpose and structure of the Estate Planning Transactions, defendants' other financial relationships, and other of defendants' accounting and tax-related information.

Thus, Ms. Ellis's testimony is critical to the SEC's claims and Mr. Rayat's defense. This Court therefore requests Ms. Ellis's deposition under oath for three days under Canadian law, or 13.5 hours total hours, to permit the numerous parties to conduct their examinations.

## 2. MNP LLP

Suite 620 - 19933 88th Avenue
Langley, BC
V2Y 4K5

Ms. Ellis's current employer, MNP LLP, provides accounting services to defendants Harmel Rayat and Jeetenderjit Sidhu. Accordingly, MNP LLP possesses documents relevant to the Estate Planning Transactions described above, defendants' other financial relationships, and defendants' other accounting and tax-related information. This Court therefore requests the production of the following documents from MNP LLP:

a. All documents and communications concerning RenovaCare, Inc., Jatinder Bhogal, Harmel Rayat, Kalen Capital Corporation, Kalen Capital Holdings LLC, 1420524 Alberta Ltd., 1420525 Alberta Ltd., or 1420468 Alberta Ltd., and any of Jeetenderjit Sidhu, 1422688 Alberta Ltd, Fargo West Investments Ltd., Collingwood Holdings LLC, Blackbriar Asset Management Ltd., Blackbriar Asset Management LLC, Treadstone Financial Group Ltd., Treadstone Financial Group LLC, the DS Sidhu Trust, the PK Sidhu Trust, Gurmeet Sidhu, Jasvir S. Kheleh, Amarjit Kaur Sidhu, Anchhattar Singh Sidhu, Manjit Kaur Sidhu, Priya Kaur Sidhu, Jasvir K. Sidhu, or Dayan Singh Sidhu;

b. All documents and communications concerning RenovaCare, Inc., Jeetenderjit Sidhu, Harmel Rayat, Kalen Capital Corporation, Kalen Capital Holdings LLC, 1420524 Alberta Ltd., 1420525 Alberta Ltd., or 1420468 Alberta Ltd., and any of Jatinder Bhogal, 1420527 Alberta Ltd., 1420527 Alberta LLC, Boston Financial Group, Ltd., Boston Financial Group LLC, Wolverhampton Holdings LLC, Vector Asset Management Inc., the Heritage Family Trust, the Legacy Family Trust, Amritpal Tanda, Arian Soheili, Nirmal Singh Bhogal, Gurdyal Kaur Bhogal, Kesar Dhaliwal, Indy Panchi, Mehar Bhogal, Mehtab Bhogal, or Ranjit K. Bhogal;

c. All documents and communications concerning the TJR Family Trust, KJR Family Trust, the TJR Investment Trust, the KJR Investment Trust, the Heritage Family Trust, the Legacy Family Trust, the DS Sidhu Trust, and the PK Sidhu Trust, including but not limited to the original trust indenture and any modifications thereto, documents concerning the current existence of these entities, any direct or indirect asset transfers,

and any documents or communications relating to the wind-down of these entities;

d. All documents and communications from January 2007 to the present concerning any transaction involving Harmel Rayat, Kalen Capital Corporation, Kalen Capital Holding LLC, 1420524 Alberta Ltd., 1420525 Alberta Ltd., or 1420468 Alberta Ltd. pursuant to Section 85 of the Canadian Income Tax Act and entities directly or indirectly owned, controlled, or associated with Jeetenderjit Sidhu or Jatinder Bhogal, including but not limited to:

    i. Documents and communications concerning transactions on or around March 15, 2007 through which Harmel Rayat or Kalen Capital Corporation sold certain common shares in exchange for preferred shares in entities owned and controlled by Jatinder Bhogal, Ranjit Bhogal, Gurmeet Sidhu, or Jeetenderjit Sidhu;

    ii. Documents and communications concerning transactions on or around December 31, 2007 through which Harmel Rayat or Kalen Capital Corporation sold certain common shares in exchange for preferred shares in entities owned and controlled by Jatinder Bhogal, Ranjit Bhogal, Gurmeet Sidhu, or Jeetenderjit Sidhu;

    iii. Documents and communications concerning transactions between Harmel Rayat or Kalen Capital Corporation and entities associated with Jeetenderjit Sidhu, Gurmeet Sidhu, Ranjit Bhogal, or Jatinder Bhogal on or around September 8, 2008;

    iv. Documents and communications concerning any redemption, retraction, or other transfer or disposition of any equity interest, including without limitation preferred or preference shares, in connection with the transactions described in (i)-(iii), including but not limited to a redemption by Boston Financial Group on or around July 8, 2010, a redemption by Fargo West Investments Ltd. on or around March 11, 2011, and a redemption by 1422688 Alberta Ltd. on or around February 22, 2011;

    v. Documents and communications concerning any transactions related to the transactions described in (i) - (iv), including but not limited to a "re- freeze," corporate resolutions related to share redemptions, or corporate reorganization under Section 85 of the Canadian Income Tax Act;

    vi. Documents and communications of transactions as described in (i) through (iv) above between Jeetenderjit Singh Sidhu, Gurmeet Sidhu, Ranjit Bhogal, or Jatinder Bhogal or any entity they owned, controlled, or were associated with.

e. All tax returns, financial statements, and related documents for Harmel Rayat, Jatinder Bhogal, and Jeetenderjit Singh Sidhu, or any entity they directly or indirectly owned or controlled (including but not limited to the entities enumerated above), for tax years 2007 to the present, including but not limited to:

    i. Canadian Revenue Agency ("CRA") forms T1, T2, T4, T5, T2054, and T2057;

    ii. Any interactions with the CRA, including notices of assessment, reassessment, or

any tax disputes; or

 iii. Documents related to any reorganization pursuant to Sections 51, 85, 86, or 87 of the Canadian Tax Act.

f. All tax returns, financial statements, and related documents for the TJR Family Trust, KJR Family Trust, TJR Investment Trust, KJR Investment Trust, the Heritage Family Trust, the Legacy Family Trust, the DS Sidhu Family Trust, and the PK Sidhu Family Trust for tax years 2007 to present, including but not limited to:

 i. CRA form T3;

 ii. Any interactions with the CRA, including notices of assessment, reassessment, or any tax disputes; or

 iii. All documentation related to the creation or dissolution of the foregoing.

g. All communications with Harmel Rayat, Jatinder Bhogal, Jeetenderjit Singh Sidhu, Gurmeet Sidhu, or Ranjit Bhogal, or anyone acting on their behalf, including but not limited to Lloyd Aasen, , subject to a review for any applicable legal privilege.

3. **<u>Deloitte LLP</u>**
  939 Granville St.
  Vancouver, BC
  V6Z 1L3

  Ms. Ellis's former employer, Deloitte LLP, provided accounting services to defendants Harmel Rayat and Jeetenderjit Sidhu at the time they entered into the Estate Planning Transactions. Accordingly, Deloitte LLP possesses documents relevant to the Estate Planning Transactions described above, defendants' other financial relationships, and other of defendants' accounting and tax-related information. This Court therefore requests the production of the following documents from MNP LLP:

a. All documents and communications concerning RenovaCare, Inc., Jatinder Bhogal, Harmel Rayat, Kalen Capital Corporation, Kalen Capital Holdings LLC, 1420524 Alberta Ltd., 1420525 Alberta Ltd., or 1420468 Alberta Ltd., and any of Jeetenderjit Sidhu, 1422688 Alberta Ltd, Fargo West Investments Ltd., Collingwood Holdings LLC, Blackbriar Asset Management Ltd., Blackbriar Asset Management LLC, Treadstone Financial Group Ltd., Treadstone Financial Group LLC, the DS Sidhu Trust, the PK Sidhu Trust, Gurmeet Sidhu, Jasvir S. Kheleh, Amarjit Kaur Sidhu, Anchhattar Singh Sidhu, Manjit Kaur Sidhu, Priya Kaur Sidhu, Jasvir K. Sidhu, or Dayan Singh Sidhu;

b.  All documents and communications concerning RenovaCare, Inc., Jeetenderjit Sidhu, Harmel Rayat, Kalen Capital Corporation, Kalen Capital Holdings LLC, 1420524 Alberta Ltd., 1420525 Alberta Ltd., or 1420468 Alberta Ltd., and any of Jatinder Bhogal, 1420527 Alberta Ltd., 1420527 Alberta LLC, Boston Financial Group, Ltd., Boston Financial Group LLC, Wolverhampton Holdings LLC, Vector Asset Management Inc., the Heritage Family Trust, the Legacy Family Trust, Amritpal Tanda, Arian Soheili, Nirmal Singh Bhogal, Gurdyal Kaur Bhogal, Kesar Dhaliwal, Indy Panchi, Mehar Bhogal, Mehtab Bhogal, or Ranjit K. Bhogal;

c.  All documents and communications concerning the TJR Family Trust, KJR Family Trust, the TJR Investment Trust, the KJR Investment Trust, the Heritage Family Trust, the Legacy Family Trust, the DS Sidhu Trust, and the PK Sidhu Trust, including but not limited to the original trust indenture and any modifications thereto, documents concerning the current existence of these entities, any direct or indirect asset transfers, and any documents or communications relating to the wind-down of these entities;

d.  All documents and communications from January 2007 to the present concerning any transaction involving Harmel Rayat, Kalen Capital Corporation, Kalen Capital Holdings LLC, 1420524 Alberta Ltd., 1420525 Alberta Ltd., or 1420468 Alberta Ltd. pursuant to Section 85 of the Canadian Income Tax Act and entities directly or indirectly owned, controlled, or associated with Jeetenderjit Sidhu or Jatinder Bhogal, including but not limited to:

    i.  Documents and communications concerning transactions on or around March 15, 2007 through which Harmel Rayat or Kalen Capital Corporation sold certain common shares in exchange for preferred shares in entities owned and controlled by Jatinder Bhogal, Ranjit Bhogal, Gurmeet Sidhu, or Jeetenderjit Sidhu;

    ii.  Documents and communications concerning transactions on or around December 31, 2007 through which Harmel Rayat or Kalen Capital Corporation sold certain common shares in exchange for preferred shares in entities owned and controlled by Jatinder Bhogal, Ranjit Bhogal, Gurmeet Sidhu, or Jeetenderjit Sidhu;

    iii.  Documents and communications concerning transactions between Harmel Rayat or Kalen Capital Corporation and entities associated with Jeetenderjit Sidhu, Gurmeet Sidhu, Ranjit Bhogal, or Jatinder Bhogal on or around September 8, 2008;

    iv.  Documents and communications concerning any redemption, retraction, or other transfer or disposition of any equity interest, including without limitation preferred or preference shares, in connection with the transactions described in (i)-(iii), including but not limited to a redemption by Boston Financial Group on or around July 8, 2010, a redemption by Fargo West Investments Ltd. on or around March 11, 2011, and a redemption by 1422688 Alberta Ltd. on or around February 22, 2011;

    v.  Documents and communications concerning any transactions related to the transactions described in (i) - (iv), including but not limited to a "re- freeze,"

corporate resolutions related to share redemptions, or corporate reorganization under Section 85 of the Canadian Income Tax Act;

vi.   Documents and communications of transactions as described in (i) through (iv) above between Jeetenderjit Singh Sidhu, Gurmeet Sidhu, Ranjit Bhogal, or Jatinder Bhogal or any entity they owned, controlled, or were associated with.

e.   All tax returns, financial statements, and related documents for Harmel Rayat, Jatinder Bhogal, and Jeetenderjit Singh Sidhu, or any entity they directly or indirectly owned or controlled (including but not limited to the entities enumerated above), for tax years 2007 to the present, including but not limited to:

i.   Canadian Revenue Agency ("CRA") forms T1, T2, T4, T5, T2054, and T2057;

ii.   Any interactions with the CRA, including notices of assessment, reassessment, or any tax disputes; or

iii.   Documents related to any reorganization pursuant to Sections 51, 85, 86, or 87 of the Canadian Tax Act.

f.   All tax returns, financial statements, and related documents for the TJR Family Trust, KJR Family Trust, TJR Investment Trust, KJR Investment Trust, the Heritage Family Trust, the Legacy Family Trust, the DS Sidhu Family Trust, and the PK Sidhu Family Trust for tax years 2007 to present, including but not limited to:

i.   CRA form T3;

ii.   Any interactions with the CRA, including notices of assessment, reassessment, or any tax disputes; or

iii.   All documents related to the creation or dissolution of the foregoing.

g.   All communications with Harmel Rayat, Jatinder Bhogal, Jeetenderjit Singh Sidhu, Gurmeet Sidhu, or Ranjit Bhogal, or anyone acting on their behalf, including but not limited to Lloyd Aasen, and subject to a review for any applicable legal privilege.

_____

The Honorable Lewis J. Liman
UNITED STATES DISTRICT JUDGE

DATED:   2/9/2023

13

# Exhibit A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **No. 1:21-cv-4777** |
| **Plaintiff,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **HARMEL S. RAYAT, and RENOVACARE, INC.** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Harmel S. Rayat ("Rayat") and RenovaCare, Inc. ("RenovaCare" or "company"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      From at least July 2017 until January 2018, RenovaCare and Rayat, the company's controlling shareholder, defrauded investors by soliciting StreetAuthority, LLC ("StreetAuthority"), an online financial publishing company, to run a promotion designed to increase RenovaCare's stock price and trading volume, and then concealed their involvement in the promotion from investors.  Rayat worked closely with StreetAuthority on the promotion.  He provided false information to StreetAuthority regarding the efficacy of RenovaCare's experimental burn-wound healing medical device called the "SkinGun," edited StreetAuthority's promotional materials, advised StreetAuthority on how to distribute the promotion to enhance its

1

effectiveness, and arranged to pay StreetAuthority for the promotion using RenovaCare's funds that were routed through third parties.

2.     By January 2018, OTC Markets Group Inc. – the entity that supervised the market where RenovaCare's stock was quoted – learned of StreetAuthority's RenovaCare promotion and sent RenovaCare a letter demanding that the company make public disclosures concerning its involvement in the promotion.  On January 8, 2018, rather than acknowledging Rayat's and the company's involvement in the StreetAuthority promotion, Rayat and RenovaCare made and publicly disseminated a press release that contained material misrepresentations and omissions that denied *any* involvement in StreetAuthority's promotion.

3.     By engaging in the conduct described in this Complaint, Rayat and RenovaCare violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and RenovaCare violated Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rules 15d-11 and 12b-20 thereunder, 17 C.F.R §§ 240.15d-1 & 240.12b-20.  Rayat also aided and abetted RenovaCare's deceptive acts and false statements pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).  Unless restrained and enjoined, Defendants will engage in further violations of these provisions.

4.     The Commission respectfully requests, among other things, that the Court enjoin Defendants from committing further violations of the Federal securities laws as alleged in this Complaint, order Defendants to pay civil monetary penalties, bar Rayat from participating in any offering of a penny stock and serving as an officer or director of a public company, and order other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§78u(d)-(e) & 78aa(a).

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(c)(3).  During the time period alleged in this Complaint, RenovaCare was headquartered and transacted business in this District, and its shares traded on the OTCQB Tier, the interdealer quotation system operated by OTC Markets Group, Inc. ("OTC Markets"), which was headquartered in this District.  In addition, certain of the transactions, acts, practices, and courses of conduct constituting the violations alleged in this Complaint occurred within this District.  Among other things, Rayat participated in telephone calls and email exchanges with RenovaCare representatives located in this District concerning the drafting and issuing of the false press release, and RenovaCare sent the deceptive payments to its third-party investor relations consultants for the StreetAuthority promotion through an account with a bank located in this District.  Rayat also conducts substantial business in the United States and owns several commercial properties in Arizona for investment purposes.

7.      Rayat is a Canadian citizen who engaged in fraudulent conduct in the United States and in Canada that had a foreseeable and substantial effect upon United States investors and the OTC market.  In connection with the violations alleged in this case, Rayat traveled to the United States on at least two occasions as an agent for RenovaCare to discuss StreetAuthority's promotion of RenovaCare.  He had frequent contact with StreetAuthority and RenovaCare employees and consultants in the United States, including in this District, over the phone, email, and other interstate means in furtherance of StreetAuthority's promotion of RenovaCare and to draft and issue the company's false press release that is the subject of this Complaint.  When

3

reviewing, approving, and transmitting the false press release to RenovaCare's CEO for dissemination to the public, Rayat frequently communicated over the telephone and email with at least one RenovaCare representative who was located in this District. Rayat also knew that the false press release was prepared in response to an inquiry from OTC Markets, which was based in this District, and would be disseminated to investors throughout the United States, including in this District.

8.        Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails, including the use of email, telephone, and the internet in connection with illegal acts alleged in this Complaint, certain of which occurred within this District.

## **DEFENDANTS**

9.        **Harmel S. Rayat**, ("Rayat") age 59, is a Canadian citizen and resident of Vancouver, British Columbia. Through his wholly owned holding company Kalen Capital Corporation ("Kalen"), Rayat has been the majority and controlling shareholder of RenovaCare, Inc. since at least 1999. As of January 1, 2021, Rayat owned 71,101,453 million shares of common stock, or 81.3 percent of the company's outstanding shares of common stock. Rayat has also served as RenovaCare's Chairman of the Board of Directors.

10.      **RenovaCare, Inc.** ("RenovaCare" or "company") is a Nevada corporation that is currently headquartered in Roseland, New Jersey. During the time period at issue in this Complaint, RenovaCare was headquartered at 430 Park Avenue, New York, New York. RenovaCare is a development stage company with no revenues, but claims to be developing a "SkinGun" medical device and "CellMist" system for the treatment of skin burns through the rapid regeneration of skin cells.

11.     RenovaCare had securities registered with the Commission pursuant to Exchange Act Section 12(g) until August 3, 2016, when it filed a Form 15 to terminate the registration. RenovaCare is currently quoted on the OTC Pink Open Market Tier, operated by OTC Markets under the ticker symbol "RCAR."  During the time period relevant to this Complaint, the company's stock constituted a penny stock because it did not meet any of the exceptions from the definition of a "penny stock" pursuant to Exchange Act Section 3(a)(51), 15 U.S.C. § 78c(a)(51), and Exchange Act Rule 3a51-1, 17 C.F.R. § 240.3a51-1.

12.     RenovaCare was originally incorporated in Utah on July 14, 1983, as "Far West Gold, Inc."  On May 20, 1999, the company changed its name to "WhatsOnline.Com, Inc.," and Rayat became, and ever since has been, the company's majority and controlling shareholder. The company later made several other name changes, until January 7, 2014, when it changed its name to RenovaCare.

**OTHER RELEVANT ENTITIES**

13.     **StreetAuthority, LLC**, ("StreetAuthority"), was an online financial publishing and research company based in Austin, Texas, that sold subscriptions to its investment research bulletins and newsletters during the time period at issue in this Complaint.  It was owned and operated by a long-time friend of Rayat ("StreetAuthority Owner").

14.     **Company A** is a company whose stock is quoted on the OTC Markets that purports to be developing and marketing windows for residential and commercial buildings that generate electricity from solar energy.  During the time period at issue in this case, Rayat was a controlling shareholder of Company A.

## FACTS

**I.**   **Rayat And RenovaCare Solicited StreetAuthority To Run A Promotional Campaign To Increase The Price And Trading Volume Of RenovaCare's Stock And Then Concealed Their Involvement In It**

15.   By July 2017, Rayat owned approximately 65 percent of RenovaCare's stock (approximately 52 million shares), and was the company's controlling shareholder.  At that time, Rayat, on behalf of RenovaCare, solicited StreetAuthority, an online financial publisher of investment newsletters with a dedicated subscriber base, to run a promotional campaign for RenovaCare and Company A, another company in which Rayat was the controlling shareholder. Rayat was interested in the promotion because he wanted to increase RenovaCare's stock price and trading volume, which would benefit him and his close associates who owned the company's stock.

16.   From the outset, Rayat worked closely with StreetAuthority on the campaign. Among other things, Rayat, on behalf of RenovaCare, reviewed StreetAuthority's promotional materials, and provided StreetAuthority with information on the company, including false information regarding the efficacy of the "SkinGun," the company's experimental medical device for treating burn wounds.

17.   Rayat also arranged for RenovaCare to pay StreetAuthority $50,000 per month for the promotion, and arranged for the payment to be made through third parties for the fraudulent purpose of concealing Rayat's and the company's involvement.

**A.**   **Rayat Solicited StreetAuthority To Promote RenovaCare's Stock**

18.   Rayat was a long-time friend of the StreetAuthority Owner.  While he was RenovaCare's controlling shareholder, on or about July 26, 2017, Rayat solicited the StreetAuthority Owner to start a promotional campaign for RenovaCare and Company A.  That

day, Rayat spoke to the StreetAuthority Owner on the phone, and later emailed marketing

materials related to RenovaCare's SkinGun to the StreetAuthority Owner.

19.  On July 28, 2017, the StreetAuthority Owner suggested to Rayat that

StreetAuthority feature RenovaCare and Company A in its annual "Predictions Report."  The

StreetAuthority Owner noted that this could "create awareness of both companies" and persuade

StreetAuthority subscribers to invest in RenovaCare and Company A.  The StreetAuthority

Owner further stated that StreetAuthority was interested in "partnering up" with Rayat to

advertise on various online media platforms.  In response, Rayat agreed it was a "great idea," and

then arranged to discuss the proposal in more detail.

20.  Between July 28 and August 31, 2017, Rayat discussed the details of the

promotion with StreetAuthority representatives on several occasions, including an in-person

meeting at StreetAuthority's headquarters in Austin, Texas, in late August, 2017.

21.  On September 4, 2017, shortly after Rayat's trip to Austin, the StreetAuthority

Owner emailed Rayat to discuss several different marketing strategies in which StreetAuthority

could promote RenovaCare and Company A, and asked if Rayat was "interested in exploring and

participating in this marketing program."

22.  Later that day, Rayat responded that "nothing would make me happier than

working with [the StreetAuthority Owner and other StreetAuthority representatives] in

spreading the word to investors and dramatically improving [RenovaCare's and Company A's]

awareness in the investment community, which I wholeheartedly believe will help the

companies raise additional capital and get senior listings, which in turn will allow institutional

investors to jump in."  Rayat further noted that he was "very interested in exploring how [they

could] work together," and suggested they speak the next day.

23.     The discussions between Rayat and StreetAuthority about the creation of a RenovaCare and Company A promotion continued into October 2017.

**B.      Rayat Concealed His And The Company's Involvement In The Promotion By Arranging For RenovaCare's Payments To StreetAuthority To Be Paid Through Third Parties**

24.     Before StreetAuthority launched its promotion of RenovaCare and Company A, the StreetAuthority Owner and Rayat orally agreed that StreetAuthority would receive a $100,000 per month for the promotion that would be split between the two companies. StreetAuthority agreed to use that money to pay for advertising and other distribution costs relating to the publication and dissemination of its promotion of RenovaCare and Company A.

25.     Rather than have RenovaCare and Company A pay StreetAuthority directly, Rayat arranged for the companies to pay StreetAuthority through a third-party investor relations company that Rayat had hired in the past for other promotional campaigns ("Investor Relations Company A").  Rayat arranged for RenovaCare to pay Investor Relations Company A $2,500 per month, and the only service Investor Relations Company A provided in exchange for this money was to prepare invoices and route payments between RenovaCare and StreetAuthority.  Rayat provided the same arrangement as to Company A.

26.     Rayat devised this deceptive payment scheme on behalf of RenovaCare to conceal from the investing public that RenovaCare was, in fact, paying StreetAuthority for the promotion.  Rayat knew, or was reckless in not knowing, that StreetAuthority would have to disclose in its promotional materials any payments RenovaCare made to StreetAuthority pursuant to Section 17(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(b). In 2000, Rayat had settled a case with the Commission in which he was charged with violating

Section 17(b) of the Securities Act.  *SEC v. EquityAlert.Com, Inc. and Harmel S. Rayat*, No. cv-00-146 (D. Ariz. Aug. 24, 2000).

27.     For example, the disclosures in StreetAuthority's RenovaCare and Company A promotional materials pursuant to Securities Act Section 17(b) stated that StreetAuthority did "not receive any direct cash payments in connection with the production of paid advertisements" for Company A and RenovaCare.  Rayat, however, arranged for the investor relations company, not RenovaCare, to make the direct payments to StreetAuthority.  Rayat's payment arrangement – that concealed the company's and its controlling shareholder's involvement in and potential financial incentives to StreetAuthority in promoting the stock – had the effect of reducing investor skepticism regarding the truthfulness of the campaign by making it appear to investors that StreetAuthority was offering an objective and fair assessment of RenovaCare's stock.

28.     Throughout StreetAuthority's campaign, RenovaCare and Company A funneled money through Investor Relations Company A to Street Authority, until another investor relations company that Rayat selected ("Investor Relations Company B"), replaced Investor Relations Company A on or around January 4, 2018.

29.     RenovaCare's CEO approved all of the payments from RenovaCare to Investor Relations Company A and Investor Relations Company B, while he knew, or was reckless in not knowing, that they were ultimately going to StreetAuthority for the promotion.  On November 9, 2017, for example, RenovaCare's CEO approved the company to pay $46,000 to Investor Relations Company A based on invoices Investor Relations Company A sent RenovaCare's CEO charging the company $43,500 for the StreetAuthority promotion and $2,500 for Investor Relations Company A's monthly retainer.

30.     In all, by January 4, 2018, RenovaCare paid approximately $90,000 to StreetAuthority through these two investor relations companies.

**C.      Rayat Worked Closely With StreetAuthority To Create And Disseminate A Promotion Of RenovaCare**

31.     By at least September 2017, StreetAuthority began drafting materials for its RenovaCare and Company A promotion, and it publicly released the promotion on or about October 24, 2017.  StreetAuthority disseminated the promotional materials in emails to its subscriber base, as well as on the internet more broadly in banners advertisements on internet search engines, social media sites, and other internet platforms.  A key piece of the promotion were certain periodic reports such as an annual "Predictions Report" for the next calendar year, of which the success of RenovaCare's and Company A's products were StreetAuthority's lead "predictions."

32.     Rayat actively worked with StreetAuthority to create StreetAuthority's promotional materials, including the Predictions Report.  He regularly provided information to StreetAuthority to use for its promotion, and he reviewed and commented on draft promotional materials prior to their release.

33.     StreetAuthority's promotional materials highly touted RenovaCare.  For example, the promotional materials claimed that the SkinGun was a "revolutionary wound-healing device," and encouraged readers to buy RenovaCare stock and hold it for "10, 20x, even 40x gains."

34.     In describing the basis for its recommendation, StreetAuthority's promotional materials described a case study of one patient who had severe burns on his arm ("Patient A") that the SkinGun purportedly healed *in three days*.  The promotional materials further showed the following purported "before" and "after" SkinGun-treatment pictures of Patient A:

10



35.     However, the SkinGun did not heal Patient A's wounds in three days; after treatment, Patient A's skin remained discolored for over a year.  Furthermore, the "before" photo was *not* Patient A's arm, and the "after" picture was taken approximately five years after Patient A's injury, not three days.

36.     Rayat provided materials containing these false pictures and claims about Patient A's SkinGun treatment to StreetAuthority.  On July 26, 2017, Rayat emailed RenovaCare marketing materials to StreetAuthority that contained Patient A's false before-and-after pictures, and on September 21, 2017, Rayat emailed StreetAuthority additional marketing materials that contained the false claim that the SkinGun healed Patient A's arm in three days.

37.     When sending these materials to StreetAuthority, Rayat knew, or was reckless in not knowing, that the materials contained false information and would be disseminated to investors.  RenovaCare employees had discussed the actual results of Patient A's treatment with Rayat, and sent Rayat an accurate summary of his treatment, as early as July 23, 2014.  The summary Rayat received that day explained that Patient A's arm took months to heal, and it contained accurate pictures illustrating the treatment, and not the pictures of Patient A that Rayat later sent to StreetAuthority.

38.     StreetAuthority's promotional materials also claimed that the SkinGun "could soon be approved by the FDA [Food and Drug Administration]. . . . RenovaCare has submitted a 510(k) filing to the FDA, which permits the marketing of a medical device.  Now it's just a

11

matter of waiting on the FDA … so this device can be rolled out at every burn unit in the country."

39.     However, RenovaCare did not have a pending 510(k) filing with the FDA at the time; in fact, it had only applied to the FDA for approval to use in clinical studies, not in general clinic or hospital settings, and RenovaCare had withdrawn that application more than a year earlier.

40.     Prior to their release to the investing public, Rayat reviewed draft promotional materials that contained both of these false claims, but did nothing to correct them.  On October 3, 2017, the StreetAuthority Owner emailed Rayat a draft Predictions Report that contained the false statements and pictures concerning Patient A's SkinGun treatment and the SkinGun's status with the FDA.  After reviewing the draft, Rayat called the StreetAuthority Owner to suggest at least one change concerning the possibility of the FDA's approval of the SkinGun, but he did not suggest that StreetAuthority correct the false statements in the draft.  StreetAuthority subsequently made Rayat's suggested change to its promotional materials.

41.     In addition, internal StreetAuthority documents reflect three versions of draft StreetAuthority promotions of RenovaCare and Company A dated October 10, 2017, that are entitled "Harmel changes," including one draft that contained an internal comment from a StreetAuthority representative indicating that he was deleting certain language in the draft because the deleted language contained something that "Har[m]el doesn't want us to talk about."

42.     When reviewing the draft promotional materials concerning RenovaCare, Rayat knew, or was reckless in not knowing, that the statements about the FDA approval were false.  Shortly before that time, in an email between Rayat and an acquaintance on April 14, 2017,

12

Rayat discussed RenovaCare's regulatory strategy, and Rayat explained that RenovaCare did not have a pending 510(k) application.

