```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                                                     :
SECURITIES AND EXCHANGE COMMISSION,                                  :
                                                                     :
                            Plaintiff,                               :
                                                                     :         21-cv-4777 (LJL)
            -v-                                                      :
                                                                     :         OPINION AND ORDER
HARMEL S. RAYAT ET AL.,                                              :
                                                                     :
                            Defendants.                              :
                                                                     :
---------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/10/2023

LEWIS J. LIMAN, United States District Judge:

The United States Securities and Exchange Commission ("SEC") moves, pursuant to Federal Rules of Civil Procedure 26 and 37, to compel production of documents it claims have been improperly withheld by Defendants[1] Harmel Rayat ("Rayat") and RenovaCare, Inc. ("RenovaCare") on the grounds of attorney-client privilege. Dkt. No. 209. Defendants oppose the motion. Dkt. No. 210. The motion is granted in part.[2]

## BACKGROUND

Familiarity with the prior proceedings and allegations of this case is presumed. In brief, the operative complaint alleges that the Case Defendants engaged in a scheme to defraud in

---

[1] The "Defendants," solely for the purpose of this Opinion and Order, are defined as Harmel S. Rayat and Renovacare, Inc. The "Case Defendants" are defined separately as Harmel S. Rayat, Renovacare, Inc., Jatinder Bhogal, Jeetenderjit Singh Sidhu, and Sharon Fleming. The "Relief Defendants" include Treadstone Financial Group LTD, Treadstone Financial Group LLC, Blackbriar Asset Management LTD., and 1420527 Alberta LTD. Dkt. No. 118 at ECF p. 1.

[2] This Opinion and Order only addresses Defendants' argument that RenovaCare may assert privilege over communications with Bhogal because he is the functional equivalent of an employee of RenovaCare. Dkt. No. 210 at 2. The Court has requested additional briefing and evidence as to Defendants' assertion of privilege based on the "common interest" doctrine over communications between Renovacare's counsel with agents of Kalen Capital Corporation, Rayat and Sidhu, and Defendants' asserted distinction between Joseph Sierchio's legal role as outside counsel and his business role as a RenovaCare director. *See* Dkt. No. 211.

violation of the Securities Act of 1933 and the Securities Exchange Act of 1934 by secretly disseminating false and misleading information about RenovaCare and its experimental medical device for treating burn wounds, "SkinGun," through an online financial publishing company, StreetAuthority, LLC, which was owned and operated by a long-time friend of Defendant Rayat. *See generally* Dkt. No. 118.  The SEC alleges a classic "pump-and-dump" scheme.  The Case Defendants allegedly pumped the price of RenovaCare stock through the promotions and then, after the price of the stock had been artificially inflated, dumped the securities onto unsuspecting members of the public.  *Id*.  The Case Defendants include Rayat, a Canadian national who was at one time the majority and controlling shareholder of RenovaCare and served as Chairman of its Board of Directors, *id*. ¶ 25, Jatinder Bhogal, who is alleged to be a "strategic advisor" to RenovaCare, *id*. ¶ 26, and Jeetenderjit Singh Sidhu, who is alleged to have been a member of the board of directors of RenovaCare's predecessor entity, *id*. ¶ 27.  The complaint alleges that while the scheme was ongoing, Case Defendants took step to conceal their role in it, including by making false statements in response to an inquiry from OTC Markets Group, Inc., the entity that supervised the exchange on which RenovaCare stock was listed.  *Id*. ¶¶ 137–66.

