UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
:
SECURITIES AND EXCHANGE COMMISSION,        :
:
Plaintiff,        :
:          21-cv-4777 (LJL)
-v-                :
:          MEMORANDUM &
HARMEL S. RAYAT ET AL.,                :          ORDER
:
Defendants.        :
:
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

The United States Securities and Exchange Commission ("SEC") moves, pursuant to Federal Rules of Civil Procedure 26 and 37, to compel production of documents it claims has been improperly withheld by Defendants Harmel Rayat and RenovaCare, Inc. ("RenovaCare") on ground of attorney-client privilege. Dkt. No. 209. The Court previously issued a memorandum and order that granted the SEC's motion to the extent that the SEC sought documents shared with Jatinder Bhogal. Dkt. No. 212.[1] This Memorandum and Order addresses the motion to the extent that it seeks copies of otherwise privileged documents of RenovaCare shared with Rayat and Jeetenderjit "Jeet" Singh Sidhu.

## BACKGROUND

Familiarity with the prior proceedings and allegations of this case is presumed. In brief, the operative complaint alleges that the Defendants[2] engaged in a scheme to defraud in violation

---

[1] Defendants have since submitted a letter motion for clarification pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure as to the documents shared with Bhogal. Dkt. No. 217. This Opinion and Order does not address the issues raised in that motion.
[2] The "Defendants" are defined as Harmel S. Rayat, RenovaCare, Inc., Jatinder Bhogal, Jeetenderjit Singh Sidhu, and Sharon Fleming.

of the Securities Act of 1933 and the Securities Exchange Act of 1934 by secretly disseminating false and misleading information about RenovaCare and its experimental medical device for treating burn wounds, "SkinGun," through an online financial publishing company, StreetAuthority, LLC ("StreetAuthority"), which was owned and operated by a long-time friend of Rayat.  *See generally* Dkt. No. 118.  The SEC alleges a classic "pump-and-dump" scheme.  The Defendants allegedly pumped the price of RenovaCare stock through the promotions and then, after the price of the stock had been artificially inflated, dumped the securities onto unsuspecting members of the public.  *Id*.  The Defendants include Rayat, a Canadian national who was at one time the majority and controlling shareholder of RenovaCare and served as Chairman of its Board of Directors, *id*. ¶ 25, Bhogal, who is alleged to be a "strategic advisor" to RenovaCare, *id*. ¶ 26, and Sidhu, who is alleged to have been a member of the board of directors of RenovaCare's predecessor entity, *id*. ¶ 27.  The complaint alleges that while the scheme was ongoing, Defendants took step to conceal their role in it, including by making false statements in response to an inquiry from OTC Markets Group, Inc. ("OTC Markets"), the entity that supervised the exchange on which RenovaCare stock was listed.  *Id*. ¶¶ 137–66.

## DISCUSSION

The SEC claims that RenovaCare and Rayat have been improperly withholding documents between RenovaCare's outside counsel, primarily Joseph Sierchio and persons who were not RenovaCare employees at the time, and Defendants Rayat and Sidhu.  Dkt. No. 209 at 1–2.  The SEC argues that the inclusion of these individuals on the communications deprives them of the confidentiality necessary for the assertion of the attorney-client privilege.  The SEC also argues that Sierchio wore two hats at RenovaCare—outside counsel and Director—and that Defendants are withholding communications to and from him in his capacity as Director.  *Id*. at

2. The SEC further claims that the descriptions of the communications in Defendants' privilege log are broad and generic. *Id*.

In a case asserting violations of federal law, like this one, federal "common law—as interpreted by United States courts in the light of reason and experience" govern Defendants' claim of privilege. Fed. R. Evid. 501; *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999) (citing Federal Rule of Evidence 501 to state that "questions about privilege in federal question cases are resolved by the federal common law"); *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (same); *Smith v. Pergola 36 LLC*, 2022 WL 17832506, at *7 (S.D.N.Y. Dec. 21, 2022) (noting that Federal Rule of Evidence 501 "provides that federal law governs claims of privilege unless, in a civil case, state law supplies the rule of decision" (internal quotation marks omitted)).