43.    From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials on the internet and to its subscriber base.

44.    Throughout this time, Rayat continued to be involved in the drafting of StreetAuthority's promotional materials, and he was closely involved in its distribution and dissemination. For example:

    a. At an in-person meeting at StreetAuthority's headquarters in Austin, Texas, on or around November 27, 2017, Rayat and several StreetAuthority representatives reviewed StreetAuthority's distribution and dissemination of the promotional materials. The StreetAuthority representatives discussed the various advertisements they were running with Rayat, and Rayat gave directions to StreetAuthority on how it could more effectively run the campaign. Rayat also provided additional edits to StreetAuthority's promotional materials. After the meeting, StreetAuthority implemented at least some of Rayat's directions.

    b. On or around December 3, 2017, Rayat sent StreetAuthority new advertisements that he wanted StreetAuthority to disseminate, and StreetAuthority representatives incorporated those advertisements into the promotional campaign.

    c. On or around December 15, 2017, Rayat approved a change in StreetAuthority's format for how StreetAuthority advertised its promotion on one online platform.

### D. StreetAuthority's Promotion Of RenovaCare Was Successful

45.     The promotional campaign that Rayat solicited, concealed the payments for, and worked closely with StreetAuthority to create and distribute was a success. During the course of the promotional campaign, internet users clicked on tens of thousands of RenovaCare ads created by StreetAuthority. For instance, one of the several online platforms StreetAuthority used to promote RenovaCare alone generated over 20,000 clicks from internet users.

46.     RenovaCare stock saw an uptick in volume and price that correlated with StreetAuthority's promotional campaign. On October 23, 2017, RenovaCare's stock price closed at $3.10 per share, and by January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase.

## II.    In Response To A Regulatory Inquiry, RenovaCare And Rayat Made And Issued A Materially False Press Release Denying Their Involvement In StreetAuthority's Promotional Campaign

### A. On January 3, 2018, OTC Markets Demanded RenovaCare Make Disclosures Concerning StreetAuthority's Promotion

47.     On or around January 2, 2018, OTC Markets, which supervised the OTCQB Tier in which RenovaCare's stock was quoted, learned of StreetAuthority's promotion.

48.     OTC Markets has a strict disclosure policy regarding company promotions, as the motivation to provide false information through such campaigns could severely impact the integrity of the OTC Markets. As a result, companies that violate the disclosure policies can be removed from OTCQB Tier and relegated to the more risky OTC Pink Open Market Tier, which could have a material impact on the stock's trading and negatively affect its price.

49.     Consistent with this policy, on January 3, 2018, OTC Markets sent RenovaCare a letter requiring the company make public disclosures relating to StreetAuthority's promotional campaign.

14

50.     OTC Markets' January 3, 2018 letter demanded that RenovaCare issue a press release concerning its involvement in the StreetAuthority promotion, including:

   a. "the date on which the Company became aware of the promotional activities;"

   b. "[a] written summary of the Company's understanding of the promotional activities," and "[i]f the company was involved in the dissemination or payment of promotional material, … direct language describing the company's involvement and a description of any engagements and/or agreements relating to the promotional material;"

   c. "whether the company has editorial control over the content in the promotional materials;" and

   d. "[w]hether, after inquiry of management, the directors and control persons, its officers, directors, any controlling shareholders (defined as shareholders owning 10% or more of the company's securities), or any third party service providers have, directly or indirectly, been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials related to the Company and its securities."

**B.     Rayat And RenovaCare Made And Issued A Materially Press Release Falsely Denying Any Involvement In StreetAuthority's Promotional Campaign**

51.     Rayat was instrumental in drafting and disseminating RenovaCare's press release in response to OTC Market's demand.  Rayat was in the best position to provide the substantive detail in response to OTC Market's inquiry because, on behalf of RenovaCare, he had solicited StreetAuthority to run the campaign, concealed RenovaCare's payments to them, and worked closely with them to create and disseminate the promotion.

15

52.     On January 3, 2018, Rayat had several conference calls with RenovaCare's CEO, RenovaCare's director and outside counsel ("RenovaCare's Director"), and a third-party consultant to discuss the company's strategy in responding to OTC Markets.

53.     By at least January 4, 2018, Rayat began working on a draft of the press release to respond to the issues raised by OTC Markets.

54.     On January 4, 2018, Rayat again had several conference calls with RenovaCare's Director, RenovaCare's CEO, and a third-party consultant to discuss the draft press release.

55.     On January 5, 2018, RenovaCare's Director emailed Rayat, RenovaCare's CEO, and a third-party consultant to request a follow-up conference call in the next few days "to discuss/review and edit the revised draft" of the press release.  Shortly thereafter, Rayat replied to suggest they talk on January 7, 2018, and noted that he would send his comments on the draft press release later by the following day. That day, Rayat also had several calls with RenovaCare's Director to discuss the draft.

56.     On January 7, 2018, Rayat, RenovaCare's CEO, and RenovaCare's Director again discussed RenovaCare's draft press release, and a draft press release dated shortly after the call contained only minor differences from the draft the company would ultimately issue.

57.     On January 8, 2018, at 12:57 p.m., Rayat emailed RenovaCare's CEO a final version of the draft press release, and instructed the company to add its boilerplate "about us" and "disclaimer" language to the draft.

58.     A few minutes later, at 1:14 p.m., RenovaCare's CEO forwarded the draft press release to Investor Relations Company B, noting that it was the final draft of the press release. As Rayat had instructed, RenovaCare's CEO requested that the consultant add the "about us" and "disclaimer" language, then issue the press release at 3:45 p.m.

16

59.     Rayat possessed the knowledge required to answer OTC Market's inquiry regarding the StreetAuthority campaign and had ultimate control of the content and dissemination of the press release to the public.  Rayat's continuous involvement in the press release's drafting, culminating in his January 8, 2018 email to RenovaCare's CEO, followed by the CEO's response, demonstrates Rayat's authority and control over the content of the statement and his intent to disseminate it to the public.

60.     On January 8, 2018, at 3:45 p.m., RenovaCare publicly issued the press release drafted by Rayat and RenovaCare and responding to OTC Markets' inquiry via BusinessWire ("January 8 Press Release").  It was not signed by any individual.

61.     On January 12, 2018, RenovaCare publicly filed a Form 8-K with the Commission, signed by RenovaCare's CEO, that attached a copy of the January 8 Press Release.

62.     Rather than fairly and accurately disclose Rayat's and RenovaCare's continuous and on-going relationship with StreetAuthority from the outset of StreetAuthority's promotional campaign, the January 8 Press Release contained numerous material misrepresentations and omissions that concealed Rayat's and RenovaCare's involvement in it.

63.     First, the January 8 Press Release stated that RenovaCare conducted an inquiry of all relevant persons, including controlling shareholders such as Rayat, "regarding their involvement in the creation or distribution of promotional materials," and stated that "the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly[] **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities."  (emphasis in original).

17

64.     This statement was materially false. Rayat was involved in the creation of StreetAuthority's promotional materials by providing information to StreetAuthority from the outset and reviewing and commenting on drafts before and during the promotion. Rayat was also involved in the distribution of StreetAuthority's promotional materials by consulting with StreetAuthority on several occasions concerning its distribution strategy and suggesting and approving changes to the promotion that StreetAuthority implemented.

65.     In addition, Rayat, RenovaCare's CEO, and the company's third-party investor relations consultants were all involved in the distribution of StreetAuthority's promotional materials by arranging for and working together to pay StreetAuthority $50,000 per month to cover StreetAuthority's distribution costs for the promotion.

66.     Second, the January 8 Press Release claimed that RenovaCare was "not affiliated in any way with the authors of the annual predictions report or its publisher." This was materially false. RenovaCare was affiliated with StreetAuthority because the company was paying StreetAuthority $50,000 per month to run StreetAuthority's promotion, including its annual Predictions Report. The company was also affiliated with StreetAuthority because Rayat had been working closely with StreetAuthority on the promotion as RenovaCare's agent.

67.     Third, the January 8 Press Release claimed that RenovaCare "had no editorial control over the content" of StreetAuthority's RenovaCare-related promotional materials. This was materially false. Rayat, acting as an agent for the company, reviewed and commented on StreetAuthority's promotional materials before and throughout StreetAuthority's promotional campaign, and on several occasions, StreetAuthority incorporated Rayat's changes before publicly releasing the promotional materials.

18

68.     Fourth, the January 8 Press Release stated that RenovaCare "was not involved in the creation, or directing the dissemination, of [StreetAuthority's Predictions] report."  This statement was materially false.  Rayat, on behalf of RenovaCare, was involved in the creation of the Predictions Report by providing information to StreetAuthority to include in the report and by reviewing and commenting on drafts before and during the promotion.  Rayat, on behalf of RenovaCare, was also involved in directing the dissemination of the report by discussing StreetAuthority's plan for disseminating the promotional materials and suggesting and approving changes to its dissemination on several occasions.  In addition, RenovaCare provided StreetAuthority the funding for the dissemination of StreetAuthority's promotional materials.

69.     Fifth, the January 8 Press Release contained material omissions, including specific information required by OTC Markets, that, if addressed, would have required Rayat and RenovaCare to admit to some awareness and involvement in StreetAuthority's campaign.  OTC Markets required that RenovaCare disclose "the date on which it became aware of the promotional activities," and yet the company failed to disclose that Rayat, on behalf of the company, was aware of the campaign since at least July 2017, and that RenovaCare's CEO was aware of the campaign by at least November 2017 when he authorized RenovaCare to pay Investor Relations Company A for expenses relating to the promotion.

70.     The misrepresentations and omissions in the January 8 Press Release were material.  The potential for small companies with illiquid and low-priced shares to fund false promotional campaigns to increase company's stock price and trading volume to benefit corporate insiders and controlling shareholders, as was done here, is precisely why RenovaCare's false January 8 Press Release is material.  OTC Markets' disclosure policy seeks to address this very issue.  RenovaCare's compliance with OTC Markets' policies on company promotions, if

19

violated, could result in the Company's removal from the OTCQB Tier and be relegated to the lesser traded OTC Pink Open Market Tier, which could have a substantial impact on the stock's trading and negatively affect its price.

71.     In fact, on February 26, 2018, OTC Markets downgraded RenovaCare's stock to the OTC Pink Open Market Tier and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's company profile due to the on-going promotional activity.  The company's stock price simultaneously dropped approximately 30 percent, from $9 per share to $6.28 per share.

72.     Consistent with OTC Markets' disclosure policy, a reasonable investor would have wanted to know, in making an investment in RenovaCare stock, that RenovaCare's controlling shareholder was assisting a promotional campaign encouraging investors to purchase RenovaCare stock and covering up the source of the funding for the promotional campaign.

73.     RenovaCare and Rayat knew, or were reckless in not knowing, that the January 8 Press Release was false when they made and issued it to the investing public.  Given his personal participation in the StreetAuthority promotion in the months leading up to the January 8 Press Release as alleged in this Complaint, Rayat knew, or was reckless in not knowing, that the January 8 Press Release contained material misstatements and omissions that he approved in the final draft and sent to RenovaCare's CEO with instructions prior to disseminating it to the investing public.

74.     As an agent and controlling shareholder of RenovaCare, and the individual acting on behalf of RenovaCare with respect to the promotion, Rayat's knowledge is imputed to RenovaCare.  Furthermore, by January 8, 2018, RenovaCare's CEO was aware that the company was involved with StreetAuthority's promotional campaign, as he had previously approved several payments to the investor relations companies that he knew, or was reckless in not

knowing, that related to the StreetAuthority promotion. The company also relied upon Rayat's knowledge of the promotional campaign when preparing the January 8 Press Release, included his substantive comments on the press release, and followed his directions when disseminating it to the public.

75. Rayat also aided and abetted RenovaCare's deceptive conduct and materially false statements and omissions. Rayat acted as RenovaCare's agent with respect to the StreetAuthority campaign. He knowingly or recklessly substantially assisted RenovaCare's deceptive acts and materially false statements by providing StreetAuthority with false information about the company to include in its promotion of RenovaCare, participating in the drafting and dissemination of StreetAuthority's promotional materials, arranging for and making payments between RenovaCare and StreetAuthority through a third party to hide the source of RenovaCare's payments to StreetAuthority, and by participating in the drafting and disseminating of RenovaCare's fraudulent January 8 Press Release and related Form 8-K as alleged in this Complaint.

## III.   Rayat And His Associates Sought To, And Did, Profit From StreetAuthority's Promotion of RenovaCare

76. Rayat made several attempts to take advantage of the impact of StreetAuthority's RenovaCare promotion. Before the StreetAuthority campaign began, Rayat engaged in several transactions to increase his RenovaCare stock holdings at below-market prices. On June 28, 2017, Rayat exercised warrants that granted his holding company, Kalen, over 114,000 shares, and on July 21, 2017, Rayat purchased another 410,000 shares from RenovaCare through a private placement at a price of $2.44 per share when the stock was trading over $3.00 per share.

77. At the same time Rayat was working with StreetAuthority on the RenovaCare promotion, Rayat attempted to sell at least 500,000 RenovaCare shares through at least two

brokerages.  The first brokerage closed Rayat's account before any sales could be made, and the compliance department of the second brokerage denied his request to open an account.  For these reasons, the sales were never made.

78.     A number of Rayat's close associates also sought to benefit, and did benefit, from the increased stock price during this period.  For example, right before the StreetAuthority promotion began, on October 16, 2017, a friend of Rayat's ("Friend A") purchased 900,000 shares directly from the company at a below-market price of $2.50 per share through a private placement by the company.

79.     In addition, while StreetAuthority's promotion was active, on February 12, 2018, RenovaCare filed a Form S-1 Registration Statement with the Commission seeking to register over 4 million restricted shares for public sale, including 2.42 million that Rayat owned, and Friend A's 900,000 shares that she just purchased in October 2017 at a below-market price.

80.     Rayat's other close associates successfully sold shares during the StreetAuthority promotion.  For example, Rayat's long-time friend and the office manager of Rayat's real estate firm sold millions of dollars in RenovaCare stock at historically high prices while StreetAuthority's promotion was active.

### FIRST CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder**
(Against Rayat and RenovaCare)

81.     Paragraphs 1-4, 15-74, and 76-80 of this Complaint are re-alleged and incorporated by reference herein.

82.     By engaging in the conduct alleged in this Complaint, specifically by drafting and disseminating the January 8 Press Release and related Form 8-K containing materially false and misleading statements and omissions, Defendants, directly or indirectly, singly or in concert, in

22

connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83. By reason of the foregoing, Defendants Rayat and RenovaCare, each violated, and unless restrained and enjoined will again violate, Exchange Act Section 10(b), 15 U.S.C. §78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5(a) & (c) Thereunder
(Against Rayat and RenovaCare)

84. Paragraphs 1 through 1-4, 15-74, and 76-80 of this Complaint are re-alleged and incorporated by reference herein.

85. By engaging in the conduct alleged in this Complaint, specifically by engaging in deceptive acts by participating in StreetAuthority's promotion of RenovaCare, providing StreetAuthority with false information for StreetAuthority's promotional campaign, participating in the drafting and dissemination of StreetAuthority's promotion, arranging for and making payments between RenovaCare and StreetAuthority through a third party to hide the source of RenovaCare's payments to StreetAuthority, and by participating in the drafting and dissemination of the materially false January 8 Press Release and related Form 8-K, Defendants, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, employed devices, schemes, or artifices to defraud, and

engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & (c).

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Violations of Exchange
### Act Section 10(b) and Rule 10b-5(b) Thereunder
(Against Rayat)

87.     Paragraphs 1-4 and 15-80 of this Complaint are re-alleged and incorporated by reference herein.

88.     By engaging in the conduct alleged in this Complaint, specifically by drafting and disseminating the false January 8 Press Release and related Form 8-K containing materially false statements and omissions, RenovaCare, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.     Rayat knew, or was reckless in not knowing, that RenovaCare was engaged in the unlawful conduct alleged in this Complaint, and he knowingly or recklessly substantially assisted and participated in the wrongdoing.  Rayat provided substantial assistance to RenovaCare by participating in the drafting and dissemination of RenovaCare's false January 8 Press Release and related Form 8-K.

24

90.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Rayat aided and abetted RenovaCare's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Exchange Act
Section 10(b) and Rule 10b-5(a) and (c) Thereunder**
(Against Rayat)

91.     Paragraphs 1-4 and 15-80 of this Complaint are re-alleged and incorporated by reference herein.

92.     By engaging in the conduct alleged in this Complaint, specifically by engaging in deceptive acts by participating in StreetAuthority's promotion of RenovaCare, providing StreetAuthority with false information for StreetAuthority's promotional campaign, participating in the drafting and dissemination of StreetAuthority's promotion, arranging for and making payments between RenovaCare and StreetAuthority through a third party to hide the source of RenovaCare's payments to StreetAuthority, and by drafting and disseminating the materially false January 8 Press Release and related Form 8-K, RenovaCare, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

93.     Rayat knew, or was reckless in not knowing, that RenovaCare was engaged in the unlawful conduct alleged in this Complaint, and he knowingly or recklessly substantially assisted and participated in the wrongdoing.  Rayat provided substantial assistance to RenovaCare by participating in StreetAuthority's promotion of RenovaCare, providing StreetAuthority with false

information for StreetAuthority's promotional campaign, arranging for the payments between RenovaCare and StreetAuthority to hide the source of RenovaCare's payments to StreetAuthority, and by participating in the drafting and dissemination of RenovaCare's materially false January 8 Press Release and related Form 8-K.

94.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. 78t(e), Rayat aided and abetted RenovaCare's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) & (c).

## FIFTH CLAIM FOR RELIEF

**Violations of Exchange Act Section 15(d) and Rules 15d-11 and 12b-20 Thereunder**
(Against RenovaCare)

95.     Paragraphs 1-4, 15-44, and 47-74 of this Complaint re-alleged and incorporated by reference herein.

96.     Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rule 15d-11 thereunder, 17 C.F.R § 240.15d-1, require issuers of securities that have filed certain registration statements to file with the Commission annual, quarterly, and current reports.  Exchange Act Rule 12b-20, 17 C.F.R. § 240.12b-20, provides that in addition to the information expressly required in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

97.     RenovaCare was required to file annual and other financial reports with the Commission pursuant to Section 15(d) of the Exchange Act and Rule 15d-11 thereunder.

98.     RenovaCare filed the January 12, 2018 Form 8-K that contained materially false statements or failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

99.     By reason of the foregoing, RenovaCare violated Section 15(d) of the Exchange Act, and Rules 15d-11 and 12b-20 thereunder.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

### **I.**

Permanently enjoin Defendants from violating the Federal securities laws alleged in this Complaint.

### **II.**

Order Defendants to pay civil money penalties pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

### **III.**

Permanently barring Rayat from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 21(d)(6), 15 U.S.C. § 78u(d)(6).

### **IV.**

Pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), permanently barring Rayat from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which are required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act

### **V.**

Grant such further relief as the Court may deem just and appropriate.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.


Dated: May 28, 2021                          Respectfully submitted,

                                             s/ Matthew Scarlato
                                             Matthew Scarlato (*Pro Hac Vice* motion to be filed)
                                             SECURITIES AND EXCHANGE
                                             COMMISSION
                                             100 F Street, NE
                                             Washington, DC 20549-4473
                                             202-551-3749
                                             scarlatom@sec.gov


OF COUNSEL:

Brian Quinn
Darren Long
Daniel Weinstein
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549-4473

# Exhibit B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| **Plaintiff,** | |
| v. | No. 1:21-cv-04777-LJL |
| HARMEL S. RAYAT, RENOVACARE, INC., JATINDER BHOGAL, JEETENDERJIT SINGH SIDHU, and SHARON FLEMING, | JURY TRIAL DEMANDED |
| **Defendants,** | |
| and | |
| TREADSTONE FINANCIAL GROUP LTD., TREADSTONE FINANCIAL GROUP LLC, BLACKBRIAR ASSET MANAGEMENT LTD., and 1420527 ALBERTA LTD., | |
| **Relief Defendants.** | |

## AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its Amended Complaint against Defendants Harmel S. Rayat ("Rayat"), RenovaCare, Inc. ("RenovaCare" or the "Company"), Jatinder Bhogal ("Bhogal"), Jeetenderjit Singh Sidhu ("Sidhu"), and Sharon Fleming ("Fleming") (collectively, "Defendants"), and Relief Defendants Treadstone Financial Group Ltd. ("Treadstone Ltd."), Treadstone Financial Group LLC ("Treadstone LLC"), Blackbriar Asset Management Ltd. ("Blackbriar Ltd."), and 1420527 Alberta Ltd. ("Alberta

1

Ltd.") (collectively, "Relief Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case concerns a longstanding and wide-reaching fraudulent scheme to
increase the share price and trading volume of the common stock of RenovaCare, a purported
medical device company with no commercially available product and no revenue.  From at least
2007 to 2018 (the "Relevant Period"), Rayat, a recidivist securities law violator and majority and
controlling shareholder of RenovaCare, orchestrated the scheme along with three long-time
friends and business associates – Bhogal, Sidhu, and Fleming.

2.      Defendants' fraudulent scheme, which was essentially a "pump and dump"
designed to artificially increase the share price and trading volume of RenovaCare stock to
permit Defendants to sell shares at an inflated price, involved a number of steps, including:  (i)
accumulating millions of shares of RenovaCare stock and distributing them among the
Defendants; (ii) coordinating the registration of restricted shares for resale, and depositing them
as "free trading" shares in brokerage accounts in the United States and Canada; (iii) promoting
RenovaCare stock to investors through a paid third-party promotional campaign while intending
to sell and selling – a practice known as "scalping;" (iv) disseminating materially false
statements in a Company press release and a Form 8-K filed with the Commission, both of which
denied any involvement in the promotional campaign orchestrated and funded by Defendants; (v)
orchestrating RenovaCare press releases to coincide with the third-party promotion; and (vi)
manipulative trading across multiple accounts to support the share price and trading volume of
RenovaCare stock while selling over one million of shares to monetize the scheme.

3.      In organizing and executing this fraudulent scheme, Rayat and his associates were
playing a "long game."  Beginning no later than 2007, Rayat transferred shares of RenovaCare

and other penny stocks to Sidhu, Bhogal, and others.  Rayat retained a financial interest in the

shares he transferred – either in the form of debt obligations or preferred shares in the entities

that received the shares.  This allowed Rayat to profit from the sale of shares by others during the

promotional activity.

4.     Each of the individual Defendants played a role in the scheme, and they acted

through and used RenovaCare as a vehicle for the fraud.  For example, Bhogal – Rayat's friend

and long-time business associate, and a large shareholder of RenovaCare stock who also served

as a consultant to the Company – played a central part in creating and maintaining RenovaCare's

"investor relations" operation, including developing a company website, managing a series of

third-party investor relations consultants, and managing the timing and content of RenovaCare's

public press releases.

5.     By at least 2015, RenovaCare's investor relations program was in place, and

Defendants engaged a series of third-party promoters to tout the Company and its common stock

in focused promotional campaigns intended to increase its stock price and trading volume to

permit them to profit.

6.     In July 2017, Rayat hired one such promoter, StreetAuthority, LLC

("StreetAuthority"), to conduct a promotional campaign focused on RenovaCare

stock and the Company's experimental medical device called the "SkinGun."  Each

year, StreetAuthority built a promotional campaign called the "Predictions

Campaign" around an annual "Predictions Report" for the next calendar year.  After

Rayat approached StreetAuthority and offered to fund the campaign, RenovaCare and

another company owned by Rayat became StreetAuthority's lead "predictions."

7.     Rayat knowingly provided materially false information to StreetAuthority for use

in its promotional campaign aimed at "pumping" the share price and trading volume of RenovaCare stock. This included false "before and after" pictures of a burn patient that was treated with a SkinGun prototype.

8.      From at least July 2017 through February 2018, Rayat organized, financed and directed StreetAuthority's efforts, which included a steady stream of "research" reports, emails, and advertisements that encouraged investors to buy RenovaCare stock. During this promotional blitz – funded by RenovaCare – the Company issued press releases to bolster the StreetAuthority promotional campaign. Bhogal was responsible for and worked on several press releases issued by the Company, all while knowing that StreetAuthority was promoting RenovaCare.

9.      Rayat, Bhogal, Sidhu, and Fleming intended to sell and all but Rayat sold RenovaCare stock while the StreetAuthority promotional campaign was ongoing – the textbook definition of scalping. During this time, Bhogal, Sidhu, and Fleming's RenovaCare stock trading tracked key events in the StreetAuthority promotional campaign as well as each other's trading activity.

10.     While the Predictions Campaign was active, Bhogal sold millions-of-dollars of RenovaCare shares through Alberta Ltd., a company in which Rayat held a substantial financial interest. Later in the scheme, Bhogal also placed at least two orders to buy RenovaCare stock that were intended to manipulate the market.

11.     Sidhu – Rayat's long-time business associate, and a former member of RenovaCare's board of directors – coordinated the registration and deposit of Defendants' RenovaCare shares during the Relevant Period. He also sold millions-of-dollars of RenovaCare shares during the fraudulent scheme, using multiple brokerage accounts, and engaged in manipulative trading to further artificially inflate the market for RenovaCare stock.

12.     Fleming – a third party investor relations consultant to RenovaCare and an active participant in the StreetAuthority promotional campaign – sold over 50,000 RenovaCare shares during the fraudulent scheme, and engaged in manipulative trading to further artificially inflate the market for RenovaCare stock.

13.     While the scheme was ongoing, Defendants also took steps to conceal their role in the Predictions Campaign.  On January 8, 2018 – in response to an inquiry from OTC Markets Group, Inc. ("OTC Markets"), the entity that supervised the exchange on which RenovaCare stock was listed – Rayat, Bhogal, and RenovaCare made and publicly disseminated a materially false press release that denied *any* involvement in the StreetAuthority promotional campaign.

14.     As a result of the fraudulent conduct alleged below, Bhogal, Sidhu, and Fleming sold millions of shares of RenovaCare stock at artificially inflated prices and made over $7 million in ill-gotten gains, either directly or through the Relief Defendants, which were entities they owned and controlled and in which Rayat had substantial financial interests.

## VIOLATIONS AND RELIEF SOUGHT

15.     By engaging in the conduct described in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; RenovaCare violated Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rules 15d-11 and 12b-20 thereunder, 17 C.F.R §§  240.15d-1 & 240.12b-20; Bhogal, Sidhu, and Fleming violated Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2); Rayat and Bhogal aided and abetted RenovaCare's violation of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e); Bhogal aided and abetted Rayat's and RenovaCare's violations of Section 17(a)

of the Securities Act, in violation of Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b); and, by acting through or by means of third parties, including StreetAuthority, RenovaCare's third-party investor relations consultants, and each other, Rayat, Bhogal, Sidhu, and Fleming violated Section 20(b) of the Exchange Act.15 U.S.C. § 78t(b). Unless restrained and enjoined, Defendants will engage in further violations of these provisions.

16. The Commission respectfully requests that the Court enter a judgment: (i) enjoining Defendants from committing further violations of the Federal securities laws as alleged in this Complaint; (ii) ordering Rayat, Bhogal, Sidhu, Fleming, and the Relief Defendants to disgorge their ill-gotten gains with prejudgment interest; (iii) ordering Defendants to pay civil monetary penalties; (iv) permanently barring Rayat, Bhogal, Sidhu, and Fleming from participating in any offering of a penny stock and serving as an officer or director of a public company; and (v) ordering other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§78u(d)-(e) & 78aa(a) and Sections 20(b)-(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b)-(d) & 77v(a). Among other things, the Defendants conducted business and engaged in the unlawful acts described herein, directly or indirectly, throughout the United States, using the means, instruments, or instrumentalities of interstate commerce and/or the mails, including the use of email, the internet, and telephone.

18. Until August 3, 2016, RenovaCare had securities registered with the Commission pursuant to Exchange Act Section 12(g), at which time it filed a Form 15 to terminate the registration. Thereafter, RenovaCare continued to regularly file forms with the Commission, including Forms 8-K. During the Relevant Period, the company's stock was a penny stock

because it did not meet any of the exceptions to the definition of a "penny stock" pursuant to Exchange Act Section 3(a)(51), 15 U.S.C. § 78c(a)(51), and Exchange Act Rule 3a51-1, 17 C.F.R. § 240.3a51-1.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(c)(3) and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).  During part of the Relevant Period, RenovaCare was headquartered and transacted business in this District.  Throughout the events described here, RenovaCare's common stock (ticker symbol "RCAR") traded on the OTCQB Tier, an interdealer quotation system operated by OTC Markets Group, Inc. ("OTC Markets"), which is headquartered in this District.

20.     In addition, certain of the transactions, acts, practices, and courses of conduct constituting the violations alleged in this Complaint occurred within or touched upon this District.  The Defendants and Relief Defendants engaged in fraudulent conduct that had a foreseeable and substantial effect upon investors and markets in this District and throughout the United States.

21.     The StreetAuthority promotional campaign, which included material misrepresentations and omissions, was directed at investors, including those in this District.  At Rayat's direction, RenovaCare deceptively routed payments to StreetAuthority through a series of third-party investor relations consultants, using an account with a bank located in this District.

22.     Defendants had frequent contact with RenovaCare employees, outside counsel, and third-party consultants in the United States, including in this District, via telephone, email, and other means of interstate communications.  At least Rayat, Bhogal, and Fleming also had contact with StreetAuthority representatives in the United States using similar means.

23.     Bhogal and Sidhu organized, owned and controlled Canadian and U.S.-based

entities through which they owned and controlled and/or traded RenovaCare common stock. Rayat repeatedly tried to open accounts with U.S.-based brokerage firms, and Bhogal, Sidhu, Fleming, and the Relief Defendants traded RenovaCare shares in accounts with U.S.-based broker-dealers, through U.S. exchanges, and/or wired the proceeds of those sales through accounts held in the U.S. and Canada in furtherance of the unlawful conduct alleged herein.