## DISCUSSION

The SEC claims that RenovaCare and Rayat have been improperly withholding documents between RenovaCare's outside counsel, primarily Joseph Sierchio, and persons who were not RenovaCare employees at the time, including Defendant Bhogal, who was a consultant to RenovaCare at the time of the communications.  Dkt. No. 209 at 1–2.  The SEC argues that the inclusion of Bhogal on the communications with Sierchio deprives those communications of the confidentiality necessary for the assertion of the attorney-client privilege.  *Id*. at 2.  The SEC further claims that the descriptions of the communications in Defendants' privilege log are broad and generic.  *Id*.  It moves to compel production of these documents, or in the alternative, for a

Court order that Defendants produce a declaration or other sworn evidence with sufficient detail to allow the SEC and the Court to assess the assertion of privilege. *Id.* at 1, 3. In response, Defendants argue that the assertion of the privilege is proper because Bhogal was the "functional equivalent" of an employee of RenovaCare, who could be copied on communications with RenovaCare's counsel, and who could communicate with that counsel in connection with legal matters for RenovaCare without waiving the privilege. Dkt. No. 210 at 2–3. In support of that contention, Defendants cite and submit excerpts from Bhogal's investigative testimony, testimony from Thomas Bold, who served as RenovaCare's chief executive officer ("CEO") from December 2013 to March 2019, and a declaration from Sierchio, among other materials. *Id.* For the following reasons, the Court concludes that Defendants have not adequately shown grounds for assertion of the attorney-client privilege and orders production of the withheld documents which were shared with Bhogal or on which he was copied.

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *see also ACLU v. NSA*, 925 F.3d 576, 589 (2d Cir. 2019); *United States v. King*, 868 F.3d 82, 86 (2d Cir. 2017). The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "[T]he attorney-client privilege 'stands in derogation of the public's right to every man's evidence.'" *United States v. Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997) (quoting *In re*

3

*Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. denied*, 414 U.S. 867 (1973)). "In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *Mejia*, 655 F.3d at 132 (internal quotation marks omitted) (quoting *In re County of Erie,* 473 F.3d 413, 418 (2d Cir. 2007)). The burden of establishing the essential elements of the privilege rests with the party asserting it. *See King*, 868 F.3d at 86. A proponent of privilege cannot meet the applicable burden by "mere conclusory or ipse dixit assertions." *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 225 (2d Cir. 1984) (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)).

In order for a communication between a client and an attorney to be privileged, it must have been "made in confidence and have been maintained in confidence." *Mejia*, 655 F.3d at 134 (quoting *In re Horowitz,* 482 F.2d at 81–82). For that reason, "disclosure of a privileged communication to a party outside the privileged relationship destroys the attorney-client privilege because it destroys the confidential nature of the communication." *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002); *see also In re Horowitz*, 482 F.2d at 81 ("[D]isclosure to a third party by the party of a communication with his attorney eliminates . . . privilege, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege."). "[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).

4

In *Upjohn*, the Supreme Court held that the attorney-client privilege applied to communications by corporate employees to corporate counsel, made at the direction of corporate superiors, in order to secure legal advice that were kept confidential by the company. *See* 449 U.S. at 394–95. The Court held that a narrower interpretation of the privilege, that would limit its protections to communications made by members of the corporation's control group, would "frustrat[e] the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation." *Id.* at 392.

Applying the reasoning of *Upjohn*, several district courts within this Circuit have recognized the existence of a "narrowly" "construed" exception to the notion that the attorney-client privilege is limited to communications between corporate employees and corporate counsel. They have extended the privilege to communications involving a person who is nominally not an employee—typically a consultant or a contractor to the entity holding the privilege—but who is "functionally equivalent" to an employee. *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F. Supp. 3d 207, 213 (E.D.N.Y. 2019). Courts have looked to several factors to determine whether a person is the functional equivalent of an employee: "whether the consultant exercised independent decision-making on the company's behalf; possessed information held by no one else at the company; served as a company representative to third parties; maintained an office at the company or otherwise spent a substantial amount of time working for it; and sought legal advice from corporate counsel to guide his or her work for the company." *Id.*; *see also Homeward Residential, Inc. v. Sand Canyon Corp.*, 2017 WL 4676806, at *14 (S.D.N.Y. Oct. 17, 2017) (describing the factors as "(1) whether the third party had primary responsibility for a key corporate job, (2) whether there

was a continuous and close working relationship between the third party and the company's principals on matters critical to the company's position in litigation, and (3) whether the third party is likely to possess information possessed by no one else at the company" (internal quotation marks omitted) (quoting *Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005))).