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *see also ACLU v. NSA*, 925 F.3d 576, 589 (2d Cir. 2019); *United States v. King*, 868 F.3d 82, 86 (2d Cir. 2017). The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "[T]he attorney-client privilege 'stands in derogation of the public's right to every man's evidence.'" *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997) (quoting *In re Horowitz*, 482 F.2d 72, 81 (2d

Cir.), *cert. denied*, 414 U.S. 867 (1973)). "In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *Mejia*, 655 F.3d at 132 (internal quotation marks omitted) (quoting *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007)). The burden of establishing the essential elements of the privilege rests with the party asserting it. *See King*, 868 F.3d at 86. A proponent of privilege cannot meet the applicable burden by "mere conclusory or ipse dixit assertions." *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 225 (2d Cir. 1984) (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)).

In order for a communication between a client and an attorney to be privileged, it must have been "made in confidence and have been maintained in confidence." *Mejia*, 655 F.3d at 134 (quoting *In re Horowitz*, 482 F.2d at 81–82). For that reason, "disclosure of a privileged communication to a party outside the privileged relationship destroys the attorney-client privilege because it destroys the confidential nature of the communication." *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002); *see also In re Horowitz*, 482 F.2d at 81 ("[D]isclosure to a third party by the party of a communication with his attorney eliminates . . . privilege, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege."). "[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).

Defendants argue that the inclusion of Rayat and Sidhu on Sierchio's attorney-client communications with RenovaCare did not waive the privilege because Rayat was the President

4

and sole stockholder of Kalen Capital Corporation ("Kalen Capital"), which at the relevant time was the majority shareholder of RenovaCare, and Sidhu had an administrative role at Kalen Capital and was Rayat's assistant there.  Dkt. No. 213 at 2.  Defendants contend that "RenovaCare and Kalen Capital shared a common interest, both as a general matter because they were closely affiliated companies and shared the same attorney, and also more specifically with regard to the challenged communications."  *Id*. at 1.  The SEC does not dispute Defendants' general proposition that an attorney's decision to share otherwise privileged advice with joint clients who share a common interest does not waive the privilege with respect to either of the joint clients, but disputes that Rayat or Kalen Capital shared a common legal interest in the communications at issue or that Sidhu acted as an employee or agent of Rayat or Kalen Capital.  Dkt. No. 219 at 4–9.  It thus argues that sharing of otherwise privileged communications with either Rayat or Sidhu destroyed RenovaCare's entitlement to invoke the attorney-client privilege.  *Id*.

The Court finds that the proper lens through which to view the parties' competing arguments is that of "the co-client (or joint-client) privilege, which applies when multiple clients hire the same counsel to represent them on a matter of common interest."  *In re Teleglobe Comm'ns Corp*., 493 F.3d 345, 359 (3d Cir. 2007) ("*Teleglobe*").  This privilege resembles, but is not identical to, the common-interest privilege which applies when clients with separate attorneys and similar legal interests share information with one another.  *Id*. at 359, 364.  The common-interest privilege comes into play when those clients "share otherwise privileged information in order to coordinate their legal activities."  *Id*. at 359.  To be eligible for protection as a common interest communication, the communication must be shared with an attorney of the member of a community of interest and the community must share a common interest.  *Id*. at

5

364–65.  The co-client privilege, by contrast, shields the communications an attorney has with two or more of her clients on a matter of common interest from disclosure to third parties.  *Id*. at 362–63.  It thus prevents each of the two or more clients in a co-client relationship from disclosing its common communications with their lawyer without the consent of each of the other clients.  *Id*. at 363.  A lawyer may undertake such a joint representation "so long as all clients consent, and there is no substantial risk of the lawyer being unable to fulfill her duties to them all."  *Id*. at 362. (citing Restatement (Third) of the Law Governing Lawyers §§ 128–31 (2000)).  "Whether individuals have jointly consulted a lawyer or merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances."  Restatement (Third) of the Law Governing Lawyers § 75 cmt. c.  "[A] co-client relationship is limited by 'the extent of the legal matter of common interest.'" *Teleglobe*, 493 F.3d at 363 (quoting Restatement (Third) of the Law Governing Lawyers § 75 cmt. c).