## DEFENDANTS

24.     **RenovaCare** is a Nevada corporation that was headquartered at 430 Park Avenue, New York, New York, during the Relevant Period.  It is now headquartered in Roseland, New Jersey.  The Company has been through several name changes and changes in purported business focus.  Most recently, on January 7, 2014, the Company changed its name to RenovaCare and purportedly changed its business focus to medical devices.  It was and is a development stage company with no revenue, but claims to be developing a medical device called the "SkinGun" that uses a "CellMist" system to treat burns.

25.     **Rayat**, age 59, is a Canadian citizen and resident of Vancouver.  He has been the majority and controlling shareholder of RenovaCare, Inc., or its predecessors since at least 1999, and has at times served as its Chairman.  As of January 1, 2021, Rayat owned 71,101,453 million shares of common stock (approximately 81.3 percent of the company's outstanding float), either individually or through his wholly owned holding companies, Kalen Capital Corporation ("Kalen Corp.") and Kalen Capital Holdings LLC ("Kalen LLC").

26.     **Bhogal**, age 42, is a Canadian citizen and resident of Vancouver.  During the Relevant Period, Bhogal, individually or through companies he owned and controlled – including Relief Defendant Alberta Ltd. – owned and controlled millions of shares of RenovaCare common stock.  He received this stock in transactions financed or arranged by Rayat, in

exchange for debt or equity obligations to Rayat. Bhogal served as a "strategic advisor" to RenovaCare through his wholly owned consulting firm Vector Asset Management, Inc. from August 1, 2013, through June 26, 2018, when he was appointed RenovaCare's Chief Operating Officer. During the Predictions Campaign, Bhogal transacted in RenovaCare shares in furtherance of the scheme.

27.      **Sidhu**, age 49, is a Canadian citizen and resident of Vancouver. During the Relevant Period, Sidhu, individually or through companies he owned and controlled – including Relief Defendants Blackbriar Ltd., Treadstone Ltd., and Treadstone LLC – owned and controlled millions of shares of RenovaCare common stock. He received this stock either directly from Rayat, or in transactions financed by Rayat, in exchange for debt or equity obligations. Sidhu served on the Board of Directors of RenovaCare's predecessor entity from September 2008 through 2010. During the Predictions Campaign, Sidhu transacted in RenovaCare shares in furtherance of the scheme.

28.      **Fleming (a/k/a Sharon Hebgin)**, age 60, is a California resident and served as a third-party investor relations consultant to RenovaCare through her wholly owned consulting firm Inspiren LLC ("Inspiren"). During the Predictions Campaign, Fleming transacted in RenovaCare shares in furtherance of the scheme.

## **RELIEF DEFENDANTS**

29.      **Treadstone Financial Group Ltd**., f/k/a 1422688 Alberta Ltd. ("Treadstone Ltd.") is a Canadian entity nominally owned and controlled by Sidhu's brother, but actually owned and controlled by Sidhu, through which he owned shares of RenovaCare common stock. During the fraudulent scheme, Sidhu sold certain of these RenovaCare shares and then wired the proceeds from an account in the United States to an account in Canada, generating ill-gotten

gains as to which Treadstone Ltd. has no legitimate claim.

30.     **Treadstone Financial Group LLC** ("Treadstone LLC"), a subsidiary of Treadstone Ltd., is a Delaware corporation nominally controlled by Sidhu's brother, but in fact owned and controlled by Sidhu, through which he owned shares of RenovaCare common stock. During the fraudulent scheme, Sidhu transferred certain RenovaCare shares from Treadstone Ltd. to an account in the United States in Treadstone LLC's name, sold the shares, and then wired the proceeds to Treadstone Ltd.'s account in Canada, generating ill-gotten gains as to which Treadstone LLC has no legitimate claim.

31.     **Blackbriar Asset Management Ltd.**, f/k/a Fargo West Investments Ltd., ("Blackbriar Ltd.") is a Canadian entity owned and controlled by Sidhu, through which he owned shares of RenovaCare common stock.  During the fraudulent scheme, Sidhu sold certain of these RenovaCare shares through U.S.-based exchanges, generating ill-gotten gains as to which Blackbriar Ltd. has no legitimate claim.

32.     **1420527 Alberta Ltd**. ("Alberta Ltd.") is a Canadian entity owned and controlled by Bhogal, through which he owned shares of RenovaCare common stock.  During the fraudulent scheme, Bhogal sold certain of these RenovaCare shares in an account in Alberta Ltd.'s name through U.S.-based exchanges, and then wired the proceeds through U.S.-based financial institutions to its account in Canada, generating ill-gotten gains as to which Alberta Ltd. has no legitimate claim.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

33.     **StreetAuthority** was an online financial publishing company based in Austin, Texas, that sold subscriptions to investment research bulletins and newsletters.  During the Relevant Period, it was owned and operated by a long-time friend of Rayat (the "StreetAuthority

Owner").

34.     **Company A** is a company that purports to be developing windows that generate electricity from solar energy.  During the Relevant Period, Rayat was a controlling shareholder of Company A, and Bhogal and Sidhu were also substantial shareholders.  Bhogal served as a consultant to Company A from February 1, 2014, through his company Vector Asset Management LLC, and became a Director on August 1, 2017.  Sidhu was an employee of Company A before 2010.  Fleming was an investor relations consultant to Company A during the Predictions Campaign.  Company A was featured in the Predictions Campaign with RenovaCare based on Rayat's agreement, and similarly paid StreetAuthority through the same third-party investor relations consultants, including Fleming.

35.     **Investor Relations Consultant 1** ("IRC 1"), a long-time business associate of Rayat, Fleming, and Bhogal, was a third-party provider of investor relations services to Rayat and RenovaCare beginning no later than 2014.  He was replaced by Fleming to work on the Predictions Campaign around the time it began.

36.     **Investor Relations Consultant 2** ("IRC 2"), a long-time friend and business associate of both Rayat and Bhogal, was a third-party provider of investor relations services to Rayat and RenovaCare beginning no later than December 2017, when he was selected by Rayat and Bhogal to replace Fleming on the Predictions Campaign.

37.     **1420527 Alberta LLC** ("Alberta LLC"), a subsidiary of Alberta Ltd., was a Delaware corporation owned and controlled by Bhogal.  During the fraudulent scheme, Bhogal transferred RenovaCare shares between Alberta Ltd. and Alberta LLC and sold shares in an account owned by Alberta Ltd.

38.     **Boston Financial Group Ltd.** ("Boston Financial") is a Canadian entity owned

11

and controlled by Bhogal and his wife that received restricted shares of RenovaCare common stock from Rayat in exchange for preferred shares in Boston Financial.

39. **Vector Asset Management Ltd.** ("Vector") is a Canadian company owned and controlled by Bhogal, through which Bhogal worked as a consultant to RenovaCare from August 1, 2013, until June 2018.

40. **Wolverhampton Holdings LLC** ("Wolverhampton") is a Delaware company owned and controlled by Bhogal that purchased shares of RenovaCare common stock in June 2013 from a friend of Rayat with the proceeds of a loan from Rayat.

41. **Blackbriar Asset Management LLC** ("Blackbriar LLC") a Delaware corporation owned and controlled by Sidhu, was used to open accounts in the United States and receive RenovaCare shares from Blackbriar Ltd.

42. **Collingwood Holdings, LLC** ("Collingwood") is a Delaware company owned and controlled by Sidhu that purchased shares of RenovaCare common stock in June 2013 from a friend of Rayat with the proceeds of a loan from Rayat. During the fraudulent scheme, Sidhu transferred certain of Collingwood's RenovaCare shares into one or more accounts in his own name and sold shares.

43. **Kalen Capital Corporation** ("Kalen Corp.") is a Canadian company owned and controlled by Rayat and headquartered in Vancouver, British Columbia, through which he owns and controls a substantial portion of his holdings of RenovaCare and other penny stocks, as well as financial interests with Sidhu, Bhogal, and Fleming and entities they owned and controlled. Certain of the acts or transactions described here were undertaken by Rayat on behalf of Kalen Corp., including one or more attempts to open brokerage accounts to sell RenovaCare shares.

44. **Kalen Capital Holdings LLC** ("Kalen LLC"), a subsidiary of Kalen Corp., is a

12

U.S.-based company owned and controlled by Rayat.  Certain of the acts or transactions described here were undertaken by Rayat on behalf of Kalen LLC, including one or more attempts to open brokerage accounts to sell RenovaCare shares.

## FACTS

I.     **Step One Of The Scheme (Setting the Table):  Defendants Accumulated RenovaCare Stock To Sell During The Scheme**

45.     Rayat has been the majority and controlling shareholder of RenovaCare, Inc. since at least 1999.  By no later than 2007, Rayat began distributing RenovaCare shares to his friends and business associates to ensure that he profited from promoting the Company even if he was unable to sell RenovaCare shares himself.

A.     **Between 2007 And 2013, Rayat Sold Millions of RenovaCare Shares To Sidhu And Bhogal, But Retained A Financial Interest**

46.     Between 2007 and 2013, Rayat sold millions of RenovaCare shares to entities owned and controlled by Sidhu and Bhogal, or financed their purchase of shares from other business associates.  These transactions allowed Bhogal and Sidhu to acquire millions of shares of RenovaCare stock for little or no money, and in exchange, Rayat received debt or equity interests that permitted him to maintain a financial interest in any later sale of these shares:

| Date | Entity | Beneficial Owner | RCAR Shares Purchased | Rayat Role | Rayat Financial Interest |
|------|--------|------------------|----------------------|------------|--------------------------|
| Dec. 31, 2007 | Blackbriar Ltd. (Relief Defendant) | Jeet Sidhu | 1,250,000 | Sold Shares | Preferred Shares of Blackbriar Ltd. redeemable for $1,062,500 |

13

| Dec. 31, 2007 | Boston Financial Group Ltd. | Jatinder Bhogal | 2,500,000 | Sold Shares | Preferred Shares of Boston Financial Group redeemable for $2,215,000 |
|---|---|---|---|---|---|
| Sept. 8, 2008 | Alberta Ltd.<br><br>(Relief Defendant) | Jatinder Bhogal | 3,000,000[1] | Sold Shares | Preferred Shares of Alberta Ltd. redeemable for $8,351,000 |
| Sept. 8, 2008 | Treadstone Ltd.<br><br>(Relief Defendant) | Jeet Sidhu | 1,250,000[2] | Sold Shares | Preferred Shares of Treadstone Ltd. redeemable for $3,741,500 |
| June 1, 2013 | Wolverhampton Holdings LLC | Jatinder Bhogal | 822,000 | Financed Purchase from third party | $425,000 loan at 4.7% annual interest |
| June 1, 2013 | Collingwood Holdings LLC | Jeet Sidhu | 1,962,000 | Financed purchase from third party | $1,200,000 loan at 4.7% annual interest |

47.    Defendants also obtained shares in private transactions with the Company. In 2008, for example, Fleming acquired 300,000 RenovaCare shares in a private placement. By October 2017, she still owned 153,630 shares of RenovaCare.

48.    Rayat also loaned substantial sums to Bhogal and Fleming. In March 2013, for example, Rayat loaned $548,000 to Vector, the company through which Bhogal managed RenovaCare's investor relations operation. In 2013, Rayat loaned Fleming $500,000 to allow

---

[1] Alberta Ltd. also received 2.8 million shares of Company A and shares in three other companies in this transaction.

[2] Treadstone Ltd. also received 1.25 million restricted shares of Company A and shares of three other companies in this transaction.

her to purchase an interest in a stock promotion company.

**B.      In Anticipation Of The Predictions Campaign, Rayat And Sidhu Orchestrated Additional Below-Market Sales Of RenovaCare Stock**

49.      In advance of the Predictions Campaign, Defendants engaged in several transactions that provided them with additional stock at below-market prices.  On June 28, 2017, for example, Rayat exercised warrants that granted Kalen over 114,000 RenovaCare shares at below-market prices.  In July 2017, Rayat purchased 410,000 RenovaCare shares, and he solicited several friends to purchase another 50,250 shares.  Sidhu assisted Rayat and RenovaCare in completing this private sale of RenovaCare shares, including by coordinating documentation of the transactions.

50.      In October 2017, shortly before the Predictions Campaign began, Rayat directed RenovaCare to engage in another private sale of shares to Rayat's friends and associates at below-market prices.  After another friend decided not to invest, Sidhu stepped in and purchased those shares, despite already owning millions of RenovaCare shares at a significantly lower cost basis.  Sidhu's participation allowed RenovaCare to publicly announce that the offering was fully subscribed, and he substantially assisted Rayat and RenovaCare in executing the transaction. Among other things, Sidhu worked with Rayat to solicit one of Rayat's friends to invest over $2 million ("Friend A"), and assisted her in completing the transaction.  Sidhu later assisted Friend A in registering her shares for resale while the Predictions Campaign was ongoing.  Later, Friend A purchased and sold RenovaCare stock on the open market during the promotional campaign.

51.      The proceeds of the July and October 2017 financings – funding exclusively provided by Rayat and his friends and associates – were the primary source of funds RenovaCare used to pay StreetAuthority for the promotional campaign.

### C. Sidhu Worked With The Other Defendants To Open Brokerage Accounts With Free-Trading RenovaCare Shares

52.     Beginning no later than 2013, Bhogal, Rayat, Fleming, and Sidhu closely coordinated their brokerage accounts.  Bhogal and Sidhu had accounts with the same U.S. broker-dealer ("Broker-Dealer A") that held shares of RenovaCare and other penny stocks that they both obtained through transactions involving Rayat, and Fleming also opened an account with Broker-Dealer A pursuant to Rayat's recommendation.  Sidhu, who had online access to Bhogal's and Rayat's accounts, regularly managed their brokerage accounts.

53.     Sidhu would frequently review Bhogal's and Rayat's accounts, including their RenovaCare holdings, when he logged into his own accounts.  For example, on January 23, 2017, Sidhu logged in and viewed all three accounts.

54.     In early 2017, Broker-Dealer A closed a number of Sidhu's and Bhogal's accounts.  Sidhu coordinated the transfer of shares between entities to prepare the shares for sale at another brokerage.  On February 10, 2017, he sent instructions to RenovaCare's transfer agent to move the shares between the various entities he and Bhogal controlled as follows:  (i) Collingwood shares to Sidhu; (ii) Alberta LLC's shares to Alberta Ltd.; (iii) Wolverhampton shares to Boston Financial; and (iv) Blackbriar Ltd. received shares from Blackbriar LLC.

55.     By April 2017, Sidhu and Bhogal were working together to deposit RenovaCare shares with another U.S. broker-dealer ("Broker-Dealer B").  Sidhu deposited shares from Collingwood into a new account in his name with Broker-Dealer B.  With Sidhu's assistance, Bhogal opened an account in Alberta Ltd.'s name and deposited shares.

56.     As of April 2017, the RenovaCare shares in both Sidhu's and Bhogal's Broker-Dealer B accounts were restricted from sale pursuant to the Federal securities laws.

57.     By May 2017, in coordination with RenovaCare's outside counsel and a member

16

of the Company's board of directors ("RenovaCare's Director"), Bhogal and Sidhu asked RenovaCare to register their shares so that they could be sold.

58.     On June 6, 2017, RenovaCare amended a Form S-1 Registration Statement already pending with the Commission to add Sidhu's and Bhogal's shares to the list of shares that the company sought to register for resale.  The prior version of the S-1 had sought to register approximately 2 million RenovaCare shares owned by Rayat and other friends and associates.

59.     As of June 2017, Bhogal owned 5.5 million RenovaCare shares, Sidhu owned over 3.3 million RenovaCare shares, and Fleming owned over 100,000 RenovaCare shares.

60.     On July 5, 2017, the Commission declared RenovaCare's June 6, 2017 S-1 effective, which removed any restrictions on the ability of Rayat, Bhogal, Sidhu, and other friends and associates of Rayat to sell their shares.

61.     Shortly thereafter, Sidhu contacted Broker-Dealer B to remove the restricted legend from his and Bhogal's RenovaCare shares.  On July 17, 2017, Sidhu informed Bhogal that both accounts were cleared to sell their RenovaCare stock.  They would wait to sell, however, until shortly after the Predictions Campaign commenced.

**D.     With Sidhu's Help, Rayat Sought to Open Accounts With Five Different Brokers To Sell RenovaCare and Company A Shares**

62.     In anticipation of the Predictions Campaign, Rayat repeatedly tried to open brokerage accounts that would allow him to sell his RenovaCare shares.  Although his efforts were ultimately unsuccessful, they demonstrate Rayat's intention to sell RenovaCare stock during the planned promotional campaign.  While these efforts were ongoing, he repeatedly asked Sidhu to track his holdings and assist him in preparing information needed to open the accounts.

63.     Rayat also coordinated accounts openings with Bhogal and Sidhu.  On June 6,

17

2017, Rayat received account opening forms from a foreign financial institution. After Rayat forwarded the email to Sidhu, Sidhu replied, "Which entity am I filling this out for?" Rayat responded, "[Kalen Capital] for me . . . and whatever company [Bhogal] has his shares in."

64.     In addition, between August 2017 and November 2017, Rayat had on-going discussions with at least four different brokerage firms concerning opening accounts. For example, on or around September 1, 2017, while he was in Austin, Texas, visiting StreetAuthority to discuss the Predictions Campaign, he discussed opening an account with one of these firms. He had previously informed this firm he intended to sell 500,000 RenovaCare shares.

65.     Similarly, on October 19, 2017 – days before the Predictions Campaign began – Rayat told another brokerage firm that he intended to sell 2.5 million to 5 million RenovaCare shares over the next two years.

66.     By November 2017, however, all four brokerages had either declined to open an account or closed the account before Rayat could sell his stock. Thus, Rayat was unable to sell his RenovaCare stock during the Predictions Campaign.

67.     Nonetheless, Rayat's beneficial interest in entities owned by Bhogal and Sidhu, including several that sold RenovaCare shares during the StreetAuthority promotional campaign, allowed Rayat to profit from the scheme.

## II.     Step Two (Scalping):  Rayat Solicited StreetAuthority To Promote RenovaCare While Defendants Intended To Sell And Sold

68.     The second part of Defendants' scheme was to aggressively promote RenovaCare while intending to sell and selling RenovaCare shares, a fraudulent practice referred to as "scalping." By 2015, Rayat and Bhogal had developed a robust "investor relations" operation within RenovaCare that included a company website and a steady stream of press releases

touting the company's prospects, despite the Company's lack of revenue or any commercially available product. Rayat and Bhogal also hired and worked with a series of third party investor relations consultants, including Fleming, IRC 1, and IRC 2, through whom they orchestrated, funded, and directed paid promotional campaigns through third-party promoters such as StreetAuthority.

### A. Bhogal, Rayat, And Sidhu Developed An Aggressive Investor Relations Program That Provided The Basis For The Predictions Campaign

69.     As of 2013, RenovaCare was known as Janus Resources Inc. and purported to be in the business of oil-and-gas production. By the middle of 2013, Bhogal and Rayat decided to radically alter RenovaCare's business plan by purchasing the technology related to the SkinGun.

70.     Bhogal received a "finder's fee" for this transaction, after which he shifted his attention to building and managing RenovaCare's investor relations and press relations operations, working as a RenovaCare consultant through Vector, his consulting company. He had regular contact with Rayat, IRC 1, Fleming, and RenovaCare's CEO, attended RenovaCare Board meetings, worked closely with IRC 1 and others to develop RenovaCare's website, and directed the timing and content of RenovaCare's press releases.

71.     Fleming was actively involved in promoting RenovaCare beginning no later than 2014, working initially through an investor relations company called Gold Key Media, and later through her own company, Inspiren, the publisher of "The Cheap Investor," an investor-focused newsletter she purchased in a transaction that Rayat financed. On May 11, 2015, for example, Fleming copied Rayat and IRC 1 on an email in which she referred to RenovaCare as "the new sponsor" of The Cheap Investor in response to a question regarding approval of an "RCAR promo piece" in the newsletter.

72.     The Cheap Investor disseminated paid promotions of RenovaCare from at least

October 2015 to July 2016.  During that period, Sidhu, Bhogal, and Fleming collectively sold over 600,000 RenovaCare shares.

73.     By October 2015, Rayat had worked with Sidhu, Bhogal, Fleming, and others to develop RenovaCare's "investor relations" strategy that would temporarily increase the price and trading volume of RenovaCare shares as they sold shares.

74.     For example, on or around October 9, 2015, Sidhu discussed the process with RenovaCare's CEO, and later forwarded wire instructions to him to be used to pay IRC 1 for his investor relations services.

75.     As RenovaCare's CEO explained in an October 9, 2015 email after he discussed with Rayat:

> [J]ust talked to Harmel.  We will enter an agreement as of Sep 1 with [IRC 1] for the entire branding, website, etc. activities.  He will be on a retainer of $10,000 per month . . .
>
> In addition we will enter an agreement for investor relation activities[.] [T]hese payments we will wire after we have the agreement. This will be done by third party companies (e.g. thecheapinvestor.com) but will run also through [IRC 1's] company.  That will be $60,000 monthly for about 4 months.

76.     The RenovaCare CEO's mention of "thecheapinvestor.com" refers to Fleming's investor-focused newsletter, and his explanation illustrates Defendants' business model – funding a short-term promotional campaign through a third-party "investor relations consultant" (at the time, IRC 1) who worked with a third-party stock promoter (at the time, Fleming – an approach that mirrored Defendants' scheme two years later involving StreetAuthority.

77.     Bhogal was directly involved in directing the timing and content of RenovaCare press releases, ensuring that they coincided with third-party promotional activity.  Bhogal served as RenovaCare's primary interface with IRC 1, and he organized weekly conference calls via Skype with RenovaCare's CEO and IRC 1 to discuss RenovaCare's investor relations program,

including building content for RenovaCare's website and to map out RenovaCare's press releases over the ensuing months.

78. In December 2016, for example, Bhogal had numerous contacts with IRC 1, RenovaCare's CEO, and other consultants to plan the content and timing of RenovaCare's press releases and other investor relations activities for the following year.

79. Defendants' investor relations strategy set the groundwork for Rayat to enlist a new third-party stock promoter in 2017 – StreetAuthority.

**B.    In July 2017, Rayat Approached StreetAuthority To Promote RenovaCare**

80. On or about July 26, 2017, Rayat contacted the StreetAuthority Owner, who was a longtime friend.  StreetAuthority was an online financial publisher of investment newsletters with a dedicated subscriber base.  That day, Rayat asked if StreetAuthority would be willing to promote RenovaCare and Company A.  Following the call, Rayat emailed the StreetAuthority Owner marketing materials related to RenovaCare and Company A.

81. On July 28, 2017, the StreetAuthority Owner suggested to Rayat that StreetAuthority feature RenovaCare and Company A in its annual "Predictions Report."  The StreetAuthority Owner noted that this could "create awareness of both companies" and attract investors, and he stated that StreetAuthority was interested in "partnering up" with Rayat to advertise on various online media platforms.  Rayat agreed it was a "great idea."  The StreetAuthority Owner proposed that RenovaCare and Company A each pay StreetAuthority $50,000 per month to fund the planned promotional campaign, and Rayat agreed.

82. On August 1, 2017, in an email to StreetAuthority employees after Rayat's call with StreetAuthority representatives, a colleague at StreetAuthority wrote the StreetAuthority Owner:

> I want to pursue a marketing partnership with Harmel/[IRC 1] for
> this promotion. We will disseminate this promotion to all our lists,
> but for it to have the kind of impact we all want, we're going to
> need to rent outside lists and promote it on
> Google/YahooFinance/etc.

83. In reply, the StreetAuthority Owner agreed, and noted that "Harmel initially called me about advertising and promoting his companies."

84. Between July 28 and August 31, 2017, Rayat discussed the details of the promotional campaign with StreetAuthority representatives on several occasions, including an in-person meeting at StreetAuthority's headquarters in Austin, Texas, in late August 2017.

85. Each year, StreetAuthority built a promotional campaign around an annual "Predictions Report" for the next calendar year. After Rayat approached StreetAuthority and offered to fund the promotional campaign, RenovaCare and Company A became StreetAuthority's lead "predictions."

86. On September 4, 2017, shortly after Rayat's trip to Austin, the StreetAuthority Owner emailed Rayat to confirm that "StreetAuthority will be featuring both [RenovaCare and Company A] in its annual 'Predictions' report and promotions for Game-Changing Stocks," one of StreetAuthority's investor-focused newsletters. He also asked if Rayat was "interested in exploring and participating in this marketing program"—referred to within Street Authority as the "Predictions Campaign"—which could include "developing native ads that can run within Google, Yahoo Gemini, Taboola, Dianomi, Outbrain and other Content Display Networks." These advertising platforms later became the subject of focused discussions with Rayat.

87. Later that day, Rayat responded:

> [N]othing would make me happier than working with
> [StreetAuthority] in spreading the word to investors and
> dramatically improving [RenovaCare's and Company A's]
> awareness in the investment community [].

So, and as it relates to 1) being featured in the annual 'Predictions' report, 2) participating in marketing programs, 3) developing research reports and 4) being featured in Game-Changing Stocks and StreetAuthority Daily, please know that I am very interested in exploring how we can work together.

88.     After expressing his interest in participating in all of the key elements of what would regularly refer to as the Predictions Campaign, Rayat suggested they speak the next day.

**C.     Rayat Worked Closely With StreetAuthority To Create, Distribute, and Disseminate The Predictions Campaign**

89.     Between July and October 2017, Rayat worked closely with StreetAuthority representatives to create promotional materials to be used in the Predictions Campaign.  Rayat provided StreetAuthority with extensive information on RenovaCare and the purported efficacy of the "SkinGun," the Company's experimental medical device.

90.     RenovaCare's website and press releases, all of which were developed under Bhogal's supervision, were the primary source of promotional content for the StreetAuthority promotion.

91.     By at least September 2017, StreetAuthority began drafting materials for its paid promotion of RenovaCare.  All or most of the information used in promotional materials during the campaign was provided to StreetAuthority by Rayat in emails, attachments, or links to RenovaCare's website or third-party websites.  Virtually all of this information came from RenovaCare's investor relations program, which was managed by Rayat and Bhogal through IRC 1, who later worked with StreetAuthority.

92.     StreetAuthority publicly launched the Predictions Campaign on or about October 24, 2017.  Rayat reviewed and commented on draft promotional materials, including the Predictions Report that was the heart of the campaign, prior to their release.

93.     After the Predictions Campaign launched in late October 2017, Rayat reviewed

draft advertisements, received reports from StreetAuthority regarding the campaign's performance, and weighed in on advertising content and "placements." He also stopped and started the advertising "spend" for the campaign based on external events, including the OTC Markets inquiry described in detail below.

94. From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials on the internet and to its subscriber base. Throughout the campaign, Rayat continued to be closely involved in the drafting, distribution, and dissemination of StreetAuthority's promotional materials.

95. For example, on or around November 28, 2017, Rayat traveled to StreetAuthority headquarters in Austin, Texas, to meet with the StreetAuthority Owner and his staff, including the copy writer for the Predictions Campaign. The next day, having had a chance to reflect on their discussion and "examine the results of the last 30 plus days" that they provided, Rayat gave StreetAuthority a series of explicit instructions:

1. Focus on Gemini [an online advertising platform];

2. Have separate single company ads and landers, so that one single company is the focus of the report ... I think this will definitely have more impact;

3. A few days later, a special report goes out on the other company so that we get another chance at the investor,

96. Rayat then suggested that if the copywriter "can get the copy tweaked right away, we can start this new strategy sooner than later."

97. Rayat explicitly linked his "suggestions" to future payments to StreetAuthority, stating that "we have to show meaningful results to the CEOs [of RenovaCare and Company A], who need to make another transfer shortly," referring to the next $50,000 monthly payments to StreetAuthority from RenovaCare and Company A.

98.     On or around December 4, 2017, a StreetAuthority employee sent Rayat a text message attaching a draft version of the "separate single company ads and landers" he had requested that related to the Predictions Campaign.

99.     On or around December 5, 2017, Rayat had another telephone conference call with StreetAuthority representatives.  After that call, the StreetAuthority employee informed Rayat that "we're ready to launch on ad networks whenever we're given the green light."  The next day, Harmel Rayat responded and approved the decision to restart the advertising campaign:  "I say we start up the machinery :)."

100.    On numerous other occasions, including on or around December 20, 2017, Rayat asked StreetAuthority employees to report on the performance of the Predictions Campaign, and weighed in on how they should proceed.

**D.      Defendants Concealed Their Involvement In The Predictions Campaign StreetAuthority Promotion By Paying StreetAuthority Through Third Party Service Providers, Including Fleming**

101.    Before StreetAuthority launched its promotion, Rayat arranged to have both RenovaCare and Company A pay StreetAuthority $50,000 per month through a series of third-party service providers that he and Bhogal selected – initially IRC 1, followed by Fleming, and followed finally by IRC 2.  Each of these third party service providers worked on the StreetAuthority promotion at the direction of Rayat and Bhogal.  Although IRC 1 was replaced before the StreetAuthority promotion began, Fleming and IRC 2 each invoiced RenovaCare and Company A for StreetAuthority's work promoting the companies.

102.    Initially, Rayat arranged for RenovaCare to pay IRC 1 a $2,500 per month retainer to prepare invoices and route payments between RenovaCare and StreetAuthority, but Rayat remained StreetAuthority's primary source of information regarding RenovaCare.

103.     Shortly before the Predictions Campaign launched on October 24, 2017, Rayat
replaced IRC 1 with Fleming, under the same payment terms and with the same limited duties.
Rayat arranged for RenovaCare to pay Fleming a $2,500 per month retainer to prepare invoices
and route payments between RenovaCare and StreetAuthority.  This arrangement – which
Fleming characterized as a "personal favor" to Rayat – served to conceal RenovaCare's and
Rayat's involvement in and funding of the StreetAuthority promotion.

104.     On October 18, 2017, pursuant to Rayat's instructions, Fleming had an
introductory phone call with several representatives of StreetAuthority, after which they
provided wire instructions for her to funnel payments from RenovaCare and Company A.