The "functional equivalent" exception appears to have had its origin in the Eighth Circuit decision in *In re Beiter Company*, 16 F.3d 929 (8th Cir. 1994). In that case, the court held that the corporate attorney-client privilege extended to communications made by a person who—while deemed an "independent consultant" by the court—was "in all relevant respects the functional equivalent of an employee." *Id*. at 938. There, the privilege-holder was a two-person partnership formed "with a single objective" to develop a parcel of farmland in Eagan, Minnesota, in which only one partner was responsible for the day-to-day operations of the partnership. *Id.* at 933, 938. The independent contractor copied on the communications was "intimately involved in the attempt to achieve that objective" over the period of many years. *Id.* at 938. He shared an office with the single member of the partnership who was resident in the state and who was responsible for the day-to-day operations of the partnership, *id.* at 930; his duties for the partnership were "varied and extensive," *id.*; he was held out to the public as the sole representative of the partnership, *id.* at 930, 938; he likely possessed information of the partnership "possessed by no other," *id.* at 938; his involvement with counsel was "rather extensive" and he often attended meetings with counsel either alone or with the partner, *id.* at 930; and the communications at issue were made by him or communicated to him on behalf of the partnership, *id.* at 933, 938. In every respect then, the contractor acted as an employee. In those circumstances, the court held that the privilege did not depend on the formal distinction of

6

whether the representative of the corporation was an employee or an independent contractor, and that it was "inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors." *Id.* at 937.

The Second Circuit has not explicitly adopted the "functionally equivalent" exception. The decisions in this Circuit upholding an assertion of privilege based on the functional employee exception are few in number. Defendants rely primarily on *American Manufacturers Mutual Insurance Company v Payton Lane Nursing Home, Inc.*, 2008 WL 5231831 (E.D.N.Y. Dec. 11, 2008). There, the court upheld the assertion of the privilege where (1) communications between plaintiffs and their counsel were shared with an independent contractor which was hired as plaintiffs' agent and their "eyes and ears" on the construction project at issue in the litigation; (2) the involvement of the third-party was "necessary and indispensable" because plaintiffs had "no on-site presence and no in-house construction expertise"; (3) the firm had the authority to make decisions related to the construction project on plaintiffs' behalf; (4) its involvement on plaintiffs' behalf in the negotiation of various contracts had clear legal ramifications for plaintiffs and required consultation with counsel on plaintiffs' behalf; and (5) the firm likely possessed information which was not possessed by anyone else employed by plaintiffs. *Id.* at *2–3; *see also In re Adelphia Comm'ns Corp.*, 2007 WL 601452, at *8–9 (S.D.N.Y. Feb. 20, 2007) (independent contractor who had substantial responsibility for the corporation's relations with another company, was given authority to make decisions and to speak on behalf of corporation, and whose job duties included seeking legal advice from corporation's counsel was the functional equivalent of a corporate employee).

In *Marvel Enterprises, Inc.*, 2002 WL 31556383, the putatively independent contractors at issue were "incorporated" into the privilege holder to engage in "essential" functions that

7

would have otherwise remained unfulfilled. They were under contract to provide production-related services and received copies of communications from counsel so that they "could accomplish their work and know the respective rights of Marvel and Fox in case a dispute should arise." *Id.* at *2. The court there upheld the assertion of the privilege, reasoning that "Fox's determination to conduct its business through the use of independent contractors is a result of the sporadic nature of employment in the motion picture industry," that "the nature of the industry dictates the use of independent contractors over employees," and that that fact "should not, without more, create greater limitations on the scope of the attorney-client privilege." *Id.*

In *In re Copper Market Antitrust Litig.*, 200 F.R.D. 213 (S.D.N.Y. 2001), the court applied the "principles" of *Bieter* and held that the privilege extended to communications between counsel for a Japanese corporation and a public relations firm hired by the corporation. *Id*. at 219. The court found that the public relations firms acted as "the functional equivalent of an in-house public relations department with respect to Western media relations, having authority to make decisions and statements on [the corporation's] behalf, and seeking and receiving legal advice from [the corporation's] counsel with respect to the performance of its duties." *Id.* at 216. The corporation did not have experience in dealing with Western media and retained the outside firm to deal with Western press, while its internal corporate communications department dealt with Japanese press. *Id.* at 215–16. The court emphasized that the outside firm "was, essentially, incorporated into [the corporation's] staff to perform a corporate function that was necessary in the context of [a] government investigation, actual and anticipated private litigation, and heavy press scrutiny obtaining at the time," and that its communications with

8

counsel concerned matters within the scope of the outside firm's duties for the corporation and were for the purpose of obtaining legal advice. *Id.* at 219.[3]

Finally, in *Spectrum Dynamics Medical Ltd. v. General Electric Co.*, 2021 WL 4131650 (S.D.N.Y. Sept. 9, 2021), the court accepted the argument that individuals who were nominally employed by a third party were de facto "essential" employees as an alternative basis for sustaining the privilege because they were hired to provide administrative, financial, and advisory services to the plaintiff at a time when it did not have a dedicated internal financial manager, and they did so pursuant to an agreement that required that they act as if they were employees of the plaintiff and required them to keep the plaintiff's information confidential as if they were employees. *Id*. at *2–5. Under those circumstances, the court held that they were "incorporated" into the company's staff to perform a necessary corporate function. *Id.* at *5.