The mere fact that, at the relevant time, the majority of the shares of RenovaCare were owned by Kalen Capital does not alone establish that the two shared a common interest such that that a communication by an attorney for RenovaCare could be shared with an employee or officer of Kalen Capital without destroying the privilege, even if that same attorney also had an attorney-client relationship with Kalen Capital.  *See In re Fresh & Process Potatoes Antitrust Litig*., 2014 WL 2435581, at *11 (D. Idaho May 30, 2014)  ("[T]he sharing of an attorney is not the equivalent of establishing the entities themselves operate as a single entity with a unity of interest."); *Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc*., 215 F.R.D. 466, 473–74 (S.D.N.Y. 2003) ("[T]he proponent of the privilege must still prove a common legal interest and may not rely solely on the fact that the entities at issue are affiliated with each other.").  It is not

6

uncommon that a corporation which has minority shareholders will have incongruent interests with the company that owns the majority of its shares. After all, the board of a corporation owes fiduciary duties to all of its shareholders—the minority as well as the majority—and there are occasions in which the naked interests of the majority will conflict with the interests of the minority and thus with the interest of the partially-owned subsidiary as a whole. *See Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000) ("Directors of Delaware corporations are fiduciaries who owe duties of due care, good faith and loyalty to the company and its stockholders."); *McMullin v. Beran*, 765 A.2d 910, 920 (Del. 2000) ("When a majority of a corporation's voting shares are owned by a single entity, there is a significant diminution in the voting power of the minority stockholders. Consequently, minority stockholders must rely for protection on the fiduciary duties owed to them by the board of directors."); *Alpert v. 28 Williams St. Corp.*, 473 N.E.2d 19, 25 (N.Y. 1984) (noting that directors "have an obligation to all shareholders to adhere to fiduciary standards of conduct and to exercise their responsibilities in good faith" and "treat all shareholders, majority and minority, fairly"); *All Am. Res., LLC v. Calais Res., Inc.*, 2015 WL 13653990, at *7 (D. Nev. Feb. 24, 2015) ("Nevada law also permits minority shareholders to sue directors of a corporation for breach of fiduciary duty."); *Carstarphen v. Milsner*, 693 F. Supp. 2d 1247, 1252 (D. Nev. 2010) (sustaining an action by minority shareholder against director when he took action in favor of a majority shareholder against the interest of the minority shareholder); *see also Teleglobe*, 493 F.3d at 367 ("If the subsidiary is not wholly owned, however, in the interest of protecting minority shareholders we revert to requiring that whoever controls the subsidiary seek to maximize its economic value with requisite care and loyalty."). Thus, Defendants must show not only that RenovaCare and

7

Kalen Capital shared a common attorney, but also that they shared a common legal interest—not simply through majority ownership—pursuant to which they retained that common attorney.

Defendants do not rely upon the affiliation between RenovaCare and Kalen Capital alone to support their claim of privilege. They argue that, in the period from January 2018 to mid-March 2018, RenovaCare and Kalen Capital jointly sought the advice of Sierchio on four separate occasions regarding five related subjects:

> (1) The response to a letter sent by the OTC Markets Director of Issue Compliance Michael Vasilios on January 3, 2018, demanding that RenovaCare issue a press release describing how it became aware of the series of articles published on StreetAuthority and whether any of its controlling shareholders were involved in the creation or distribution of promotional materials related to RenovaCare. At the time, Kalen Capital beneficially owned just under 66% of RenovaCare stock. RenovaCare responded to the letter on January 8, 2018. Dkt. No. 214 ¶¶ 6–8.
>
> (2) Periodic legal advice from January 8, 2018 to February 23, 2018 concerning potential and anticipated consequences of the OTC markets inquiry. *Id*. ¶ 9.
>
> (3) Legal advice during the time period from February 23, 2018 to March 13, 2018 regarding the response by RenovaCare to the notice it received from OTC Markets that RenovaCare was being removed from its trading platform and would be forced to trade on the less desirable OTC Pink Current Information platform. Dkt. No. 213 at 3; Dkt. No. 214 ¶ 10.
>
> (4) The response, including how to approach the appropriate regulators, to information that FINRA member trading firms were engaged in trading activity designed to depress the stock price of RenovaCare, from March 1, 2018 to March 5, 2018. Dkt. No. 214 ¶ 13.
>
> (5) From March 15, 2018 to March 16, 2018, how to approach FINRA on information about additional short-seller activity. Dkt. No. 213 at 3–4; Dkt. No. 214 ¶ 14.