**E.     Defendants Failed to Disclose Their Involvement In The Predictions
Campaign And Intent To Sell**

105.     Defendants knew, or were reckless in not knowing, that it was unlawful to
promote RenovaCare stock while they intended to sell RenovaCare stock without disclosing this
fact to investors.  For example, as a recidivist securities law violator, Rayat was well aware of
the rules surrounding stock promotion.  In 2000, Rayat settled a case with the Commission in
which he was charged with violating Section 17(b) of the Securities Act for failing to disclose
compensation received relating to a stock promotion.  *See SEC v. EquityAlert.Com, Inc. and
Harmel S. Rayat*, No. cv-00-146 (D. Ariz. Aug. 24, 2000).  Nonetheless, Defendants schemed to
defraud investors by orchestrating and financing a promotion through StreetAuthority without
disclosing their intent to sell, and later, their orchestrated sales of RenovaCare stock.

106.     Defendants could have accurately disclosed their involvement in the Predictions
Campaign, and their intent to sell.  In an email on October 3, 2017, the StreetAuthority Owner
asked Rayat to provide "disclaimer" language for StreetAuthority to use in the Predictions
Campaign.  Rayat contacted RenovaCare's Director, who provided draft disclaimer language that

26

had been used in earlier third-party promotions of RenovaCare by The Cheap Investor, Fleming's newsletter. Rayat provided this disclaimer to the StreetAuthority Owner, who worked with a lawyer referred by RenovaCare's outside counsel to review it.

107. In its final form, the disclaimer disclosed that StreetAuthority was compensated, and disclosed the ownership of RenovaCare shares by certain individuals involved in the Predictions Campaign, but it did not clearly explain that Rayat and RenovaCare were funding the Predictions Campaign, or that they were directly involved in creating and distributing promotional materials related to the campaign. The language of the disclaimer that appeared in the promotional materials was very similar to the draft that Rayat gave the StreetAuthority Owner, but substituted Fleming and Inspiren for IRC 1 and substituted StreetAuthority for The Cheap Investor.

108. Rather than clearly disclosing that Rayat and RenovaCare were funding the Predictions Campaign, the disclaimer stated that StreetAuthority did "not receive any direct cash payments in connection with the production of paid advertisements" for RenovaCare, which gave investors the impression that it was an objective recommendation of RenovaCare, when, in fact, it was orchestrated and funded by Rayat and RenovaCare.

109. Furthermore, this disclaimer failed to disclose a number of material facts relating to the Defendants' involvement in the promotion and intent to sell during it, including that: (1) RenovaCare was featured in the Predictions Report based on a verbal agreement between Rayat and StreetAuthority that RenovaCare would fund the Predictions Campaign; (2) Rayat, Bhogal, and Sidhu directly and indirectly owned and controlled millions of RenovaCare shares; (3) Rayat, Bhogal, Fleming, and Sidhu intended to sell their RenovaCare shares during the promotion; (4) Bhogal and Sidhu were actively selling RenovaCare shares as of November 8,

27

2018, while the promotion was on-going; (5) Fleming began actively selling RenovaCare shares as of January 3, 2018, when she transitioned her work with StreetAuthority on RenovaCare's behalf to IRC 2; and (6) Rayat held financial interests in entities through which Bhogal and Sidhu sold stock.

110.   Some of StreetAuthority's promotional materials, including the Predictions Report, contained this disclaimer while others, including periodic promotional emails and advertisements related to the campaign, included more limited language or no disclaimer at all.

111.   Defendants controlled the content of the disclaimer, which never disclosed Defendants' involvement in the campaign or Defendants' intent to sell RenovaCare shares while the company was being promoted.  Rayat and Fleming had the authority to direct StreetAuthority to amend its disclaimer, given their direct involvement in the Predictions Campaign and the fact they were funding the campaign through RenovaCare.

112.   StreetAuthority acknowledged Defendants' influence.  For example, on January 3, 2018, the StreetAuthority Owner sent an internal email concerning issues relating to its spending on the campaign, and stated, "It is very important that we spend the budget equally -- $50,000/month for each RCAR and $50,000/month for [Company A].  I think this is important to ensure that RCAR does not withdraw from the marketing program."  Similarly, StreetAuthority's publisher testified that Rayat had influence over the Predictions Campaign because he "controlled the purse strings at the end of the day."

113.   By late December 2017, Rayat and Bhogal directed RenovaCare's transition from Fleming to IRC 2, and Bhogal instructed IRC 2 regarding how to manage the StreetAuthority promotion on RenovaCare's behalf.  On December 20, 2017, for example, Bhogal was copied on an email from IRC 2 to RenovaCare's CEO forwarding a "Market Services Agreement" and an

initial invoice to RenovaCare "[f]urther to my conversations with Jay." Thereafter, Bhogal was in regular communication with IRC 2 as the Predictions Campaign continued into January and February 2018.

114.     Among other things, Fleming provided IRC 2 with the disclaimer she used while working with StreetAuthority, and then Rayat and Bhogal provided IRC 2 with guidance on updating the disclaimer for the StreetAuthority promotional campaign, and directed him to update and share it with StreetAuthority to be used in the promotional campaign. The updated disclaimer was almost identical, except it replaced references to Fleming with IRC 2, and clarified that "out of pocket expenses" paid by RenovaCare included funding for the Promotions Campaign.

115.     After talking to Bhogal and Rayat, on December 29, 2017, IRC 2 sent the StreetAuthority Owner "the attached disclaimer for updating your records pertaining to" RenovaCare and Company A, which StreetAuthority then followed the instructions and updated their promotional materials.

116.     These communications, among others, demonstrate that Defendants controlled the content of the disclaimer, which never clearly disclosed Defendants' involvement in the campaign or Defendants' intent to sell RenovaCare shares during the promotion.

**F.     StreetAuthority's Promotional Materials Included Materially False Statements**

117.     The Predictions Campaign touted RenovaCare, notwithstanding the fact that the Company had no revenue and no commercially available product. For example, the promotional materials claimed that the SkinGun was a "revolutionary wound-healing device," and encouraged readers to buy RenovaCare stock and hold it for "10, 20x, even 40x gains."

118.     StreetAuthority's promotional materials also highlighted a case study of one

29

patient ("Patient A"), claiming that the SkinGun healed his burns "without scarring—in just three days" and showing purported "before" and "after" pictures:



119.    These pictures and statements were false:  (1) the SkinGun did not heal Patient A's wounds in three days.  Instead, his skin remained discolored for at least a year after treatment; (2) the "before" photo was not Patient A's arm, instead depicting a patient with more severe burns; and (3) the "after" picture was taken several years after his injury, not three days later.

120.    Rayat was the source of these false claims and pictures.  On July 26, 2017, he sent an email to StreetAuthority that contained the false "before" and "after" pictures, and on September 21, 2017, he emailed StreetAuthority additional marketing materials that contained the false claim that the SkinGun treatment had healed Patient A's arm in three days.

121.    Rayat knew, or was reckless in not knowing, the truth.  On or about July 23, 2014, RenovaCare employees had discussed the actual results of Patient A's treatment with Rayat, and sent him an accurate summary of Patient A's treatment.  The summary explained that Patient A's arm took months to heal, and included accurate pictures illustrating Patient A's course of treatment.  The summary did not include the misleading pictures Rayat later sent to StreetAuthority.

122.    StreetAuthority's promotional materials also claimed that the SkinGun "could soon be approved by the FDA . . . . RenovaCare has submitted a 510(k) filing to the FDA, which

30

permits the marketing of a medical device. Now it's just a matter of waiting on the FDA … so this device can be rolled out at every burn unit in the country." In fact, RenovaCare had applied to the FDA only for approval to use the SkinGun in clinical studies, not to make the SkinGun available to treat patients in clinic or hospital settings, and had withdrawn the 510(k) application more than a year earlier.

123.    Rayat knew, or was reckless in not knowing, the truth. On April 14, 2017, Rayat discussed RenovaCare's regulatory strategy in an email with an acquaintance, and acknowledged that RenovaCare did not have a pending 510(k) application.

124.    Rayat knew, or was reckless in not knowing, that the StreetAuthority promotions containing these false statements and fake "before" and "after" pictures would be disseminated to investors, because he reviewed StreetAuthority's draft promotional materials prior to their release to the investing public, but he did nothing to correct them.

125.    On October 3, 2017, for example, the StreetAuthority Owner emailed Rayat a draft Predictions Campaign promotion for StreetAuthority's Game-Changing Stocks newsletter that contained the false statements regarding FDA approval, the fake "before" and "after" pictures and the false claim that Patient A's "arm healed without scarring—in just three days." recovery. After reviewing the draft, Rayat called the StreetAuthority Owner to suggest at least one change, but he did not suggest that they correct the false statements or replace the pictures.

126.    In an internal email dated October 10, 2017, the lead copy writer for the Predictions campaign circulated a document entitled "HIO report with 2 picks—Editorial Review, Harmel Changes" and wrote:

Here is the report back, with Harmel's changes input

…

fyi, the doc that [the StreetAuthority Owner] reviewed with Harmel was one of the promos where nothing was identified, not this hybrid report where Harmel's stocks are identified.

…

He should probably review this at some point.

127.     Three versions of the draft promotion circulated internally at StreetAuthority on October 10, 2017, all with filenames including "Harmel Changes," one of which included a comment that the copy writer had deleted language that "Har[m]el doesn't want us to talk about."

### G.     Shortly After The Predictions Campaign Was Launched, Defendants Began Selling RenovaCare Shares

128.     The StreetAuthority promotion of RenovaCare went public on October 24, 2017. At the time, RenovaCare stock was trading around $3 per share, and its daily trading volume was about 10,000 shares per day.  By early November, the Predictions Campaign began to have its intended effect.  On November 7, 2017, RenovaCare stock price rose to nearly $4 per share (up about 30% from October 24), and trading volume was over 60,000 shares (up about 600 percent).

129.     In early November 2017, while Fleming and Rayat worked with StreetAuthority and RenovaCare on the promotional campaign, Sidhu and Bhogal began selling RenovaCare shares in a highly coordinated manner.  Their trades tracked the Predictions Campaign, and evidences their knowing participation in the scheme.

130.     On November 8, 2017, Bhogal and Sidhu began selling RenovaCare shares. Between November 8 and December 7, 2017, they sold more than 100,000 shares at historically high prices.

131.     In early December 2017, Rayat directed StreetAuthority to pause advertising related to the Predictions Campaign while he considered how to maximize the effectiveness of

the campaign.  On December 8, 2017, Bhogal and Sidhu stopped trading.

132.    On or about December 11, 2018, Rayat directed StreetAuthority to resume advertising the Predictions Campaign.  Bhogal and Sidhu again waited for the campaign to impact the market before both resumed selling RenovaCare stock.  Between December 18, 2017, and January 3, 2018, Sidhu sold over 30,000 shares, and Bhogal sold over 131,000 shares.

133.    On January 3, 2018, a day after Rayat and Bhogal replaced her with IRC 2 and she stopped handling RenovaCare's payments to StreetAuthority for the Predictions Campaign, Fleming sold 7,000 shares of RenovaCare stock.  She did so despite having been directly involved in the campaign, and with knowledge that the paid promotion she had helped organize was ongoing.

134.    During the Predictions Campaign, Sidhu, Bhogal, and Fleming ultimately sold more than 1 million shares of RenovaCare stock through at least seven brokerage accounts.

135.    By November 8, 2017, Bhogal knew, or was reckless in not knowing, about the Predictions Campaign, including because:  (1) Bhogal's transactions in RenovaCare stock tracked the timing and progress of the StreetAuthority promotion; (2) on September 21, 2017, Rayat forwarded to Bhogal an email between Rayat and StreetAuthority concerning the campaign; (3) on October 6, 2017, Bhogal participated in a phone call with StreetAuthority representatives and Rayat; (4) on October 31, 2017, Bhogal attended a RenovaCare Board meeting, a presentation for which included an item stating that the company planned to spend $300,000 on investor relations through March 2018, an amount consistent with Rayat's agreement that RenovaCare would pay Street Authority $50,000 per month to fund the campaign; (5) on November 8, 2017, a friend sent Bhogal a StreetAuthority campaign email promoting RenovaCare and Company A; and (6) in September 2017, Bhogal received two emails

33

concerning Rayat's attempts to sell his shares.

136.    By November 8, 2017, Sidhu knew, or was reckless in not knowing, about the Predictions Campaign, including because: (1) Sidhu's transactions in RenovaCare stock tracked the timing and progress of the campaign; (2) he was in daily contact with Rayat while Rayat worked on the campaign;  (3) in August 2017, Rayat asked Sidhu to send a package to a StreetAuthority representative; (4) Sidhu planned two of Rayat's trips to visit StreetAuthority in Austin; (5) on November 2, 2017, Rayat sent Sidhu an email stating, "Jeet, I need to be in Austin for at least one night during the week of November 27 . . . . Let's discuss tomorrow;" (6) Sidhu managed and tracked the RenovaCare shares held by Rayat and Bhogal, and assisted with the company's private sales of stock to Rayat, Sidhu, and other of Rayat's friends in July and October 2017.

III.    **Step Three (Misrepresentation, Omissions, and Related Fraudulent Conduct):**  In Response To OTC Markets' Inquiry, RenovaCare And Rayat Issued A Materially False Press Release Denying Any Involvement In The Predictions Campaign

A.    **On January 3, 2018, OTC Markets Required RenovaCare To Disclose The Company's Role In The StreetAuthority Promotion**

137.    On or around January 2, 2018, OTC Markets, which supervised the OTCQB Tier in which RenovaCare stock was quoted, learned of StreetAuthority's ongoing promotion of RenovaCare.  OTC Markets has a strict disclosure policy regarding company promotions, and companies that violate the policy may be removed from the OTCQB Tier and relegated to the less desirable OTC Pink Open Market Tier, which can negatively impact a stock's trading volume and share price.

138.    Consistent with this policy, around noon on January 3, 2018, OTC Markets sent RenovaCare a letter requiring the Company make public disclosures relating to the StreetAuthority promotion.  Attached to the letter was a January 2, 2018, Predictions Campaign

promotion for Game-Changing Stocks, a StreetAuthority newsletter. The promotional "copy" was based on information from RenovaCare's investor relations program that had been provided to StreetAuthority by Rayat, and the promotional language had been reviewed by Rayat prior to publication. In fact, the promotion, which included the false statements about FDA approval and Patient A's course of treatment, as well as the fake "before and after" pictures, was an updated version of the promotion the StreetAuthority Owner emailed to Rayat for his review on October 3, 2017.

139.    OTC Markets' letter demanded that RenovaCare issue a press release concerning its involvement in the January 2, 2018 StreetAuthority promotion, including:

a.    "the date on which the Company became aware of the promotional activities;"

b.    "[a] written summary of the Company's understanding of the promotional activities," and "[i]f the company was involved in the dissemination or payment of promotional material, … direct language describing the company's involvement and a description of any engagements and/or agreements relating to the promotional material;"

c.    "whether the company has editorial control over the content in the promotional materials;" and

d.    "[w]hether, after inquiry of management, the directors and control persons, its officers, directors, any controlling shareholders (defined as shareholders owning 10% or more of the company's securities), or any third party service providers have, directly or indirectly, been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials related to the Company and its securities."

**B.    On January 3, 2018, Rayat Instructed StreetAuthority To Pause The Predictions Campaign, And Defendants Paused Their Selling**

140.    On January 3, 2018, a few hours after RenovaCare received OTC Markets' inquiry, Rayat instructed StreetAuthority to pause the Predictions Campaign while he, Bhogal, and RenovaCare considered how to respond to the inquiry.

141.    As of January 3, 2018, Sidhu and Bhogal were actively selling RenovaCare

shares, and Fleming had just begun selling RenovaCare shares after her duties were transitioned
to IRC 2.  After RenovaCare received the inquiry from OTC Markets, Bhogal, Fleming and
Sidhu stopped trading, and did not sell any more shares for nearly a week.

### C. On January 8, 2018 Rayat, Bhogal, And RenovaCare Made And Issued A Materially False Press Release Denying Any Involvement In The StreetAuthority Promotion

142.    On January 3, 2018, Rayat held several conference calls with RenovaCare's CEO,
RenovaCare's Director, and Bhogal to discuss the response to OTC Markets.

143.    By January 4, 2018, Rayat had assembled a team and was working on a draft
press release, with Bhogal's assistance.  Bhogal had numerous discussions with IRC 2
concerning RenovaCare's response, and provided information for IRC 2 to share with Rayat and
RenovaCare in the drafting of the release.  Rayat again had several conference calls with the
RenovaCare director, RenovaCare's CEO, and Bhogal to discuss the draft press release.  Bhogal
also received several of the coordinating emails.

144.    On January 5, 2018, the RenovaCare director emailed Rayat, RenovaCare's CEO,
and Bhogal to request a follow-up conference call "to discuss/review and edit the revised draft"
of the press release.  Shortly thereafter, Rayat replied by email to suggest they talk on January 7,
2018, and noted that he would send his comments on the draft press release by the following day.
That day, Rayat also had several calls with the RenovaCare director to discuss the draft.

145.    On January 7, 2018, Rayat, RenovaCare's CEO, and the RenovaCare director
again discussed RenovaCare's draft press release.  A draft press release dated shortly after the
call contained only minor differences from the draft the company would ultimately issue.

146.    On January 8, 2018, at 12:57 p.m., Rayat emailed RenovaCare's CEO a final
version of the draft press release, and instructed him to add the Company's boilerplate "about us"

and "disclaimer" language to the draft. A few minutes later, at 1:14 p.m., RenovaCare's CEO forwarded the draft press release to IRC 2, noting that it was the final draft of the press release. As Rayat had instructed, RenovaCare's CEO requested that the consultant add the "about us" and "disclaimer" language and issue the press release at 3:45 p.m.

147.    On January 8, 2018, at 3:45 p.m., RenovaCare publicly issued the press release drafted by Rayat and RenovaCare and responding to OTC Markets' inquiry via BusinessWire ("January 8 Press Release"). It was not signed by any individual.

148.    Rayat instructed RenovaCare to issue the January 8 Press Release at 3:45 p.m., because he wanted to limit the potential impact of the Press Release by releasing it shortly before the market closed at 4 p.m. Bhogal assisted Rayat and RenovaCare in disseminating the January 8 Press Release, and he helped IRC 2 to correct an issue with this timing.

149.    To further reduce the market impact of the January 8 Press Release, Rayat and RenovaCare also issued RenovaCare's year-end "Shareholder Update" at 9 a.m. on January 9, 2018.

150.    On January 12, 2018, RenovaCare publicly filed a Form 8-K with the Commission, signed by RenovaCare's CEO, that attached a copy of the January 8 Press Release.

151.    Based on his involvement in the Predictions Campaign on RenovaCare's behalf, Rayat possessed the knowledge required to accurately answer OTC Market's inquiry regarding the campaign, and as RenovaCare's controlling shareholder he had ultimate control over the content and dissemination of the press release to the public. Rayat's involvement in the drafting process, including his January 8, 2018, email to RenovaCare's CEO, and the CEO's adherence to his instructions, also demonstrates his authority and control over the content and public dissemination of the statement.

**D.    The January 8 Press Release Contained Materially False Statements And Omissions**

152.    The January 8 Press Release contained numerous material misrepresentations and omissions concerning Rayat's and RenovaCare's involvement in the Predictions Campaign.

153.    **First**, the January 8 Press Release stated that Rayat and RenovaCare had no involvement in the StreetAuthority promotion:

> "[T]he Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly[] **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities."  (emphasis in original).

154.    This statement was materially false.  Rayat was RenovaCare's controlling shareholder, and he was directly involved in the creation of StreetAuthority's promotional materials, including the Predictions Report.  Among other things, he: (i) provided detailed information about RenovaCare to StreetAuthority representatives, including the lead author of the Predictions Report; (ii) reviewed and commented on draft promotions and advertisements before and during the Predictions Campaign; and (iii) consulted with StreetAuthority throughout the campaign concerning advertising and distribution of the Predictions Report and other promotional materials related to RenovaCare.

155.    In addition, Rayat, RenovaCare's CEO, and the Company's third-party investor relations consultants, including Fleming, were all involved in the distribution of StreetAuthority's promotional material by funding the Predictions Campaign, and Rayat had numerous discussions with StreetAuthority regarding how campaign promotional materials should be distributed.

156.    **Second**, the January 8 Press Release claimed that RenovaCare was "not affiliated in any way with the authors of the annual predictions report or its publisher."  Again, this was

materially false.  RenovaCare was affiliated with StreetAuthority as a paying customer.

157.  **Third**, the January 8 Press Release claimed that RenovaCare "had no editorial control over the content" of the promotion, including the Predictions Report.  This was materially false.  Rayat, RenovaCare's controlling shareholder and agent, reviewed, commented on, and edited promotional materials, including the Predictions Report, before and during the Predictions Campaign.  And Rayat and RenovaCare had the "power of the checkbook" – if either was dissatisfied with the content of the Predictions Report or other promotional materials, or the timing or content of advertising related to the Predictions Campaign, they could have refused to fund the campaign at the outset or at any time during the campaign.

158.  **Fourth**, the January 8 Press Release stated that RenovaCare "was not involved in the creation, or directing the dissemination, of [StreetAuthority's Predictions] report."  This statement was materially false.  Rayat, on behalf of RenovaCare, was involved in the creation of the Predictions Report.  He provided detailed information to StreetAuthority to include in the report, and he reviewed and commented on draft promotions and advertisements before and during the Predictions Campaign.  Rayat was also involved in directing the dissemination of the report, including weighing in on the timing, content, and placement of advertisements related to the campaign, all of which were funded by RenovaCare.  For example, on January 3, 2018, a few hours after RenovaCare received OTC Markets' inquiry, Rayat instructed StreetAuthority to pause the Predictions Campaign.

159.  **Fifth**, the January 8 Press Release contained material omissions regarding Rayat and RenovaCare's awareness and involvement in the StreetAuthority promotion and the Predictions Report.  OTC Markets required that RenovaCare disclose "the date on which it became aware of the promotional activities."  RenovaCare and Rayat failed to disclose that

Rayat became aware of the campaign when he approached StreetAuthority in July 2017, and that the Company was aware of the Predictions Campaign no later than November 8, 2017, when the Company's CEO received an invoice from Fleming that included line items for "StreetAuthority – Media Spend" and "StreetAuthority - $50,000 Monthly Fee."

160.    These misrepresentations and omissions were material.  Small companies like RenovaCare with illiquid and low-priced shares are susceptible to schemes to fund misleading promotions to increase a company's stock price and trading volume to benefit corporate insiders and controlling shareholders, which is exactly what the Defendants did here.

161.    OTC Markets' disclosure policy is premised on the fact that investors would want to know the truth.  Failure to comply with the disclosure policy can result in a company's removal from the OTCQB Tier and a downgrade to the OTC Pink Open Market Tier, which could have a substantial impact on a stock's price and trading volume.

162.    As explained in more detail below, this is exactly what happened here.  On February 23, 2018, OTC Markets downgraded RenovaCare to its lower tier "pink sheets" trading tier after it became aware of further promotional activity, and RenovaCare's share price dropped almost immediately, from $9 per share to $6.28 per share.

163.    RenovaCare and Rayat knew, or were reckless in not knowing, that the January 8 Press Release was false when they made and issued it to the investing public.  Given his personal participation in the StreetAuthority promotion, Rayat knew, or was reckless in not knowing, that the January 8 Press Release contained material misstatements and omissions.  As RenovaCare's agent with respect to StreetAuthority, and as the Company's controlling shareholder, Rayat's knowledge is imputed to RenovaCare.  And the Company's CEO was aware that the company was funding the Predictions Campaign.

164.    Rayat caused RenovaCare to issue the misleading January 8, 2018 Press Release in order to further conceal Defendants' role in both the Predictions Campaign and the overall fraudulent scheme to manipulate and scalp RenovaCare stock.

**E.    Rayat And Bhogal Aided And Abetted The False Statements In The January 8 Press Release**

165.    Rayat and Bhogal also aided and abetted RenovaCare's materially false statements and omissions.  They knowingly or recklessly substantially assisted RenovaCare by participating in the drafting and dissemination of the fraudulent January 8 Press Release and related Form 8-K.  Rayat and Bhogal knew, or were reckless in not knowing, that the January 8 Press Release contained material misstatements and omissions.  For example, Rayat knew that he orchestrated and directed the StreetAuthority promotional campaign, and he knew that RenovaCare was funding the campaign through a series of third-party service providers.

166.    Bhogal knew, or was reckless in not knowing, Rayat's and RenovaCare's role in the Predictions Campaign no later than September 21, 2017, when Rayat forwarded him an email concerning the campaign.  Bhogal also participated in at least one telephone conference with StreetAuthority before the start of the campaign, and by no later than December 28, 2017, Bhogal was coordinating the transition from Fleming to IRC 2, and described the nature of the relationship between StreetAuthority and RenovaCare to IRC 2.

**IV.    Step Four (Manipulative Trading And Related Conduct): After Issuing the January 8 Press Release, Defendants Restarted The Predictions Campaign And Resumed Trading**

167.    After issuing the false January 8 Press Release, Defendants restarted the Predictions Campaign, resumed selling shares, and engaged in deceptive conduct to support RenovaCare's share price and trading volume.

41

### A. Defendants Restarted The StreetAuthority Promotion

168. While Rayat, RenovaCare's CEO, and Bhogal were working on a response to the OTC Markets inquiry, Rayat and Bhogal were working with IRC 2 prepare to restart the Predictions Campaign. On January 5, 2018, they initiated a review of StreetAuthority's promotional materials to allow StreetAuthority to support the claim that the promotional "copy" was based on publicly available information. During this process, IRC 2 and the Company identified several misstatements, and corrected some of them. While the review was ongoing, and notwithstanding ongoing and extensive communications with StreetAuthority regarding the promotional campaign, RenovaCare issued the January 8 Press Release disavowing any affiliation with StreetAuthority or involvement in the campaign.

169. On January 22, 2018, Defendants, IRC 2, and StreetAuthority completed the content review, and Rayat authorized StreetAuthority to resume the Predictions Campaign.

### B. Defendants Resumed Their Coordinated Trading

170. After issuing the false and misleading January 8 Press Release, Defendants also resumed trading RenovaCare stock. On January 9, 2018, Fleming bought 370 shares, despite the fact that RenovaCare stock was trading near a historic high, and the fact that she owned more than 100,000 shares at a lower cost basis. Her trading was intended to create an artificial impression of demand for the stock to assist in maintaining share price and trading volume and counteract any negative market reaction to the January 8 Press Release.

171. Between January 9 and January 22, 2018, Bhogal and Sidhu sold some shares, but after January 22, 2018, Defendants' trading pattern took off, again in a coordinated fashion. Bhogal, Sidhu, and Fleming all started by selling small amounts until about a week after StreetAuthority resumed the Predictions Campaign, when they began taking turns selling large

42

quantities of shares.

172.    First, Bhogal ramped up his selling to over 50,000 shares per day on January 26. On January 30, 2018, Bhogal sold 133,900 shares through Alberta Ltd.'s account, which left him with only about 10,000 shares in that account.

173.    Second, on January 31, 2018, Sidhu ramped up his activity, selling over 150,000 shares that day and at least 50,000 shares per day for the rest of that week.  Fleming also continued to sell on most trading days in this time period, selling approximately 25,000 shares between January 29 and February 2, 2018.

174.    This coordinated pattern of trading continued until February 7, 2018, when another threat to Defendants' scheme emerged.

### C.    Rayat And Bhogal Caused RenovaCare To Issue Press Releases To Counteract Negative Press And Complement The Predictions Campaign

175.    On February 7, 2018, RenovaCare received an inquiry from an online financial media company ("Media Company 1").  Media Company 1 asked RenovaCare to answer several questions that suggested Media Company 1's view that RenovaCare was involved in a pump-and-dump scheme.

176.    IRC 2 discussed Media Company 1's inquiry with Bhogal and Rayat, and they decided to take action to counteract anticipated negative market reaction to the planned article. Bhogal, Rayat, and others immediately prepared a draft RenovaCare press release attacking the credibility of Media Company 1 and the negative article they anticipated.

177.    The next morning, on February 8, 2018, Media Company 1 published an article on RenovaCare that, among other things, called it "the most dangerous stock covered to date." In response, Rayat and Bhogal directed RenovaCare to issue a press release on February 12, 2018.  Rather than responding to the facts in Media Company 1's article, this press release

43

attacked the credibility of its authors.

178.     Defendants further attempted to counteract this negative news by doubling

StreetAuthority's promotional budget for the Predictions Campaign.  On the morning of

February 8, 2018, IRC 2 emailed StreetAuthority, ordering the promoter to double the

advertising budget for the next two weeks "from its current spend of $12,500 to $25,000 per

week."  Soon thereafter, Rayat contacted another StreetAuthority representative and reiterated

the request, noting that "It's kinda important that it gets turned on sooner rather than later."

StreetAuthority quickly implemented these instructions.

179.     Rayat also consulted with StreetAuthority to strategize ways to respond to Media

Company 1's negative coverage.  In response, on February 12, 2018, the StreetAuthority Owner

emailed Rayat and other StreetAuthority representatives and stated,

> "What can we do?
>
> I recommend, if [RenovaCare] will issue any PR release, that you
> should not address this article at all.  The release should be about a
> positive story about Renova[C]are.  **_If you have news on the FDA_**
> **_or your submission to the FDA address that_** . . . .
>
> My sense is that I do not think this negative story has received a
> great deal of press/readership.  The stock is up .54% and trading
> volume is pretty decent at mid-day.
>
> Regarding additional marketing exposure, I spoke with [another
> StreetAuthority representative] to crank up the spend. . . .
>
> **_I think it is important to keep a steady spend to keep [the] volume_**
> **_up and the stock price up_.**" (emphasis added)

180.     Just as the StreetAuthority Owner suggested, RenovaCare issued a press release

on February 15, 2018, announcing a "successful FDA meeting," despite the fact that the meeting

had occurred **_a year earlier_**.  Rayat and Bhogal were involved in the drafting and dissemination

of this press release, which was intended to complement the promotional campaign and Defendants' manipulative trading.