In each of those decisions, the third party at issue—though not formally denominated an employee—was entrusted with authority to make decisions on behalf of the corporation, was essentially incorporated into the corporation's staff, and had the most direct information necessary for the corporation's counsel to provide advice to prevent the individual's actions from creating liability on behalf of the corporation. The only reason for them to seek advice or to

---

[3] The result in *In re Copper Market*, if not the reasoning, may also be explained by the rationale later offered by Judge Kaplan in *In re Grand Jury Subpoenas Dated March 24, 2003 Directed to (A) Grand Jury Witness Firm and (B) Grand Jury Witness*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003), in upholding the assertion of privilege over a similar set of documents shared with an outside public relations firm on *Kovel* grounds. *See United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). Judge Kaplan reasoned: "the ability of lawyers to perform some of their most fundamental client functions—such as (a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, (b) seeking to avoid or narrow charges brought against the client, and (c) zealously seeking acquittal or vindication—would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants." *Id.* at 330. Defendants here do not rely on *Kovel*.

receive it would be to prevent liability on the part of the corporation. There was no ulterior or independent interest the person would have had in the advice.

Most decisions, however, reject the assertion of privilege based on the functional employee exception. In *Export-Import Bank of the U.S.*, 232 F.R.D. 103, for example, the court rejected defendant's position that the attorney-client privilege extended to communications between defendant's counsel and a financial advisor whom defendant hired to lead defendant through a debt restructuring process even though the advisor was retained to negotiate on behalf of the defendant, to help formulate its financial strategies, and to articulate its positions to the creditor community and the defendant did not itself have management level personnel with restructuring experience. *Id.* at 112–14. The defendant there failed to show that the advisor was "so thoroughly integrated into [defendant's] structure that he should be treated as though he were a corporate employee for privilege purposes." *Id.* at 113. Although the advisor was given an office by the defendant, there was no evidence he had used it and, while the advisor spent eighty to eighty-five percent of his time on the restructuring deal at issue, there "were times he was free enough of his . . . obligations [to defendant] to start and build a successful consulting business." *Id.* at 114.

In *Steinfeld v. IMS Health Inc.*, 2011 WL 6179505 (S.D.N.Y. Dec. 9, 2011), the court held that an independent equity compensation consultant retained by the defendant was not a de facto employee where there was no evidence that the consultant exercised any measure of independent decisionmaking authority on behalf of the defendant or sought out legal advice from the corporation's attorneys as part of his work with the corporation, where he did not spend a substantial amount of his time interacting with or working on behalf of the company, and where he was not held out by the company as an employee. *Id.* at *3–4.

In *Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, 2014 WL 7238354 (S.D.N.Y. Dec. 19, 2014), the court also rejected the claim that the third party, an outside marketing firm, was a de facto employee because there was no evidence that it had "primary responsibility for a key corporate job" or that it had a continuous working relationship with the company's principals on matters critical to the company's position in litigation. *Id*. at *3

In *Homeward Residential, Inc. v. Sand Canyon Corp.*, 2017 WL 4676806 (S.D.N.Y. Oct. 17, 2017), too, the court held that the third party, a data storage and management company and its employees, were not de facto employees of their client where they were not given primary responsibility for a key corporate job, provided services to multiple clients, and were not integrated into client's corporate structure. *Id*. at *14.