Defendants rely on the declaration of Sierchio, in which he declares that during the June 2013 to June 2018 timeframe he served as outside U.S. general corporate counsel to both Kalen Capital and RenovaCare, that he and his associates functioned as one outside legal department servicing both Kalen Capital and RenovaCare, and that there were occasions in which Kalen Capital and RenovaCare together solicited his legal advice. Dkt. No. 214 ¶ 4. He characterizes the advice that he provided on each of the subjects above as joint advice. *See id.* ¶¶ 9, 10, 13, 15.

8

Defendants also rely on (1) the contents of the January 3, 2018 letter from OTC Markets to Thomas Bold at RenovaCare requesting that RenovaCare issue the press release, including disclosure of the involvement of any controlling shareholders in any promotional activity related to RenovaCare, Dkt. No. 216-1; (2) Rayat's SEC administrative testimony in which he characterized Sidhu as a friend but also said he had an administrative role at Kalen Capital and was "more or less" Rayat's assistant, Dkt. No. 216-5 at 41; (3) RenovaCare's press release of January 8, 2018 (the "January 8 Press Release") which reflects, among other things, that RenovaCare made inquiry of its controlling shareholders regarding their involvement in the creation and distribution of promotional materials, and makes statements on behalf of RenovaCare and those controlling shareholders, Dkt. No. 216-7; (4) the February 23, 2018 email from OTC Markets to RenovaCare stating that RenovaCare would be removed from its trading platform, Dkt. No. 216-8; (5) RenovaCare's March 13, 2018 response to OTC Markets, Dkt. No. 216-9; (6) a March 5, 2018 press release from RenovaCare indicating that it has approached investigatory agents of FINRA about what it claims to be predatory trading practices in the company's stock by short sellers and confirms that Kalen Capital has not sold any company shares since 2008, Dkt. No. 216-10; (7) a March 15, 2018 email from Rayat to Bold stating that he will seek legal counsel regarding what he believes to be a malicious attack on RenovaCare's shares, Dkt. No. 216-11; (8) a March 16, 2018 email from Bold to a representative of FINRA attaching Rayat's March 15, 2018 email and copying Sierchio and asking for FINRA's assistance in investigating trading activity related to RenovaCare's shares, Dkt. No. 216-12; and (9) SEC testimony in which Sierchio testified that he represented Rayat and Kalen Capital jointly in financing transactions in 2017, Dkt. No. 216-15 at 50–51.

The SEC responds that Defendants have provided no declarations from RenovaCare, Kalen Capital, or Rayat and no agreements between Sierchio and any of the relevant parties or other information regarding the scope of any purported common interest agreement. Dkt. No. 219 at 4–5. But such an agreement need not be express for the joint-client privilege; it may be implied. *See Supreme Forest Prod., Inc. v. Kennedy,* 2017 WL 120644, at *3 (D. Conn. Jan. 12, 2017) ("As the commentary to the Restatement makes clear, the focus is on whether the respective co-clients 'have expressly or *impliedly* agreed to common representation in which confidential information will be shared.'" (emphasis in *Kennedy*) (quoting Restatement (Third) of the Law Governing Lawyers § 75 cmt. c.)); *see id.* (relying on the "course of dealing" that made it "clear . . . that they would have justifiably expected their co-client communications with counsel to be protected by the privilege"); *see also Teleglobe*, 493 F.3d at 363 ("While written agreements limiting the scope of a joint representation might be preferable, nothing requires this so long as the parties understand the limitations."). Defendants have met their burden to show that RenovaCare and Kalen Capital justifiably expected that their co-client communications with Sierchio, on matters of common legal interest, would have been protected by the joint-client privilege. As to his engagement with RenovaCare and Kalen Capital, Sierchio repeatedly declares, under the penalty of perjury, that he "acted as a legal advisor on joint communications" as to the OTC Markets letter, that he provided "joint legal advice" during the OTC Markets inquiry, that Bold and Rayat "jointly sought [his] legal advice on how to respond," and that he "regarded communications between [himself], . . . RenovaCare, and . . . Kalen Capital as protected by attorney-client privilege due to their common interest in responding to OTC Markets." Dkt. No. 214 ¶¶ 7–11. Supporting evidence indicates an implied agreement to joint representation on a common legal interest. Indeed, the January 3, 2018 letter from OTC Markets