181.    A week later, Defendants coordinated another RenovaCare press release with the Predictions Campaign.  On February 21, 2018, Rayat and Bhogal drafted and disseminated another RenovaCare press release announcing that RenovaCare "secures [a] patent victory."  In fact, this "victory" had occurred months earlier, in December 2017.  Shortly after this press release was issued, Rayat forwarded a link to StreetAuthority Owner and another representative, stating that the release was "fresh off the presses and still warm."  The StreetAuthority Owner replied, "Just read the story . . . Need to figure out how to leverage this news on other media."

182.    Furthermore, on February 23, 2022, working at Rayat's and/or Bhogal's direction, IRC 2 emailed StreetAuthority to provide internet links "for the most recent news related to [RenovaCare and Company A] to update your copy."  By "copy," IRC 2 meant StreetAuthority's promotional materials.

### D.    Defendants Supported The Scheme Through Manipulative Trading

183.    By February 8, 2018, Sidhu, Bhogal, and Fleming also took other steps to bolster RenovaCare's share price and trading volume.  First, they stopped selling shares, which could depress the share price.  Second, they soon began aggressively buying RenovaCare stock at historically high prices to artificially inflate the market.

184.    On February 9, 2018, Sidhu bought 15,000 RenovaCare shares.  Despite owning millions of shares at no cost basis, he bought additional shares at then-near historic high prices of more than $7 per share.  This purchase had no economic justification other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock.

185.    On February 12, 2018, Media Company 1 issued another negative article

suggesting that RenovaCare was involved in a pump-and-dump scheme.

186.    In response, that same day and continuing throughout that week, Sidhu purchased more RenovaCare stock.  In all, between February 9, 2018, and February 16, 2018, Sidhu purchased over 155,000 shares of RenovaCare stock at near historically high prices, often placing purchase orders at or above the highest market prices at the time, which increased the effect of his orders on the market.  Again, Sidhu had no economic justification for these purchases other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock for the purpose of inducing its purchase or sale by others.

187.    In coordination with Sidhu, between February 12 and 16, 2017, Fleming also placed several purchase orders and ultimately purchased 3,200 shares of RenovaCare stock, with no economic justification other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock for the purpose of inducing its purchase or sale by others.

188.    Bhogal also engaged in manipulative trading during this period.  On February 20 and 21, 2018, Bhogal placed several buy orders for RenovaCare stock to further support RenovaCare's share price and trading volume.  Although these orders were never executed, they created a false impression of demand for the stock at the order prices. At the time, RenovaCare stock reached a new all-time high of over $10.50 per share, and Bhogal held millions of shares of RenovaCare stock at a low or no cost basis.  These buy orders were intended to manipulate the market for the purpose of inducing its purchase or sale by others.

189.    From February 21 to 22, 2018, Fleming and Sidhu resumed selling shares as the Predictions Campaign continued.

190.     At the time, Sidhu, Bhogal, and Fleming knew, or were reckless in not knowing, that they were engaged in manipulative trading of RenovaCare stock, based on the highly coordinated nature of their trading with each other's trades and with the ongoing promotional activity, the nature and timing of their purchases, and the fact that they all owned substantial shares at a low or no cost basis at a time they were buying more stock at historically high prices.

**E.     On February 9, 2018, RenovaCare Filed A New S-1 Seeking To Register Millions Of Restricted Shares Owned By Defendants**

191.     In the midst of the pump-and-dump scheme, Defendants also sought to "reload" on stock by registering additional restricted RenovaCare shares to be sold.  On February 9, 2018, RenovaCare issued a new Form S-1 that sought to register for resale over 4.4 million shares held by Rayat and his associates, including:  (i) 2.42 million shares held by Kalen Capital; (ii) 900,000 shares held by a friend of Rayat; (iii) 508,636 shares held by Bhogal through Alberta Ltd.; and (iv) 355,000 shares held by Sidhu.  The shares RenovaCare sought to register included shares purchased in the July and October 2017 offerings.  Sidhu assisted RenovaCare's filing of the February 9, 2018 S-1 by providing information on his, Rayat's, and Bhogal's share holdings.

**F.     In February 2018, the Scheme Collapsed**

192.     On February 23, 2018, after becoming aware of further promotional activity related to RenovaCare, OTC Markets downgraded the Company's stock to the OTC Pink Open Market Tier, also known as the "pink sheets," and placed a "Caveat Emptor" ("buyer beware") warning and skull and crossbones symbol on RenovaCare's company profile.

193.     After OTC Markets acted in response to the ongoing promotional activity, RenovaCare's share price plummeted, and Defendants abandoned their scheme.  Shortly thereafter, Defendants directed StreetAuthority to halt the Predictions Campaign.

## V.  <u>The Scheme's Final Result</u>:  The Defendants Reaped Millions

194.    The fraudulent scheme orchestrated by Defendants was ultimately successful, allowing Defendants to sell millions of shares of RenovaCare stock at artificially inflated prices and obtain millions of dollars of ill-gotten gains.

### A.    RenovaCare's Share Price And Trading Volume Increased Dramatically During The Predictions Campaign

195.    As internet users clicked on tens of thousands of RenovaCare ads during the StreetAuthority promotional campaign, RenovaCare's share price and trading volume increased dramatically.  For example, a single online platform, one of several that StreetAuthority used to promote RenovaCare, generated over 20,000 clicks from internet users.  On October 23, 2017, shortly before the Predictions Campaign began, RenovaCare stock price closed at $3.10 per share.  By January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase, and on February 21, 2018, RenovaCare stock traded at an all-time high of over $10.50 per share.

### B.    Defendants Reaped Millions From Their Sales of RenovaCare Shares At Artificially Inflated Prices

196.    Collectively, Defendants reaped millions from the scheme.  During the StreetAuthority promotional campaign, Sidhu, Bhogal, and Fleming ultimately sold more than one million shares of RenovaCare stock through at least six separate accounts and obtained more than $7 million in trading proceeds:

| Account Holder | Beneficial Owner | Brokerage Firm | How Acquired Shares | Shares Sold Between October 24, 2017 and February 28, 2018 | Sale Proceeds |
|---|---|---|---|---|---|
| Treadstone LLC (Relief Defendant) | Jeet Sidhu | Broker-Dealer A | Treadstone Ltd. Purchase from Rayat in exchange for preferred shares | 265,839 | $1,598,185 |

| Jeet Sidhu | Jeet Sidhu | Broker-Dealer B | Collingwood purchase in 2013 in exchange for loan from Rayat, and open market purchases in February 2018 | 332,360 | $2,867,023 |
|---|---|---|---|---|---|
| Alberta Ltd. (Relief Defendant) | Jatinder Bhogal | Broker-Dealer B | Alberta Ltd. Purchase from Rayat in exchange for preferred shares | 491,364 | $2,659,410 |
| Sharon Fleming | Sharon Fleming | Broker-Dealer C | July 2008 company private placement when Rayat was its CEO | 52,200 | $380,802 |
| **TOTAL** | | | | | **$7,505,420** |

197.    In addition to the above sales, between December 2017 and February 2018, Sidhu transferred another 500,000 of Blackbriar Ltd.'s RenovaCare shares to an account with a broker-dealer outside the United States, and sold at least some of those shares on a U.S.-based exchange during the Relevant Period.  Sidhu also transferred another 250,000 shares in his name that originated from Collingwood's purchase in 2013 to an account with a broker-dealer outside the United States, and sold at least some of those shares on a U.S.-based exchange during the Relevant Period.  Sidhu ultimately sold RenovaCare shares from five brokerage accounts while the Predictions Campaign was ongoing.

198.    While Defendants engaged in this selling, Rayat continued to maintain millions-of-dollars of financial interests with Bhogal and Sidhu individually and/or through entities they owned and controlled, including Alberta Ltd. and Blackbriar Ltd.

199.    In addition to acting directly in furtherance of the scheme alleged in this Complaint, Defendants acted through a variety of third parties—both individuals and entities—to execute the scheme.  Defendants organized a false promotion of RenovaCare through StreetAuthority, and arranged for RenovaCare to pay StreetAuthority through a series of third-

party service providers, for the fraudulent purpose of concealing their involvement in the StreetAuthority promotional campaign.  Defendants could not directly promote RenovaCare stock while intending to sell and selling RenovaCare stock—an inherently deceptive practice known as scalping—without violating the Federal securities laws.  Nor could Defendants directly make material misrepresentations about RenovaCare.  They therefore acted through third parties to avoid direct liability while monetizing their scheme.

200.    Rayat also acted through Bhogal, Sidhu, and Fleming to maintain a beneficial interest in the RenovaCare shares they sold during the promotional campaign, while Bhogal, Sidhu, and Fleming acted through Rayat to promote RenovaCare.  Collectively, Rayat, Bhogal, Sidhu, and Fleming acted through RenovaCare to monetize the scheme by distributing millions of shares of RenovaCare stock to themselves and entities they controlled, and to ensure that the shares were registered for resale in advance of the StreetAuthority promotional campaign.  The scheme involved several deceptive acts, misrepresentations, and omissions, including scalping, manipulative trading, and false statements, all of which violated the securities laws.  Defendants are liable for these acts, misrepresentations, and omissions, notwithstanding the fact that they did so to some extent through or by means of other individuals and entities.

**C.    The Relief Defendants Received Ill-Gotten Gains**

201.    Relief Defendant Treadstone Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants.  Treadstone Ltd. has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Treadstone Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants.

202.    Relief Defendant Treadstone LLC received ill-gotten funds transferred to it or for its benefit by the Defendants.  Treadstone LLC has no legitimate claim to the ill-gotten funds it

directly or indirectly received, and accordingly, Treadstone LLC should be required to disgorge the amounts it directly or indirectly received from Defendants.

203. Relief Defendant Blackbriar Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants. Blackbriar Ltd. has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Blackbriar Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants.

204. Relief Defendant Alberta, Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants. Alberta, Ltd. has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Alberta, Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and**
**Rule 10b-5 Thereunder**
(Against All Defendants)

205. Paragraphs 1-14, 24-32, 45-164, and 167-200 of this Complaint are re-alleged and incorporated by reference herein.

206. By engaging in the conduct alleged in this Complaint, specifically by engaging in deceptive acts by orchestrating, funding, and participating in the Predictions Campaign while intending to sell RenovaCare common stock, providing StreetAuthority with false information regarding RenovaCare and its products, participating in the drafting and dissemination of StreetAuthority promotions, which contained materially false and misleading statements and omissions, arranging for and making payments between RenovaCare and StreetAuthority through a third party to conceal the source of those payments, drafting and disseminating the January 8 Press Release and related Form 8-K, both of which contained materially false and misleading statements and omissions, and buying and selling RenovaCare common stock in a

manipulative manner, Defendants, directly or indirectly, in connection with the purchase or sale of a security, by use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with *scienter*, employed devices, schemes, or artifices to defraud, made one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

207. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 10(b) and**
**Rule 10b-5(b) Thereunder**
(Against Rayat and Bhogal)

208. Paragraphs 1-14, 24-32, and 45-200 of this Complaint are re-alleged and incorporated by reference herein.

209. By engaging in the conduct alleged in this Complaint, specifically by drafting and disseminating the false January 8 Press Release and related Form 8-K containing materially false statements and omissions, RenovaCare, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

210. Rayat and Bhogal, knew, or were reckless in not knowing, that RenovaCare was

52

engaged in the unlawful conduct alleged in this Complaint, and they knowingly or recklessly substantially assisted and participated in the wrongdoing. Rayat and Bhogal provided substantial assistance to RenovaCare by participating in the drafting and dissemination of RenovaCare's false January 8 Press Release and related Form 8-K.

211. By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Rayat and Bhogal aided and abetted RenovaCare's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

**THIRD CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
(Against All Defendants)

212. Paragraphs 1-14, 24-32, 45-164, and 167-200 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

213. By engaging in the conduct alleged in this Complaint, specifically by orchestrating, funding, and participating in the StreetAuthority promotion of RenovaCare while intending to sell RenovaCare common stock, providing StreetAuthority with false information regarding RenovaCare and its products, participating in the drafting and dissemination of StreetAuthority promotions, which contained materially false and misleading statements and omissions, arranging for and making payments between RenovaCare and StreetAuthority through a third party to conceal the source of those payments, drafting and disseminating the January 8 Press Release and related Form 8-K, both of which contained materially false and misleading statements and omissions, and buying and selling RenovaCare common stock in a manipulative manner, Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices,

schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

214. By reason of the foregoing, Defendants directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Securities Act Section 17(a), 15 U.S.C. § 77q(a).

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 17(a) of the Securities Act
(Against Bhogal)

215. Paragraphs 1-14, 24-32, and 45-200 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

216. By engaging in the conduct alleged in this Complaint, specifically by drafting and disseminating the false January 8 Press Release and related Form 8-K containing materially false statements and omissions, RenovaCare and Rayat, directly or indirectly, singly or in concert, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon the purchaser.

217.    Bhogal, knew, was reckless in not knowing, or should have known that RenovaCare and Rayat were engaged in the unlawful conduct alleged in this Complaint, and he knowingly or recklessly substantially assisted and participated in the wrongdoing.  Bhogal provided substantial assistance to RenovaCare and Rayat by participating in the drafting and dissemination of RenovaCare's false January 8 Press Release and related Form 8-K.

218.    By reason of the foregoing, pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), Bhogal aided and abetted Rayat's and RenovaCare's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### FIFTH CLAIM FOR RELIEF
#### Violations of Section 20(b) of the Exchange Act
(Against Rayat, Bhogal, Sidhu, and Fleming)

219.    Paragraphs 1-14, 24-32, and 45-200 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

220.    Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b), precludes any person, directly or indirectly, from doing any act which would be unlawful under the Exchange Act for such person to do, through or by means of any other person.

221.    By engaging in the conduct alleged in this Complaint, specifically by knowingly or recklessly using StreetAuthority, a series of investor relations consultants, and each other to promote RenovaCare common stock while intending to sell and selling, arranging for payments to StreetAuthority to be made through a series of third-party investor relations consultants for the fraudulent purpose of concealing Rayat's and the company's involvement in the StreetAuthority promotional campaign, organizing a false promotion of RenovaCare through StreetAuthority, enabling Rayat to maintain a financial interest in the Defendants' RenovaCare share sales, and

concealing Rayat, Bhogal, Sidhu, and Fleming's beneficial ownership, intent to sell, and/or sales of RenovaCare common stock, Rayat, Bhogal, Sidhu, and Fleming, directly or indirectly, violated Section 20(b) of the Exchange Act. These acts, done through and by means of the third-party promoters, investor relations consultants, and each other, violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

222. By reason of the foregoing, Rayat, Bhogal, Sidhu, and Fleming directly or indirectly, singly or in concert, have violated, and unless restrained and enjoined will continue to violate Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).

**SIXTH CLAIM FOR RELIEF**
**Violations of Section 9(a)(2) of the Exchange Act**
(Against Bhogal, Sidhu, and Fleming)

223. Paragraphs 1-14, 24-32, and 167-200 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

224. By engaging in the conduct alleged in the Complaint, specifically by conducting the trading in RenovaCare shares alleged in this Complaint, Bhogal, Sidhu, and Fleming, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or any facility of any national securities exchange, or for any member of a national securities exchange, with specific intent, effected, alone or with persons, a series of transactions in RenovaCare securities that created the actual or apparent trading in such security, or raised or depressed the price of such security, for the purpose of inducing the purchase or sale of such security by others.

225. By reason of the foregoing, Bhogal, Sidhu, and Fleming violated, and, unless restrained and enjoined, will again violate Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2).

## SEVENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(d) and
### Rules 15d-11 and 12b-20 Thereunder
(Against RenovaCare)

226.    Paragraphs 1-14, 24-32, and 45-164 of this Complaint are re-alleged and incorporated by reference herein.

227.    Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rule 15d-11 thereunder, 17 C.F.R § 240.15d-1, require issuers of securities that have filed certain registration statements to file with the Commission annual, quarterly, and current reports.  Exchange Act Rule 12b-20, 17 C.F.R. § 240.12b-20, provides that in addition to the information expressly required in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

228.    RenovaCare was required to file annual and other financial reports with the Commission pursuant to Section 15(d) of the Exchange Act and Rule 15d-11 thereunder.

229.    RenovaCare filed the January 12, 2018 Form 8-K that contained materially false statements or failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

230.    By reason of the foregoing, RenovaCare violated Section 15(d) of the Exchange Act, and Rules 15d-11 and 12b-20 thereunder.

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
(Against Treadstone Ltd., Treadstone LLC,
Blackbriar Ltd., and Alberta Ltd.)

231.    Paragraphs 1-14, 24-32, 45-164, and 167-204 of this Complaint are re-alleged and incorporated by reference herein.

232.     Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78(d)(5) states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

233.     As alleged in this Complaint, Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd. received funds or property that were the proceeds, or are traceable to the proceeds, of Defendants' securities law violations alleged in this Complaint.  Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd. had no legitimate claims to these proceeds, and gave no consideration in exchange for receipt of those funds.

234.     Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd. obtained the funds and property alleged above as part of and in furtherance of the Federal securities law violations alleged in this Complaint and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds and property.  They were unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Permanently enjoin Defendants from violating the Federal securities laws alleged in this Complaint.

### II.

Order Rayat, Bhogal, Sidhu, Fleming, and the Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

### III.

Order Defendants to pay civil money penalties pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## IV.

Permanently barring Rayat, Bhogal, Sidhu, and Fleming from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 21(d)(6), 15 U.S.C. § 78u(d)(6).

## V.

Pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), permanently barring Rayat, Bhogal, Sidhu, and Fleming from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which are required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

## VI.

Grant such further relief as the Court may deem just and appropriate.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.


Dated: August 26, 2022     Respectfully submitted,

            s/ Matthew Scarlato
            Matthew Scarlato (admitted *Pro Hac Vice*)
            John J. Bowers (Bar No. JB8515)
            SECURITIES AND EXCHANGE
            COMMISSION
            100 F Street, NE
            Washington, DC 20549-4473
            scarlatom@sec.gov
            bowersj@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------------X
                                                        :
SECURITIES AND EXCHANGE COMMISSION,                     :
                                                        :
                          Plaintiff,                    :
                                                        :
              -v-                                       :
                                                        :
HARMEL S. RAYAT, AND RENOVACARE INC.,                   :
                                                        :
                          Defendants.                   :
                                                        :
------------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __08/24/2022__

21-cv-4777 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

The United States Securities and Exchange Commission ("SEC" or "Plaintiff") moves pursuant to Rules 15(a), 16(b) and 21 of the Federal Rules of Civil Procedure to file an amended complaint and to join new parties. Dkt. No. 85. Proposed additional defendants Jeetenderjit Singh Sidhu ("Sidhu"), Jatinder Bhogal ("Bhogal"), and Sharon Fleming ("Fleming") (collectively, "Proposed Defendants") move to intervene and oppose the amendment. Dkt. Nos. 92, 97, 99. The SEC does not oppose the motions of the Proposed Defendants to intervene for the limited purpose of responding to the SEC's motion to amend, *see* Dkt. No. 104 at 1, and the motions to intervene therefore are granted. *See Lopez v. Bell Sports, Inc.*, 2014 WL 6473533, at *2 (E.D.N.Y. Nov. 18, 2014) ("Several district courts adjudicating motions to join new defendants have allowed the proposed new defendants to intervene for the limited purpose of opposing joinder."). This opinion and order addresses Plaintiff's motion to amend and join new parties.[1]

---

[1] Bhogal also moves out-of-time for reconsideration of the Court's August 8, 2022 Order and Decision granting the SEC's Request for International Judicial Assistance and Letter Rogatory and requesting the assistance of Canada for his testimony and documents. Dkt. Nos. 99, 100-2. The motion is denied as moot in light of the Court's decision to grant the SEC's request to add

# BACKGROUND

## I.    Procedural History

The initial complaint ("Original Complaint") in this case was filed on May 28, 2021. Dkt. No. 1.   It charges defendants Harmel S. Rayat ("Rayat") and RenovaCare, Inc. ("RenovaCare") (collectively, "Defendants") with committing securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rules 10b-5(a), (b), and (c), promulgated thereunder, 17 C.F.R. § 240.10b-5(a)–(c), and making false statements in an SEC filing in violation of Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rules 15d-11 and 12b-20, promulgated thereunder, 17 C.F.R § 240.15d-1, 12b-20. RenovaCare is a public company purportedly engaged in the business of developing medical devices, whose stock traded as a penny stock.   During the period relevant to the Original Complaint, RenovaCare generated no revenue.   Dkt. No 1 ¶¶ 10, 11.   Rayat, a Canadian national, has been the majority and controlling shareholder of RenovaCare and served as Chairman of its Board of Directors.   *Id.* ¶ 9.   In summary, the Original Complaint alleges that from July 2017 until January 2018, Defendants engaged in a scheme to artificially inflate the trading price of RenovaCare stock by making false and misleading representations about RenovaCare through a purported third-party stock promoter, all without revealing the promoter's relationship to the Defendants and lying when asked about their relationship with the promoter. The Defendants then attempted to and did profit from the StreetAuthority's promotion of RenovaCare.

---

Bhogal as a defendant and the SEC's representation that if the Court granted the motion to amend the complaint and to join Bhogal as a defendant, it would withdraw the Request and seek discovery from Bhogal as a party pursuant to the Federal Rules of Civil Procedure.  Dkt. No. 88 at 9.

More specifically, the Original Complaint alleges that Defendants secretly disseminated false and misleading information about RenovaCare and its experimental medical device for treating burn wounds, "SkinGun," through an online financial publishing company, StreetAuthority, LLC ("StreetAuthority"), which was owned and operated by a long-time friend of Rayat. The Defendants concealed their involvement in disseminating the information by arranging for the payments to StreetAuthority to be paid through a third-party investor relations company that Rayat had hired in the past for other promotional campaigns.[2] Rayat would later replace that investor relations company with another investor relations company. Then, after the stock price of RenovaCare had increased to historically high prices while StreetAuthority's promotion was active, Rayat and his close associates successfully sold shares in the company. The Original Complaint identifies several transactions that were allegedly part of the scheme: Rayat exercised warrants to purchase RenovaCare shares in June 2017; he purchased shares of RenovaCare through a private placement in July 2017; he attempted to sell shares during the promotion through two brokerages; a friend of Rayat purchased shares at a below-market price in October 2017; and "Rayat's long-time friend and the officer manager of Rayat's real estate firm sold millions of dollars of RenovaCare stock at historically high prices while StreetAuthority's promotion was active." *Id.* ¶ 80.

On or around January 2, 2018, OTC Markets Group Inc., which supervised the market on which RenovaCare's stock was quoted, sent RenovaCare a letter demanding that it make public disclosures concerning its involvement in the StreetAuthority promotion. *Id.* ¶¶ 47–50. On January 8, 2018, RenovaCare issued a press release (the "January 8 Press Release") falsely

---

[2] The Original Complaint also alleges that the promoter disseminated false and misleading information about another company of which Rayat was also the controlling shareholder.

denying that it had been involved in the creation and distribution of the promotional materials prepared by StreetAuthority and stating that it was "not affiliated in any way" with the authors of the StreetAuthority report or its publisher. *Id.* ¶¶ 60–69. The Original Complaint does not name the owner of StreetAuthority (alleged to have formed the agreement with Rayat), the investor relations companies and their principals, or the close associates of Rayat who engaged in the trading of RenovaCare stock or were otherwise involved in the promotion.

Discovery in the case commenced on August 12, 2021 when the Court entered its first Case Management Plan and Scheduling Order. Dkt. No. 17. Throughout the course of the litigation, the parties requested numerous extensions to address issues raised by the Covid-19 pandemic, the international scope of the case, and Defendants' election to change counsel. The Court's initial Case Management Plan and Scheduling Order provided that any motion to amend or join additional parties would be filed no later than September 13, 2021 and that all discovery would be completed by March 25, 2022. *Id.* On December 23, 2021, the parties submitted a joint motion to extend the discovery cutoff to May 24, 2022, noting that as a result of logistical challenges and the fact that almost all witnesses were non-parties with separate counsel (and that three of those witnesses resided abroad), they had been able to complete only one deposition. Dkt. No. 40. The Court granted that motion and entered a new Case Management Plan and Scheduling Order providing that all discovery was to be completed by May 24, 2022. Dkt. No. 43. On March 1, 2022, the parties submitted a second joint motion to extend the discovery schedule. Dkt. No. 53. This motion acknowledged that no new depositions had been taken since the prior extension was granted in December 2021, and it ascribed that delay to the challenges in scheduling depositions due to concerns arising from the resurgence of Covid-19 in late 2021 to early 2022 and the substitution of new counsel for defendants. *Id.* at 2. At the parties' request,

the Court entered an Amended Case Management Plan and Scheduling Order providing that all discovery was to be completed by August 15, 2022.  Dkt. No. 54.

On May 24, 2022, the parties submitted a third joint motion to extend the discovery cutoffs, seeking a new deadline for the close of fact discovery of August 30, 2022, and a close of all discovery of October 30, 2022.  Dkt. No. 77.  The joint letter motion stated that the parties had been able to conduct additional depositions, including that of Sidhu,[3] but it noted that they had been forced to postpone three non-party depositions after several individuals working on the matter contracted Covid-19, and that the parties contemplated taking additional depositions as discovery progressed (including the depositions of the Defendants).  *Id.* at 1.  Thus, as of late May 2022, four depositions had been taken.  The letter announced that the SEC was filing a separate letter with the Court addressing the possibility that it would seek leave of the Court to file an amended complaint, stating that the SEC did not believe that such a possibility materially affected the current request for an extension.  *Id.* at 2.

That same day, the SEC filed a letter indicating that as a result of discovery it had recently obtained, it was considering asking the Court for leave to amend the Complaint.  Dkt. No. 78.  The letter advised that the process of obtaining approval from the Commission—which would be necessary before any amendment could be filed—would typically take four to six weeks but that the SEC staff would explore options to expedite review.  *Id.*  It also expressed the SEC's view that the amendment would not substantially broaden the scope of discovery.  *Id.*

---

[3] As further discussed below, Sidhu's deposition took place pursuant to a Request for International Judicial Assistance sent by this Court to the Supreme Court of British Columbia, in Vancouver, British Columbia, Canada.  Dkt. No. 32.

The Court granted the motion and scheduled the close of fact discovery for August 30, 2022 and the close of all discovery for October 30, 2022.  Dkt. No. 79.[4]

As of today, seven witnesses have been deposed.  Dkt. No. 95 at 8.  Defendants have produced over 5,000 records in discovery and answered two sets of interrogatories.  *Id.*

On July 25, 2022, the SEC filed this motion to file an amended complaint and to join additional parties along with a memorandum of law in support.  Dkt. Nos. 85–86.  Defendants filed a memorandum of law in opposition to the motion on August 8, 2022, Dkt. No. 95, and the SEC filed a reply memorandum in further support of its motion on August 15, 2022, Dkt. No. 103.  Meanwhile, on August 5, 2022, the Court received a letter from counsel for Fleming stating her opposition to the motion, Dkt. No. 91, and a letter from counsel for Bhogal stating the same, Dkt. No. 96.  The Court issued an order that the letters would not be considered by the Court unless counsel for the non-parties filed a motion to intervene.  Dkt No. 94.  Sidhu filed a motion to intervene and a memorandum in support of that motion on August 8, 2022.  Dkt. Nos. 92–93.  Fleming filed a motion to intervene and a memorandum of law in support of her motion on August 10, 2022.  Dkt. Nos. 97–98.  Bhogal filed a motion to intervene and a memorandum of law in support of that motion on August 10, 2022.  Dkt. Nos. 99–100.  The SEC filed a memorandum in opposition to the motions to intervene on August 15, 2022.  Dkt. No. 104.[5]

_____

[4] On July 5, 2022, on motion of the SEC, the Court issued a Request for International Judicial Assistance to the Central Authority in the Federal Republic of Germany, requesting the assistance of that authority in obtaining the testimony of non-party witness, Thomas Bold, the former Chief Executive Officer of RenovaCare.  Dkt No. 84.  On August 8, 2022, on motion of the SEC, the Court also issued a Request for International Judicial Assistance to the Supreme Court of British Columbia, in Vancouver, British Columbia, Canada, seeking its assistance in compelling the appearance of Bhogal for a deposition.  Dkt. No. 90.  The SEC's letter motion requesting that relief stated that if the Court granted the motion to amend the complaint and to join Bhogal as a defendant, it would withdraw the Request and seek discovery from Bhogal as a party pursuant to the Federal Rules of Civil Procedure.  Dkt. No. 88 at 9.
[5] On August 14, 2022, the Court granted the joint letter motion of the parties to stay the deadline

## II.     The Proposed Amended Complaint

The SEC's memorandum of law in support of the motion attaches its proposed amended complaint ("Amended Complaint").  Dkt. No. 86-1.  The Amended Complaint continues to center on the StreetAuthority promotional campaign (the "StreetAuthority campaign")[6] and the undisclosed involvement in it by Rayat and RenovaCare from July 2017 until February 2018 (rather than the Original Complaint's end date of January 2018).  The alleged misrepresentations are identical.  StreetAuthority's campaign misrepresented the efficacy and regulatory status of SkinGun.  *Id.* ¶¶ 117–24.  RenovaCare issued the false January 8 Press Release.  *Id.* ¶¶ 152–64.  However, the Amended Complaint dates the commencement of the fraudulent scheme back to 2007 and contains significant additional detail regarding the involvement of Rayat in it as well as the involvement of Sidhu, Bhogal, and Fleming—each of whom the Amended Complaint names as defendants.