In *Narayanan v. Sutherland Global Holdings Inc.*, 285 F. Supp. 3d 604 (W.D.N.Y. 2018), the court likewise, in denying the privilege, called it a "distinction of material significance" that although the consultant had been retained to conduct a fact-gathering investigation of behalf of the putative privilege holder, it was not granted authority to make decisions on behalf of the privilege holder. *Id*. at 616.  The court further indicated that "no evidence exists in the record that [the third party] held themselves out . . . as representatives of [the privilege holder] or were viewed by others as employees." *Id*.

A key theme of these cases in which the exception did not apply is that the person at issue was not vested with discretion to make decisions on behalf of the corporation on a key corporate matter, was not integrated into the corporate structure, and therefore was not in a position where it would have a particular need to consult corporate counsel to prevent its actions from giving rise to corporate liability.  *See also In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust*

11

*Litig.*, 352 F. Supp. 3d at 213 (rejecting claim of de facto employee where consultant did not exercise any independent decisionmaking authority on behalf of client); *Durling v. Papa John's Int'l, Inc.*, 2018 WL 557915, at *5 (S.D.N.Y. Jan. 24, 2018) (third party consultant was not functional equivalent of an employee where it did not have independent authority to make decisions on behalf of its client or primary responsibility for an important corporate function and was not fully integrated into its client's hierarchy such that its employees were de facto employees). The principle that emerges is that when a corporation or partnership chooses to do business through contractors or consultants rather than employees, and where those contractors or consultants are integrated into the corporate structure in a manner such that their relationship is necessary and that they are not fully independent, *see, e.g.*, *Spectrum Dynamics Med. Ltd.*, 2021 WL 4131650, at *5; *Twentieth Century Fox Film Corp.*, 2002 WL 31556383, at *2, and where they both possess unique knowledge regarding the matters on which advice is needed and are in a position to make decisions with respect to those matters, *see, e.g.*, *Narayanan*, 285 F. Supp. 3d at 618; *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 433 (S.D.N.Y. 2013), they may be considered de facto employees. In that instance, the facts upon which such advice is based and the advice that is given need not be conveyed through an employee or principal, but may be conveyed between the third party whose conduct alone could give rise to corporate liability and counsel without threat to the privilege. The title the individual bears and whether he or she is formally on the payroll or receives a W-4 form is not dispositive. *See In re Beiter Company*, 16 F.3d at 937.

Defendants rely on the following evidence to support their burden of showing that Bhogal was a de facto employee: (1) deposition testimony of Bold that he had "a very close relationship" with Bhogal and that they had contact "on a daily basis" and Bhogal assisted him

12

"in almost everything" because Bold was unfamiliar with "be[ing] a CEO for an American company," Dkt. No. 210-4 at 40; (2) testimony of Bhogal that Bold was reliant on Bhogal as "his person in the United States that could do tasks" and that he reported to Bold for operations of the company and "operational and tactical and strategic operations matters," Dkt. No. 210-6 at 119–21; and (3) the declaration of Sierchio that he understood Bhogal to be "performing many different roles" and viewed him to be necessary to provide legal advice and counsel to RenovaCare, Dkt. No. 210-1 ¶¶ 12–16.  Defendants also rely on RenovaCare's annual report on Form 10-K for the year ended December 31, 2017, which states that the company has one full time employee, and three consultants, two of whom provide services as officers and that it from time to time uses additional independent contractors to provide it with services, but that none of the consultants are required to expend all of their time and efforts on behalf of RenovaCare.  *See* Dkt. No. 210-2 at ECF p. 10.  Finally, Defendants rely on RenovaCare's 30(b)(6) testimony that Bold was a part-time CEO and that that company originally had one full-time employee and later two full-time employees.  *See* Dkt No. 210-3 at 110.  For its part, the SEC points to the consulting agreement that Bhogal, in his capacity as President and CEO of Vector Asset Management, Inc. signed with RenovaCare (under its predecessor name Janus Resources, Inc.) ("Consulting Agreement").  *See* Dkt. No. 209-6.  The Consulting Agreement contemplates that Vector and the individuals whose services it retains will assist Janus in identifying and obtaining various joint venture project for the exploitation of Janus's human skin regeneration technology but that (1) it will not be involved with the management of the business of the company; (2) it may perform services for others; and (3) no employee or agency relationship is created.  *Id.* at ECF p. 3.