10

to RenovaCare specifically requires RenovaCare to make an "inquiry" request of any "controlling shareholders," Dkt. No. 216-1 at 1, and RenovaCare's press release makes representations on behalf of those shareholders, namely that Kalen Capital was "not involved in any way" with the promotion and that it had "not sold or purchased. . . any shares of common stock . . . within the last 90 days." Dkt. No. 216-7 at 2. After RenovaCare was removed from the OTC Markets trading platform, RenovaCare sent a letter to OTC Markets with representations of Kalen Capital's activities—including that it "had not sold any Company shares in many years" and had further invested in the company. Dkt. No. 216-9 at 4. Sierchio further notes that he developed a "joint legal strategy" regarding short sellers after requests from RenovaCare and Kalen Capital, Dkt. No. 214 ¶ 13, and that he likewise regarded that communication as privileged due to "their common interest in developing a joint legal strategy," *id.* ¶ 15. Again, that implied agreement of joint representation, and common legal interest, is further evidenced by the communications from Rayat to Bold and the subsequent forwarding of that email from Bold to a representative of FINRA. *See* Dkt. Nos. 216-11, 216-12. And as to communications with Rayat in particular, Sierchio declares that Rayat "was the CEO and owner of Kalen Capital, and he served as the company's agent" and that he "understood Mr. Rayat to be acting on behalf of Kalen Capital." Dkt. No. 210-1 ¶ 19; *see also* Dkt. No. 214 ¶ 4 (describing Rayat as Kalen Capital's "president"). Defendants have met their burden that communications with Kalen Capital and Rayat are protected under the joint-client privilege.

The SEC further contends that Defendants fail to distinguish Sierchio's role as counsel and as a director. It argues that the January 8 Press Release "involved a business decision regarding a planned public statement," and that "Defendants sought to conceal their involvement in the promotional campaign does not convert a business decision . . . into a legal issue." Dkt.

11

No. 219 at 7. Therefore, it contends that the predominant purpose of Sierchio's communications must have been business-related in nature. *Id*. But Sierchio's declaration with respect to those communications stated that "on all of the topics described in the Donohue Declaration, [Dkt. No. 215,] I acted as a legal advisor, and the communications involve or reflect a request for legal advice to me or my provision of it." Dkt. No. 214 ¶ 5. The declaration is entitled to be treated as sworn as it avers that it is true and correct and it was produced under the penalty of perjury pursuant to 29 U.S.C. § 1746. *See also In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013) (describing the requirements and effect of 29 U.S.C. § 1746). Further, the record supports Sierchio's declaration that such communications were for a common legal purpose. The January 8 Press Release was issued in response to a request from OTC Markets, which had expressed concern about the StreetAuthority promotional materials. OTC Markets requested comment on "whether the statements made in the promotional materials are materially false and/or misleading," imposed disclosure requirements on RenovaCare and its controlling shareholders, requested additional compliance documentation, and indicated that "OTC Markets is reviewing the Company's eligibility to continue trading on the . . . marketplace." Dkt. No. 216-1. RenovaCare and Kalen Capital (and Rayat, by extension) had common legal interests in ensuring that those statements and their representations were not materially false or misleading, as the veracity of representations by one entity potentially would have legal implications for the other. *See Somers v. QVC, Inc.*, 2021 WL 3487315, at *4 (E.D. Pa. Aug. 9, 2021) (contrasting a "business or commercial interest" in a co-client relationship with a situation in which clients together have a "cognizable legal interest").[3]

---

[3] The SEC briefly argues, in a footnote, that "communications related to the January 8 Press Release were in furtherance of the fraudulent scheme," and thus the "communications *may* also be subject to the crime-fraud exception." Dkt. No. 219 at 7 n.3 (emphasis added). The SEC's