The Amended Complaint divides the scheme into four "Steps."  Step One, described as "Setting the Table" for the scheme, alleges the "[a]ccumulat[ion of] RenovaCare [s]tock [by Defendants and Proposed Defendants] [t]o [s]ell [d]uring [t]he [s]cheme" from 2007 to 2013.  *Id.* ¶¶ 45–46.  Two friends and business associates of Rayat—Bhogal, who is described as a "strategic advisor" to RenovaCare, *id.* ¶ 26, and Sidhu, who is described as member of the board of RenovaCare's predecessor entity, *id.* ¶ 27 (and as "Rayat's long-time friend and the officer manager of Rayat's real estate firm" in the Original Complaint, Dkt. No. 1 ¶ 80)—purchased millions of shares of RenovaCare from Rayat through entities that they controlled for little or no money in exchange for debt or equity interests that permitted Rayat to maintain a financial

---

for completing discovery while the motion to amend was pending.  Dkt. Nos. 101–02.
[6] The Amended Complaint refers to the StreetAuthority campaign as the Predictions Campaign. *Id.* ¶ 6.  The Court continues to refer to the campaign as the StreetAuthority campaign for purposes of convenience.

7

interest in any later sale of the RenovaCare shares.  Dkt. No. 86-1 ¶¶ 45–46.  In addition, Fleming, described as "a third-party investor relations consultant to RenovaCare . . . . [d]uring the [StreetAuthority campaign]," *id.* ¶ 28, acquired 300,000 RenovaCare shares in a private placement, *id.* ¶ 47.  Beginning no later than 2013, Bhogal, Fleming, and Sidhu—along with Rayat—"closely coordinated their brokerage accounts."  *Id.* ¶ 52.  Among other things, Fleming opened an account with a broker dealer whom Rayat had recommended.  *Id.*  Sidhu coordinated the transfer of shares to various entities that he and Bhogal controlled and worked together with Bhogal to deposit shares with another U.S. broker dealer.  *Id.* ¶¶ 54–55.  Sidhu and Bhogal also worked with RenovaCare to remove the restricted legend on their shares and to register the shares so that they could be sold publicly.  *Id.* ¶¶ 56–58, 60–61.  In June 2017, Rayat also coordinated account openings with Bhogal and Sidhu.  *Id.* ¶ 63.

Step Two of the alleged scheme is described as "Scalping."  *Id.* ¶¶ 68–136.  It is the lengthiest part of the Amended Complaint.  Aside from some background information and substantial additional evidentiary detail (including about the three new Proposed Defendants), it largely repeats the allegations of the Original Complaint regarding the use of StreetAuthority to falsely promote RenovaCare and make false statements about SkinGun.  The Amended Complaint alleges that Bhogal arranged for the purchase of the technology related to SkinGun, *id.* ¶¶ 69–70, and that he worked closely with Rayat, Fleming, and another investor relations consultant to promote the company, *id.* ¶ 70.  It further alleges that by October 2015, Rayat had worked with Sidhu, Bhogal, Fleming and others to develop RenovaCare's "investor relations" strategy that would temporarily increase the price and trading volume of RenovaCare shares as they sold shares.  *Id.* ¶ 73.  Defendants' business model, as conceived then, and as executed later

in 2018 through StreetAuthority, involved the funding of a short-term promotional campaign through a third-party investor relations consultant.  *Id.* ¶ 76.

The Amended Complaint alleges the role of the three new Proposed Defendants with the StreetAuthority campaign.  Rayat and Bhogal selected the third-party service providers who were to work on the StreetAuthority promotion and to funnel payments to StreetAuthority.  *Id.* ¶ 101.  Fleming was one of those third-party service providers; she also provided the false disclaimer to an investor relations consultant who replaced her.  *Id*. ¶¶ 101, 103–04, 107, 114.  Then, "while Fleming and Rayat worked with StreetAuthority and RenovaCare on the promotional campaign, Sidhu and Bhogal began selling RenovaCare shares in a highly coordinated manner."  *Id*. ¶ 129.  A day after she was replaced as the investor relations consultant, Fleming stopped handling the payments that RenovaCare made to StreetAuthority through her investor relations company for the campaign and sold 7,000 shares of her RenovaCare stock notwithstanding that she had been directly involved in the campaign and knew that the paid promotion she had helped organize was ongoing. *Id.* ¶ 133.  For his part, Bhogal knew about the campaign because, *inter alia*, Rayat sent him an email between Rayat and StreetAuthority about the campaign, and Bhogal participated in a phone call with StreetAuthority representatives and Rayat.  *Id.* ¶ 135.  Sidhu knew about the campaign because, *inter alia*, he was in daily contact with Rayat while Rayat worked on the campaign, he sent a package to StreetAuthority representatives at Rayat's requests, and he planned two of Rayat's trips to visit StreetAuthority in Austin, Texas.  *Id.* ¶ 136.  The transactions by the two of them in RenovaCare tracked the timing and progress of the StreetAuthority campaign.  *Id.* ¶¶ 135–36.

Step Three of the scheme in the Amended Complaint consists of alleged "Misrepresentations, Omissions, and Related Fraudulent Conduct" in the January 8 Press

9

Release.  That section of the Amended Complaint largely tracks the allegations of the Original

Complaint that, in response to an inquiry from the supervisory authority of the market on which

RenovaCare stock was quoted, Rayat and RenovaCare lied and falsely denied that RenovaCare

and its officers, directors or controlling shareholder had a role in the promotion.  It also adds an

allegation, not found in the Original Complaint, identifying Bhogal by name and stating that he

aided and abetted RenovaCare's false statements.  *Id.* ¶¶ 165–66.

Step Four of the Amended Complaint, described as "Manipulative Trading and Related

Conduct," appears to be mostly new.  It alleges that after issuing the January 8 Press Release, the

defendants named in the Amended Complaint restarted the promotional campaign and resumed

trading.  *Id.* ¶¶ 167–93.  It contains allegations of stock trading by Fleming, Bhogal, and Sidju,

and the issuance of a false press releases by RenovaCare, assisted by Rayat and Bhogal, in

response to a suggestion by StreetAuthority.  The Amended Complaint alleges that the scheme

collapsed in February 2018.  *Id.* ¶¶ 192–93.

Finally, the Amended Complaint alleges that Rayat and the three new individual

Proposed Defendants together reaped over $7.5 million in ill-gotten gains from trading in

RenovaCare stock.  *Id.* ¶ 196.

The Amended Complaint would (1) add Sidhu, Bhogal, and Fleming as defendants, (2)

add as relief defendants four entities owned by Sidhu or Bhogal that transacted in RenovaCare

stock allegedly in furtherance of the scheme (1420527 Alberta Ltd., Blackbriar Asset

Management Ltd., Treadstone Financial Group Ltd., and Treadstone Financial Group LLC) and

add a claim for unjust enrichment against the relief defendants, (3) add new claims under Section

17(a) of the Securities Act of 1933 ("Securities Act") and Sections 9(a)(2) and 20(b) of the

Exchange Act, and (4) add a claim for relief of disgorgement of ill-gotten gains against all defendants except for RenovaCare.

## LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The court may deny such a motion only on grounds of "undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). However, "[m]ere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). Rather, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Sherman v. Fivesky, LLC*, 2020 WL 5105164, at *3 (S.D.N.Y. Aug. 31, 2020) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). "While the party seeking to amend its pleading must explain any delay, the party opposing the amendment bears the burden of showing prejudice, bad faith, and futility of the amendment." *Contrera v. Langer*, 314 F. Supp.3d 562, 567 (S.D.N.Y. 2018) (cleaned up).

Under Rule 21, a court may allow a party to be added or removed "at any time, on just terms." Fed. R. Civ. P. 21. "In deciding whether to permit joinder, courts apply the same standard of liberality afforded to motions to amend pleadings under Rule 15." *New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F.Supp.3d 216, 249 (S.D.N.Y. 2020) (quoting *Bridgeport Music, Inc. v. Universal Music Grp., Inc.*, 248 F.R.D. 408, 412 (S.D.N.Y. 2008)); *see also Tarr v. Acto Techs., Inc.*, No. 19-cv-7703 (S.D.N.Y. Dec. 29, 2020), Dkt. No. 50 at 3. In addition, Rule 20(b) provides that "[p]ersons . . . may be joined in one action as defendants if:

11

(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(b); *see also O'Gorman v. Mercer Kitchen L.L.C.*, 2021 WL 602987, at *1 (S.D.N.Y. Feb. 16, 2021).

"The generous approach that courts take to Rule 15 and Rule 21 motions does not extend to motions filed after a previously ordered deadline has run." *Cheng v. Via Quadronno LLC*, 2022 WL 1210839, at *2–3 (S.D.N.Y. Apr. 25, 2022). Thus, "[w]hen a party files a motion to amend after the pleading deadline set forth in the case management plan and scheduling order, Fed. R. Civ. P. 16(b) governs and the party must establish 'good cause' to amend its pleadings." *Pristine Jewelers NY, Inc. v. Broner*, 492 F. Supp. 3d 130, 131–32 (S.D.N.Y. 2020) (citing *Sherman*, 2020 WL 5105164, at *1). "To show good cause, a movant must demonstrate diligence before filing her motion, such that despite the movant's effort, the deadline to amend the pleadings could not have been reasonably met." *Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 197 (S.D.N.Y. 2014). "[T]he good cause standard of Rule 16 is not satisfied when the proposed amendment rests on information that the party knew or should have known, in advance of the deadline." *Sherman*, 2020 WL 5105164, at *1 (quoting *DeCastro v. City of New York*, 2020 WL 4932778, at *7 (S.D.N.Y. Aug. 24, 2020)). "The Court 'also may consider other relevant factors, including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice [non-movants].'" *Weng v. HungryPanda US, Inc.*, 2021 WL 1750305, at *2 (S.D.N.Y. May 4, 2021) (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007)). "Even if good cause is established . . . , a court may deny a motion to amend if the proposed amendment 'would be futile, unduly prejudicial, or otherwise improper . .

. .'" *DeCastro*, 2020 WL 4932778, at *7 (quoting *Youngers v. Virtus Inv. Partners Inc.*, 2017 WL 5991800, at *6 (S.D.N.Y. Dec. 4, 2017)). "[A] finding of 'good cause' depends on the diligence of the moving party," *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000), as well as on "whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants," *Kassner*, 496 F.3d at 244.

## DISCUSSION

Defendants and Proposed Defendants both argue that Plaintiff's motion to amend and to join additional parties should be denied on grounds of undue delay and prejudice and for failure to establish good cause. In particular, the Defendants argue:

- that the information that led the SEC to pursue charges against the Proposed Defendants was available to the SEC before it brought this lawsuit and that the SEC showed a lack of diligence in pursuing the potential "line[s] of inquiry for a period of years," Dkt. No. 95 at 21;

- that the Defendants would suffer prejudice from the conversion of the matter from a two-defendant case focused on a seven-month time period to a five-defendant case focused on a 11-year time period;

- that the introduction of new defendants in this case would delay the case's resolution for at least a year to the Defendants' detriment, leaving Rayat under a continued cloud and preventing RenovaCare from engaging in an FDA-approved clinical trial;

- that "[g]ood cause does not exist for the SEC to take a mulligan on its investigation . . . when the parties are about to complete fact discovery," *id.* at 16.

- that the SEC was not forthright with the Court because the SEC's May 24, 2022 letter stated that the contemplated amendment of the Complaint would not substantially broaden discovery and omitted that the SEC would seek to add the three new Proposed Defendants; and

- that the SEC violated its commitment to the British Columbia Supreme Court made through the Letter of Request not to use evidence given by Sidhu in deposition to "advance . . . claims against Sidhu," *id.* at 1, 10–12 (quoting Dkt. No. 95-8 ¶ 2).

The Proposed Defendants largely echo these arguments. Sidhu argues that the SEC has violated its commitment to the British Columbia Supreme Court to not use his compelled

testimony against him in this proceeding; that the SEC failed to timely investigate him; that an amendment would unduly prejudice the current Defendants as Sidhu would seek to reopen discovery and file motions; and that the amendment would be futile.  *See* Dkt. No. 93-1.  Bhogal likewise argues that the SEC has failed to demonstrate good cause because it possessed information about his involvement in RenovaCare press releases and his purchases and sales of RenovaCare shares.  Bhogal also adds the claim that the SEC acted in bad faith by negotiating to obtain his testimony (which it has not yet taken) without telling him, prior to Commission authorization, that he might be added as a defendant.  Dkt. No. 100-3.  Fleming argues that the SEC has not shown good cause to add her now to the case based on allegations nearly completely overlapping with those in the Original Complaint.  She further claims that she would suffer severe prejudice in the form of getting up to speed on discovery, taking new discovery, and making motions.  Dkt. No. 91.  Based on those premises, the Defendants and Proposed Defendants ask the Court to conclude that the SEC should have joined the three Proposed Defendants in the Complaint or at least by the September 2021 deadline for amendments and joinder of parties.

The Defendants' and Proposed Defendants' arguments that the SEC lacks good cause and has unduly delayed are unconvincing.  The Amended Complaint rests on significant new information that the SEC did not have at the time that it filed its Original Complaint.  Further, the SEC has provided good cause for why it was not able to obtain that evidence before the September 13, 2021 deadline for filing an amended complaint and joining new parties.  To be sure, the SEC had information before the filing of the Original Complaint that Rayat had sold RenovaCare common shares to Sidhu for redeemable preferred shares in a British Columbia entity owned by Sidhu, Dkt. No. 95 at 19–20, that in November 2019, Rayat had received

preferred shares in Bhogal's entity in exchange for RenovaCare stock he provided to Bhogal, *id.* at 20–21, and that Fleming had engaged in the purchase and sale of RenovaCare shares, *id.* at 21. But the SEC lacked the necessary information to know the significance of those transactions— namely, that the transactions were part of an alleged coordinated effort by the three Proposed Defendants and Rayat to pump up the price of RenovaCare shares and then to dump their stock.

The SEC's lack of access to that information resulted not from its own lethargy, but from Defendants' failure to provide that information to the SEC. Rayat admitted in his SEC investigative testimony that, in exchange for his transfer of RenovaCare stock to Sidhu and Bhogal, he received preferred shares in the companies that held those shares. However, Rayat characterized the transfer as a "gift," "as [his] way of saying thank you" to Sidhu and Bhogal, who Rayat described as "good employees," and that he "never had any expectations . . . of any kind of cash or monetary return." Dkt. No. 86-3 at 150–51, 155. The SEC was not able to obtain Sidhu's testimony during the investigative phase because he is a resident of Canada. When efforts to obtain his voluntary testimony failed after this case was filed, the SEC moved promptly for the issuance of a Letter of Request to the Supreme Court of British Columbia in Vancouver for its assistance in obtaining his testimony. Dkt. No. 31. The Court signed the Letter of Request on November 29, 2021. Dkt. No. 32. His deposition was delayed until March 2022, in part as a result of the change of counsel by Defendants. Dkt. No. 53. When the SEC was able finally to obtain his testimony, Sidhu made clear that "[Rayat] didn't gift me stock. He sold me stock . . . ," Dkt No. 86-2 at 40, and that Rayat benefitted from Sidhu's stock sales. Among other things, Rayat had a significant equity interest in another entity, Blackbriar Asset Management Ltd., that sold RenovaCare shares in January and February 2018. *Id.* at 46–49. In addition, Rayat arranged for another Sidhu entity, Collingwood Holdings, LLC, to purchase

RenovaCare stock by encouraging Sidhu to buy the shares, introducing him to the seller, and then lending the entity $1.2 million with which to buy the shares on a loan that remains outstanding.  Dkt. No. 86-2 at 56–58.

There were also deficiencies in the document production at the investigative stage that the SEC could address only after litigation commenced.[7]  Rayat, Bhogal, or Fleming did not produce electronic messages from platforms such as Skype and WhatsApp.  In fact, Rayat testified that he deleted electronic messages "until I was told not to."  Dkt. No. 86-3 at 17–18.  There is evidence that he continued to delete messages even after he knew that the SEC had commenced an investigation and subpoenaed RenovaCare.  *See* Dkt. No. 86-4.  Although Sidhu did not respond to SEC attempts to secure his cooperation, the SEC used tools of civil discovery to obtain Skype messages demonstrating Rayat's involvement in the promotion by StreetAuthority in February 2018—a date later than that initially alleged in the Original Complaint.  *Id*.  Skype messages produced by a third party also demonstrated Bhogal's involvement with the StreetAuthority campaign, Dkt. No. 104-13, 103-14, and contradicted his investigative testimony that he was not involved with the January 8 Press Release. *Compare* Dkt. No. 104-10 at 190 (testimony that Bhogal was not involved with the release or the timing of the release) *with* Dkt. No. 104-15 (Skype message showing Bhogal's involvement with the timing of release).  Fleming produced a new email demonstrating her involvement in the continuation of the StreetAuthority campaign at the same time as she was selling RenovaCare stock.  Dkt. No. 104-18.

---

[7] The SEC has stated that Rayat destroyed documents and that the new defendants failed to retain and produce relevant documents.  The Court need not conclude whether any defendant engaged in any intentional improper conduct during the investigation to conclude that the SEC acted diligently in this case.

On April 28, 2022, Rayat filed a motion for a protective order seeking to prevent the SEC from obtaining documents from him about specific transactions going back to 2007. Dkt. No. 55. The Court denied that motion, finding that "the SEC has explained why it could not readily obtain at least certain of the information during the investigative phase" and that "no rule of law requires the SEC to request in the investigative stage every document that might turn out to be relevant in the litigation phase." Dkt. No. 65 at 5–6. The Court also concluded that the requested documents were relevant, as they went to "central issues in this case—whether Rayat had a financial motive to 'pump' the price of RenovaCare and whether he profited from the increase in its price during the period of the alleged scheme." *Id.* at 5. Among the documents produced by Rayat in response to the requests permitted by the Court were emails from him to Sidhu and Bhogal regarding the opening of brokerage accounts and transactions in RenovaCare shares that show the coordination of trading accounts. Certain emails also demonstrate Sidhu's involvement and knowledge of Rayat's involvement with the StreetAuthority promotion. The emails were produced by him in June 2022, well after the amendment and joinder deadline. Dkt No. 103, Tbl. A. The SEC also obtained from third parties numerous other documents probative of the scheme alleged in the complaint. *Id.*

The SEC's inability to obtain the testimony of Sidhu during the investigative stage, the SEC's diligence in obtaining his testimony after this lawsuit was brought, the significance of that testimony, the delay caused by Rayat's motion for a protective order, and the importance of the documents produced by him and the other third parties, each independently establish good cause for the SEC's out-of-time motion. The Sidhu testimony establishes Rayat's profit motive and the documents show the participation of the Proposed Defendants in the allegedly fraudulent scheme. Those facts also establish that the SEC acted with diligence in bringing the Amended

Complaint and that it did not move with undue delay.  *See S.E.C. v. DCI Telecommunications, Inc.*, 207 F.R.D. 32, 34 (S.D.N.Y. 2002) (finding no undue delay where the SEC claimed that critical evidence was recently revealed).

The Defendants and Proposed Defendants also base their argument on a legally flawed premise:  they assume that because the SEC was in possession of information that would have supported further inquiry into the conduct of the Proposed Defendants, it was required to have completed that inquiry before it brought the case against the Defendants.  In short, under their view, the time from when the SEC had clues as to Proposed Defendants' involvement—and not the time from the filing of the Original Complaint—should determine whether there is good cause or there has been undue delay.  Defendants and Proposed Defendants, however, cite no law for that proposition.

Good cause and its cousin undue delay, as they have been interpreted by the courts, refer to delay from the date of the filing of the complaint to the filing of an amendment or, in the case of good cause, from the date of the deadline for amendment to the filing of an amendment.  It speaks to the harm caused to judicial efficiency and to the potential for prejudice to the opposing party when the movant sits on evidence it has obtained in the case before seeking to amend.  *See*, *e.g.*, *Verdone v. Am. Greenfuels*, LLC, 2017 WL 3668596, at *4 (D. Conn. Aug. 24, 2017) (assessing "good cause" in terms of the "Court's interest in judicial economy"); *see also Sly Magazine, LLC v. Weider Publ'ns L.L.C.*, 241 F.R.D. 527, 532 (S.D.N.Y. 2007) (describing general judicial economy interests underlying joinder).  It does not speak to the thoroughness of the pre-suit investigation.  The rule that speaks to the thoroughness of the pre-suit investigation is Rule 11, which as a general matter requires only that the complaining party have engaged in an "inquiry reasonable under the circumstances" to determine whether its factual contentions have

evidentiary support.  Fed. R. Civ. P. 11(b).  While the SEC plainly is required to act with

diligence on information that it knew or should have known from its investigation, *see*, *e.g.*,

*Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (finding that plaintiff had

not established good cause when he possessed evidence relevant to his claim prior to the

complaint), it is not required before suing one defendant to run down every last lead it would

have against every other proposed defendant during the investigative stage.  *Cf. Oneida Indian*

*Nation of N.Y. v. Cnty of Oneida*, 199 F.R.D. 61, 74–76 (N.D.N.Y. 2000) (rejecting argument of

undue delay by the federal government because it moved to amend shortly after having moved to

intervene notwithstanding argument by defense that it took the government "over a generation"

to decide whether to intervene).

      Neither the SEC's interest, nor the interests of a subject of an investigation, would be

served by Defendants' articulation of a "good cause" or "undue delay" standard that extends to

the scope and thoroughness of investigatory matters prior to the filing of an initial complaint.

Requiring the SEC to conclude its investigation as to all potential members of a scheme before

suing any of them, on pain that it would later be significantly time-limited in its ability to amend

to do so, would undercut the SEC's "statutory mandate to protect the public interest through

*prompt* and effective enforcement of the federal securities laws."  *Treats Int'l Enters., Inc. v.*

*S.E.C.*, 828 F. Supp. 16, 18 (S.D.N.Y. 1993) (emphasis added) (quoting H. Rep. No. 1321, 96th

Cong., 2d Sess. 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3874, 3878).  Such a standard would

also disserve the interests of a subject of an investigation, who has an expectation that the SEC

will keep its investigation confidential and not profligately shower every person who might have

relevant information with a request before it has decided whether the case merits prosecution, *see*

SEC Enforcement Manual, § 5.1, available at

https://www.sec.gov/divisions/enforce/enforcementmanual.pdf (describing the access policy to information from the SEC's investigation).  In any event, there is no evidence that the SEC acted with anything other than diligence during the pre-Original Complaint investigative stage.  Even if there were, the record establishes that it acted with diligence in uncovering the evidence that permitted it to file the Amended Complaint and that it has good cause for not doing so within the time permitted by deadline for amendment.

With respect to Defendants' claims of "undue prejudice," which is "perhaps [the] most important" factor in the Rule 15(a)(2) analysis, *Flour Corp.*, 654 F.2d at 856, Defendants have not established that the amendment would require them to expend significant additional resources or that it would significantly delay the resolution of the dispute.  "In determining what constitutes 'prejudice,' [courts] generally consider whether the assertion of the new claim or defense would '(1) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'"  *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Block*, 988 F.2d at 350); *see also Phoenix Light SF Ltd. v. HSBC Bank USA, N.A.*, 2021 WL 568080, at *2 (S.D.N.Y. Feb. 16, 2021); *Ramirez v. Bernstein*, 2020 WL 7230729, at *3 (S.D.N.Y. Dec. 7, 2020); *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of New York & New Jersey*, 2016 WL 6083956, at *7 (S.D.N.Y. Oct. 17, 2016).

 In claiming undue prejudice, Defendants argue that the amendment would require them to "conduct discovery on the SEC's new Complaint, which is far broader and more complex than the one that has been the subject of discovery to date."  Dkt. No. 95 at 12.  Defendants' argument is overstated.  The claims for relief in the Amended Complaint, as in the Original Complaint,

remain centered on the StreetAuthority campaign and January 8 Press Release.  *See* Dkt. No. 86-1 First Claim for Relief ¶¶ 205–07 (alleging that Defendants violated Section 10(b) of Exchange Act by engaging in the StreetAuthority campaign and January 8 Press Release); Second Claim for Relief ¶¶ 208–11 (alleging that Rayat and Bhogal aided and abetted violations of Section 10(b) in connection with January 8 Press Release); Third Claim for Relief ¶¶ 212–14 (alleging Defendants' violations of Section 17(a) of the Securities Act in connection with the StreetAuthority campaign and January 8 Press Release); Fourth Claim for Relief ¶¶ 215–18 (alleging that Bhogal aided and abetted a violation of Section 17(a) in connection with January 8 Press Release); Fifth Claim for Relief ¶¶ 219–22 (alleging that Rayat, Bhogal, Sidhu, and Fleming violated Exchange Act Section 20(b) in connection with the StreetAuthority campaign); Sixth Claim for Relief ¶¶ 223–25 (alleging that Bhogal, Sidhu and Fleming violated Exchange Act Section 9(a)(2) in connection with their trading activity in February 2018; no allegation against Rayat and RenovaCare); Seventh Claim for Relief ¶¶ 226–30 (alleging that RenovaCare violated Exchange Act Section 15(d) based on its conduct before and during the StreetAuthority campaign and in connection with January 8 Press Release); Eighth Claim for Relief ¶¶ 231–34 (alleging an unjust enrichment claim against relief defendants based on profits reaped as a result of the StreetAuthority campaign, January 8 Press Release, and February 2018 conduct).

To be sure, the Amended Complaint alleges conduct that reaches back to 2007 when the Original Complaint itself reached back only to 2017.  That extension, however, could not have been a surprise, nor does it represent a significant expansion.  Defendants had notice of the claim and the new allegations arise from the same transactions as the claims in the original pleading.  *See A.V.E.L.A., Inc. v. Estate of Monroe*, 34 F. Supp.3d 311, 317 (S.D.N.Y. 2014) ("Whether [the opposing] party had prior notice of [the new] claim and whether th[at] claim arises from the

21

same transaction as the claims in the original pleading are central to [the prejudice] determination." (citing *Monahan*, 214 F.3d at 284)). The Court also addressed precisely this issue in May 2022, well before there was a proposed Amended Complaint, when resolving Rayat's motion for a protective order. In response to Defendants' argument that conduct going back to 2007 was irrelevant to the allegations in the Original Complaint, the Court ruled to the contrary that it went to "central issues in this case." Dkt. No. 65 at 5. The Court did not exclude such evidence on grounds that the date made it irrelevant. All that the Amended Complaint did with respect to the Defendants was to add the evidentiary detail.

The thrust of Defendants' argument is that the resolution of the case against them would be delayed by the discovery that the Proposed Defendants would have to take, in re-deposing witnesses, reviewing documents already produced in discovery, making new documents requests, and engaging in reciprocal requests for admission and interrogatories. Dkt. No. 95 at 12, 16. Defendants also suggest that there might be some delay caused by the right of the new defendants to make motions addressed to the pleadings. But the argument that new allegations will require new discovery can be made in any case where an amendment expands the case. Such a "'burden . . . , standing alone, does not suffice to warrant denial of a motion to amend a pleading.' . . . Were it otherwise, Rule 15's promise that leave to amend shall be freely granted would be rendered illusory and courts would be constrained to reject all but those amendments that merely regurgitate the factual allegations of the original complaint but only under different labels." *Sherman*, 2020 WL 5105164, at *3 (quoting *United States v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1255 (2d Cir. 1989)). With respect to joinder, there will always be some delay when a new defendant is added to a case after discovery has

already started.  Each defendant, after all, has a right to review the discovery that has already

been exchanged and to make some requests to address the claims against it.

In addition, Defendants and Proposed Defendants have not shown that the amendment or

a subsequent motion to dismiss will significantly delay the resolution of the dispute.  Seven

depositions have been taken.  Some of them may need to be reopened.  Documents have been

exchanged.  The Proposed Defendants will have to review them.  But discovery has not yet

closed, depositions remain to be taken, no dispositive motions have been filed, and no trial date

has been set.  *See A.V.E.L.A.*, 34 F. Supp.3d at 318 (finding no prejudice where "discovery was

not yet closed, nor had any dispositive motions been filed").  And, as to motions to dismiss,

assuming they are made, there is no reason why the defendants cannot actively participate in

discovery while the legal issues are under consideration by the Court.  *See Hong Leong Finance*

*Ltd. (Singapore) v. Pinnacle Performance Ltd.*, 297 F.R.D. 69, 72 (S.D.N.Y. 2013) ("A motion

to dismiss does not automatically stay discovery, except in cases covered by the Private

Securities Litigation Reform Act.").  There is no reason why such motions must delay the

completion of discovery in this case.

Tellingly, Defendants assert no specific prejudice to them from the delay.  They make

only the conclusory assertion that "RenovaCare is unable to carry out FDA-approved clinical

trials of its burn-treatment product while this action is pending," Dkt. No. 95 at 17, and that

Rayat has put his life "on hold," *id*. at 18.  But those statements are not only unsupported, but

also ring hollow considering Defendants' silence during previous delays.  A good amount of the

delay in this case has been a result of the Defendants' change in counsel.  The Court does not

begrudge them that decision, but until the motion to amend the complaint, Defendants never

demonstrated any interest in expediting the case against them.  Moreover, discovery in this case has been outstanding for only one year.

Defendants' argument that the SEC acted with "bad faith" is also without merit.  Bad faith as used with respect to a motion to amend does not serve as an invitation for the party opposing amendment to raise every generalized grievance it has with respect to the litigation tactics and style of the movant.  It refers to the objective with which the motion to amend is made, including whether, on the one hand, based on the motion's timing and content, the movant intended "solely to gain a tactical advantage," *Oneida Indian Nation of N.Y. v. Cnty. of Oneida*, 199 F.R.D. 61, 80 (N.D.N.Y. 2000); *see also Primetime 24 Joint Venture v. DirecTV, Inc.*, 2000 WL 426396, at *6 (S.D.N.Y. Apr. 20, 2000) (holding that whether the moving party's reasons for seeking leave to amend are "proffered dishonestly," the "relevant issue" is whether the moving party "sought to derive some tactical advantage") or to "annoy, harass, and delay," *Fezzani v. Bear, Stearns & Co.*, 2022 WL 782751, at *2 (S.D.N.Y. Mar. 15, 2022) (internal quotation marks omitted), or on the other hand, whether the movant sought "to facilitate a proper decision on the merits," *Foman*, 371 U.S. at 182 (quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957)).  There is no basis to believe that the SEC has moved to amend to gain a tactical advantage or to annoy, harass, or delay.  The SEC has acted with appropriate expedition in prosecuting this action and made the motion as soon as it reasonably believed it had the evidence to support the additional charges.  Those additional charges all arise out of the same nucleus of operative facts and are intended to facilitate the efficient and proper decision of this case based on all the relevant facts.