Defendants' evidence is insufficient to sustain its claim that Bhogal was a functional employee of RenovaCare. The evidence does not support that Bhogal had "primary responsibility for recruiting subject matter experts to RenovaCare, directing analyses of RenovaCare's market competition and regulatory pathways, and evaluating how RenovaCare could best exploit its technology and intellectual property," Dkt. No. 210 at 2, in the sense that Bhogal was vested with authority to make decisions on behalf of RenovaCare.

There is no evidence that Bhogal functioned as an employee who could "by actions within the scope of [his] employment, embroil the corporation in serious legal difficulties," and who would have the most direct access to "the relevant information needed" for counsel to provide advice. *Upjohn*, 449 U.S. at 391. The testimony supports that Bhogal had a close relationship with Bold and that Bold relied on him to do certain unspecific tasks in the United States. The evidence, however, does not establish that the tasks were essential, or necessary, or that they related to the communications at issue. The declaration and the testimony describe how he was "involved in helping" with key tasks, *see* Dkt. No. 210-1 ¶ 13, or how he "assisted" Bold, Dkt. No. 210-4 at 40, but do not describe necessary tasks that he alone accomplished. *See In re Allergan plc Sec. Litig.*, 2021 WL 4121300, at *9 (S.D.N.Y. Sept. 9, 2021) ("Providing 'extensive support' and 'assistance' to Allergan hardly shows that the companies or advisors operated as the functional equivalent of an Allergan employee."); *Exp.-Imp. Bank of the U.S.*, 232 F.R.D. at 114. From all that appears, it was Bold and the others listed on RenovaCare's Form 10-K who could make decisions on behalf of the Company. *See* Dkt. No. 210-2 at ECF p. 10. It was their actions that could expose RenovaCare to liability to third parties and it was they who were in a position to seek legal advice to protect RenovaCare from that liability. Bhogal was a consultant. He did not have primary responsibility for a "key corporate job." *Monterey*

*Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 2023 WL 315072, at *15 (S.D.N.Y. Jan. 19, 2023) (rejecting application of functional equivalent doctrine because "[p]laintiffs have not provided a sufficient basis" for showing that the third parties "had a primary responsibility for a key corporate job" (internal quotation marks omitted)).  Nor does the evidence establish that Bhogal had such a continuous and close working relationship with RenovaCare to make him de facto an employee.  To the contrary, the Form 10-K upon which Defendants rely makes clear that "[n]one of the consultants are required to expend all of their time and efforts on our behalf and may engage in other activities."  Dkt. No. 210-2 at ECF p. 10; *see also Exp.-Imp. Bank of the U.S.*, 232 F.R.D. at 114 (denying the exception when the third parties was "free enough of his . . . obligations to start and build a successful consulting business").  Finally, there is no evidence that he had responsibility or possessed any independent decisionmaking authority.  *See Egiazaryan*, 290 F.R.D. at 433 (rejecting application of exception when "no facts have been presented to suggest that BGR was functioning as the entity that gave direction to FZWZ in lieu of Egiazaryan doing so").  Bhogal himself agreed that he was not an employee and did not have management authority under the express terms of his agreement, *see* Dkt. No. 209-6 at ECF p. 3; nor is there evidence that in spite of that agreement, he executed such managerial authority.  There is no testimony or evidence indicating that he possessed information that no other employee or regular consultant for RenovaCare possessed.  *See In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. at 218 (discussing importance of showing information that is necessary to facilitating the attorney-client relationship).

      Under these circumstances, at best, Defendants have shown that Bhogal was a helpful consultant to RenovaCare.  They have not shown that he was a de facto employee warranting application of the exception.

## CONCLUSION

Plaintiff's motion is GRANTED IN PART as to Bhogal. The Court reserves decision as to the remaining assertions of privilege.

SO ORDERED.

Dated: July 10, 2023
New York, New York

LEWIS J. LIMAN
United States District Judge