12

The SEC also argues that Defendants have not produced any evidence to support that Sidhu served as Rayat or Renovacaare's agent. Dkt. No. 219 at 8–9. Although Sierchio testified that he did not ever do any work for Sidhu, Dkt. No. 219-1 at 35, he also testified that Sidhu was "working for Mr. Rayat" and for Kalen Capital, during which period he functioned as a "true administrative assistant." *Id*. at 55–56. He elaborated that Sidhu assisted "in the sense that whatever documentation Mr. Rayat had to review or get out, he facilitated that review and the disbursement, transmittal of whatever material Mr. Rayat had to get out" and that "[i]t was more clerical work" for Kalen Capital. *Id*. Defendant has met their burden of showing that Sidhu operated as an agent acting on behalf of Kalen Capital and thus, by extension, that communications between Sierchio and Sidhu are entitled to the co-client privilege. *See Teamsters*, 119 F.3d at 215 ("Recognizing that entities can act only through agents, courts have held that any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee."); *see generally Upjohn*, 449 U.S. 383.

Finally, the SEC argues that Defendants fail to support the assertion of privilege as to communications received by other third parties identified in their communications with

---

equivocal assertion fails to adequately invoke that exception. Application of the crime-fraud exception requires a party to "at least demonstrate that there is probable cause to believe a crime or fraud has been attempted or committed and *that the communications were in furtherance thereof*." *United States v. Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir.1995) (emphasis added). Because of the "at least" language from the Second Circuit, "[c]ourts have the discretion to require a standard of proof higher than probable cause." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 107 (S.D.N.Y. 2017). "The crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud." *Id*. Further, "[m]ere suspicion . . . is not enough to warrant invading the attorney-client privilege." *Id*. The SEC has not produced anything more than mere suspicion that Defendants "used communications with their attorneys" to commit a fraud. *In re Omnicom Grp., Inc. Sec. Litig.*, 2007 WL 2376170, at *16 (S.D.N.Y. Aug. 10, 2007). The Court thus declines to apply, without more, the crime-fraud exception here.

Defendants and flagged in their motion. *See* Dkt. No. 219 at 10; *see also* Dkt. No. 209-4 (outlining the third parties); Dkt. No. 209 at 2. As an initial matter, the Court disagrees with the SEC's broad assertion that Sierchio's declaration failed to address the "SEC Filings and Related Transactions." *See* Dkt. No. 219 at 10 n. 5. Sierchio's declaration states that "[t]hroughout the June 2013 to June 2018 period," he "essentially functioned as one outside legal department servicing both Kalen Capital and RenovaCare on a variety of issues, including for matters related to U.S. corporate and securities law." Dkt. No. 214 ¶ 4. Both "separately and together," they sought his "legal advice" on these issues. *Id*. He further attests to his understanding that he regarded those communications as privileged. *Id*. That is sufficient to meet Defendants' burden as to this category of disclosures. The Court notes, however, that several of these communications were disclosed to third parties. The SEC's motion specifically flagged communications disclosed to "Rhonda Rosen," who is included in the privilege logs attached to the Donohue Declaration and is described as a "consultant & RenovaCare de facto employee." *See* Dkt. No. 209 at 2 (identifying the use of "consultant & RenovaCare de facto employee" as being "broad, generic" and identifying Rosen by name); Dkt. No. 215-3 (privilege log entries). Because Defendants have not sought to meet their burden of asserting privilege over communications disclosed to Rosen, they must produce any withheld communications disclosed to her.[4]

---

[4] To the extent that Defendants are withholding communications that were disclosed to other third parties such as John Conklin of SolarWindow, *see* Dkt. No. 219 at 10 n.6; Dkt. No. 215-1, or Justin Frere, another individual identified as "consultant & RenovaCare de facto employee," *see* Dkt. No. 215-3, the SEC made no mention of Conklin, SolarWindow, or Frere in its motion, nor was there any briefing on those individuals. The SEC's motion is denied without prejudice to renewal as to any other third parties not addressed on this motion.

## CONCLUSION

The motion to compel is DENIED IN PART. As noted in Dkt. No. 212, the motion is otherwise GRANTED with respect to communications involving Defendant Bhogal.

SO ORDERED.

Dated: July 24, 2023
New York, New York

_____
LEWIS J. LIMAN
United States District Judge