In addition, the Court does not consider the SEC's May 24, 2022 letter to be misleading. Consistent with the Amended Complaint that ultimately was filed, the SEC's letter states that the

amendment "would relate to the scheme already alleged in the Complaint." Dkt. No. 78. It also states that "[f]rom the SEC's perspective, only a limited amount of additional discovery would be required." *Id.* The Court expects to hold the SEC to that representation. But the letter does not purport to speak on behalf of the Defendants. Nor can the Court fault the SEC for not mentioning that it might add new defendants to the case. It would not necessarily have been appropriate for the SEC to mention that there would be new defendants—and to cause the public to speculate as to who those new defendants might be—until after the Commission itself had authorized the filing of an amendment and the bringing of charges against new defendants.

The Court also rejects the argument that the SEC failed to abide by the limitations of the order of the British Columbia Supreme Court pursuant to which the SEC took Sidhu's testimony. That order expressly provided: "[t]he evidence given and documents produced by Sidhu are to be used only in the U.S. Proceeding and not for any other purpose." Dkt No. 93-2 ¶ 10. In turn, the "U.S. Proceeding" is defined as this case. *Id.* ¶ 12(a)(i). The Order goes on to say that "[i]n particular, no document produced, no testimony given, and no evidence derived from any such evidence shall be used in subsequent proceedings against the party who produced the document or gave the testimony, except as proof of a prior inconsistent statement or in prosecution for perjury," *id.* ¶ 11, and then adds "that the documents and evidence will not be used to advance, in *any* proceeding, directly or indirectly, any claims against [Sidhu] or any entities related to him," *id.* ¶ 12(a)(i) (emphasis added). The SEC also executed an undertaking that it would not use the "documents and evidence" obtained pursuant to the order of the British Columbia Supreme Court "to advance, in any proceeding, directly or indirectly, any claims against Mr. Sidhu or an entities related to him." Dkt No. 93-3 ¶ 2(a). The Order thus makes clear: (1) the anticipation that the "documents and evidence" may be used in *this* proceeding albeit not to advance any

claims against Sidhu; and (2) that the only limitation on the SEC is that it not use the documents

or evidence against Sidhu. There is no other limitation against suing Sidhu in this action.

Sidhu has not identified any documents or evidence that the SEC uses in the Amended

Complaint to advance the claim against him. In his opposition to the amendment, Sidhu

mentions that the SEC attaches his testimony to its motion to amend and characterizes it as a

"watershed moment." Dkt. No. 93-1 at 2. But the Order and the SEC undertaking expressly

permit the SEC to use the Sidhu testimony in this proceeding generally—that is the reason why

the SEC requested and the Court signed the Letter of Request. And the testimony was in fact

used in this proceeding for the procedural purpose of seeking permission to file an amended

complaint as well as perhaps the substantive purpose of identifying evidence that could be

offered against the other defendants. The only proscription is that it not be used to advance a

claim against Sidhu (save for use as a prior inconsistent statement) and Sidhu has offered no

persuasive evidence that the SEC intends to use the testimony or documents for that purpose. [8]

Tellingly, the SEC does not seek to use the testimony or documents obtained pursuant to the

Order to advance a claim against Sidhu in this proceeding.[9] It seeks to use the testimony against

Rayat. Dkt. No. 104 at 8.[10]

---

[8] Sidhu claims that the allegations in paragraphs 46 and 196 of the Amended Complaint that
Rayat sold RenovaCare shares to entities controlled by him and Bhogal, that a $1.2 million loan
was extended to Collingwood Holdings LLC, and that those entities later sold their shares are
based on his compelled testimony. But the SEC had demonstrated that it was already and
independently aware prior to Sidhu's testimony of the entities and their transactions, including
that Rayat had loaned more than $1 million to Collingwood and that he had sold RenovaCare
shares to Treadstone in exchange for preferred shares. Dkt. No. 104 at 9–10.
[9] Bhogal's claim that the SEC negotiated for his testimony in bad faith likewise is meritless. The
Staff of the SEC was under no obligation to tell Bhogal that he would be named as a defendant
until the Commission made the decision that he should be made a defendant. Importantly, the
SEC did not take Bhogal's testimony under false pretenses.
[10] Additional defendant Sidhu moves to file a surreply, asserting (without citation) that a
*Kastigar* hearing is "clearly warranted" in this case. Dkt. Nos. 106, 106-1, at 4 (citing *Kastigar*

Finally, "judicial efficiency weighs in favor of allowing the amendment." *A.V.E.L.A.*, 34 F. Supp.3d at 318. The evidence cited in the Amended Complaint against the Defendants would likely all be admissible in a trial of the Complaint. The claims against the Proposed Defendants arise out of the identical transactions as the claims against Defendants. There are few, if any, facts that would be relevant to the defense of the Proposed Defendants that would not also have some probative value with respect to the claims of the Defendants. It therefore is appropriate and efficient that the amendment be permitted and that all of the claims be tried together.

Various of the Proposed Defendants also argue that amendment should be denied because it would be futile; according to them, the Amended Complaint fails to state a claim for relief. Dkt Nos. 93-1 at 12–13, 96 at 4 n.7. The Court will address those arguments when, and if, a motion to dismiss or for judgment on the pleadings is made. *See*, *e.g.*, *Intercloud Sys., Inc. v. Integration Partners Corp.*, 2017 WL 11570456, at *1 (S.D.N.Y. July 31, 2017) (postponing decision on the futility of an amended complaint until the receipt of a "fully briefed motion to dismiss"); *Bryant v. Steele*, 64 F. Supp. 3d 441, 446 (E.D.N.Y. 2014) (allowing defendants to "formally move to dismiss" with respect to the futility of an amendment to ensure that the issue is "more fully briefed").

## CONCLUSION

The motions of the Proposed Defendants to intervene are GRANTED. The SEC's motion to amend the complaint and join the parties is GRANTED. Bhogal's out-of-time motion for reconsideration of the Court's August 8, 2022 Order and Decision is DENIED as moot. Sidhu's motion for leave to file a surreply is DENIED.

---

*v. United States*, 406 U.S. 441, 461–62 (1972)). The request is premature and the motion at Dkt. No. 106 is denied.

The Clerk of Court is respectfully directed to close Dkt. Nos. 85, 92, 97, 99, 106.


SO ORDERED.


Dated: August 24, 2022
       New York, New York

_____
              LEWIS J. LIMAN
       United States District Judge

# Exhibit 1

| From: | Ellis, Mary (CA - Langley) <mellis@deloitte.ca> |
|---|---|
| Sent: | Monday, March 28, 2011 11:16 AM |
| To: | Jeet Sidhu; Harmel Rayat |
| Cc: | Yurik, Norman (CA - Vancouver) |
| Subject: | FW: Alberta Company |
| Attachments: | 3204_001.pdf |

Hi,

I have sent Wendy instructions for redeeming the preferred shares owned by Harmel. See the letter below. The following payments should be made by issuing cheques dated February 28, 2011:

- Harmel – taxable dividend $839,035 Cdn or $861,521 USD

- Harmel – capital dividend $544,000 Cdn or $558,579 USD

- Harmel – promissory note $166,522 Cdn or $170,985 USD

- DS Sidhu Trust - capital dividend $280,000 Cdn or $287,504 USD

After the above transactions, Harmel will no longer hold any shares in the company.

Please call if you have any questions.

Regards,
**Mary Ellis**
Senior Manager, Tax
Deloitte & Touche LLP
Phone 604-534-7477, Ext. 615
Fax 604-534-4220
mellis@deloitte.ca
www.deloitte.ca

**From:** Ellis, Mary (CA - Langley)
**Sent:** Monday, March 28, 2011 11:01 AM
**To:** 'Wendy Phillips'
**Subject:** Alberta Company

1

**Confidential Treatment Requested**                                      **RCHR-SEC-000011915**

Wendy,

Here are the final instructions for 1422688 Alberta Ltd. We are only redeeming shares in these 2 companies for now.

Please call if you have any questions.

Regards,

**Mary Ellis**
Senior Manager, Tax
Deloitte & Touche LLP
Phone 604-534-7477, Ext. 615
Fax 604-534-4220
mellis@deloitte.ca
www.deloitte.ca

---

Confidentiality Warning: This message and any attachments are intended only for the use of the intended recipient(s), are confidential, and may be privileged. If you are not the intended recipient, you are hereby notified that any review, retransmission, conversion to hard copy, copying, circulation or other use of this message and any attachments is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail, and delete this message and any attachments from your system.
Information confidentielle: Le présent message, ainsi que tout fichier qui y est joint, est envoyé à l'intention exclusive de son ou de ses destinataires; il est de nature confidentielle et peut constituer une information privilégiée. Nous avertissons toute personne autre que le destinataire prévu que tout examen, réacheminement, impression, copie, distribution ou autre utilisation de ce message et de tout fichier qui y est joint est strictement interdit. Si vous n'êtes pas le destinataire prévu, veuillez en aviser immédiatement l'expéditeur par retour de courriel et supprimer ce message et tout document joint de votre système. Merci.

**Confidential Treatment Requested**                                                                 **RCHR-SEC-000011916**



Deloitte & Touche LLP
20316 - 56th Avenue
Suite 225
Langley BC  V3A 3Y7
Canada

Tel: 604-534-7477
Fax: 604-534-4220
www.deloitte.ca

February 22, 2011

Wendy Phillips
Emery Jamieson
1700, 10235 - 101 Street
Edmonton AB  T5J 3G1

**Subject: 1422688 Alberta Ltd.**

Dear Wendy,

We have been advised by the shareholders of 1422688 Alberta Ltd. ("1422688") that the company intends to redeem preferred shares held by Harmel Rayat. We request your assistance in preparing the legal documentation to complete the transactions.  Our comments are based on the following facts and assumptions:

1.  The authorized and issued share capital of 1422688 is as follows:

| | |
|---|---|
| Unlimited | Class "A" Common Voting Shares |
| Unlimited | Class "B" Common Voting Shares |
| Unlimited | Class "C" Non-Voting Shares |
| Unlimited | Class "A" Preferred Non-Voting Shares , redeemable at $1,000 USD per share |
| Unlimited | The Class "B" Preferred Non-Voting Shares redeemable at $1,000 Cdn per share |

2.  The issued share capital of 1422688 is as follows:

| Shareholder | Number of Shares | Class | FMV – Cdn $ | ACB Cdn $ | PUC Cdn $ |
|---|---|---|---|---|---|
| Gurmeet Sidhu, in trust for the DS Sidhu Trust | 100 | Class "A" Common Voting Shares | $1 | $1 | $1 |
| Harmel Rayat | 1,383.035 | Class "B" Preferred Shares | $1,383,035 | $1 | $1 |

**2011 Transactions**

Redemption resulting in taxable dividend

- On February 28, 2011, 1422688 will redeem 839.035 Class "B" preference shares for an aggregate redemption value of $839,035 Cdn, or $1,000  Cdn per share. This will result in a $839,034.16 taxable deemed dividend.

Membre de / Member of Deloitte Touche Tohmatsu Limited

**Confidential Treatment Requested**

**RCHR-SEC-000011917**

**Wendy Phillips**
Emery Jamieson
February 22, 2011
Page 2

Redemption resulting in capital dividend

- On February 28, 2011, 1422688 will redeem 544 Class "B" preference shares for an aggregate redemption value of $544,000 Cdn, or $1,000 Cdn per share. This will result in a $543,999.46 deemed dividend.
- The directors want the dividend to be paid as a capital dividend

**Additional Capital Dividend**
On February 28, 2011, the directors also want to pay a $280,000 capital dividend in aggregate, or $2,800 per share, on the 100 Class "A" common shares owned by the Trust.

**Assistance required**
We request your assistance in preparing the legal documents for the share redemptions and capital dividends noted above. We will require a certified copy of the capital dividend resolutions for filing with the capital dividend elections.

Once you have had an opportunity to review the above, please do not hesitate to contact Mary Ellis at 604-539-3615 for further information.

Yours truly,

Randy Munro
Associate Partner
Deloitte & Touche LLP

c: H. Rayat

# Exhibit 2

# CONFIDENTIAL FAX MEMO

To:         Llyod Aasen

            Lando & Company LLP (604-662-8293)

Pages:      11

From:       Harmel S. Rayat

Date:       September 1, 2008

RE:         Trust Documents

Cc:         Mary Ellis (604-534-4220)


Dear Lloyd:

   1. Listed below are the various familial relationships for me:


Trust # 1: Sukhjit Kaur Chohan is the MOTHER of Jasbinder Chohan

Trust # 2: Shamsher Singh Chohan is FRIEND of David Ernest Jenkins

Trust # 3: Kundan Singh Rayat is a FRIEND of David Ernest Jenkins

Trust # 4: Kundan Singh Rayat is the FATHER-IN-LAW of Jasbinder Chohan

Jay Trust # 1: Nirmal Singh Bhogal is FATHER of Amritpal Kaur Tanda

Jay Trust # 2: Gurdyal Kaur Bhogal is FRIEND of Arian Soheili

Jeet Trust # 1: Amarjit Kaur Sidhu is MOTHER of Gurmeet Singh Sidhu

Jeet Trust # 2: Anchhattar Singh Sidhu is UNCLE of Jasvir Singh Kheleh

**Confidential Treatment Requested**                                    **RCHR-SEC-000010517**

2. The power to remove and appoint trustees for all 4 of my trusts rests with:

Mr. Tareq Abu Ghazaleh (who is the husband of Jasbinder Chohan, in case you need to know)

Also, please note that the following individuals have the power to replace trustees for both of Jay and Jeet's trusts:

For Jay -  Mr. Kesar Singh Dhaliwal (friend)

For Jeet – Manjit Kaur Sidhu (sister of Jeet Sidhu)


3. With regards to having separate S85 agreement purchase and sale agreements, unless you suggest otherwise, I don't see any reason to have separate agreements. Mary also agrees with my thoughts on this matter.

4. Description of shares is noted on the attachments.

5. I will p/u the coins in the next week or so. As you may know, I am traveling to NYC on Tuesday afternoon and will not return until the weekend.


Thank you and I look forward to our call on Tuesday morning at 9:30 am.

**Confidential Treatment Requested**

# Exhibit 3


Canada Customs and Revenue Agency    Agence des douanes et du revenu du Canada

**ELECTION ON DISPOSITION OF PROPERTY BY A TAXPAYER TO A TAXABLE CANADIAN CORPORATION**

- For use by a taxpayer and a taxable Canadian corporation to jointly elect under subsection 85(1) where the taxpayer has disposed of eligible property within the meaning of subsection 85(1.1) to the corporation and has received as consideration shares of any class in that corporation.
- File one completed copy of the election and related schedules (if any) as follows:
  - 1 – a) one copy by the transferor, or
    - b) two or more copies if two or more transferors elect regarding the transfer of the same property (co-ownership), or two or more members of the same partnership elect for the transfer of their partnership interests. In these situations, one transferor designated for the purpose should file simultaneously one copy for each transferor, together with a list of all transferors electing. This list should contain the address and Social insurance number or Business Number of each transferor;
  - 2 – on or before the earlier date on which any one of the parties to the election is required to file an income tax return for the taxation year in which the transaction occurred, taking into consideration any election under subsection 99(2) (due date);
  - 3 – at the tax centre where the transferor's income tax return is normally filed. Where two or more co-owners or members of a partnership referred to above elect, the elections will be processed in bulk and should be filed at the tax centre of the transferee; and
  - 4 – separate from any tax returns. You may put it in the same envelope with a return, but do not insert it in or attach it to the return.
- Sections and subsections referred to on this form are from the *Income Tax Act*.

| Do not use this area |
|---|

| Name of taxpayer (transferor) (print) | | | | | Social insurance number or Business Number |
|---|---|---|---|---|---|
| HARMEL S. RAYAT | | | | | |

| Address | | | | | | Postal code |
|---|---|---|---|---|---|---|
| 6826 CHURCHILL STREET | | | | | | |
| VANCOUVER, BC | | | | | | V6P 5B3 |

| Taxation year of taxpayer for the period from | Year Month Day 2007/01/01 | to | Year Month Day 2007/12/31 | Tax services office VANCOUVER |
|---|---|---|---|---|

| Name of co-owner(s), if any (if more than one, attach schedule giving similar details) (print) | | Social insurance number |
|---|---|---|

| Address | | Postal code | Tax services office |
|---|---|---|---|

| Name of corporation (transferee) (print) | Business Number |
|---|---|
| BOSTON FINANCIAL GROUP | 824586325 |

| Address | | | Postal code |
|---|---|---|---|
| 2010 – 1055 WEST GEORGIA STREET, VANCOUVER, BC | | | V6E 3P3 |

| Taxation year of corporation for the period from | Year Month Day 2007/03/14 | to | Year Month Day 2008/03/13 | Tax services office VANCOUVER |
|---|---|---|---|---|

| Name of person to contact for additional information | Area code Telephone number |
|---|---|
| DELOITTE & TOUCHE LLP (MARY ELLIS) | 604-534-7477 |

---

**Penalty for late-filed and amended elections**

An election that is filed after its due date is subject to a late-filing penalty. Form T2057 can be filed within 3 years after its due date if an estimate of the penalty is paid at the time of filing. Form T2057 can also be amended or filed after the 3-year period, but in these situations, a written explanation of the reason for why the election is amended or late-filed must be attached for consideration by the Minister and an estimate of the applicable penalty must be paid at the time of submission.

Calculation of late-filing penalty:

| | | |
|---|---|---|
| Fair market value of property transferred | 8,182,392.00 | |
| Less: agreed amount | | |
| Difference | 8,182,392.00 | A |
| Amount A 8,182,392.00   x 1/4 x 1% x N*   = | | B |
| $100 x N*   = | | C |

*N represents the sum of each month or each part of a month in the period from the due date to the actual filing date. Amount C cannot exceed $8,000.

Late-filing penalty is the lesser of B and C above

Make cheque or money order payable to the Receiver General. Specify "T2057" on the remittance and, to ensure proper credit, indicate the name and social insurance number of the taxpayer, or Business Number if a corporation.

Unpaid amounts including late-filing penalties are subject to daily compound interest, at a prescribed rate.

| Do not use this area |
|---|

| Amount enclosed | |
|---|---|

T2057 (05)

TI FILE

**Confidential Treatment Requested**      **RCHR-SEC-000010522**

Name HARMEL S. RAYAT

S.I.N. or B.N. 717512222

## Information required

On the following page, list, describe, and state the fair market value of transferred properties. The description and fair market value of the consideration received has to be shown opposite the related property transferred. Where the transferred property is a partnership interest, attach a schedule of the calculation of the adjusted cost base. If space on the form is insufficient, attach schedules giving similar details. You have to designate the order of disposition of each depreciable property. With this election you do not have to file the following materials: schedules supporting this designation, documentation relating to the responses to the questions below, and a brief summary of the method of evaluating the fair market value of each property transferred. However you have to keep them as the Canada Revenue Agency may ask to see them at a later date.

| | | yes | no |
|---|---|---|---|
| 1 – Is there a written agreement relating to this transfer? | | X yes | no |
| 2 – Does a price adjustment clause apply to any of the properties? (See the Interpretation Bulletin IT-169 for details.) | | X yes | no |
| 3 – Do any persons other than the taxpayer own or control directly or indirectly any shares of any class of the transferee? | | X yes | no |
| 4 – Does a non-arm's length rollover exist between 2 or more corporations? | | yes | X no |
| 5 – a) Have all or substantially all (90% or more) of all the properties of the corporation(s) been transferred to the transferee corporation? | | yes | no |
| Is the taxpayer a non-resident of Canada? | | yes | X no |
| 6 – Are any of the properties transferred capital properties? | | X yes | no |
| If yes, | | | |
| a) have they been owned continuously since Valuation-Day (V-Day)? | | yes | X no |
| b) have they been acquired after V-Day in a transaction considered not to be at arm's length? | | yes | X no |
| c) since V-Day, has the taxpayer or any person from whom shares were acquired in a non-arm's length transaction received any subsection 83(1) dividends for transferred shares? (If yes, provide details of amounts and dates received and attach a schedule.) | | yes | X no |
| 7 – Is the agreed amount of any of the transferred properties based on an estimate of fair market value on V-Day? | | yes | X no |
| a) If yes, does a formal documented V-Day value report exist? | | yes | no |
| 8 – Has an election under subsection 26(7) of the Income Tax Application Rules (Form T2076) been filed by or on behalf of the taxpayer? | | yes | X no |

Where shares of the capital stock of a private corporation are included in the property disposed of, provide the following:

| Name of corporation (print) | Business Number | Paid-up capital of shares transferred |
|---|---|---|
| PER ATTACHED SCHEDULE | | 216,583.0000 |

## Description of shares received

| Number of shares transferor received | Class of shares | Redemption value per share | Paid-up capital | Voting or non-voting | Are shares retractable? * |
|---|---|---|---|---|---|
| 6,959.0000 | CLASS A PREF | 1,175.8000 | 6,959.0000 | non-voting | X yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |

* Retractable means redeemable at the option of the holder.

## Informative notes

- The rules for section 85 elections are complex. Essential information is contained in Information Circular, IC76-19 and Interpretation Bulletins, IT-169, IT-291, and IT-378.
- Complete all the information areas and answer all questions. If this form is incomplete, the Canada Revenue Agency may consider the election invalid, and subsequent submissions may be subject to a late-filing penalty.
- If the agreed amount exceeds the adjusted cost base of the property in the election, you must report the difference as a capital gain, as income or a combination of both, whichever applies.

Confidential Treatment Requested

RCHR-SEC-000010523

Name HARMEL S. RAYAT

S.I.N. or B.N. 717512222

# Particulars of Eligible Property Disposed of and Consideration Received

Date of sale or transfer of all properties listed below:

Year Month Day 2007/03/15

Note: For properties sold or transferred on different dates, use separate T2057s.

| Property Disposed of | | | Amount to be reported B - A (If > 0 see Note 4) | Consideration Received | | | Fair Market Value of Total Consideration |
|---|---|---|---|---|---|---|---|
| Description | Elected Amount Limits * | | | Non-share | Share | | |
| | Fair Market Value A | Agreed Amount B | | Description | Number and Class | | |
| (Brief legal) | $ (See Note 1) | $ | $ | | | | $ |
| 1,000,000 HEPALIFE | 752,512,000 | 752,512,000 | 30,260,000 | | | 640 CLASS A PR | 752,512,000 |
| Capital Property 8,000,000 PHYTOMED | 4,421,008,000 | 160,320,000 | 160,320,000 | | | 3760 CLASS A PR | 4,421,008,000 |
| Excluding Depreciable 2,250,000 OCTILLION | 2,963,016,000 | 23,962,000 | 23,962,000 | | | 2520 CLASS A PR | 2,963,016,000 |
| Property 1,300,000 US PETROL | 45,806,000 | 2,041,000 | 2,041,000 | | | 39 CLASS A PR | 45,806,000 |

8,192,362

518 8,182,392

| Depreciable Property | (Description and prescribed Class) | (See Note 2) | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Eligible Capital Property | (Kind) | (See Note 3) | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Confidential Treatment Requested

RCHR-SEC-000010524

Name HARMEL S. RAYAT

S.I.N. or B.N. 717512222

## Particulars of Eligible Property Disposed of and Consideration Received (cont.)

Date of sale or transfer of all properties listed below:

Year Month Day 2007/03/15

Note: For properties sold or transferred on different dates, use separate T2057s.

| Property Disposed of | | | Agreed Amount B | Amount to be reported B - A (If > 0 see Note 4) | Consideration Received | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Non-share | Share | | Fair Market Value of Total Consideration |
| Description | Elected Amount Limits * | | | | Description | Number and Class | | |
| | Fair Market Value | A | | | | | | |
| (Kind) | $ | $ (Cost Amount) | $ | $ | | | | $ |
| Inventory Excluding Real Property | | | | | | | | |
| | | | | | | | | |
| (Brief legal) | | NIL | | | | | | |
| | | NIL | | | | | | |
| Resource Property | | NIL | | | | | | |
| | | NIL | | | | | | |
| | | NIL | | | | | | |
| (Description) | | (Cost Amount) | | | | | | |
| Security or Debt Obligation Property | | | | | | | | |
| | | | | | | | | |
| Specified Debt Obligation (For financial institutions only) | | | | | | | | |

Confidential Treatment Requested

RCHR-SEC-000010525

Page 4

Name HARMEL S. RAYAT

S.I.N. or B.N. 7175122222

## Particulars of Eligible Property Disposed of and Consideration Received (cont.)

Date of sale or transfer of all properties listed below:

Year Month Day 2007/03/15

Note: For properties sold or transferred on different dates, use separate T2057's.

| Property Disposed of | | | Agreed Amount B | Amount to be reported B - A (If > 0 see Note 4) | Consideration Received | | Fair Market Value of Total Consideration |
|---|---|---|---|---|---|---|---|
| Description | Elected Amount Limits * | | | | Non-share | Share | |
| | Fair Market Value A | | | | Description | Number and Class | |
| | $ | $ | $ | $ | | | $ |
| Capital Property That is Real Property Owned by a Non-Resident Person | | | | | | | |
| NISA Fund No. 2 | | | | | | | |

Note 1: Adjusted cost base (which is subject to adjustment per section 53).

Note 2: The lesser of undepreciated capital cost of all property of the class and the cost of the property.

Note 3: The lesser of 4/3 x cumulative eligible capital and the cost of the property. (New rules will apply on subsequent dispositions of eligible capital property occurring after December 20, 2002).

Note 4: This amount is to be reported either as a capital gain or as income, whichever applies. Also, in the case of depreciable property or eligible capital property, a portion of the amount may have to be reported as a capital gain while another portion may have to be reported as income.

* Refer to current Interpretation Bulletin IT-291 for more information on eligible property and an explanation of the limits.

## Election and Certification

The taxpayer and corporation hereby jointly elect under subsection 85(1) in respect of the property specified, and certify that the information given in this election, and in any documents attached, is to the best of their knowledge, correct and complete.

_____ and _____

Signature of Transferor, of Authorized Officer or Authorized Person*

Signature of Authorized Officer of Transferee

_____

Date

* Attach a copy of authorizing agreement

Confidential Treatment Requested

RCHR-SEC-000010526

Page 5

SCHEDULE I

Shares Transferred by Harmel Rayat to Boston Financial Group Ltd. 2007-03-15

| Name of Company | Business Number | Description of Shares | Paid Up Capital (Aggregate) | Fair Market Value | Adjusted Cost Base | Agreed Amount |
|---|---|---|---|---|---|---|
| Hepalife Technologies Inc. | | 1,000,000 common | 30,260.00 | 752,512.00 | 30,260.00 | 30,260.00 |
| Phytomedical Technologies, Inc. | | 8,000,000 common | 160,320.00 | 4,421,008.00 | 160,320.00 | 160,320.00 |
| Octillion Corp. | | 2,250,000 common | 23,962.50 | 2,963,016.00 | 23,962.50 | 23,962.50 |
| US Petroleum Corporation | | 1,300,000 common | 2,041.00 | 45,856.20 | 2,041.00 | 2,041.00 |
| | | | 216,583.50 | 8,182,392.20 | 216,583.50 | 216,583.50 |

Confidential Treatment Requested

RCHR-SEC-000010527

# Exhibit 4

 Canada Customs and Revenue Agency    Agence des douanes et du revenu du Canada

## ELECTION ON DISPOSITION OF PROPERTY BY A TAXPAYER TO A TAXABLE CANADIAN CORPORATION

+ For use by a taxpayer and a taxable Canadian corporation to jointly elect under subsection 85(1) where the taxpayer has disposed of eligible property within the meaning of subsection 85(1.1) to the corporation and has received as consideration shares of any class in that corporation.

+ File one completed copy of the election and related schedules (if any) as follows:
  1 – a) one copy by the transferor, or
     b) two or more copies if two or more transferors elect regarding the transfer of the same property (co-ownership), or two or more members of the same partnership elect for the transfer of their partnership interests. In these situations, one transferor designated for the purpose should file simultaneously one copy for each transferor, together with a list of all transferors electing. This list should contain the address and Social insurance number or Business Number of each transferor;
  2 – on or before the **earlier date** on which any one of the parties to the election is required to file an income tax return for the taxation year in which the transaction occurred, taking into consideration any election under subsection 99(2) (due date);
  3 – at the tax centre where the transferor's income tax return is normally filed. Where two or more co-owners or members of a partnership referred to above elect, the elections will be processed in bulk and should be filed at the tax centre of the transferee; and
  4 – separate from any tax returns. You may put it in the same envelope with a return, but do not insert it in or attach it to the return.

* Sections and subsections referred to on this form are from the *Income Tax Act*.

| Do not use this area |
|---|

| Name of taxpayer (transferor) (print) | | | | Social insurance number or Business Number |
|---|---|---|---|---|
| HARMEL S. RAYAT | | | | ▮ |

| Address | | | | | Postal code |
|---|---|---|---|---|---|
| 6826 CHURCHILL STREET | | | | | |
| VANCOUVER, BC | | | | | V6P 5B3 |

| Taxation year of taxpayer for the period from | Year Month Day 2007/01/01 | to | Year Month Day 2007/12/31 | Tax services office VANCOUVER |
|---|---|---|---|---|

| Name of co-owner(s), if any (if more than one, attach schedule giving similar details) (print) | | Social insurance number |
|---|---|---|
| | | |

| Address | Postal code | Tax services office |
|---|---|---|
| | | |

| Name of corporation (transferee) (print) | | | | Business Number |
|---|---|---|---|---|
| FARGO WEST INVESTMENTS LTD. | | | | 826633562 |

| Address | | | | | Postal code |
|---|---|---|---|---|---|
| 2010 – 1055 WEST GEORGIA STREET, VANCOUVER, BC | | | | | V6E 3P3 |

| Taxation year of corporation for the period from | Year Month Day 2007/03/14 | to | Year Month Day 2008/03/13 | Tax services office VANCOUVER |
|---|---|---|---|---|

| Name of person to contact for additional information | Area code Telephone number |
|---|---|
| DELOITTE & TOUCHE LLP (MARY ELLIS) | 604-534-7477 |

### Penalty for late-filed and amended elections

An election that is filed after its due date is subject to a late-filing penalty. Form T2057 can be filed within 3 years after its due date if an estimate of the penalty is paid at the time of filing. Form T2057 can also be amended or filed after the 3-year period, but in these situations, a written explanation of the reason for why the election is amended or late-filed must be attached for consideration by the Minister and an estimate of the applicable penalty must be paid at the time of submission.

Calculation of late-filing penalty:

| | | |
|---|---|---|
| Fair market value of property transferred | 4,375,152.00 | |
| Less: agreed amount | | |
| Difference | 4,375,152.00 | A |
| Amount A 4,375,152.00 x 1/4 x 1% x N* = | | B |
| $100 x N* = | | C |

*N represents the sum of each month or each part of a month in the period from the due date to the actual filing date. Amount C cannot exceed $8,000.

Late-filing penalty is the lesser of B and C above

Make cheque or money order payable to the Receiver General. Specify "T2057" on the remittance and, to ensure proper credit, indicate the name and social insurance number of the taxpayer, or Business Number if a corporation.

| Do not use this area |
|---|

Amount enclosed _____

Unpaid amounts including late-filing penalties are subject to daily compound interest, at a prescribed rate.

T2057 (05)      Page 1 of 5      Canada

T1 FILE

Confidential Treatment Requested      RCHR-SEC-000010533

Name HARMEL S. RAYAT                                                S.I.N. or B.N. 717512222

## Information required

On the following page, list, describe, and state the fair market value of transferred properties. The description and fair market value of the consideration received has to be shown opposite the related property transferred. Where the transferred property is a partnership interest, attach a schedule of the calculation of the adjusted cost base. If space on the form is insufficient, attach schedules giving similar details. You have to designate the order of disposition of each depreciable property. With this election you do not have to file the following materials: schedules supporting this designation, documentation relating to the responses to the questions below, and a brief summary of the method of evaluating the fair market value of each property transferred. However you have to keep them as the Canada Revenue Agency may ask to see them at a later date.

| | | | |
|---|---|---|---|
| 1 – Is there a written agreement relating to this transfer? | | X yes | no |
| 2 – Does a price adjustment clause apply to any of the properties? (See the Interpretation Bulletin IT-169 for details.) | | X yes | no |
| 3 – Do any persons other than the taxpayer own or control directly or indirectly any shares of any class of the transferree? | | X yes | no |
| 4 – Does a non-arm's length rollover exist between 2 or more corporations? | | yes | X no |
| a) Have all or substantially all (90% or more) of all the properties of the corporation(s) been transferred to the transferee corporation? | | yes | no |
| 5 – Is the taxpayer a non-resident of Canada? | | yes | X no |
| 6 – Are any of the properties transferred capital properties? | | X yes | no |
| If yes, | | | |
| a) have they been owned continuously since Valuation-Day (V-Day)? | | yes | X no |
| b) have they been acquired after V-Day in a transaction considered not to be at arm's length? | | yes | X no |
| c) since V-Day, has the taxpayer or any person from whom shares were acquired in a non-arm's length transaction received any subsection 83(1) dividends for transferred shares? (If yes, provide details of amounts and dates received and attach a schedule.) | | yes | X no |
| 7 – Is the agreed amount of any of the transferred properties based on an estimate of fair market value on V-Day? | | yes | X no |
| a) If yes, does a formal documented V-Day value report exist? | | yes | no |
| 8 – Has an election under subsection 26(7) of the Income Tax Application Rules (Form T2076) been filed by or on behalf of the taxpayer? | | yes | X no |

Where shares of the capital stock of a private corporation are included in the property disposed of, provide the following:

| Name of corporation (print) | Business Number | Paid-up capital of shares transferred |
|---|---|---|
| PER ATTACHED SCHEDULE | | 125,412.0000 |

## Description of shares received

| Number of shares transferor received | Class of shares | Redemption value per share | Paid-up capital | Voting or non-voting | Are shares retractable? * |
|---|---|---|---|---|---|
| 3,721.0000 | CLASS A PREF | 1,175.8000 | 3,721.0000 | non-voting | X yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |
| | | | | | yes / no |

* Retractable means redeemable at the option of the holder.

## Informative notes

- The rules for section 85 elections are complex. Essential information is contained in Information Circular, IC76-19 and Interpretation Bulletins, IT-169, IT-291, and IT-378.
- Complete all the information areas and answer all questions. If this form is incomplete, the Canada Revenue Agency may consider the election invalid, and subsequent submissions may be subject to a late-filing penalty.
- If the agreed amount exceeds the adjusted cost base of the property in the election, you must report the difference as a capital gain, as income or a combination of both, whichever applies.

Confidential Treatment Requested

RCHR-SEC-000010534

**Name** HARMEL S. RAYAT    **S.I.N. or B.N.** 717512222

## Particulars of Eligible Property Disposed of and Consideration Received

Date of sale or transfer of all properties listed below.    Year Month Day 2007/03/15

Note: For properties sold or transferred on different dates, use separate T2057s.

| Property Disposed of | | Elected Amount Limits * | | Agreed Amount B | Amount to be reported B – A (If > 0 see Note 4) | Consideration Received | | | Fair Market Value of Total Consideration |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Non-share | Share | | |
| Description | Fair Market Value | A | (See Note 1) | | | Description | Number and Class | | |
| (Brief legal) | $ | $ | (See Note 1) | $ | $ | | | | $ |
| 1,250.000 HEPALIFE | 940,640.000 | 37,825.000 | | 37,825.000 | | | 800 CLASS A PR | | 940,640.000 |
| Capital Property 3,800.000 PHYTOMED | 2,099,979.000 | 76,152.000 | | 76,152.000 | | | 1786 CLASS A PR | | 2,099,978.000 |
| Excluding Depreciable Property 1,000.000 OCTILLION | 1,316,896.000 | 10,650.000 | | 10,650.000 | | | 1120 CLASS A PR | | 1,316,896.000 |
| 500,000 US PETROL. | 17,637.000 | 785.000 | | 785.000 | | | 15 CLASS A PR | | 17,637.000 |
| | | | | | | | 3721 s6 | | |
| | | | | | | | (17867) | | |
| (Description and prescribed Class) | | (See Note 2) | | | | | 1935 | | |
| Depreciable Property | | | | | E others | town1-Dec 97 Oretived | 1062-5 795.6 | | |
| (Kind) | | (See Note 3) | | | | | | | |
| | | | | | | | 3721 | | |
| Eligible Capital Property | | | | | | | 1062.5 | | |
| | | | | | | | 47835 | | |

Name HARMEL S. RAYAT

S.I.N. or B.N. 717512222

## Particulars of Eligible Property Disposed of and Consideration Received (cont.)

Date of sale or transfer of all properties listed below:

Year Month Day 2007/03/15

Note: For properties sold or transferred on different dates, use separate T2057s.

| Property Disposed of | | Elected Amount Limits * | | Agreed Amount B | Amount to be reported B - A (If > 0 see Note 4) | Consideration Received | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Non-share | Share | | Fair Market Value of Total Consideration |
| Description | | Fair Market Value | A | | | Description | Number and Class | | |
| (Kind) | | $ | $ (Cost Amount) | $ | $ | | | | $ |
| Inventory Excluding Real Property | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Resource Property | (Brief legal) | | NIL | | | | | | |
| | | | NIL | | | | | | |
| | | | NIL | | | | | | |
| | | | NIL | | | | | | |
| | | | NIL | | | | | | |
| Security or Debt Obligation Property | (Description) | | (Cost Amount) | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Specified Debt Obligation (For financial institutions only) | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Confidential Treatment Requested                    RCHR-SEC-000010536

Name HARMEL S. RAYAT

S.I.N. or B.N. 717512222

## Particulars of Eligible Property Disposed of and Consideration Received (cont.)

Date of sale or transfer of all properties listed below:

Year Month Day
2007/03/15

Note: For properties sold or transferred on different dates, use separate T2057s.

| Property Disposed of | | Elected Amount Limits * | | Agreed Amount B | Amount to be reported B - A (If > 0 see Note 4) | Consideration Received | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Non-share | Share | | Fair Market Value of Total Consideration |
| Description | | Fair Market Value A | | | | Description | Number and Class | | |
| | $ | | $ | $ | $ | | | | $ |
| Capital Property That is Real Property Owned by a Non-Resident Person | | | | | | | | | |
| NISA Fund No. 2 | | | | | | | | | |

Note 1: Adjusted cost base (which is subject to adjustment per section 53).

Note 2: The lesser of undepreciated capital cost of all property of the class and the cost of the property.

Note 3: The lesser of 4/3 x cumulative eligible capital and the cost of the property. (New rules will apply on subsequent dispositions of eligible capital property occurring after December 20, 2002)

Note 4: This amount is to be reported either as a capital gain or as income, whichever applies. Also, in the case of depreciable property or eligible capital property, a portion of the amount may have to be reported as a capital gain while another portion may have to be reported as income.

* Refer to current Interpretation Bulletin IT-291 for more information on eligible property and an explanation of the limits.

## Election and Certification

The taxpayer **and** corporation hereby jointly elect under subsection 85(1) in respect of the property specified, and certify that the information given in this election, and in any documents attached, is to the best of their knowledge, correct and complete.

_____   and   _____

Signature of Transferor, of **Authorized Officer or Authorized Person** *                Signature of **Authorized Officer of** Transferee

_____
Date

* Attach a copy of authorizing agreement

RCHR-SEC-000010537

**SCHEDULE I**

**Shares Transferred by Harmel Rayat to Fargo West Investments Ltd. 2007-03-15**

| Name of Company | Business Number | Description of Shares | Paid Up Capital (Aggregate) | Fair Market Value | Adjusted Cost Base | Agreed Amount |
|---|---|---|---|---|---|---|
| Hepalife Technologies Inc. | | 1,250,000 common | 37,825.00 | 940,640.00 | 37,825.00 | 37,825.00 |
| Phytomedical Technologies, Inc. | | 3,800,000 common | 76,152.00 | 2,099,979.00 | 76,152.00 | 76,152.00 |
| Octillion Corp. | | 1,000,000 common | 10,650.00 | 1,316,896.00 | 10,650.00 | 10,650.00 |
| US Petroleum Corporation | | 500,000 common | 785.00 | 17,637.00 | 785.00 | 785.00 |
| | | | 125,412.00 | 4,375,152.00 | 125,412.00 | 125,412.00 |

**Confidential Treatment Requested**

**RCHR-SEC-000010538**

# Exhibit 5

| Canada Customs and Revenue Agency | Agence des douanes et du revenu du Canada | **ELECTION ON DISPOSITION OF PROPERTY BY A TAXPAYER TO A TAXABLE CANADIAN CORPORATION** |
|---|---|---|

- For use by a taxpayer and a taxable Canadian corporation to jointly elect under subsection 85(1) where the taxpayer has disposed of eligible property within the meaning of subsection 85(1.1) to the corporation and has received as consideration shares of any class in that corporation.
- File one completed copy of the election and related schedules (if any) as follows:
  - 1 – a) one copy by the transferor, or
    - b) two or more copies if two or more transferors elect regarding the transfer of the same property (co-ownership), or two or more members of the same partnership elect for the transfer of their partnership interests. In these situations, one transferor designated for the purpose should file simultaneously one copy for each transferor, together with a list of all transferors electing. This list should contain the address and Social insurance number or Business Number of each transferor;
  - 2 – on or before the **earlier date** on which any one of the parties to the election is required to file an income tax return for the taxation year in which the transaction occurred, taking into consideration any election under subsection 99(2) (due date);
  - 3 – at the tax centre where the transferor's income tax return is normally filed. Where two or more co-owners or members of a partnership referred to above elect, the elections will be processed in bulk and should be filed at the tax centre of the transferee; and
  - 4 – separate from any tax returns. You may put it in the same envelope with a return, but do not insert it in or attach it to the return.
- Sections and subsections referred to on this form are from the *Income Tax Act*.

| Do not use this area |
|---|
| File |

| Name of taxpayer (transferor) (print) | Social insurance number or Business Number |
|---|---|
| HARMEL S. RAYAT | |

| Address | | | Postal code |
|---|---|---|---|
| #216 - 1628 WEST 1ST AVENUE | | | |
| VANCOUVER, BC | | | V6J1G1 |

| Taxation year of taxpayer for the period from | Year Month Day 2008/01/01 | to | Year Month Day 2008/12/31 | Tax services office VANCOUVER |
|---|---|---|---|---|

| Name of co-owner(s), if any (if more than one, attach schedule giving similar details) (print) | Social insurance number |
|---|---|
| | |

| Address | Postal code | Tax services office |
|---|---|---|
| | | |

| Name of corporation (transferee) (print) | Business Number |
|---|---|
| 1420527 ALBERTA LTD | New |

| Address | Postal code |
|---|---|
| 1700 OXFORD TOWER, 10235 101 STREET EDMONTON, ALBERTA | T5J 3G1 |

| Taxation year of corporation for the period from | Year Month Day 2008/08/19 | to | Year Month Day 2008/12/31 | Tax services office |
|---|---|---|---|---|

| Name of person to contact for additional information | Area code Telephone number |
|---|---|
| DELOITTE & TOUCHE LLP (MARY ELLIS) | 604-534-7477 |

---

### Penalty for late-filed and amended elections

An election that is filed after its due date is subject to a late-filing penalty. Form T2057 can be filed within 3 years after its due date if an estimate of the penalty is paid at the time of filing. Form T2057 can also be amended or filed after the 3-year period, but in these situations, a written explanation of the reason for why the election is amended or late-filed must be attached for consideration by the Minister and an estimate of the applicable penalty must be paid at the time of submission.

| Do not use this area |
|---|

Calculation of late-filing penalty:

| | | |
|---|---|---|
| Fair market value of property transferred ..................... | 8,891,309.70 | |
| Less: agreed amount ....................................... | 8,891,309.70 | A |
| Difference ................................................ | | B |
| Amount A 8,891,309.70 x 1/4 x 1% x N* .......... = | | |
| $100 x N* ................................................ | = | C |

*N represents the sum of each month or each part of a month in the period from the due date to the actual filing date. Amount C cannot exceed $8,000.

Late-filing penalty is the lesser of B and C above .......................

Make cheque or money order payable to the Receiver General. Specify "T2057" on the remittance and, to ensure proper credit, indicate the name and social insurance number of the taxpayer, or Business Number if a corporation.

**Amount enclosed** ...............

Unpaid amounts including late-filing penalties are subject to daily compound interest, at a prescribed rate.

Page 1 of 5

T2057 (05)

Canada

**RCHR-SEC-000010549**

| Name HARMEL S. RAYAT | S.I.N. or B.N. 717512222 |
|---|---|

## Information required

On the following page, list, describe, and state the fair market value of transferred properties. The description and fair market value of the consideration received has to be shown opposite the related property transferred. Where the transferred property is a partnership interest, attach a schedule of the calculation of the adjusted cost base. If space on the form is insufficient, attach schedules giving similar details. You have to designate the order of disposition of each depreciable property. With this election you do not have to file the following materials: schedules supporting this designation, documentation relating to the responses to the questions below, and a brief summary of the method of evaluating the fair market value of each property transferred. However you have to keep them as the Canada Revenue Agency may ask to see them at a later date.

| | | |
|---|---|---|
| 1 – Is there a written agreement relating to this transfer? | [X] yes | [ ] no |
| 2 – Does a price adjustment clause apply to any of the properties? (See the Interpretation Bulletin IT-169 for details.) | [X] yes | [ ] no |
| 3 – Do any persons other than the taxpayer own or control directly or indirectly any shares of any class of the transferree? | [X] yes | [ ] no |
| 4 – Does a non-arm's length rollover exist between 2 or more corporations? | [ ] yes | [X] no |
| a) Have all or substantially all (90% or more) of all the properties of the corporation(s) been transferred to the transferee corporation? | [ ] yes | [ ] no |
| 5 – Is the taxpayer a non-resident of Canada? | [ ] yes | [X] no |
| 6 – Are any of the properties transferred capital properties? | [X] yes | [ ] no |
| If yes, | | |
| a) have they been owned continuously since Valuation-Day (V-Day)? | [ ] yes | [X] no |
| b) have they been acquired after V-Day in a transaction considered not to be at arm's length? | [ ] yes | [X] no |
| c) since V-Day, has the taxpayer or any person from whom shares were acquired in a non-arm's length transaction received any subsection 83(1) dividends for transferred shares? (If yes, provide details of amounts and dates received and attach a schedule.) | [ ] yes | [X] no |
| 7 – Is the agreed amount of any of the transferred properties based on an estimate of fair market value on V-Day? | [ ] yes | [X] no |
| a) If yes, does a formal documented V-Day value report exist? | [ ] yes | [ ] no |
| 8 – Has an election under subsection 26(7) of the Income Tax Application Rules (Form T2076) been filed by or on behalf of the taxpayer? | [ ] yes | [X] no |

Where shares of the capital stock of a private corporation are included in the property disposed of, provide the following:

| Name of corporation (print) | Business Number | Paid-up capital of shares transferred |
|---|---|---|
| PER ATTACHED SCHEDULE | | 373,520.0000 |

## Description of shares received

| Number of shares transferor received | Class of shares | Redemption value per share | Paid-up capital | Voting or non-voting | Are shares retractable? * |
|---|---|---|---|---|---|
| 8,351.0000 | CLASS A PREF | 1,064.7000 | 8,891.3100 | non-voting | [X] yes [ ] no |
| | | | | | [ ] yes [ ] no |
| | | | | | [ ] yes [ ] no |
| | | | | | [ ] yes [ ] no |
| | | | | | [ ] yes [ ] no |
| | | | | | [ ] yes [ ] no |
| | | | | | [ ] yes [ ] no |
| | | | | | [ ] yes [ ] no |

* Retractable means redeemable at the option of the holder.

## Informative notes

- The rules for section 85 elections are complex. Essential information is contained in Information Circular, IC76-19 and Interpretation Bulletins, IT-169, IT-291, and IT-378.
- Complete all the information areas and answer all questions. If this form is incomplete, the Canada Revenue Agency may consider the election invalid, and subsequent submissions may be subject to a late-filing penalty.
- If the agreed amount exceeds the adjusted cost base of the property in the election, you must report the difference as a capital gain, as income or a combination of both, whichever applies.

**Confidential Treatment Requested**

**RCHR-SEC-000010550**

Name HARMEL S. RAYAT

S.I.N. or B.N. 7175122222

# Particulars of Eligible Property Disposed of and Consideration Received

Date of sale or transfer of all properties listed below:  Year Month Day 2008/09/08

Note: For properties sold or transferred on different dates, use separate T2057s.

| Property Disposed of | | | | | Consideration Received | | |
|---|---|---|---|---|---|---|---|
| | | Elected Amount Limits * | | Agreed Amount B | Non-share | Share | Fair Market Value of Total Consideration |
| Description (Brief legal) | Fair Market Value | A (See Note 1) | Amount to be reported B − A (if > 0 see Note 4) | | Description | Number and Class | |
| | $ | $ | $ | $ | | | $ |
| 3,000,000 HEPALIFE | 1,022,112.000 | 90,780.000 | | 90,780.000 | | 960 PREF | 1,022,112.000 |
| Capital Property Excluding Depreciable Property 9,000,000 PHYTOMEDIC | 776,166.300 | 180,360.000 | | 180,360.000 | | 729 PREF | 776,166.300 |
| 3,600,000 OCTILLION | 2,504,174.400 | 29,280.000 | | 29,280.000 | | 2,352 PREF | 2,504,174.400 |
| 3,000,000 ENTHEOS | 2,395,575.000 | 12,660.000 | | 12,660.000 | | 2,250 PREF | 2,395,575.000 |
| 2,000,000 INT'L ENER | 2,193,282.000 | 59,900.000 | | 59,900.000 | | 2,060 PREF | 2,193,282.000 |
| Depreciable Property (Description and prescribed Class) | | (See Note 2) | | | | | |
| Eligible Capital Property (Kind) | | (See Note 3) | | | | | |

Confidential Treatment Requested

RCHR-SEC-000010551

Page 4

S.I.N. or B.N. 717512222

Name HARMEL S. RAYAT

## Particulars of Eligible Property Disposed of and Consideration Received (cont.)

Date of sale or transfer of all properties listed below:

Year Month Day 2008/09/08

Note: For properties sold or transferred on different dates, use separate T2057's.

| Property Disposed of | | | | | Consideration Received | | | |
|---|---|---|---|---|---|---|---|---|
| Description | Elected Amount Limits * | | Agreed Amount B | Amount to be reported B – A (if > 0 see Note 4) | Non-share | | Share | Fair Market Value of Total Consideration |
| | Fair Market Value | A (Cost Amount) | | | Description | | Number and Class | |
| (Kind) $ | $ | $ (Cost Amount) | $ | $ | | | $ | $ |
| Inventory Excluding Real Property | | | | | | | | |
| (Brief legal) | | NIL | | | | | | |
| | | NIL | | | | | | |
| Resource Property | | NIL | | | | | | |
| | | NIL | | | | | | |
| | | NIL | | | | | | |
| (Description) | | (Cost Amount) | | | | | | |
| Security or Debt Obligation Property | | | | | | | | |
| Specified Debt Obligation (For financial institutions only) | | | | | | | | |

**Confidential Treatment Requested**

RCHR-SEC-000010552

Name HARMEL S. RAYAT

S.I.N. or B.N. 71512222

## Particulars of Eligible Property Disposed of and Consideration Received (cont.)

Date of sale or transfer of all properties listed below:

Year Month Day 2008/09/08

Note: For properties sold or transferred on different dates, use separate T2057's.

| Property Disposed of | | Elected Amount Limits * | Agreed Amount B | Amount to be reported B - A (If > 0 see Note 4) | Consideration Received | | | Fair Market Value of Total Consideration |
|---|---|---|---|---|---|---|---|---|
| Description | | Fair Market Value A | | | Non-share | | Share | |
| | | | | | Description | | Number and Class | |
| | $ | $ | $ | $ | | | | $ |
| Capital Property That is Real | | | | | | | | |
| Property Owned by a Non-Resident Person | | | | | | | | |
| NISA Fund No. 2 | | | | | | | | |

Note 1: Adjusted cost base (which is subject to adjustment per section 53)

Note 2: The lesser of undepreciated capital cost of all property of the class and the cost of the property.

Note 3: The lesser of 4/3 x cumulative eligible capital and the cost of the property. (New rules will apply on subsequent dispositions of eligible capital property occurring after December 20, 2002).

Note 4: This amount is to be reported either as a capital gain or as income, whichever applies. Also, in the case of depreciable property or eligible capital property, a portion of the amount may have to be reported as a capital gain while another portion may have to be reported as income.

* Refer to current Interpretation Bulletin IT-291 for more information on eligible property and an explanation of the limits.

## Election and Certification

The taxpayer and corporation hereby jointly elect under subsection 85(1) in respect of the property specified, and certify that the information given in this election, and in any documents attached, is to the best of their knowledge, correct and complete.

Signature of Transferor, of **Authorized Officer or Authorized Person***

and

Signature of **Authorized Officer of Transferee**

2009/03/11

Date

* Attach a copy of authorizing agreement

**Confidential Treatment Requested**

RCHR-SEC-000010553

Name: HARMEL S. RAYAT

S.I.N. or B.N. 717 52 2222

## Particulars of Eligible Property Disposed of and Consideration Received (cont.)

Date of sale or transfer of all properties listed below:

Year Month Day  2008/09/08

Note: For properties sold or transferred on different dates, use separate T2057s.

| Property Disposed of | | Elected Amount Limits * | | Agreed Amount B | Amount to be reported B − A (if B > D see Note 4) | Consideration Received | | | | Fair Market Value of Total Consideration |
|---|---|---|---|---|---|---|---|---|---|---|
| Description | | Fair Market Value A | | | | Non-share | | Share | | |
| | | | | | | Description | | Number and Class | | |
| | $ | $ | | $ | $ | | | | | $ |
| Capital Property That is Real Property Owned by a Non-Resident Person | | | | | | | | | | |
| | | | | | | | | | | |
| NISA Fund No. 2 | | | | | | | | | | |

Note 1: Adjusted cost base (which is subject to adjustment per section 53).

Note 2: The lesser of undepreciated capital cost of all property of the class and the cost of the property.

Note 3: The lesser of 4/3 x cumulative eligible capital and the cost of the property. (New rules will apply on subsequent dispositions of eligible capital property occurring after December 20, 2002).

Note 4: This amount is to be reported either as a capital gain or as income, whichever applies. Also, in the case of depreciable property or eligible capital property, a portion of the amount may have to be reported as a capital gain while another portion may have to be reported as income.

* Refer to current Interpretation Bulletin IT-291 for more information on eligible property and an explanation of the limits.

## Election and Certification

The taxpayer and corporation hereby jointly elect under subsection 85(1) in respect of the property specified, and certify that the information given in this election, and in any documents attached, is to the best of their knowledge correct and complete.

_____    and    _____    2009/03/11
Signature of Transferor, of Authorized Officer or Authorized Person*    Signature of Authorized Officer of Transferee    Date

* Attach a copy of authorizing agreement

Confidential Treatment Requested    RCHR-SEC-000010554

# Exhibit 6

Deloitte & Touche LLP
20316 - 56th Avenue
Suite 225
Langley BC  V3A 3Y7
Canada

Tel: 604-534-7477
Fax: 604-534-4220
www.deloitte.ca

February 21, 2011

Lloyd H. Aasen
Barrister & Solicitor
Lando & Company LLP
P.O. Box 11140
2010-1055 West Georgia Street
Vancouver BC  V6E 3P3

**Subject: Boston Financial Group Ltd. (revised)**

Dear Lloyd,

We have been engaged by the shareholders of Boston Financial Group Ltd. "Boston" to assist in a corporate reorganization of the company. The planning for the reorganization began in July 2010. We request your assistance in preparing the legal documentation to complete the transactions.  Our comments are based on the following facts and assumptions:

1. The Legacy Family Trust was settled on August 28, 2008.
2. The income beneficiaries of the Legacy Family Trust are Mehtab Bhogal and Ranjit Bhogal.
3. The capital beneficiaries of the Legacy Family Trust are Mehtab Bhogal and Ranjit Bhogal.
4. The authorized and issued share capital of Boston is as follows:

| | |
|---|---|
| 1,000,000 | Class "A" Common Voting Shares |
| 1,000,000 | Class "B" Common Voting Shares |
| 1,000,000 | Class "C" Non-Voting Shares |
| 5,000,000 | Class "A" Preference Non-Voting Shares , redeemable at $1,000 USD per share |
| 20,000,000 | The Class "B" Preferred Non-Voting Shares, redemption value to be set by the directors at the time of issuance |
| 1,000,000 | Series 1 Shares |

5. The issued share capital of Boston is as follows:

| Shareholder | Number of Shares | Class | FMV – Cdn $ | ACB Cdn $ | PUC Cdn $ |
|---|---|---|---|---|---|
| Arian Soheili, in trust for the Legacy Family Trust | 100 | Class "A" Common Voting Shares | $1 | $1 | $1 |
| Harmel Rayat | 9,084 | Class "A" preference shares | $2,173,526 | $227,133 | $9,084 |
| Ranjit Bhogal | 1,856.43 | Class "A" preference shares | $444,234 | $85,371 | $1,856 |

**RCHR-SEC-000002953**

Lloyd H. Aasen
Lando & Company LLP
February 21, 2011
Page 2

6. As at July 8, 2010 the aggregate FMV of Boston's investments $2,507,430 USD or $2,617,760 Cdn.
7. The Class "A" preference shares have an aggregate redemption value of $10,940,430 USD ($9,084,000 and $1,856,430).

As Harmel and Ranjit intended for the future value of Boston to accrue to the benefit of the Legacy Family Trust, we recommended the following steps:

Re-freeze Boston
- On July 8, 2010, Harmel exchanged his 9,084 Class "A" preference shares for 2,173.526 Class "B" preferred shares with an aggregate redemption value equal to $2,173,526 Cdn or $1,000 Cdn per share, the estimated FMV of the common shares.
- On July 8, 2010, Ranjit exchanged her 1,856.43 Class "A" preference shares for 444.234 Class "B" preferred shares with an aggregate redemption value equal to $444,234 Cdn or $1,000 Cdn per share, the estimated FMV of the common shares.
- To ensure the freeze is valid, the preferred shares should be retractable at the option of the holder and redeemable at the option of Boston.
- The preferred shares should be entitled to a discretionary, non-cumulative dividend rate, to be set by the directors at a rate that does not exceed the prescribed rate of interest at the time of issuance; 1%.
- The dividend entitlement, and redemption entitlement on the new preferred shares should not have priority over the existing preferred shares.
- The exchange will be accomplished on a tax deferred basis pursuant to subsection 51(1) of the Income Tax Act.

**Assistance required**
We request your assistance in preparing the legal documents for the following:

- Re-freeze and corporate reorganization of Boston as outlined above

Please forward draft copies of the legal documents prior to executing the documents.

Once you have had an opportunity to review the above, please do not hesitate to contact Mary Ellis at 604-539-3615 for further information.

Yours truly,


Randy Munro
Associate Partner
Deloitte & Touche LLP

c: H. Rayat

**Confidential Treatment Requested**